Jeffrey R. Elliott, Esquire
Attorney I.D. 38147
KOZLOFF STOUDT
2640 Westview Drive
Wyomissing, PA 19610
610-670-2552                                        Attorney for Defendant

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONNIE ONELY, | : CIVIL ACTION |
| Plaintiff | : |
| | : |
| v. | : No. 21-cv-4785 |
| | : |
| REDNER'S MARKETS, INC. | : |
| Defendant | : Assigned to: Wendy Beetlestone, J. |

---

## EXHIBIT "C"

---

KS - MSJ 000833

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

– – –

| | |
|---|---|
| CONNIE ONLEY | : |
| | : |
| Plaintiff, | : |
| | : |
| vs. | :CIVIL ACTION |
| | :NO. 2:21-cv-04785-WB |
| | : |
| REDNER'S MARKETS, INC. | : |
| | : |
| Defendant. | : |

– – –


REMOTE videoconference of KARL MICHENER, held on Monday, June 27, 2022, beginning at approximately 11:05 a.m., before Robin A. Vance, CCR, RPR and Notary Public for New Jersey, Pennsylvania and Delaware.


– – –


R&K REPORTING, INC.
Court Reporting Services
37390 Harmony Drive
Selbyville, Delaware 19975
215-946-7009   rkreporting@gmail.com

KARL MICHENER

[Page 2]

A P P E A R A N C E S:

(ALL PARTICIPANTS WERE PRESENT REMOTELY)


KARPF, KARPF & CERUTTI, P.C.
BY:  ANDREW R. OLCESE, ESQUIRE
3331 Street Road, Suite 128
Bensalem, PA 19020
215-639-0801
aolcese@karpf-law.com
-- Attorneys for the Plaintiff


KOZZLOFF STOUDT
BY:  JEFFREY R. ELLIOTT, ESQUIRE
2640 Westview Drive
Wyomissing, PA 19610
610-370-6700
jelliott@kozloffstoudt.com
-- Attorneys for the Defendant

KS - MSJ 000835

KARL MICHENER

I N D E X

WITNESS                                          PAGE

KARL MICHENER

      BY MR. OLCESE                              5


EXHIBITS REFERENCED

| No. | DESCRIPTION | PAGE |
|---|---|---|
| D-2 | Redner's Meat Department Listing (KS000696) | 19 |
| D-4 | Transcript of Testimony (KS000227 to 000262) | 84 |
| D-5 | 10/1/20 Statement - Sandra McGrory (KS000317-320) | 77 |
| D-7 | 1/18/21 Statement - Karl Michener (KS000315) | 95 |
| D-8 | Employee Warning Record (KS000316) | 93 |

R&K Reporting Inc.

Phone: 215-946-7009                    rkreporting@gmail.com

KARL MICHENER

```
 1                    (It is agreed by and between
 2          counsel that reading, signing,
 3          certification and sealing are hereby
 4          waived; all objections, except as to the
 5          form of the questions, are reserved until
 6          the time of trial.)
 7                    COURT REPORTER:  The attorneys
 8          participating in this proceeding
 9          acknowledge that I am not physically
10          present with the witness and that I will
11          be reporting this proceeding remotely.
12                    They further acknowledge that, in
13          lieu of an oath administered in person,
14          the witness will verbally declare that his
15          testimony in this matter is under penalty
16          of perjury.
17                    The parties and their counsel
18          consent to this arrangement and waive any
19          objections at this time.
20                    Counsel also acknowledges and
21          agrees that the official transcript is
22          solely the one transcribed by the court
23          reporter.
24                    Counsel, please indicate your
```

KARL MICHENER

[Page 5]

```
 1        agreement by stating your name and your
 2        agreement on the record beginning with
 3        Plaintiff's counsel.
 4              MR. OLCESE:  Andrew Olcese for the
 5        plaintiff.  I consent and agree.
 6              MR. ELLIOTT:  Jeffrey Elliott for
 7        the defendant.  I also consent and agree.
 8                    -   -   -
 9              KARL MICHENER, having been duly
10        sworn, was examined and testified as
11        follows:
12                    -   -   -
13                 EXAMINATION
14                    -   -   -
15              MR. OLCESE:  Usual stipulations,
16        Jeff?
17              MR. ELLIOTT:  Yes.
18   BY MR. OLCESE:
19      Q.    Good morning, Mr. Michener.  My name
20   is Andrew Olcese.  I represent the plaintiff,
21   Connie Onley, in a lawsuit against Redner's.
22   You're here for your deposition.
23              So my first question, have you ever
24   been deposed before?
```

KARL MICHENER

```
 1      A.      No.

 2      Q.      Okay.  So let me explain a little bit

 3  of the groundwork; what this is, what to expect.

 4  Pretty much this is a question-and-answer

 5  session.  It's an opportunity for me on behalf of

 6  Miss Onley to ask you questions and find out what

 7  you know regarding her employment at Redner's and

 8  her termination.  Okay?

 9              Obviously we are doing this

10  remotely.  You and I can see each other, we can

11  hear each other.  But even though I can see you,

12  if you're going to respond to any of my questions

13  that could be answered with just a yes or a no,

14  and you answer in like a head nod or a head bob,

15  the court reporter Robin is not going to be able

16  to write that down.  So I might, if you do that,

17  ask you just to respond verbally, is that a yes

18  or is that a no.  Is that understood?

19      A.      Understood.

20      Q.      Also, if you say, in the affirmative,

21  like uh-huhs or uh-uhs, words like that, I might

22  be able to understand, but again it's not going

23  to be clear on the transcript later on.  I'm

24  going to ask if that's a yes or a no, depending
```

KARL MICHENER

1   what your response is.  Okay?

2       A.      Understood.

3       Q.      Probably the most important thing I

4   can ask of you today, and it's for Robin's

5   benefit, is that we take our time.  Okay?  So

6   take our time and then one person speaks at a

7   time.  So with that being said, I'm going to ask

8   that even if you know what question I'm about to

9   ask, that you refrain from responding in

10  answering my question until I fully get it out.

11  And I'm going to try to wait and make sure you

12  fully response as best as you want until I move

13  on to the next question.  Okay?

14      A.      Understood.

15      Q.      All right.  If you don't understand

16  any of my questions at any time today, please let

17  me know.  I am not trying to confuse you.  I am

18  happy to clarify something, ask it another way.

19  But I'm going to assume that if you're able to

20  answer my question and provide a response, that

21  you understood what was being asked.  Okay?

22      A.      Understood.

23      Q.      All right.  At any time if your

24  counsel objects to my question and states it for

KARL MICHENER

```
 1   the record, you will still need to answer my
 2   question, even with an objection, unless Jeff
 3   explicitly tells you not to answer that question.
 4   Okay?  Now, I don't expect that to happen today,
 5   but if it does, do you understand that?
 6       A.      Understood.
 7       Q.      All right.  If you need a break at
 8   all, Mr. Michener, please let me know.  Not an
 9   endurance test.  Certainly I don't think we're
10   going to be here all morning, but if you need to
11   stand, up use the restroom, get a bite to eat,
12   the only thing I ask is that you are answering
13   any pending questions before we take a break.
14   Okay?
15       A.      Yes, sir.
16       Q.      All right.  Any questions about my
17   instructions?
18       A.      No, sir.
19       Q.      Are you on any medication this morning
20   that would inhibit your ability to recall past
21   events?
22       A.      No, sir.
23       Q.      All right.  And is there any reason
24   you can think of that you won't be able to answer
```

KARL MICHENER

1   my questions fully and truthfully today?

2        A.      No, sir.

3        Q.      Very good.  Can you please state your

4   full name for the record?

5        A.      Karl Michener.

6        Q.      Okay.  Are you known by any other

7   names?

8        A.      No, sir.

9        Q.      What is your current home address?

10       A.      1111 South Sanatoga Road.

11       Q.      Okay.  And your date of birth, please?

12       A.      7/9/1984.

13       Q.      And currently, where are you taking

14   today's deposition?

15       A.      I'm sorry, I don't know the address

16   exactly here.

17       Q.      Are you at your counsel's office?

18       A.      Offices, yes.

19       Q.      All right.  And I see Mr. Elliott is

20   there with you.  Is there anyone else in the room

21   other than yourself and Mr. Elliott?

22       A.      No, sir.

23       Q.      Okay.  And what, if anything, have you

24   done to prepare for today's deposition?

KARL MICHENER

```
 1       A.      I was shown some paperwork, the
 2  complaint, also the response from the employer.
 3  I was shown some of Miss Onley's work history,
 4  her personnel file.  I was shown her deposition.
 5       Q.      Okay.  And who -- who or whom showed
 6  you these documents?
 7       A.      Mr. Elliott.
 8       Q.      Okay.  And when you say you were shown
 9  Miss Onley's deposition, are you referring to you
10  were able to review the transcript from her
11  deposition?
12       A.      Yes, sir.
13       Q.      Okay.  And when did you review these
14  documents?
15       A.      I don't recall the date.  It was the
16  week of the 11th, June 11th.
17       Q.      Okay.
18       A.      We met in that week before I went on
19  vacation.
20       Q.      And other than any conversations you
21  had with your counsel in preparation for this
22  deposition, did you speak to anyone else about
23  today's deposition?
24       A.      No.
```

KARL MICHENER

```
 1      Q.      Did you ever talk to Miss Foreman
 2   about your deposition today?
 3      A.      No.
 4      Q.      Did you ever talk to Miss McGrory
 5   about your deposition today?
 6      A.      No.
 7      Q.      Okay.  And I apologize in advance, I
 8   ask everyone this question who I depose, have you
 9   ever been criminally convicted of a crime?
10      A.      No.
11      Q.      Okay.  Are you currently employed?
12      A.      Yes, sir.
13      Q.      And where are you currently employed?
14      A.      Redner's Markets.
15      Q.      Is there a particular store that you
16   work out of?
17      A.      I'm at the Potts Grove location,
18   number 36.
19      Q.      And what's that address?
20      A.      I don't have it memorized.  I just was
21   transferred there recently.
22      Q.      When were you transferred there?
23      A.      In April.
24      Q.      2022?
```

KARL MICHENER

[Page 12]

```
 1      A.      Correct.
 2      Q.      Okay.  Prior to being transferred to
 3  the Potts Grove location, where did you work
 4  previously?
 5      A.      Our Audubon location, number 67.
 6      Q.      Okay.  The transfer to Potts Grove,
 7  was that by your choice or was it by someone else
 8  in upper management?
 9      A.      Upper management.
10      Q.      Do you know why you were transferred
11  to Potts Grove?
12      A.      The store director that was there was
13  promoted to a supervisory position and they chose
14  me to take his place.
15      Q.      Okay.  And what is your position
16  currently at Potts Grove?
17      A.      Store director.
18      Q.      Store director, is that analogous to
19  store manager?
20      A.      Yes.
21      Q.      Is it fair to assume that at Potts
22  Grove, in that location, you are the highest
23  ranking title?
24      A.      Yes.
```

KARL MICHENER

[Page 13]

```
 1      Q.      Okay.  When did you start working at
 2  the Audubon location?
 3      A.      September 4, 2019, approximately.
 4      Q.      Okay.  And when you started at Audubon
 5  on September 4, 2019, what position did you hold?
 6      A.      Store director.
 7      Q.      Fair to say the entire time you were
 8  at Audubon you were the store director?
 9      A.      Correct.
10      Q.      Okay.  Did you work at Redner's prior
11  to September 4, 2019?
12      A.      Yes.
13      Q.      Okay.  Where did you work prior to
14  September 4, 2019?
15      A.      Many locations.
16      Q.      All right.  So let's go back in order.
17  Prior to Audubon, what location most recent to
18  starting at Audubon did you work out of?
19      A.      Our Douglassville location, number 87.
20      Q.      And when did you start at
21  Douglassville?
22      A.      2017.
23      Q.      Okay.
24      A.      Maybe June or thereabout.  May, June.
```

KARL MICHENER

```
 1      Q.      Understood.  And I appreciate like
 2  you're doing already.  I know I'm going to be
 3  asking you a couple things years back.  You know,
 4  as best you can ballpark or approximate is fine.
 5  I appreciate that.
 6      A.      Understood.
 7      Q.      In Douglassville, what position or
 8  positions did you hold?
 9      A.      Store director.
10      Q.      Okay.  For the entire time at
11  Douglassville?
12      A.      Correct.
13      Q.      Prior to working at the Douglassville
14  location, what location, if any, did you work in
15  Redner's?
16      A.      Our Boyertown location, number 97.
17      Q.      And when did you start at Boyertown?
18      A.      Approximately a year and a half
19  previous to Douglassville, so 2016, maybe 2015.
20      Q.      Okay.  And what position or positions
21  did you hold in Boyertown?
22      A.      Store director.
23      Q.      When did you start working for
24  Redner's at any location?
```

KARL MICHENER

[Page 15]

1    A.    My initial hire was in 2005 in June.

2  I was part time through college.  I was hired

3  full time in 2006 after I graduated from college.

4    Q.    And when you were hired in 2006 full

5  time, what position were you hired into?

6    A.    Frozen clerk.

7    Q.    Is it fair to assume after being hired

8  as a frozen clerk, you continued to work at

9  Redner's full time since 2006 to the present?

10   A.    Correct.

11   Q.    Okay.  And then from that time, you

12  obviously worked your way up in the position to

13  eventually become store director?

14   A.    Correct.

15   Q.    When did you become store director?

16   A.    2015, I believe.

17   Q.    And was that the Boyertown location?

18   A.    That was actually at the Red Hill

19  location, number 31.

20   Q.    Okay.  So in 2015 at some point is the

21  first time you became a store director at the Red

22  Hill location, correct?

23   A.    I believe it was 2015, yes.

24   Q.    Okay.  Very good.  Your current job

KARL MICHENER

[Page 16]

1    duties as the store director at Potts Grove, have

2    they changed at all from the job duties you had

3    when you were the store director at Audubon?

4         A.    The store doesn't have a gas station,

5    so that's slightly different.  But as far as the

6    day-to-day, it is the same.

7         Q.    Okay.  So excluding the job duties you

8    may have had with the gas station at Audubon,

9    generally describe what job duties you had as

10   store director when you worked at Audubon.

11        A.    Um, I was in charge of all day-to-day

12   operations; hiring, terminations, other human

13   resources, problem solving, ordering,

14   merchandising, training, customer service

15   obviously, budgeting.  That's a basic outline of

16   what I do, I suppose.

17        Q.    Okay.  When you worked at Audubon, did

18   that location have its own personal human

19   resources department?

20        A.    No.

21        Q.    So you mentioned you did a little bit

22   of human resources.  Would you serve as the human

23   resources personnel while you were the store

24   director at Audubon?

KARL MICHENER

[Page 17]

1      A.      It's one of the duties, yes.

2      Q.      Okay.  But am I correct that if human

3  resources, for instance the human resources

4  department, needs to be engaged by you, that's

5  done at a corporate level?

6      A.      We do have a corporate level human

7  resources department, yes.

8      Q.      Okay.  All right.  Is it fair to

9  assume that while you were store director at

10  Audubon, you're also in charge of managing all of

11  the different department managers?

12     A.      Yes.

13     Q.      Okay.  And estimating, ballpark, how

14  many different departments did you oversee at

15  Audubon?

16     A.      Eight, nine.

17     Q.      And one of those departments being the

18  meat department; is that correct?

19     A.      Correct.

20     Q.      When you were overseeing the Audubon

21  location, who was the manager of the meat

22  department?

23     A.      Marcos Mercon.

24     Q.      M-E-R-C-O-N, correct?

KARL MICHENER

[Page 18]

```
 1      A.      Correct.

 2      Q.      Mr. Michener, I'm going to show you my

 3  first exhibit today.  Throughout the course of

 4  this deposition, I'm going to share my screen and

 5  show a number of documents to you.  With any

 6  document I show you, take as much time as you

 7  need to look it over, if you like, but generally

 8  I'm going to direct your question maybe to a

 9  certain area for a few questions.  Okay?

10      A.      Understood.

11              MR. ELLIOTT:  As we have done in

12          the past, I'm going to -- anticipating

13          that you're going to be doing this,

14          Andrew, I'm going to have a hard copy to

15          put in front of the witness so that he can

16          opt in to looking at it in both media.

17              MR. OLCESE:  That's perfectly fine.

18  BY MR. OLCESE:

19      Q.      And, Mr. Michener, whatever is easier

20  for you.  Okay?

21      A.      Yes, sir.

22              (Document being shown.)

23  BY MR. OLCESE:

24      Q.      Okay.  All right.  Mr. Michener, I
```

KARL MICHENER

```
 1   just shared my screen and I am showing a document
 2   I premarked as D-2.  On the bottom right is a
 3   designation and number that us attorneys call a
 4   Bates stamp.  It's only for legal purposes for
 5   identification.  This one is Bates stamped KS696.
 6   Okay?  With any document, and I apologize for not
 7   mentioning this earlier, please let me know if
 8   you'd like me to scroll up or down, or Zoom in or
 9   out to make it more visible to you.  Okay?
10        A.     Yes, sir.
11        Q.     So I want to focus on, if I may, the
12   middle section of this document marked D-2.
13   Okay?  Do you recognize this document?
14        A.     I believe I saw it as part of what I
15   was shown for the case.
16        Q.     For your preparation?
17        A.     Yes.
18        Q.     Okay.  And can you see the names on
19   the left side of the chart that I'm circling with
20   my cursor right now?
21        A.     Yes.
22        Q.     Okay.  It's my understanding that
23   these are the individuals six months prior to
24   October 5, 2020 who worked in the meat department
```

KARL MICHENER

1    at Audubon.  Take a look at those names and let

2    me know if you believe that's accurate.

3        A.      (Reviewing document).  To the best of

4    my knowledge.

5        Q.      Okay.  All right.  And I know now you

6    don't work at Audubon, you're at Potts Grove, but

7    out of the seven names listed here, who of those

8    do you know does not work for Redner's currently?

9        A.      Thomas Haley I'm not familiar with.

10        Q.      Okay.

11        A.      Herman Narvaez I'm not familiar with.

12    David Mosteller no longer works for Redner's.

13    The bottom four do, as far as -- I'm sorry, the

14    next three do; Shaun, Marcos and Sandra.  Connie

15    does not?

16        Q.      Okay.  So starting with Mr. Thomas

17    Haley, you don't know whether he currently works

18    for Redner's or not; is that accurate?

19        A.      I belive he was terminated, but I was

20    not involved in that.

21        Q.      Okay.  Do you know why he was

22    terminated?

23        A.      I can't say for sure --

24        Q.      Okay.

KARL MICHENER

[Page 21]

```
 1      A.      -- why.

 2      Q.      Do you have a belief why he was

 3  terminated?

 4      A.      If I remember, there was discussion

 5  about possibly on-the-job drinking or coming in

 6  intoxicated, at any rate.

 7      Q.      Okay.  And on the right, termination

 8  date, there's a listing for September 24, 2019.

 9  Does that sound accurate to you?

10      A.      I don't know.

11      Q.      Okay.  And Mr. Herman Narvaez, am I

12  correct you don't know whether that individual

13  works for Redner's currently or not?

14      A.      Correct.

15      Q.      Okay.  And then Mr. David Mosteller

16  you said was terminated as well, correct?

17      A.      Correct.

18      Q.      There's a termination date listed,

19  September 27, 2021.  Do you believe that date to

20  be accurate?

21      A.      Yes.

22      Q.      Do you know why Mr. Mosteller was

23  terminated?

24      A.      Dave was cleanup and didn't want to do
```

KARL MICHENER

```
 1   cold -- didn't want to work in the cold anymore.

 2       Q.     What does that mean, just specify?

 3       A.     Our prep room is refrigerated where

 4   they cut the meat.  He was our cleanup guy and

 5   just -- he's an older gentleman and I think he

 6   had enough of working in 50-degree weather

 7   essentially in the department while he was

 8   cleaning up.  I don't think he wanted to do it

 9   anymore.

10       Q.     Were you involved in his termination?

11       A.     Termination so far as I sent the

12   termination through.  It wasn't a disciplinary

13   action or anything.  It's just a separation

14   essentially, but, yes.

15       Q.     Well, just to kind of clarify then, do

16   you believe his separation was voluntary or was

17   it involuntary?

18       A.     Voluntary.

19       Q.     Okay.  Understood.  And then just to

20   clarify, Shaun Rhoton, Marcos Mercon, and Sandra

21   McGrory still work for Redner's, right?

22       A.     Yes.

23       Q.     Okay.  In the middle of this chart

24   we're looking at on D-2, it writes the ethnicity
```

KARL MICHENER

1   of the individuals that work that we just went

2   through.  Is it accurate to your assessment that

3   Miss Onley was the only Black or African-American

4   employee within the meat department?

5        A.    Yes.

6        Q.    Okay.  All right.  Mr. Michener, you

7   work full time, correct?

8        A.    Yes.

9        Q.    Has your schedule remained the same

10  throughout the time you've worked at the Potts

11  Grove location?

12       A.    I don't have a set schedule.

13       Q.    Okay.  So you don't work, for

14  instance, Monday through Friday, like 9 a.m. to 5

15  p.m., anything like that?

16       A.    No, sir.

17       Q.    Okay.  Is there any way you can

18  describe for me what are the days and hours you

19  work currently?

20       A.    In general the start time is 6 a.m.

21  for store directors.  I usually follow that.  We

22  do have to cover for our evening managers.  That

23  is on Thursdays and Fridays normally.  So I might

24  have to work a Thursday night or a Friday night

KARL MICHENER

[Page 24]

 1    or both.  I don't have set days that I'm off

 2    normally.  I try to take off Wednesdays.  Other

 3    than that, it's fair game.  I work based off of

 4    our business.

 5         Q.     Understood.  And that kind of

 6    schedule, so to speak, that necessitates to work

 7    when business dictates it, how it is right now

 8    for Potts Grove, is that how it was also during

 9    your time at Audubon?

10         A.     Yes.

11         Q.     Did you also try to generally take off

12    Wednesdays at Audubon when you could?

13         A.     I did, yes.

14         Q.     Okay.  All right.  And in your role as

15    store director -- so I want to try to focus now

16    during your time at Audubon, if I may -- did you

17    have any direct reports that were under your

18    supervision?

19         A.     Could you explain that in a different

20    way?

21         Q.     Sure.  Were there any positions or

22    individuals that directly reported to you while

23    were you store director at Audubon?

24         A.     I have an assistant manager and a

KARL MICHENER

1   grocery manager.  And then all the department

2   managers I would say were mine, direct reports.

3       Q.     Okay.  In terms of hierarchy, the

4   assistant manager is second only to the store

5   director at any location?

6       A.     Correct.

7       Q.     All right.  So when you're at Audubon,

8   who or whom were the assistant managers that

9   worked underneath you at Audubon?

10      A.     James Schlegel.  He opened the store

11  with me.

12      Q.     And did Mr. Schlegel remain your

13  assistant manager throughout the entire time you

14  worked at Audubon?

15      A.     While he was at Audubon, yes.

16      Q.     So my question, just to clarify, is,

17  you did not have any other assistant manager

18  during your time at Audubon?

19      A.     I had another assistant manager,

20  Dakota Loose.

21      Q.     How do you spell Dakota's last name?

22      A.     L-O-O-S-E.

23      Q.     As of October 2020, who was your

24  assistant manager?

KARL MICHENER

[Page 26]

1        A.      James Schlegel.

2        Q.      Okay.  When did he become your

3    assistant manager?

4        A.      Same date that we started, the 4th of

5    September, 2019.

6        Q.      And when did Mr. Schlegel not be your

7    assistant manager, so to speak; when did he

8    either leave that position or leave Redner's and

9    you had Mr. Loose as your assistant manager?

10       A.      I don't recall the date.

11       Q.      Can you narrow the year?

12       A.      '20, '21.

13       Q.      Okay.  Do you know if Mr. Schlegel

14   currently works for Redner's?

15       A.      He does.

16       Q.      And what is his current position if

17   you know?

18       A.      Assistant.

19       Q.      And where does he work?

20       A.      Potts Grove.

21       Q.      Okay.  So is he currently your

22   assistant manager at Potts Grove?

23       A.      Yes.

24       Q.      So am I correct that at some point in

KARL MICHENER

[Page 27]

1    2021, Mr. Schlegel transferred from Audubon to

2    Potts Grove?

3        A.        Correct.

4        Q.        Okay.  All right.  And is it fair to

5    assume obviously as store director, that even

6    though the grocery manager and the assistant

7    manager are your direct reports, meaning they

8    directly report to you, all the department

9    managers also report to you if necessary,

10   correct?

11       A.        Correct.

12       Q.        All right.  When you were the store

13   director at Audubon, who did you directly report

14   to?

15       A.        My district manager, James Polchin.

16       Q.        And how do you spell Mr. Polchin's

17   last name?

18       A.        P-O-L-C-H-I-N.

19       Q.        Okay.  Was Mr. Polchin your district

20   manager the entire time you worked at Audubon?

21       A.        No, he retired and was replaced by

22   Brian Golden, G-O-L-D-E-N.

23       Q.        When did Mr. Polchin retire?

24       A.        April of 2021, I believe.

KARL MICHENER

1      Q.      Okay.  Other than Mr. Polchin and

2   Mr. Golden, did you report directly to anyone

3   else while you were working at Audubon?

4      A.      No.

5      Q.      Okay.  I understand that Redner's has

6   a position called regional manager; is that

7   accurate?

8      A.      You may be referring to our department

9   supervisors.

10     Q.      Okay.  Let me ask you this.

11             The district managers, do you know

12   what position they report to?

13     A.      Our vice president of grocery

14   operations.

15     Q.      Okay.  Do you know an Alexis Foreman?

16     A.      Yes.

17     Q.      What position, to your knowledge, does

18   she currently have?

19     A.      She's a director in human resources.

20     Q.      Okay.  And when you worked at Audubon,

21   was she in that same position?

22     A.      Yes.

23     Q.      Would you consider her one of your

24   direct reports, who you -- excuse me -- who you

KARL MICHENER

1    would directly report to?

2       A.      Could you repeat that?

3       Q.      Was Miss Foreman someone, when you

4    worked at Audubon, that was one of your

5    supervisors?

6       A.      She is a supervisor that, I don't

7    report to them, but ask for support from.  My

8    direct supervisor is Brian Golden.  If I have a

9    human resources issue, I'd go to human resources.

10      Q.      Okay.  Understood.  And when you say

11   if you had to go to human resources, is Miss

12   Foreman the individual you would go to when you

13   worked at Audubon?

14      A.      Sometimes.  There's also Randy --

15   Randall Kostelac, the other human resources

16   manager at the corporate office.

17      Q.      And do you know how to spell Randall's

18   last name?

19      A.      K-O-S-T-E-L-A-C.

20      Q.      Okay.  And to your understanding then,

21   Mr. Kostelac was also a director of human

22   resources?

23      A.      Yes.

24      Q.      Okay.  How would you determine -- or,

KARL MICHENER

```
1    you know, whether you would reach out to Miss

2    Foreman or Mr. Kostelac for any HR question or

3    support you needed?

4         A.    Alexis handles employees specifically,

5    issues, concerns, assistance with that.

6    Mr. Kostelac handles training.  So depending on

7    what my issue was, I would try to determine --

8    and of course they can both handle any issue, but

9    they were separated as far as designated roles,

10   so that you could kind of forward any issues to

11   the direct -- the right person initially.

12        Q.    Understood.

13        A.    But they handle everything.

14        Q.    Right.  Understood.  But when it came

15   to any issues you might have had with the

16   employees, for instance, maybe issuing discipline

17   to employees, am I correct to assume that

18   generally you would go to Miss Foreman rather

19   than Mr. Kostelac?

20        A.    Yes.

21        Q.    All right.  Okay.  And you mentioned

22   that they're located at Redner's corporate

23   address.  Do you know what that address is?

24        A.    I believe it's 3 Quarry Road in
```

KARL MICHENER

1    Reading.

2        Q.        Have you ever met Mr. Kostelac in

3    person?

4        A.        Yes.

5        Q.        Is it a practice, to your knowledge,

6    for these -- for Mr. Kostelac to visit the stores

7    on a regular basis?

8        A.        Could you quantify regular?

9        Q.        Well, however you define regular.

10        A.        I would see them -- we have weekend

11    visitation where they have to work every six

12    weeks or so.  They'll be put on rotation per

13    weekend, so I might see him if my store was

14    designated for him to visit.  And he would also

15    come out just to visit, talk to management,

16    employees.  But I had no way of knowing if that

17    was going to happen, nor do I know its frequency

18    as far as they're required to do.

19        Q.        Understood.  Okay.  And the same for

20    Miss Foreman; have you ever met Miss Foreman in

21    person?

22        A.        Yes.

23        Q.        Okay.  And do you have any

24    understanding if part of her practice is to visit

KARL MICHENER

[Page 32]

1    the stores on a regular basis?

2        A.    In the same way I described it for

3    Mr. Kostelac.

4        Q.    Okay.  Has there ever been an occasion

5    where you and Miss Foreman met in person to

6    discuss an employee issue you were trying to

7    resolve?

8        A.    Not that I can recall.

9        Q.    Okay.  All right.  Does Redner's have

10   an employee handbook?

11       A.    Yes.

12       Q.    And are you familiar with that

13   handbook?

14       A.    Fairly.

15       Q.    Is the employee handbook kept at the

16   store location in Potts Grove for employees to

17   review if necessary?

18       A.    They all have access to it online and

19   it can be printed very easily.  I've done that

20   many times for employees.

21       Q.    Okay.  And I framed my question just

22   speaking of Potts Grove.  To your understanding,

23   is that the same as it was in Audubon when you

24   were the store director?

KARL MICHENER

[Page 33]

```
 1      A.     Yes.
 2      Q.     Okay.  To your knowledge, has that
 3 employee handbook been updated or edited since
 4 October of 2020?
 5      A.     I don't believe it's been updated
 6 since then, no.
 7      Q.     Okay.  Are you aware of Redner's
 8 discipline policy?
 9      A.     Yes.
10      Q.     Is it fair to say that Redner's has a
11 progressive discipline policy?
12      A.     Yes.
13      Q.     And how would you describe that
14 progressive discipline policy?
15      A.     Depending on the infraction, you can
16 start with verbal conversation, hey, this is a
17 problem; you can do a counseling form, so this is
18 the issue, this is how we need to handle it; and
19 then in general we go to a warning form, you're
20 still continuing to break this policy.  And then,
21 you know, you go to suspension and review with
22 human resources.  Of course, and it's stated in
23 the handbook that you can go to any position in
24 that disciplinary procedure, depending on what
```

KARL MICHENER

1   happens, depending on the infraction.

2       Q.      Okay.  So depending on the infraction,

3   the progressive discipline policy as you

4   described with a verbal, counseling, warning,

5   suspension, does not always need to be followed

6   in that order; is that right?

7       A.      Correct.

8       Q.      Okay.

9       A.      You can go to any stage depending on

10  the infraction.

11      Q.      And when you say you can go to any

12  stage depending on the infraction, just speaking

13  of positions, who makes the decision as to

14  whether an infraction should be a counseling

15  versus a warning versus immediate termination?

16      A.      I believe that would depend on the

17  infraction again.  Employee not taking a break

18  punch, or having issue with a time card, minor

19  infraction, you follow that.  You wouldn't

20  require, you know, support from human resources.

21  If another employee stole from another employee,

22  I'm going to get human resources or possibly loss

23  prevention involved.  So it depends on the

24  infraction, I suppose.

KARL MICHENER

1      Q.      Okay.  In your role as store director

2  since Audubon, as part of your job duties do you

3  have sole discretion to terminate employees?

4      A.      No.

5      Q.      So, am I fair to assume then you would

6  need to consult with someone before reaching a

7  decision to terminate?

8      A.      I'm sorry to say, but again I think it

9  would defend -- it would depend on what was

10  happening.  If it was a no-call/no-show, they

11  didn't show up for two days in a row, it's in our

12  handbook that that's job abandonment and it's a

13  terminable offense.  I don't need to get

14  somebody's approval to move forward with that.

15      Q.      Okay.  So you do have the ability to

16  terminate employees at your own discretion for

17  some infractions?

18      A.      Correct.

19      Q.      Okay.  And other than your example of

20  no-call/no-show two days in a row, you can make

21  the decision to terminate that employee, are

22  there any other infractions you're aware of where

23  you do not need to consult with anyone else at

24  Redner's and you make the decision to terminate

KARL MICHENER

[Page 36]

```
 1   someone?
 2      A.     I'm sorry for taking time.  There's
 3   just a lot of things people can do.
 4      Q.     Take your time with any question.
 5      A.     Okay.  Could you just repeat it one
 6   more time.
 7      Q.     Yeah.  So you gave me an example of
 8   where you can decide to terminate an employee on
 9   your own without consultation, and that was if an
10   employee has a no-call/no-show two days in a row
11   because, as you say, that's job abandonment in
12   the handbook.  So I'm asking you, other than that
13   example, that infraction, is there any other
14   infraction where you have the ability to decide
15   at your own discretion without consultation
16   whether to terminate an employee or not?
17      A.     There may be, but I don't operate that
18   way.  Is that helpful?
19      Q.     So it's never happened in your time as
20   store director at any location other than
21   no-call/no-show, you can terminate someone?
22      A.     I can't recall another situation.
23      Q.     Okay.  So is it fair to assume then,
24   if there is a performance issue or a discipline
```

KARL MICHENER

1    issue regarding an employee, and termination is a

2    consideration, it's your practice to consult with

3    someone before reaching that decision?

4         A.    Most often my district manager I would

5    say, or human resources, yes.

6         Q.    Okay.  So let me break that again.

7    You say most often.  So is there an instance

8    you're thinking of where you would not consult

9    with your district manager or human resources

10   when it involves an employee discipline or

11   performance issue?

12        A.    You are asking me about termination,

13   not discipline?

14        Q.    Correct.

15        A.    So if I'm terminating somebody, my

16   practice is to get the opinion or direction from

17   a supervisor.  It could be a department

18   supervisor, it could be my district manager, it

19   could be human resources.

20        Q.    Okay.

21        A.    In general I try not to terminate as a

22   first response to somebody's disciplinary

23   problems or lack of ability, you know, that kind

24   of thing.  That's not obviously what we want to

KARL MICHENER

1  do is fire people all day.  That's not what we're

2  trying to do.

3      Q.      Understood.  And in your practice,

4  when you're consulting with someone in human

5  resources about terminating an employee for

6  either performance issues or discipline, is -- am

7  I correct that the person you consult with, at

8  least as of the time you were working at Audubon,

9  Miss Foreman?

10      A.      Yes.

11      Q.      Okay.  Is there anyone else in human

12  resources while you worked at Audubon that you

13  would consult with in the human resource

14  department?

15      A.      Mr. Kostelac, and then their boss or

16  direct report would be Bob McDonough.

17      Q.      And do you know Mr. McDonough's

18  position as of when you worked at Audubon?

19      A.      Vice president of human resources, I

20  believe.

21      Q.      Okay.  Am I correct to assume that

22  department managers do not have the ability to

23  terminate an employee without getting consent

24  from you --

KARL MICHENER

```
 1      A.      Correct.
 2      Q.      -- if you were the director?  Right?
 3  Okay.  All right.
 4              Can a department manager issue an
 5  employee discipline without your knowledge or
 6  consultation?
 7      A.      They can.
 8      Q.      Okay.  All right.  Do you recall the
 9  employment of Connie Onley?
10      A.      Yes.
11      Q.      Okay.  And do you know when she
12  started at the Audubon location?
13      A.      We opened October '19, so I would say
14  it would be within that week, so previous to
15  that, leading up to.
16      Q.      So she --
17      A.      Perhaps.
18      Q.      Sorry about that.
19              So she started with Audubon when
20  the store opened, correct?
21      A.      Correct.
22      Q.      Okay.  And was it your understanding
23  that she had worked for Redner's prior to working
24  at the Audubon location?
```

KARL MICHENER

[Page 40]

```
 1        A.      Yes.

 2        Q.      Okay.  What store did she previously

 3   worked at before Audubon?

 4        A.      Lansdale, number 63.

 5        Q.      Okay.  And is it your understanding

 6   that she was transferred from Audubon to Lansdale

 7   around October of 2019?

 8        A.      Yes.

 9        Q.      Did you have to approve that transfer?

10        A.      No.

11        Q.      Were you part of the decision to

12   transfer her?

13        A.      No.

14        Q.      Did you know about Connie Onley before

15   she started working at Audubon?

16        A.      No.

17        Q.      What position did she hold while

18   working at Audubon?

19        A.      She was a meat wrapper.  That entails

20   a lot of things in our meat department.  Seafood

21   was her main gig, I suppose.

22        Q.      Okay.  And fair to assume that

23   Mr. Macrone was her direct supervisor?

24        A.      Mercon, yes.
```

KARL MICHENER

[Page 41]

```
 1      Q.      Mercon, excuse me.

 2              And on occasion, were you able to

 3  observe her work at the Audubon location?

 4      A.      Yes.

 5      Q.      Were you able to speak with her and

 6  get to know her while she worked at Audubon?

 7      A.      Yes.

 8      Q.      How would you describe her performance

 9  as a meat wrapper when you worked with her?

10      A.      Connie was very good with our guests.

11  She presented a very nice seafood case.  She was

12  pleasant.

13      Q.      Did you ever do -- did you ever

14  conduct performance evaluations for Miss Onley?

15      A.      No.

16      Q.      Okay.  Do you know if she was ever

17  disciplined while working at Audubon pertaining

18  to her performance?

19      A.      I don't believe so.

20      Q.      You mentioned that she was pleasant.

21  Is it fair to assume that personally you two got

22  along when you worked together?

23      A.      I thought so.

24      Q.      Okay.  And you understand that at some
```

KARL MICHENER

```
 1   point Miss Onley's employment at Redner's was
 2   terminated, correct?
 3       A.      Yes.
 4       Q.      Fair to assume that was involuntary
 5   rather than voluntary separation?
 6       A.      I believe she still wanted to work
 7   with us, yes.
 8       Q.      Okay.  And do you know when she was
 9   terminated from Redner's?
10       A.      October of 2020.
11       Q.      And who made the decision to terminate
12   Miss Onley?
13       A.      Miss Foreman.
14       Q.      Did you make the decision as well?
15       A.      No.
16       Q.      Did you recommend to Miss Foreman that
17   Miss Onley be terminated?
18       A.      No.
19       Q.      Did you recommend against Miss Onley's
20   termination?
21       A.      No.
22       Q.      What was your understanding why Miss
23   Onley was terminated?
24       A.      Violation of our sexual harassment
```

KARL MICHENER

```
 1   policy.
 2        Q.      And just to clarify, how did Miss
 3   Onley, in your estimation, violate Redner's
 4   sexual harassment policy?
 5        A.      She admitted to me that she spoke
 6   about playing a prank on Mr. Rhoton by placing a
 7   dildo in his meat coat pocket, and also admitted
 8   to speaking about using a dildo after watching a
 9   movie called 50 Shades of Gray.
10        Q.      Okay.  And after she informed you of
11   this, was it your estimation that Miss Onley
12   violated the sexual harassment policy?
13        A.      I investigated and gave the
14   information to Miss Foreman, who determined that
15   she broke that policy.
16        Q.      Okay.
17        A.      My opinion is -- it's not my place to
18   determine whether or not she should be terminated
19   or not in that sense.
20        Q.      And why do you say that?
21        A.      Because it's -- she broke a policy, I
22   was instructed to investigate and then I gave
23   that information to Alexis.  She's the direct --
24   a director in human resources.  I'm the store
```

KARL MICHENER

1    director.   She makes that decision above me.

2        Q.      Okay.  So I'm going to be working a

3    little bit backwards, but I just want to stay on

4    this since we're talking about it.

5                To your knowledge, how did you

6    first find out about this incident, I'll describe

7    it, with Miss Onley trying to play a prank on

8    Mr. Rhoton and discussing everything else you

9    just described?

10       A.      The statement from Miss McGrory.

11       Q.      Okay.  And that was a written

12   statement, correct?

13       A.      Correct.

14       Q.      All right.  Do you know when you

15   learned of Miss McGrory's written statement?

16       A.      I learned of it when I got to work.

17   It was an afternoon shift for me.  I started at 1

18   or 1:30 on a Thursday, so it would have been the

19   end of September, approximately.

20       Q.      And who informed you of Miss McGrory's

21   statement?

22       A.      It was there for me to read in my

23   office.

24       Q.      So if I'm correct, you came in your

KARL MICHENER

```
 1   office that day to start your shift and there was

 2   just a written statement on your desk and you

 3   just read it; is that how it happened?

 4       A.      So I -- when I come into my store, I

 5   walk the perimeter and greet my employees, any

 6   guests, and heard about the incident that was the

 7   catalyst to the statement.  So I had prior

 8   knowledge of something going on before I read the

 9   statement, but didn't know the entirety of the

10   situation until I read Miss McGrory's statement.

11       Q.      Okay.  So when you first came in and,

12   as you say, you were aware of the incident that

13   was the catalyst for the statement, how did you

14   find out about the incident the very first time

15   and who told you about the so-called incident?

16       A.      James Schlegel, my assistant, told me

17   about -- started to fill me in and said there was

18   a statement to read.

19       Q.      Did he tell you this in person when

20   you entered the store?

21       A.      Yes.

22       Q.      Okay.  So he -- you arrive at the

23   store, you're greeting everyone as part of your

24   practice, your assistant manager comes up, says,
```

KARL MICHENER

1    hey, we had an incident, there's a statement in

2    your office, and then you go to read it; is that

3    accurate?

4        A.    Yes.  I'm sure other things happened

5    in the time between me learning of it and getting

6    to my office and all that, but -- you know, I'm

7    running a grocery store, so there's lots of

8    things going on of course.

9        Q.    No, I understand.  After you read the

10   statement, what do you do in terms of any

11   investigation or anything regarding the incident;

12   what is your first course of action?

13       A.    I contacted Miss Foreman.

14       Q.    Okay.

15       A.    For direction.

16       Q.    I'm sorry.  How did you contact her?

17       A.    By phone.

18       Q.    Okay.  So you have a phone

19   conversation, the very same day you look at the

20   statement, with Miss Foreman.  Do you remember

21   what you discussed with her?

22       A.    I -- I want to back up.  I most likely

23   scanned the document and e-mailed it to her so

24   that she could read the statement.  And then

KARL MICHENER

[Page 47]

```
 1    usually -- I don't know if this is what happened
 2    then, if I called her and spoke with her
 3    immediately or perhaps the day after, but at some
 4    point I spoke with her and was given direction to
 5    get statements -- a statement from Mr. Rhoton,
 6    and then get Miss Onley involved for conversation
 7    and statement.
 8         Q.     Okay.  So who -- who directed you to
 9    get a statement from Mr. Rhoton and Miss Onley?
10         A.     Miss Foreman.
11         Q.     Did she direct you also to speak with
12    Miss McGrory?
13         A.     I did speak with Miss McGrory after I
14    read the statement.
15         Q.     Okay.  And what do you recall Miss
16    McGrory telling you about the alleged incident?
17         A.     The incident that happened that day.
18    They were in the meat department, in the prep
19    area.  She was doing dishes and Miss Onley was
20    preparing shrimp I think in the steamer, or
21    seafood in some -- some way.  And they were
22    talking about Antifa and the rioting and Proud
23    Boys, and Miss Onley was refusing to understand
24    that the Antifa was behind the rioting, Miss
```

KARL MICHENER

```
 1   McGrory was refusing to understand that these
 2   Proud Boys were behind the rioting, and at some
 3   point Miss McGrory got upset and stormed out.
 4   She was yelling to Miss Onley to be quiet, or
 5   shut up, maybe, I think she wrote.  And she left
 6   the back of the meat department.  She told me
 7   that Miss Onley followed her.  She went out the
 8   back of the store and again Miss Onley followed
 9   her, and took some time to cool off.  She came
10   back inside.  Mr. Schlegel asked her what was
11   going on.  She told him.  Asked for a statement.
12            And that's in general the -- what
13   happened that day, as far as Miss McGrory is
14   concerned and me learning about the incident.
15   Q.     Okay.  So I want to try to narrow the
16   timing if I can.  I know we're talking, you know,
17   almost two years past now.
18   A.     Yeah.
19   Q.     But it's my understanding, and I'll
20   represent to you, that the date of what you just
21   described between Miss Onley and Miss McGrory was
22   October 1, 2020.  Does that sound accurate to
23   you?
24   A.     I'm not -- I'm not sure.
```

KARL MICHENER

[Page 49]

```
 1      Q.      But sometime late September or early
 2   October; does that accurate?
 3      A.      Yes.
 4      Q.      Okay.  So what I want to know is the
 5   day this occurred, to your knowledge, between
 6   Miss Onley and Miss McGrory, is that the same day
 7   that you heard about it from Mr. Schlegel and
 8   read the statement?
 9      A.      It was either the day of -- I heard of
10   the incident the day of.  I'm not sure if the
11   statement was from the day of -- the day of or
12   the day after I read it.
13      Q.      Okay.  And when you had the
14   opportunity to speak with Miss McGrory about what
15   happened, was that the same day you read her
16   statement?
17      A.      I believe so.
18      Q.      Okay.  And do you recall in that
19   conversation with Miss McGrory ever her and Miss
20   Onley speaking about 50 Shades of Gray, a prank
21   against Mr. Rhoton, a dildo, or anything else
22   sexual in nature?
23      A.      Could you repeat that?
24      Q.      Yeah.  What I'm trying to ask is, when
```

KARL MICHENER

[Page 50]

```
 1   Miss McGrory described to you what happened
 2   between her and Miss Onley where they had that
 3   argument and Miss McGrory had to leave and then
 4   wrote a statement, did she ever tell you that
 5   anything sexual in nature was discussed during
 6   that argument?
 7       A.      No.
 8       Q.      Okay.  So where did the 50 Shades of
 9   Gray comment she made, the prank on Mr. Rhoton
10   with the use of a dildo, where did that come
11   from?
12       A.      Her statement.
13       Q.      Okay.  And that's from a time prior to
14   the argument she had with Mr.[sic] Onley about
15   Antifa or the Proud Boys or anything else?
16       A.      Yes.
17       Q.      Okay.
18       A.      I believe so.
19       Q.      Did you only speak with Miss McGrory
20   one time about what she wrote in the statement?
21       A.      No.
22       Q.      You spoke with her multiple times
23   about it?
24       A.      After speaking with Miss Onley, I had
```

KARL MICHENER

[Page 51]

```
 1   to go back to Miss McGrory, as Miss Onley had

 2   made some statements about the situation as well.

 3   So I wanted to investigate what Miss Onley had

 4   mentioned as well.

 5        Q.    Okay.  So starting off with Miss

 6   Onley, you speak with Miss McGrory first after

 7   reading the statement --

 8        A.    Yes.

 9        Q.    -- you go to Miss -- you go to Miss

10   Onley, what does she tell you?

11        A.    So -- okay.  So I brought her into the

12   room and mentioned that there was a complaint

13   from Sandy about that day.  So we started talking

14   about the politics first, I believe.  I asked her

15   what happened.  She described a similar situation

16   where they were talking about Antifa and the

17   Proud Boys.  She was watching CNN and they had

18   mentioned that Antifa was fake, but the Proud

19   Boys were a real organization causing part of the

20   rioting.

21              I asked her if it was common for

22   them to discuss politics, which she said it was.

23   I asked if she felt like it was friendly, if it

24   was unwanted, if she was a willing participant.
```

KARL MICHENER

```
 1   She said that she was.  I asked if she thought
 2   they were friends.  And she said, I thought we
 3   were.  I said, okay.  So she mentioned that they
 4   had texted back and forth.  She showed me some of
 5   the texts, very cursory glances.  I couldn't
 6   speak to what the content was.  But there was no
 7   aggression or there wasn't any unwanted
 8   conversations as far as politics goes.
 9            And I said, okay, the other part of
10   this complaint is about talking about 50 Shades
11   of Gray.  And she said, yeah, you know, we were
12   talking about it and Sandy said it was her
13   favorite movie.  And I said, did you talk about
14   using it.  And she said, well, you know, I'm --
15   I'm alone, I don't have my husband anymore,
16   and -- it wasn't an easy conversation when it got
17   to that part, to be honest with you.  I -- it
18   was -- we had a good working relationship, I felt
19   like, and it was a little bit awkward.  So we
20   talked about it as easily as we could, but she
21   did say that she was talking about it.  And I
22   asked her about the incident with pranking Shaun,
23   Mr. Rhoton, with using the dildo.  And she said,
24   yeah.  I was like, you know, that's -- Sandy
```

KARL MICHENER

```
 1   talked you out of that.  She's like, yes, she
 2   said it wasn't a good idea.  And I go, she was
 3   right, it wasn't going to be a good idea.  And
 4   she's kind -- you know, I know that, I shouldn't
 5   have done that, I shouldn't have...
 6                   And I tried to get more information
 7   out of her about the -- talking about the dildo,
 8   because she had mentioned that they had spoken --
 9   I'm sorry, I shouldn't say they -- Miss McGrory
10   and her had spoken about it previously.  And I
11   said, well, when did that happen.  And she said,
12   when we were on break out in front of the store.
13   We have steps that employees sometimes sit on.
14   And I said, was anybody else around for that.
15   And she said, yes.  And I said, who.  And she
16   said, I don't want anybody else to get in trouble
17   for this.  I said, listen, I need to know what
18   happened so I can -- you know, a proper
19   investigation.  I need to determine what was
20   going on.  She said, I don't want anybody else to
21   get in trouble.  So she wouldn't tell me who was
22   involved in that conversation apart from her and
23   Miss McGrory.  And so I said, okay, so my
24   direction has been to get your statement.  I'd
```

KARL MICHENER

1    like to get this written down if we could.  And

2    she was like, we just talked for an hour, you

3    want me to write that down.  And I said, yes, I'd

4    like you to write a statement about this.  And

5    she said, I'm not doing that.  So I couldn't make

6    her write the statement, unfortunately.

7                    My direction from Miss Foreman was

8    to send her home after I spoke with her, so I did

9    that.  I sent her home and I said this would

10   be -- all this information I would give to human

11   resources.  I'm going to go talk to Sandy about

12   what you said about, you know, the interaction

13   you've already had concerning some of this and

14   I'll be in touch.  I believe that was on a Friday

15   or a Saturday.  That same week.

16       Q.    Okay.  So I want to break that apart

17   just a little bit.

18       A.    Sure.  There was a lot.

19       Q.    You mentioned -- and I need to be

20   specific for the transcript -- the prank with the

21   dildo regarding Mr. Rhoton.  Am I correct Miss

22   Onley made a joke that she would place a dildo in

23   his coat pocket; is that right?

24       A.    Correct.  Meat coat pocket, not his

KARL MICHENER

1   personal coat.

2      Q.     Okay.  Like a big white meat jacket

3   that they wear when they're in the meat

4   department?

5      A.     Yes, to protect themselves from blood

6   and other bits.

7      Q.     Okay.  And to your knowledge, though,

8   she never went through with this prank, correct?

9      A.     Correct.

10      Q.     And did you ever have a chance to

11   speak with Mr. Rhoton where he confirmed he was

12   never pranked?

13      A.     Yes.

14      Q.     Okay.  All right.  And the

15   conversation when you were getting information

16   from Miss Onley, when she describes speaking to

17   Miss McGrory about doing this prank, did she tell

18   you when that conversation took place?

19      A.     Not that I can recall.

20      Q.     Did she inform you that that same

21   conversation had occurred the same day that her

22   and Miss McGrory had talked about politics?

23      A.     I was under the understanding that

24   politics was a regular conversation they had, so

KARL MICHENER

1    I don't -- she didn't designate the frequency

2    that she talked about politics along with the

3    dildo and the prank.  Is that what you're asking?

4         Q.     Well, let me ask you this.

5                Did you ever come to learn that the

6    conversation regarding pranking Mr. Rhoton and

7    talking about 50 Shades of Gray and a dildo, had

8    happened around September 5, 2020, almost a month

9    prior to their argument about politics?

10        A.     We didn't discuss a timeline on when

11   that was happening.  I don't know if they were

12   congruent, if they happened at the same time.  I

13   don't know that.

14        Q.     Okay.  So from your conversations

15   after reading the statement with Miss McGrory

16   first and then Miss Onley as you just described,

17   after those two conversations, you did not know

18   when approximately the discussions occurred about

19   pranking Mr. Rhoton and talking about a dildo had

20   happened?

21        A.     I believe Miss McGrory had dates in

22   her statement.  September 5th sounds like a date

23   that was in that statement.

24        Q.     Okay.

KARL MICHENER

```
 1      A.      But I don't know that the discussion
 2  about the prank -- I don't believe the discussion
 3  about the prank and the discussion about 50
 4  Shades of Gray happened the same day.  I don't
 5  know that.
 6      Q.      Understood.  Okay.  All right.  And do
 7  you recall ever hearing about 50 Shades of Gray
 8  and a prank with a dildo from Miss Onley, Miss
 9  McGrory, or anyone else in the meat department
10  while you worked at Audubon prior to this late
11  September, early October incident after you read
12  Miss McGrory's statement?
13      A.      No.
14      Q.      Okay.  All right.  So now going back
15  to after you speak with Miss Onley, you said you
16  went and spoke with Miss McGrory for a second
17  time, correct, as part of your investigation?
18      A.      Correct.
19      Q.      All right.  When you spoke with her,
20  what do you remember in that discussion?
21      A.      I indicated that Miss Onley said that
22  this was a discussion that they were having
23  together.  She denied that.  I said, so she was
24  just talking about this and you wanted nothing to
```

KARL MICHENER

[Page 58]

1   do with it, you hadn't spoken about it before,

2   you hadn't suggested that she purchase something

3   before, or anything along those lines.  And she

4   said, no, I don't talk about that stuff.

5        Q.     Before you go on, when you say that

6   stuff, are we referring to politics or are we

7   referring to 50 Shades of Gray and a dildo?

8        A.     I would believe she was talking about

9   sex or sex life with Miss Onley.

10        Q.     Okay.  Did she say anything else

11   during this discussion?

12        A.     I don't believe so.  That was the --

13   that was what I needed to determine, because that

14   was what Miss Onley was indicating.  So that is

15   what I was trying to determine, whether that was

16   true or not.

17        Q.     Okay.  After you read Miss McGrory's

18   statement and you spoke to her two times, did you

19   ever discuss if there was anything else she

20   wanted to add to her statement?

21        A.     No.

22        Q.     Is it fair to assume, though, that as

23   part of your investigation, that you went through

24   that statement with Miss McGrory to find out more

KARL MICHENER

1    information about what she wrote about?

2       A.      We discussed it, of course.

3       Q.      Okay.  So after your second

4    conversation with Miss McGrory, is it at that

5    time you then contact Miss Foreman and she gives

6    you directions to send Miss Onley home?

7       A.      I sent Miss Onley home after speaking

8    with her.  Went back to -- that was the direction

9    I got from -- the complaint was about Miss Onley,

10   so that was the direction I got, to send her home

11   because she was the -- that was who the complaint

12   was about.  Spoke with Miss McGrory to follow up,

13   and then spoke with Miss Foreman again with

14   the -- what I found out about her -- Miss Onley's

15   side of the story.

16      Q.      Okay.  So just again for my

17   chronological understanding, did Miss Foreman

18   direct you to send Miss Onley home prior to you

19   questioning Miss Onley and you say you spoke to

20   her for about an hour?

21      A.      Yes.

22      Q.      Okay.  So regardless of what Miss

23   Onley was going to say to, let's -- per se defend

24   herself, she was going to get sent home because

KARL MICHENER

[Page 60]

1   the complaint was against her; is that right?

2        A.     Because of the nature of the complaint

3   I would assume, but I don't know what Miss

4   Foreman's thinking was as to why to do that.  I

5   was just following the direction.

6        Q.     Right.  And then later in the day

7   after doing your investigation, speaking to Miss

8   Onley, speaking to Miss McGrory on two occasions,

9   you relay all that information to Miss Foreman;

10  is that right?

11       A.     Yes.

12       Q.     Okay.  Was it during that conversation

13  Miss Foreman informed you Miss Onley would be

14  terminated?

15       A.     No.

16       Q.     What was said during that conversation

17  other than you just relaying what you had learned

18  in your investigation?

19       A.     That she would get back to me with a

20  determination.

21       Q.     Okay.  And how long from that

22  conversation was it until she got back to you;

23  the next day, two days, to the best of your

24  knowledge?

KARL MICHENER

```
 1      A.      That was the weekend, so I don't

 2  believe I heard from her until Monday or Tuesday.

 3      Q.      Okay.

 4      A.      Of the following week.

 5      Q.      And how did she contact you Monday or

 6  Tuesday the following week?

 7      A.      I believe I reached out to her.

 8      Q.      Did you call her?

 9      A.      Yes.

10      Q.      Why did you call her?

11      A.      Why?

12      Q.      Yes.

13      A.      To get a determination on what we were

14  doing with Miss Onley.

15      Q.      Okay.  And when you told her -- when

16  you called her, did you ever make a

17  recommendation at any point about issuing her a

18  form of discipline rather than a termination?

19      A.      No.

20      Q.      Did Miss Foreman ever discuss with you

21  considering any other form of discipline rather

22  than an immediate termination?

23      A.      No.

24      Q.      Why did you never bring that up?
```

KARL MICHENER

[Page 62]

```
 1      A.      What do you mean?
 2      Q.      Well, you said it was part of your
 3 practice, you don't want to terminate employees,
 4 you want to issue discipline, you know, you don't
 5 want a lot of turnover at your location.  So in
 6 this incident, why did you not bring up and
 7 discuss with Miss Foreman, you know, maybe we can
 8 issue her a suspension, a written warning, a
 9 verbal counseling, rather than an immediate
10 termination?
11      A.      The nature of the violation.  I mean,
12 sexual harassment is unacceptable in the
13 workplace.  Unacceptable means unacceptable.  You
14 can't have that conversation with employees,
15 other employees.
16      Q.      So you believed it was a terminable
17 offense, what Miss Onley did?
18      A.      Based off of our policy, yes.
19      Q.      Okay.  Did Miss McGrory ever tell you
20 that she felt harassed?
21              MR. ELLIOTT:  Object to the form.
22         You can answer.
23              THE WITNESS:  Could you repeat
24         that?
```

KARL MICHENER

1   BY MR. OLCESE:

2       Q.      Yeah.  So when Miss McGrory spoke to

3   you on those two occasions as part of your

4   investigation, did she ever tell you that she

5   felt harassed by Miss Onley?

6               MR. ELLIOTT:  Same objection.  You

7          can answer.

8               THE WITNESS:  No.

9   BY MR. OLCESE:

10      Q.      Okay.  Are you aware if Miss McGrory

11  had ever complained about Miss Onley prior to

12  making that written statement that we just

13  discussed?

14      A.      Yes.

15      Q.      Okay.  How many times to your

16  knowledge, prior to the written statement, has

17  Miss McGrory complained about Miss Onley?

18      A.      I mean, an official complaint as

19  opposed to, like, just complaining about a fellow

20  employee or...

21      Q.      Well, you tell me.  What's an official

22  complaint?

23      A.      Miss McGrory mentioned to myself that

24  Miss Onley was trying to group them together in a

KARL MICHENER

1    complaint about their treatment in the workplace,

2    and Miss McGrory wanted to state to us that she

3    didn't feel part of that complaint, the -- and it

4    was only Miss Onley's complaint, she never voiced

5    it to me or my department manager that I know of.

6         Q.    Okay.  So when you say that Miss

7    McGrory came to you about Miss Onley trying to

8    group her into her complaint, what was your

9    understanding that Miss Onley was complaining

10   about?

11        A.    Her treatment in the meat department

12   as a woman, I think.

13        Q.    Okay.  Was it your understanding that

14   she was also complaining of race discrimination?

15        A.    No, not at that time.

16        Q.    It was about gender discrimination,

17   correct?

18        A.    I believe so, yes.

19        Q.    And Miss McGrory was, am I correct,

20   informing you that she did not feel that she was

21   being discriminated based on her gender?

22        A.    Correct.

23        Q.    When did Miss McGrory have this

24   conversation with you that she did not feel she

1  was being discriminated?

2       A.      The summer of 2021 I would say -- or

3  2020.

4       Q.      If I said August of 2020, does that

5  sound more accurate to you?

6       A.      Yeah, perhaps.

7       Q.      Okay.  And this was just a verbal

8  complaint, so to speak, from Miss McGrory to you?

9       A.      Correct.

10      Q.      Okay.  Nothing was written down?

11      A.      No.

12      Q.      And when you say an official

13  complaint, in your -- to your understanding, does

14  that mean when it's written down?

15      A.      No.  When I say that, I meant Miss

16  Onley never approached me and said, I have a

17  problem that I need to discuss with you, that

18  things are going wrong, I feel a certain way

19  about something.  This was an employee telling me

20  that another person is complaining and I don't

21  feel that I'm part of it.  So when I say

22  official, Miss Onley never approached me an told

23  me that something was wrong.

24      Q.      Understood.  Do you remember any other

KARL MICHENER

1    occasion other than what you just described, Miss

2    McGrory coming to you and complaining about Miss

3    Onley in some form or fashion?

4         A.    No, I don't believe so.

5         Q.    Okay.  You don't recall any time Miss

6    McGrory said anything about Miss Onley's lack of

7    performance?

8         A.    No.

9         Q.    Or any other occasion where she

10   complained that Miss Onley was harassing her in

11   some form or fashion?

12        A.    No.

13        Q.    And is it your understanding and

14   belief that if she had made those complaints to

15   someone else, let's say Mr. Schlegel or

16   Mr. Mercon, that as part of your practice of

17   being the store director, you would be made aware

18   of that?

19        A.    I would hope so, yes.

20        Q.    Do you recall any time Mr. Mercon or

21   Mr. Schlegel ever approaching you prior to

22   September 2020 and saying, Mr. Michener, hey,

23   Miss Onley is harassing her coworkers?

24        A.    No.

KARL MICHENER

```
 1        Q.      Okay.  You mentioned also about, when
 2    we talked about Miss Onley's complaint, that at
 3    that time she was complaining of gender
 4    discrimination, when I had asked you about if she
 5    was complaining of race discrimination.  So my
 6    question for you is, has Miss Onley ever
 7    complained of race discrimination working for
 8    Redner's?
 9                    MR. ELLIOTT:  Objection to form.
10                    THE WITNESS:  Not to me.
11    BY MR. OLCESE:
12        Q.      Did you ever learn that she complained
13    of race discrimination to anyone at the Audubon
14    location?
15        A.      No.
16        Q.      Okay.  Did you ever learn she
17    complained of race discrimination working at the
18    Lansdale location?
19        A.      Previous to the information I've been
20    given before this questioning?
21        Q.      Well, let me ask you this then.  Maybe
22    it'll clear it up.
23                    Prior to litigation, did you ever
24    learn Miss Onley complained of race
```

KARL MICHENER

1   discrimination to anyone at Redner's?

2       A.      No.

3       Q.      Okay.

4       A.      No, I learned about Lansdale from the

5   complaint that was filed.

6       Q.      Okay.  Did Miss McGrory receive any

7   form of discipline for her actions during the

8   argument we described between her and Miss Onley

9   where they were talking about politics and Antifa

10  and such?

11      A.      No.

12      Q.      And why not?

13      A.      The situation didn't call for

14  discipline.

15      Q.      Did you ever consider, based on what

16  she described happened, issuing her discipline?

17      A.      Who is she?

18      Q.      Miss McGrory.  Sorry.  Miss McGrory.

19      A.      No.

20      Q.      So just to clarify, you never had

21  conversation with Miss Foreman about whether or

22  not Miss McGrory should be issued any form of

23  discipline?

24      A.      So, in the investigation when I heard

KARL MICHENER

1   about it, I mean, I'm sure I thought about what I

2   would have to do depending on how the

3   investigation came out.

4       Q.      But my question was specifically about

5   your communications with Miss Foreman.  When you

6   and Miss Foreman were speaking about your

7   investigation and what to do with Miss Onley as a

8   result of it, was it ever brought up whether or

9   not Miss McGrory would be subject to any form of

10  discipline?

11      A.      Yes, I think we discussed discipline

12  depending on how Miss Onley defended herself

13  against the allegations and whether or not we

14  would have to address it with Miss McGrory.  I

15  believe so, yes.

16      Q.      Okay.  The meat department at Audubon,

17  the whole department, and I have an understanding

18  from Miss McGrory of the layout, but that's

19  visible and within an earshot of the public,

20  correct?

21              MR. ELLIOTT:  Object to the form.

22          You can answer.

23              THE WITNESS:  Physically it's

24          within earshot, but it's very loud in the

KARL MICHENER

[Page 70]

```
 1          prep area.
 2   BY MR. OLCESE:
 3      Q.      Okay.  So it's my understanding that
 4   the heated exchange occurred in front of a sink
 5   where Miss McGrory was doing the dishes; is that
 6   correct to your understanding?
 7      A.      Yes.
 8      Q.      And is that sink within visible view
 9   of the public?
10      A.      There are things obstructing it, but
11   yes, I would say so.  There are meat tables and
12   supplies and everything as well in the
13   department.
14      Q.      Right.  And to your understanding, if
15   you're standing where the public is at the meat
16   department, can they hear any exchange going on
17   at the sink area?
18      A.      I can't speak for whether or not
19   people can hear.
20      Q.      Okay.  Just do your belief.  If there
21   are two individuals in a heated exchange,
22   shouting at each other as described in Miss
23   McGrory's statement, would the public be able to
24   hear that, to your knowledge?
```

KARL MICHENER

```
 1                MR. ELLIOTT:  Object to the form.
 2                THE WITNESS:  Maybe.
 3   BY MR. OLCESE:
 4      Q.     You don't know, though?
 5      A.     It's very loud in that room, so it's
 6   hard to hear even a conversation -- if they're at
 7   the front and I'm trying to speak with them, it's
 8   hard to hear because of the evaporators that are
 9   in there make a lot of noise.  Every -- you know,
10   I don't -- how loud is the argument, and how much
11   is the person paying attention.  We have
12   intercoms that go off, music playing all the
13   time.  I'm not sure if a person would be able to
14   hear it or not at any given time.
15      Q.     Did you ever come to learn that during
16   that exchange Miss McGrory used expletives at
17   Miss Onley, cursed at her?
18                MR. ELLIOTT:  Object to the form.
19                THE WITNESS:  From what I recall
20        her saying, was she told her to shut up.
21   BY MR. OLCESE:
22      Q.     So you don't recall any point in time
23   learning, prior to litigation, Miss McGrory
24   telling you that she yelled at Miss Onley, stay
```

KARL MICHENER

```
 1   the fuck away from me?
 2       A.    I don't recall being told that she
 3   said that.
 4       Q.    Okay.  And if an employee said
 5   something in that fashion or similar, and the
 6   public can hear it, a customer can hear someone
 7   use the word fuck, is that a discipline -- is
 8   that something an employee can be disciplined
 9   for?
10                 MR. ELLIOTT:  Object to the form.
11           You can answer it.
12                 THE WITNESS:  Could be.
13   BY MR. OLCESE:
14       Q.    Not all the time though?
15       A.    They could always be disciplined for
16   it.  That doesn't mean necessarily that they
17   would be.
18       Q.    Okay.  And at any point prior to
19   litigation, did you ever come to learn that
20   during that exchange, Miss McGrory threw a pot?
21       A.    I believe Miss Onley described it as
22   such, yes.
23       Q.    Did Miss McGrory ever tell you in her
24   written statement to your knowledge, or the two
```

KARL MICHENER

[Page 73]

```
 1   conversations you had with her during the
 2   investigation, that she threw a pot?
 3       A.      I think she described putting the
 4   stuff down that she was cleaning in the sink like
 5   this (indicating).  We have three-bay sinks,
 6   right, and she was cleaning in the sink.  I think
 7   she said she might have thrown the pots down.  Do
 8   you mean that or do you mean like hurling it
 9   across the room?
10       Q.      I mean throwing the pots; that she
11   said, in her own words, she threw pots?
12       A.      I think she threw them down, like fed
13   up with the situation, I'm going to throw this
14   down and exit, get away from it.
15       Q.      Okay.  And you recall that there was
16   an unemployment hearing on behalf of Miss Onley,
17   correct?
18       A.      Yes.
19       Q.      And you participated in that hearing,
20   right?
21       A.      Yes.
22       Q.      And do you remember Miss McGrory
23   saying then that she threw pots?
24       A.      I don't recall as such, but it's
```

KARL MICHENER

[Page 74]

```
 1   possible.
 2       Q.      Does Redner's have a policy against
 3   violence and intimidation?
 4       A.      Yes.
 5       Q.      Did you ever consider that Miss
 6   McGrory throwing a pot was an act of violence or
 7   intimidation?
 8       A.      No.
 9       Q.      You never discussed that with her?
10       A.      No.
11       Q.      Did you ever discuss throwing the pot
12   with any of the conversations you had with Miss
13   Foreman during your investigation?
14       A.      No.
15       Q.      Has -- to your knowledge, has Miss
16   McGrory ever complained about any other coworker
17   other than Miss Onley?
18       A.      Yes.
19       Q.      Who else has she complained about?
20       A.      She complains about a cashier on the
21   front end whose hair was dyed.
22       Q.      Do you know that cashier's name?
23       A.      Sorry.  Give me a second.  Sorry, I
24   can't pull it out right now.
```

KARL MICHENER

```
 1      Q.      If I told you the name Rachida, does
 2  that sound accurate?
 3      A.      Yes, Rachida Tou.  It's -- it ends
 4  with a T-O-U I believe on the end of it.  It's
 5  her full name.
 6      Q.      Okay.  And what was your understanding
 7  of the complaint from Miss McGrory about
 8  Rachida's hair?
 9      A.      We have a dress code policy which does
10  include hair and different colors.  I believe the
11  policy states natural color hair.  And Rachida
12  had dyed her hair.  I'm colorblind so I'm not
13  exactly sure what the color was, but it was a
14  lighter color and Miss McGrory felt that it was
15  against the policy.  Rachida had told me that.  I
16  said, listen, it's not her job, it's not her
17  responsibility to deal with that, I think your
18  hair is fine, you're okay.  So if you're okay,
19  then I will have a conversation with her and we
20  won't hear any more about it.
21              So that's what I did.  I went to --
22  told Sandy that this isn't your scope of
23  responsibility, don't worry about other people's
24  hair or dress code or anything else.  That's for
```

KARL MICHENER

```
 1  the management team to deal with, not you.

 2      Q.      So did Rachida have to change her hair

 3  color?

 4      A.      No, not at all.

 5      Q.      And you had a conversation with Miss

 6  McGrory and you told her that that's not her

 7  concern, correct?

 8      A.      Not her scope of responsibility, yes.

 9      Q.      Okay.  Do you recall anyone else Miss

10  McGrory has ever complained about other than Miss

11  Onley and Rachida?

12      A.      No, I don't believe so.

13      Q.      Okay.  And Rachida, what race or

14  ethnicity is she?

15      A.      African-American.

16      Q.      To your knowledge, has Miss McGrory

17  ever been issued any form of discipline?

18      A.      Perhaps attendance.

19      Q.      Okay.  I'm going to show you the next

20  exhibit, Mr. Michener.  It's going to be Miss

21  McGrory's written statement that we've talked

22  about.  I just want to present it to you.  We're

23  going to take a look, I have a few more

24  questions.  Okay, so bear with me.
```

KARL MICHENER

```
 1              MR. ELLIOTT:  While you get that
 2        up, can we take a short five or 10-minute
 3        break for a restroom break?
 4              MR. OLCESE:  Yeah, that's fine if
 5        it's okay with everyone else.
 6              (Discussion held off the Record.)
 7              (Brief recess.)
 8  BY MR. OLCESE:
 9     Q.     All right, Mr. Michener.  We just took
10  a quick five to 10-minute break.  During that
11  break did you have any substantive talks with
12  your counsel about your deposition?
13     A.     He just said I'm doing good and if I
14  need a break, to tell you.
15     Q.     Very good.  Not a problem.  All right.
16  So I want to show you Miss McGrory's statement
17  that we've talked about previously, so bear with
18  me while I pop that on the screen.
19     A.     Yes, sir.
20              (Document being shown.)
21  BY MR. OLCESE:
22     Q.     Okay.  Mr. Michener, I'm sharing my
23  screen with an exhibit marked D-5.  It is a
24  four-page exhibit Bates stamped KS317
```

KARL MICHENER

[Page 78]

1    consecutively until KS320.  Okay?  Let me know if

2    you want me to zoom in or scroll up or down.  I

3    understand you might have a physical copy with

4    you.

5        A.    Yes.

6        Q.    But take a look at the first page and

7    let me know if you recognize this document.

8        A.    Yes, I do.

9        Q.    All right.  Do you understand this to

10   be the statement Miss McGrory submitted after the

11   incident we described between her and Miss Onley?

12       A.    Yes.

13       Q.    Okay.  And on the top right it's dated

14   October 1, 2020.  Does that refresh your

15   recollection as to the date this incident

16   occurred?

17       A.    Yes.

18       Q.    And I'll represent to you October 1,

19   2020 is a Thursday.  Does that sound accurate to

20   you?

21       A.    Yes.

22       Q.    All right.  Very good.  And then on

23   the last page of D-5 there's a signature.  Do you

24   understand that signature to be Miss McGrory's?

KARL MICHENER

[Page 79]

```
 1      A.      Yes.

 2      Q.      Okay.  And this is the statement we

 3  talked about earlier that you read that was

 4  sitting on your desk; is that right?

 5      A.      Yes.

 6      Q.      Okay.  So I just want to go through it

 7  together.  And the first thing Miss McGrory

 8  writes about in the top paragraph was an issue

 9  approximately two to three months ago where her

10  name was brought up by Miss Onley about being

11  discriminated against based on her gender.  Do

12  you see that?

13      A.      Yes.

14      Q.      So she writes two to three months ago,

15  so that would be July, August of 2020.  And that

16  sounds accurate to you?

17      A.      Yes.

18      Q.      Do you remember having any more

19  conversations with Miss McGrory about her not

20  feeling discriminated against, or conversations

21  about Miss Onley feeling she was discriminated

22  against based on her gender, other than what she

23  references here?

24      A.      No.
```

KARL MICHENER

[Page 80]

1       Q.      Okay.  Do you have any understanding

2   why Miss McGrory is writing about not feeling she

3   is discriminated against based on her gender on

4   October 1, 2020 in her statement when it

5   happened, as she says, two to three months ago?

6       A.      I don't know why she would feel that

7   way.

8       Q.      Did you ever speak with Mr. Schlegel,

9   who provided any information, as to why Miss

10  McGrory provided this information in her

11  statement?

12      A.      No.

13      Q.      Okay.  She writes in the second

14  paragraph:  Things have not calmed down and I am

15  constantly on guard with Connie, as I have been.

16              And we talked about this prior.

17  Other than the complaint she made on October 1,

18  2020 with the statement we're reading right now,

19  you don't recall any other time that Miss McGrory

20  said she felt on guard around Connie, do you?

21      A.      I don't recall.

22      Q.      Okay.  And then on the second page,

23  KS318, it's the first time Miss McGrory brings up

24  sexual explicit toys and comments that happened

KARL MICHENER

[Page 81]

1    approximately on September 5th.

2                    Do you see that?

3    A.      Yes.

4    Q.      And did you ever come to learn or have

5    any understanding why Miss McGrory included this

6    commentary from September 5th in her October 1,

7    2020 statement?

8    A.      During the unemployment hearing, I

9    believe she mentioned that she felt uncomfortable

10   talking about that with management, if I remember

11   correctly.

12   Q.      Okay.  But in this statement it's

13   your -- so I guess at unemployment she said she

14   was uncomfortable.  Is that your understanding

15   why, I guess, Miss McGrory wrote about it almost

16   a month later?

17   A.      Yes.

18   Q.      Okay.  And like we talked about prior,

19   she never brought this to your attention before

20   this written statement that we're looking at

21   right now in D-5?

22   A.      Correct.

23   Q.      And then on the bottom of the third

24   page and continuing to the fourth page of D-5 is

KARL MICHENER

[Page 82]

1    where she first starts talking about what had

2    happened that day on October 1st, right?

3        A.      Looks like that, yes.

4        Q.      So, the date of the statement, she

5    only dedicates about one page of it to what

6    actually happened that day, that precipitated the

7    statement, right?

8        A.      Yes.

9        Q.      All right.  What I'd like you to do,

10   and let me know if you want me to scroll down if

11   you're looking at the digital copy versus on your

12   person, if you can read the statement from where

13   it states on the bottom of the third page with

14   October 1, 2020, to the end of the statement, and

15   let me know when you're finished, please.

16       A.      October 1, 2020.

17              MR. ELLIOTT:  Did you mean aloud?

18   BY MR. OLCESE:

19       Q.      No, no, just to yourself.

20       A.      I'm sorry.

21       Q.      Not a problem.  Just to yourself.  Let

22   me know when you're finished.

23       A.      (Reviewing document).  I'm finished.

24       Q.      Okay.  I asked you previously about

KARL MICHENER

```
 1   whether you were aware if Miss McGrory ever said

 2   she used an expletive against Miss Onley during

 3   this incident.  And in the middle of the last

 4   page you can see she writes:  I don't fucking

 5   care, stop it.

 6              Do you see that?

 7   A.     Yes, I do.

 8   Q.     Okay.  And do you see anywhere in the

 9   section I asked you to read, Miss McGrory admits

10   that she threw a pot during this incident?

11   A.     I didn't see anything about a pot.

12   Q.     Okay.  Did you ever come to learn any

13   reason why Miss McGrory did not include that she

14   threw a pot in her statement?

15   A.     No.

16   Q.     Okay.  Does Redner's have a policy

17   about making good-faith, truthful complaints?

18              MR. ELLIOTT:  Object to the form.

19        You can answer.

20              THE WITNESS:  Yes.

21   BY MR. OLCESE:

22   Q.     And do you believe that Miss McGrory

23   leaving out that she threw a pot was making a

24   good-faith, honest complaint here?
```

KARL MICHENER

[Page 84]

```
1      A.      I don't know if she threw a pot.  I

2   wasn't there.  I didn't see any incident.  I'm

3   not sure how I should judge on whether this

4   statement is accurate if I wasn't there to see

5   her throw a pot.

6      Q.      Okay.  So you were not present for the

7   incident on October 1st that Miss McGrory is

8   describing with Miss Onley, correct?

9      A.      Correct.

10     Q.      Okay.  And you did not see her throw a

11  pot.  Are you stating here today that you don't

12  know or never learned that Miss McGrory admitted

13  to throwing a pot?

14     A.      I can't say for sure.  I don't know.

15     Q.      Okay.  Let me pull up another exhibit.

16  Hold on one second.

17                   (Document being shown.)

18  BY MR. OLCESE:

19     Q.      All right, Mr. Michener.  I'm showing

20  you an exhibit marked D-4.  This is a transcript

21  of the unemployment hearing that you participated

22  in regarding Miss Onley.  Have you ever seen the

23  front page of this document?

24     A.      Yes.
```

KARL MICHENER

[Page 85]

```
 1      Q.      Okay.  And there's a transcript based

 2   on what was said during that hearing.  Have you

 3   ever seen this transcript that I'm scrolling

 4   through slowly?

 5      A.      Yes, sir.

 6      Q.      Okay.  This transcript is 36 pages.

 7   It's Bates stamped KS227 all the way to KS262.

 8   Okay?  And I want to just direct your attention

 9   to one specific spot during Miss McGrory's

10   testimony.  So bear with me, okay?

11      A.      Yes, sir.

12            MR. ELLIOTT:  He can read through

13         it in the meantime, though, all right?  Is

14         that all right, Andrew?  Or do you want to

15         just focus him on one line?

16            MR. OLCESE:  Just one line if I

17         can.

18   BY MR. OLCESE:

19      Q.      But certainly, Mr. Michener, after

20   seeing it, if you want to read more for context

21   and you think you need, be my guest.  Okay?  But

22   bear with me.  I don't want to go through the

23   whole thing if we don't need to.  All right?

24      A.      Yes, sir.
```

KARL MICHENER

[Page 86]

```
 1              (Document being shown.)
 2   BY MR. OLCESE:
 3      Q.     All right.  So I'm on Bates stamp
 4   KS237.  I will have it here and it's going to be
 5   in this section, but feel free to look at the
 6   hard copy if you have it in front of you as well.
 7   All right.  So I'll represent to you that EW2
 8   means Employer Witness 2 and that's Miss McGrory.
 9   Okay?  EL means the employer lawyer that's asking
10   Miss McGrory questions during this hearing.
11   Okay?
12              Do you remember the attorney asking
13   Miss McGrory questions during the hearing?
14      A.     Yes, sir.
15      Q.     All right.  So, on this section, the
16   employer lawyer asks:  All right.  Now, how did
17   you end up -- did you end up discussing with
18   store management Connie Onley's talking about
19   using sex toys at work?
20              Miss McGrory says:  There was an
21   event that took place in the meat department.
22              Okay?  And then after that, in the
23   big testimony block from Miss McGrory, okay, if
24   you go about midway down, and I'm just going to
```

KARL MICHENER

```
 1   read this:  And then, I think it was actually a
 2   few days later, after I talked to Dave, I was
 3   doing dishes -- I'm a huge Trump supporter -- and
 4   Connie had walked up and she was going on in
 5   regard to us Trump supporters are the ones that
 6   are causing the riots out west and down south.
 7   And I told her, I don't want to talk about this,
 8   and I asked her to be quiet.  I had asked her to
 9   shut up, and she wouldn't; and I ended up picking
10   up the pot and throwing it into the filthy water
11   and I told -- and told her, just shut up.
12                Did I read that section accurately?
13      A.     Yes.
14      Q.     Does that refresh your recollection
15   learning that Miss McGrory threw a pot during
16   this exchange with Miss Onley?
17                MR. ELLIOTT:  Object to the form.
18                THE WITNESS:  She said she threw a
19        pot.
20   BY MR. OLCESE:
21      Q.     Okay.  So let's go back now to the
22   previous exhibit, D-5.
23                (Document being shown.)
24   BY MR. OLCESE:
```

KARL MICHENER

[Page 88]

1      Q.      So, Mr. Michener I just put up D-5

2    again and I'm only on the last page, KS320.  And

3    I asked you before I showed you the unemployment

4    transcript about whether Miss McGrory, in your

5    opinion, was being truthful when she admitted

6    throwing the pot.  And you said you couldn't

7    remember because you weren't there, if she threw

8    a pot.  Well, we just saw that she testified that

9    she threw a pot.

10            So seeing that now, would you agree

11    with me that Miss McGrory was not honest

12    completely in her statement?

13            MR. ELLIOTT:  Object to the form.

14            THE WITNESS:  Because of omission,

15        you're saying that she's not honest?  Is

16        that your...

17    BY MR. OLCESE:

18      Q.      That's what I'm asking you.

19      A.      I don't -- I don't have an opinion on

20    whether that's honest or not.  She threw a pot in

21    the water.  Like I said, it's a three-bay sink.

22    Throwing a pot against a wall or at Miss Onley is

23    bad.  Throwing a pot into the water is put --

24    throwing the pot into the water at the sink.

KARL MICHENER

[Page 89]

```
 1      Q.      So am I correct, when Miss McGrory is
 2  writing down a statement of everything that
 3  happened to lead to her complaint, you find it
 4  acceptable that she admitted she threw a pot into
 5  the sink?
 6                  MR. ELLIOTT:  Object to the form.
 7                  THE WITNESS:  Could you repeat that
 8      one more time?  I'm sorry.
 9  BY MR. OLCESE:
10      Q.      I'm asking if in this statement, Miss
11  McGrory's writing everything to completely
12  describe what had happened on October 1, 2020,
13  that you find it acceptable that she admitted
14  throwing a pot in the sink?
15      A.      If she didn't put it in this
16  statement.
17      Q.      Are you asking me?
18      A.      I'm -- you're asking me if I think
19  it's okay that she admitted to throwing a pot in
20  the statement but it's not in this statement?
21      Q.      I'm asking you if you find it
22  acceptable that Miss Onley[sic] omitted and did
23  not fully write down that she threw a pot in this
24  statement?
```

KARL MICHENER

```
 1      A.      I don't know.  I don't know how to
 2   answer that.
 3      Q.      Okay.  Do you know if you had learned
 4   that Miss McGrory had threw a pot during this
 5   exchange with Miss Onley on October 1, 2020,
 6   whether that would have led you to issue her
 7   discipline or whether that would have affected
 8   the decision to terminate Miss Onley?
 9                MR. ELLIOTT:  Object to the form.
10                THE WITNESS:  If I learned that a
11          pot was thrown at Miss Onley, yes, there
12          would be disciplinary action because
13          that's not acceptable in the workplace.
14   BY MR. OLCESE:
15      Q.      And I am admitting, and we know, there
16   was not a pot thrown at Miss Onley, like to her
17   person, it was thrown by Miss McGrory, in her own
18   words, in anger in the sink.  And I'm asking, if
19   you knew that and it was part of this statement,
20   would that have changed your decision to not
21   issue Miss McGrory discipline?
22                MR. ELLIOTT:  Object to the form.
23                THE WITNESS:  Yes.
24   BY MR. OLCESE:
```

KARL MICHENER

1      Q.      Okay.  Would that have changed the

2   decision to terminate Miss Onley?

3      A.      I don't know.  I didn't choose to

4   terminate Miss Onley.

5      Q.      Okay.  Do you remember ever discussing

6   with Miss Foreman, before the decision was

7   reached to terminate Miss Onley, anything about

8   Miss McGrory throwing a pot?

9      A.      No.

10      Q.      So we established that October 1, 2020

11   was a Thursday.  What day, to the best of your

12   knowledge now knowing that, is when you spoke

13   personally with Miss Onley during your

14   investigation?

15      A.      I believe Miss Onley had left on

16   Thursday already, so I couldn't speak with her

17   that day.

18      Q.      Okay.

19      A.      I don't recall if it was Friday or

20   Saturday.

21      Q.      Okay.

22      A.      It was the next available time where I

23   was at work and she was at work at the same time.

24      Q.      And do you recall Miss Onley ever

KARL MICHENER

```
 1   returning to work after you sent her home that

 2   day?

 3       A.      She did not.

 4       Q.      Okay.  How did Miss Onley learn of her

 5   termination?

 6       A.      I called her.

 7       Q.      Okay.  Was anyone else on the call

 8   other than you?

 9       A.      No, sir.

10       Q.      All right.  So it was just between you

11   and Miss Onley, and what did you say to her?

12       A.      I told her that we wouldn't be

13   bringing her back.  She violated our harassment

14   policy, sexual harassment policy.

15       Q.      Do you remember if she said anything

16   in response?

17       A.      She said, well, that's the way the

18   world is.  And she thanked me.

19       Q.      Was it -- sounds like a fairly brief

20   conversation then?

21       A.      It was brief, yes.

22       Q.      Less than five minutes in your

23   estimation?

24       A.      I believe so.
```

KARL MICHENER

```
 1      Q.      Do you remember also during that call
 2  when you had to inform her that she was
 3  terminated that, you know, you apologized that
 4  she was being terminated?
 5      A.      I don't recall.  I may have.
 6      Q.      Why would you apologize to her about
 7  being -- notifying her of her termination?
 8      A.      If I did, giving somebody bad news.
 9      Q.      Did you agree that Miss Onley deserved
10  to be terminated?
11      A.      Yes.
12      Q.      Did you ever draft a termination
13  notice for Miss Onley?
14      A.      No.
15      Q.      Let me just take a look at that.
16              (Document being shown.)
17  BY MR. OLCESE:
18      Q.      All right, Mr. Michener.  I'm showing
19  you a document marked D-8.  It is a one-page
20  exhibit Bates stamped KS316.  Let me zoom in a
21  little bit.  Just at the top here, and I can
22  scroll down, do you recognize this document?
23      A.      I do.
24      Q.      Okay.  Is this the termination notice
```

KARL MICHENER

1    that you had drafted for Miss Onley?

2        A.    It's the termination notice for the

3    company records.  Miss Onley wasn't presented

4    this.

5        Q.    Was Miss Onley ever presented any

6    paperwork regarding her termination?

7        A.    Not that I'm aware of.

8        Q.    Okay.  And after you had called Miss

9    Onley and notified her over the phone that she

10   was terminated, have you ever had any subsequent

11   conversations with her?

12       A.    She called me maybe within a month

13   asking for employment information.

14       Q.    Asking for like a reference?

15       A.    No, asking for hire date, termination

16   date, that sort of thing.  We use employment --

17   an employment verification company.  I gave her

18   that information.

19       Q.    Understood.  Okay.

20       A.    She thanked me for it.

21       Q.    The date on this employee warning

22   record, D-8, is October 7, 2020.  Is that the day

23   you drafted this?

24       A.    Yes.

KARL MICHENER

1      Q.      Okay.  And I'll represent it's also --
2  it looks like there's an electronic signature
3  that same day.  That's from you, correct?
4      A.      Yes, sir.
5      Q.      Do you know if the date you drafted
6  this document was before, on the same day, or
7  after you called Miss Onley to inform her she was
8  terminated?
9      A.      I believe it was after.
10      Q.      Okay.  And in the section regarding
11  company remarks, again, you didn't reference
12  anything about a prior first warning, second
13  warning, third warning, right?
14      A.      Correct.
15      Q.      Okay.  This document was never
16  provided to Miss Onley?
17      A.      I don't know that for sure.
18      Q.      Okay.  All right.  Okay.  Let me show
19  you one last exhibit.
20              (Document being shown.)
21  BY MR. OLCESE:
22      Q.      All right, Mr. Michener.  I'm showing
23  you another exhibit marked D-7.  It's a one-page
24  exhibit Bates stamped KS315.  I'm going to zoom

KARL MICHENER

[Page 96]

```
 1  in a little bit.  Feel free to take your time if
 2  you'd like to read it, or if you want me to
 3  scroll up or down if you don't have a physical
 4  copy in front of you.  But do you recognize this
 5  document?
 6      A.     Yes.
 7      Q.     What is this document?
 8      A.     I was asked to --
 9             MR. ELLIOTT:  Hold on.  Can you
10         scroll all the way to the bottom of it?  I
11         haven't gotten a copy in front of him yet,
12         and I don't want him to identify the
13         document half paged as it appears on the
14         screen.
15  BY MR. OLCESE:
16      Q.    Mr. Michener, let me know when you
17  feel comfortable that you've seen the entire
18  document.
19      A.     (Reviewing document).
20             MR. ELLIOTT:  I got him a hard
21         copy.  Sorry for the delay, Andrew.
22             MR. OLCESE:  Not a problem at all.
23             THE WITNESS:  This is a statement I
24         was asked to provide for the unemployment
```

KARL MICHENER

```
 1          hearing.  Wait.  I'm not sure if it's for

 2          the unemployment or if it's for this

 3          hearing, but it's a statement that I was

 4          requested, that Miss Foreman asked me to

 5          write a statement concerning the

 6          termination of Miss Onley.

 7   BY MR. OLCESE:

 8      Q.    Okay.  And it's dated at the top

 9   January --

10               MR. ELLIOTT:  I'm sorry for the

11          interruption, but the record is not going

12          to be clear on that statement.  Let me

13          just -- let me just apologize first.

14               The client just said this hearing,

15          referring to either this litigation or

16          this deposition procedure.  It was

17          prepared for neither, so I don't want that

18          to be hanging out there.

19               MR. OLCESE:  Well, let me just ask

20          Mr. Michener his understanding.  Okay?

21   BY MR. OLCESE:

22      Q.    So, Mr. Michener, it's dated January

23   17, 2021.  Do you see that?

24      A.    Yes.
```

KARL MICHENER

[Page 98]

```
 1      Q.      And that was a few months after Miss
 2  Onley's termination, right?
 3      A.      Correct.
 4      Q.      Do you remember being made aware of
 5  Miss Onley's lawsuit or complaint as of January
 6  17, 2021?
 7      A.      I believe paperwork was sent to my
 8  store.
 9      Q.      Okay.  And Miss Foreman asked you to
10  write this, correct?
11      A.      Correct.
12      Q.      Did you type this document?
13      A.      Yes.
14      Q.      Okay.  You write in the statement that
15  Miss Onley's termination was twofold, one
16  being -- talking about pranking Mr. Rhoton which
17  we described earlier.  Do you see that?
18      A.      Yes.
19      Q.      Well, you know, you testified that Mr.
20  Rhoton was never actually pranked, Miss Onley
21  never did what she joked about with Miss McGrory,
22  so are you saying now that that was part of the
23  decision to terminate Miss Onley?
24      A.      Sorry, repeat that?
```

KARL MICHENER

```
 1      Q.      Was the discussion between Miss Onley
 2  and Miss McGrory where they talked about joking
 3  to Mr. Rhoton about putting a dildo in his work
 4  coat pocket, was that part of the reason Miss
 5  Onley was terminated?
 6      A.      I didn't make the decision to
 7  terminate.  You would have to ask Miss Foreman if
 8  that was part of her decision to terminate Miss
 9  Onley.
10      Q.      Well, you write here that her
11  termination was twofold.  And then you describe
12  that one of it was joking about putting a dildo
13  in Mr. Rhoton's coat pocket.
14      A.      That is the investigation that I made.
15  I wrote up what my investigation said.
16      Q.      So you're not saying that part of her
17  termination was because of that attempted or
18  joked-about prank?
19      A.      What I'm saying is in regards to her
20  termination, this is the issue that I discovered.
21      Q.      So what do you --
22      A.      As part of my investigation --
23      Q.      Go ahead.  I'm sorry.  Go ahead.
24      A.      As part of my investigation, this is
```

KARL MICHENER

[Page 100]

1  what I found.  That's what I wrote there.  I did

2  not make the decision to terminate Connie.

3      Q.      Well, you write, regarding Connie's

4  termination --

5      A.      Correct.

6      Q.      -- it was twofold, right?

7      A.      Yeah.

8      Q.      So what are the two aspects of

9  Connie's termination?

10      A.      The complaint about the use of a sex

11  toy while watching 50 Shades of Gray was one of

12  the issues that I discovered, while in the

13  presence of Shaun.  And also bringing the --

14  suggestion of bringing the sex toy to work and

15  placing it in Shaun's jacket as a practical joke.

16      Q.      So as of the time you wrote this

17  statement, I'm -- am I correct you believed that

18  was part of the reason that Miss Onley was

19  terminated?

20      A.      Yeah, for sexual harassment.

21      Q.      But the two issues you just described?

22      A.      Are considered sexual harassment.

23      Q.      Okay.  So Miss Onley -- okay.

24  Understood.  Okay, Mr. Michener.  I appreciate

KARL MICHENER

1    your time.  I don't have any further questions
2    unless your counsel has some.
3                    MR. ELLIOTT:  I have no questions.
4            Thanks, everybody.
5                    The processing of the transcript is
6            just fine as to Ms. McGrory's.  We'll just
7            do that the same way.
8                    COURT REPORTER:  In other words,
9            Counsel, you're ordering a copy of the
10           transcript, correct?
11                   MR. ELLIOTT:  Correct, in the same
12           way and the same format that I previously
13           did with Ms. McGrory.
14                        -   -   -
15                   (Witness excused.)
16                   (Deposition concluded at approximately
17   1:11 p.m.)
18
19
20
21
22
23
24

KARL MICHENER

```
 1              C E R T I F I C A T I O N

 2

 3          I hereby certify that the

 4   proceedings, evidence, and objections noted

 5   herein are contained fully and accurately in the

 6   stenographic notes taken by me upon the foregoing

 7   matter, and that this is a correct transcript of

 8   the same.

 9

10

11

12          _____

13          Robin A. Vance, CCR, RPR

14          CCR-NJ License No. XI 02131

15          RPR - NCRA No. 817327

16          Notary Public

17          City of Philadelphia, Philadelphia County

18          Commission Expires 8/25/22

19

20          (The foregoing certification of this

21   transcript does not apply to any reproduction of

22   the same by any means, unless under the direct

23   control and/or supervision of the certifying

24   reporter.)
```

KARL MICHENER

KARL MICHENER

104

**A**

abandonment ...
  35:12 36:11
ability (5) 8:20
  35:15 36:14
  37:23 38:22
able (9) 6:15,22
  7:19 8:24
  10:10 41:2,5
  70:23 71:13
acceptable (4)
  89:4,13,22
  90:13
access (1) 32:18
accurate (14)
  20:2,18 21:9
  21:20 23:2
  28:7 46:3
  48:22 49:2
  65:5 75:2
  78:19 79:16
  84:4
accurately (2)
  87:12 102:5
acknowledge (2)
  4:9,12
acknowledges ...
  4:20
act (1) 74:6
action (4) 1:5
  22:13 46:12
  90:12
actions (1) 68:7
add (1) 58:20
address (6) 9:9
  9:15 11:19
  30:23,23 69:14
administered (...
  4:13
admits (1) 83:9
admitted (7)
  43:5,7 84:12
  88:5 89:4,13
  89:19
admitting (1)

90:15
advance (1) 11:7
affirmative (1)
  6:20
africanameric...
  23:3 76:15
afternoon (1)
  44:17
aggression (1)
  52:7
ago (3) 79:9,14
  80:5
agree (4) 5:5,7
  88:10 93:9
agreed (1) 4:1
agreement (2)
  5:1,2
agrees (1) 4:21
ahead (2) 99:23
  99:23
alexis (3) 28:15
  30:4 43:23
allegations (1)
  69:13
alleged (1) 47:16
aloud (1) 82:17
analogous (1)
  12:18
andor (1) 102:23
andrew (6) 2:4
  5:4,20 18:14
  85:14 96:21
anger (1) 90:18
answer (11) 6:14
  7:20 8:1,3,24
  62:22 63:7
  69:22 72:11
  83:19 90:2
answered (1)
  6:13
answering (2)
  7:10 8:12
anticipating (1)
  18:12
antifa (6) 47:22

47:24 50:15
  51:16,18 68:9
anybody (3)
  53:14,16,20
anymore (3)
  22:1,9 52:15
aolcese (1) 2:6
apart (2) 53:22
  54:16
apologize (4)
  11:7 19:6 93:6
  97:13
apologized (1)
  93:3
appears (1)
  96:13
apply (1) 102:21
appreciate (3)
  14:1,5 100:24
approached (2)
  65:16,22
approaching (1)
  66:21
approval (1)
  35:14
approve (1) 40:9
approximate (1)
  14:4
approximately...
  1:13 13:3
  14:18 44:19
  56:18 79:9
  81:1 101:16
april (2) 11:23
  27:24
area (4) 18:9
  47:19 70:1,17
argument (6)
  50:3,6,14 56:9
  68:8 71:10
arrangement (1)
  4:18
arrive (1) 45:22
asked (18) 7:21
  48:10,11 51:14

51:21,23 52:1
  52:22 67:4
  82:24 83:9
  87:8,8 88:3
  96:8,24 97:4
  98:9
asking (15) 14:3
  36:12 37:12
  56:3 86:9,12
  88:18 89:10,17
  89:18,21 90:18
  94:13,14,15
asks (1) 86:16
aspects (1) 100:8
assessment (1)
  23:2
assistance (1)
  30:5
assistant (15)
  24:24 25:4,8
  25:13,17,19,24
  26:3,7,9,18,22
  27:6 45:16,24
assume (14) 7:19
  12:21 15:7
  17:9 27:5
  30:17 35:5
  36:23 38:21
  40:22 41:21
  42:4 58:22
  60:3
attempted (1)
  99:17
attendance (1)
  76:18
attention (3)
  71:11 81:19
  85:8
attorney (1)
  86:12
attorneys (2) 2:7
  2:12 4:7 19:3
audubon (50)
  12:5 13:2,4,8
  13:17,18 16:3

16:8,10,17,24
  17:10,15,20
  20:1,6 24:9,12
  24:16,23 25:7
  25:9,14,15,18
  27:1,13,20
  28:3,20 29:4
  29:13 32:23
  35:2 38:8,12
  38:18 39:12,19
  39:24 40:3,6
  40:15,18 41:3
  41:6,17 57:10
  67:13 69:16
august (2) 65:4
  79:15
available (1)
  91:22
aware (8) 33:7
  35:22 45:12
  63:10 66:17
  83:1 94:7 98:4
awkward (1)
  52:19

**B**

back (14) 13:16
  14:3 46:22
  48:6,8,10 51:1
  52:4 57:14
  59:8 60:19,22
  87:21 92:13
backwards (1)
  44:3
bad (2) 88:23
  93:8
ballpark (2)
  14:4 17:13
based (8) 24:3
  62:18 64:21
  68:15 79:11,22
  80:3 85:1
basic (1) 16:15
basis (2) 31:7
  32:1

KS - MSJ 000937

KARL MICHENER

105

**bates (7)** 19:4,5
77:24 85:7
86:3 93:20
95:24
**bear (4)** 76:24
77:17 85:10,22
**beginning (2)**
1:12 5:2
**behalf (2)** 6:5
73:16
**belief (3)** 21:2
66:14 70:20
**believe (36)**
15:16,23 19:14
20:2 21:19
22:16 27:24
30:24 33:5
34:16 38:20
41:19 42:6
49:17 50:18
51:14 54:14
56:21 57:2
58:8,12 61:2,7
64:18 66:4
69:15 72:21
75:4,10 76:12
81:9 83:22
91:15 92:24
95:9 98:7
**believed (2)**
62:16 100:17
**belive (1)** 20:19
**benefit (1)** 7:5
**bensalem (1)** 2:5
**best (5)** 7:12
14:4 20:3
60:23 91:11
**big (2)** 55:2
86:23
**birth (1)** 9:11
**bit (7)** 6:2 16:21
44:3 52:19
54:17 93:21
96:1
**bite (1)** 8:11

**bits (1)** 55:6
**black (1)** 23:3
**block (1)** 86:23
**blood (1)** 55:5
**bob (2)** 6:14
38:16
**boss (1)** 38:15
**bottom (5)** 19:2
20:13 81:23
82:13 96:10
**boyertown (4)**
14:16,17,21
15:17
**boys (5)** 47:23
48:2 50:15
51:17,19
**break (12)** 8:7
8:13 33:20
34:17 37:6
53:12 54:16
77:3,3,10,11
77:14
**brian (2)** 27:22
29:8
**brief (3)** 77:7
92:19,21
**bring (2)** 61:24
62:6
**bringing (3)**
92:13 100:13
100:14
**brings (1)** 80:23
**broke (2)** 43:15
43:21
**brought (4)**
51:11 69:8
79:10 81:19
**budgeting (1)**
16:15
**business (2)** 24:4
24:7

─────
**C**
**c (4)** 2:1,4 102:1
102:1

**call (6)** 19:3 61:8
61:10 68:13
92:7 93:1
**called (8)** 28:6
43:9 47:2
61:16 92:6
94:8,12 95:7
**calmed (1)** 80:14
**cant (6)** 20:23
36:22 62:14
70:18 74:24
84:14
**card (1)** 34:18
**care (1)** 83:5
**case (2)** 19:15
41:11
**cashier (1)** 74:20
**cashiers (1)**
74:22
**catalyst (2)** 45:7
45:13
**causing (2)**
51:19 87:6
**ccr (2)** 1:14
102:13
**ccrnj (1)** 102:14
**certain (2)** 18:9
65:18
**certainly (2)** 8:9
85:19
**certification (2)**
4:3 102:20
**certify (1)** 102:3
**certifying (1)**
102:23
**cerutti (1)** 2:4
**chance (1)** 55:10
**change (1)** 76:2
**changed (3)** 16:2
90:20 91:1
**charge (2)** 16:11
17:10
**chart (2)** 19:19
22:23
**choice (1)** 12:7

**choose (1)** 91:3
**chose (1)** 12:13
**chronological ...**
59:17
**circling (1)**
19:19
**city (1)** 102:17
**civil (1)** 1:5
**clarify (6)** 7:18
22:15,20 25:16
43:2 68:20
**cleaning (3)** 22:8
73:4,6
**cleanup (2)**
21:24 22:4
**clear (3)** 6:23
67:22 97:12
**clerk (2)** 15:6,8
**client (1)** 97:14
**cnn (1)** 51:17
**coat (6)** 43:7
54:23,24 55:1
99:4,13
**code (2)** 75:9,24
**cold (2)** 22:1,1
**college (2)** 15:2
15:3
**color (4)** 75:11
75:13,14 76:3
**colorblind (1)**
75:12
**colors (1)** 75:10
**com (3)** 1:23 2:6
2:11
**come (8)** 31:15
45:4 50:10
56:5 71:15
72:19 81:4
83:12
**comes (1)** 45:24
**comfortable (1)**
96:17
**coming (2)** 21:5
66:2
**comment (1)**

50:9
**commentary (1)**
81:6
**comments (1)**
80:24
**commission (1)**
102:18
**common (1)**
51:21
**communicatio...**
69:5
**company (3)**
94:3,17 95:11
**complained (10)**
63:11,17 66:10
67:7,12,17,24
74:16,19 76:10
**complaining (7)**
63:19 64:9,14
65:20 66:2
67:3,5
**complains (1)**
74:20
**complaint (23)**
10:2 51:12
52:10 59:9,11
60:1,2 63:18
63:22 64:1,3,4
64:8 65:8,13
67:2 68:5 75:7
80:17 83:24
89:3 98:5
100:10
**complaints (2)**
66:14 83:17
**completely (2)**
88:12 89:11
**concern (1)** 76:7
**concerned (1)**
48:14
**concerning (2)**
54:13 97:5
**concerns (1)**
30:5
**concluded (1)**

KARL MICHENER

106

101:16
**conduct (1)**
41:14
**confirmed (1)**
55:11
**confuse (1)** 7:17
**congruent (1)**
56:12
**connie (11)** 1:3
5:21 20:14
39:9 40:14
41:10 80:15,20
86:18 87:4
100:2
**connies (2)**
100:3,9
**consecutively ...**
78:1
**consent (4)** 4:18
5:5,7 38:23
**consider (3)**
28:23 68:15
74:5
**consideration ...**
37:2
**considered (1)**
100:22
**considering (1)**
61:21
**constantly (1)**
80:15
**consult (6)** 35:6
35:23 37:2,8
38:7,13
**consultation (3)**
36:9,15 39:6
**consulting (1)**
38:4
**contact (3)**
46:16 59:5
61:5
**contacted (1)**
46:13
**contained (1)**
102:5

**content (1)** 52:6
**context (1)**
85:20
**continued (1)**
15:8
**continuing (2)**
33:20 81:24
**control (1)**
102:23
**conversation (...**
33:16 46:19
47:6 49:19
52:16 53:22
55:15,18,21,24
56:6 59:4
60:12,16,22
62:14 64:24
68:21 71:6
75:19 76:5
92:20
**conversations ...**
10:20 52:8
56:14,17 73:1
74:12 79:19,20
94:11
**convicted (1)**
11:9
**cool (1)** 48:9
**copy (8)** 18:14
78:3 82:11
86:6 96:4,11
96:21 101:9
**corporate (4)**
17:5,6 29:16
30:22
**correct (62)** 12:1
13:9 14:12
15:10,14,22
17:2,18,19,24
18:1 21:12,14
21:16,17 23:7
25:6 26:24
27:3,10,11
30:17 34:7
35:18 37:14

38:7,21 39:1
39:20,21 42:2
44:12,13,24
54:21,24 55:8
55:9 57:17,18
64:17,19,22
65:9 69:20
70:6 73:17
76:7 81:22
84:8,9 89:1
95:3,14 98:3
98:10,11 100:5
100:17 101:10
101:11 102:7
**correctly (1)**
81:11
**couldnt (4)** 52:5
54:5 88:6
91:16
**counsel (10)** 4:2
4:17,20,24 5:3
7:24 10:21
77:12 101:2,9
**counseling (4)**
33:17 34:4,14
62:9
**counsels (1)** 9:17
**county (1)**
102:17
**couple (1)** 14:3
**course (6)** 18:3
30:8 33:22
46:8,12 59:2
**court (6)** 1:1,22
4:7,22 6:15
101:8
**cover (1)** 23:22
**coworker (1)**
74:16
**coworkers (1)**
66:23
**crime (1)** 11:9
**criminally (1)**
11:9
**current (3)** 9:9

15:24 26:16
**currently (11)**
9:13 11:11,13
12:16 20:8,17
21:13 23:19
26:14,21 28:18
**cursed (1)** 71:17
**cursor (1)** 19:20
**cursory (1)** 52:5
**customer (2)**
16:14 72:6
**cut (1)** 22:4

**D**

**d (1)** 3:1
**d2 (4)** 3:12 19:2
19:12 22:24
**d4 (2)** 3:13
84:20
**d5 (7)** 3:15
77:23 78:23
81:21,24 87:22
88:1
**d7 (2)** 3:16
95:23
**d8 (3)** 3:18
93:19 94:22
**dakota (1)** 25:20
**dakotas (1)**
25:21
**date (15)** 9:11
10:15 21:8,18
21:19 26:4,10
48:20 56:22
78:15 82:4
94:15,16,21
95:5
**dated (3)** 78:13
97:8,22
**dates (1)** 56:21
**dave (2)** 21:24
87:2
**david (2)** 20:12
21:15
**day (27)** 38:1

45:1 46:19
47:3,17 48:13
49:5,6,9,10,11
49:11,12,15
51:13 55:21
57:4 60:6,23
82:2,6 91:11
91:17 92:2
94:22 95:3,6
**days (7)** 23:18
24:1 35:11,20
36:10 60:23
87:2
**daytoday (2)**
16:6,11
**deal (2)** 75:17
76:1
**decide (2)** 36:8
36:14
**decision (17)**
34:13 35:7,21
35:24 37:3
40:11 42:11,14
44:1 90:8,20
91:2,6 98:23
99:6,8 100:2
**declare (1)** 4:14
**dedicates (1)**
82:5
**defend (2)** 35:9
59:23
**defendant (3)**
1:8 2:12 5:7
**defended (1)**
69:12
**define (1)** 31:9
**delaware (2)**
1:15,23
**delay (1)** 96:21
**denied (1)** 57:23
**department (29)**
3:12 16:19
17:4,7,11,18
17:22 19:24
22:7 23:4 25:1

KARL MICHENER

107

37:17 38:14,22
39:4 40:20
47:18 48:6
55:4 57:9 64:5
64:11 69:16,17
70:13,16 86:21
**departments (2)**
17:14,17
**depend (2)**
34:16 35:9
**depending (10)**
6:24 30:6
33:15,24 34:1
34:2,9,12 69:2
69:12
**depends (1)**
34:23
**depose (1)** 11:8
**deposed (1)** 5:24
**deposition (14)**
5:22 9:14,24
10:4,9,11,22
10:23 11:2,5
18:4 77:12
97:16 101:16
**describe (7)** 16:9
23:18 33:13
41:8 44:6
89:12 99:11
**described (16)**
32:2 34:4 44:9
48:21 50:1
51:15 56:16
66:1 68:8,16
70:22 72:21
73:3 78:11
98:17 100:21
**describes (1)**
55:16
**describing (1)**
84:8
**description (1)**
3:11
**deserved (1)**
93:9

**designate (1)**
56:1
**designated (2)**
30:9 31:14
**designation (1)**
19:3
**desk (2)** 45:2
79:4
**determination...**
60:20 61:13
**determine (6)**
29:24 30:7
43:18 53:19
58:13,15
**determined (1)**
43:14
**dictates (1)** 24:7
**didnt (14)** 21:24
22:1 35:11
45:9 56:1,10
64:3 68:13
83:11 84:2
89:15 91:3
95:11 99:6
**different (5)**
16:5 17:11,14
24:19 75:10
**digital (1)** 82:11
**dildo (15)** 43:7,8
49:21 50:10
52:23 53:7
54:21,22 56:3
56:7,19 57:8
58:7 99:3,12
**direct (14)** 18:8
24:17 25:2
27:7 28:24
29:8 30:11
38:16 40:23
43:23 47:11
59:18 85:8
102:22
**directed (1)** 47:8
**direction (8)**
37:16 46:15

47:4 53:24
54:7 59:8,10
60:5
**directions (1)**
59:6
**directly (5)**
24:22 27:8,13
28:2 29:1
**director (29)**
12:12,17,18
13:6,8 14:9,22
15:13,15,21
16:1,3,10,24
17:9 24:15,23
25:5 27:5,13
28:19 29:21
32:24 35:1
36:20 39:2
43:24 44:1
66:17
**directors (1)**
23:21
**disciplinary (4)**
22:12 33:24
37:22 90:12
**discipline (23)**
30:16 33:8,11
33:14 34:3
36:24 37:10,13
38:6 39:5
61:18,21 62:4
68:7,14,16,23
69:10,11 72:7
76:17 90:7,21
**disciplined (3)**
41:17 72:8,15
**discovered (2)**
99:20 100:12
**discretion (3)**
35:3,16 36:15
**discriminated ...**
64:21 65:1
79:11,20,21
80:3
**discrimination...**

64:14,16 67:4
67:5,7,13,17
68:1
**discuss (8)** 32:6
51:22 56:10
58:19 61:20
62:7 65:17
74:11
**discussed (6)**
46:21 50:5
59:2 63:13
69:11 74:9
**discussing (3)**
44:8 86:17
91:5
**discussion (9)**
21:4 57:1,2,3
57:20,22 58:11
77:6 99:1
**discussions (1)**
56:18
**dishes (3)** 47:19
70:5 87:3
**district (8)** 1:1,2
27:15,19 28:11
37:4,9,18
**document (27)**
18:6,22 19:1,6
19:12,13 20:3
46:23 77:20
78:7 82:23
84:17,23 86:1
87:23 93:16,19
93:22 95:6,15
95:20 96:5,7
96:13,18,19
98:12
**documents (3)**
10:6,14 18:5
**doesnt (2)** 16:4
72:16
**doing (11)** 6:9
14:2 18:13
47:19 54:5
55:17 60:7

61:14 70:5
77:13 87:3
**dont (68)** 7:15
8:4,9 9:15
10:15 11:20
20:6,17 21:10
21:12 22:8
23:12,13 24:1
26:10 29:6
33:5 35:13
36:17 41:19
47:1 52:15
53:16,20 56:1
56:11,13 57:1
57:2,4 58:4,12
60:3 61:1 62:3
62:4 65:20
66:4,5 71:4,10
71:22 72:2
73:24 75:23
76:12 80:6,19
80:21 83:4
84:1,11,14
85:22,23 87:7
88:19,19 90:1
90:1 91:3,19
93:5 95:17
96:3,12 97:17
101:1
**douglassville (6)**
13:19,21 14:7
14:11,13,19
**draft (1)** 93:12
**drafted (3)** 94:1
94:23 95:5
**dress (2)** 75:9,24
**drinking (1)**
21:5
**drive (2)** 1:22
2:10
**duly (1)** 5:9
**duties (6)** 16:1,2
16:7,9 17:1
35:2
**dyed (2)** 74:21

KARL MICHENER

75:12

**E**

**e (4)** 2:1,1 3:1
102:1
**earlier (3)** 19:7
79:3 98:17
**early (2)** 49:1
57:11
**earshot (2)**
69:19,24
**easier (1)** 18:19
**easily (2)** 32:19
52:20
**eastern (1)** 1:2
**easy (1)** 52:16
**eat (1)** 8:11
**edited (1)** 33:3
**eight (1)** 17:16
**either (4)** 26:8
38:6 49:9
97:15
**el (1)** 86:9
**electronic (1)**
95:2
**elliott (29)** 2:9
5:6,6,17 9:19
9:21 10:7
18:11 62:21
63:6 67:9
69:21 71:1,18
72:10 77:1
82:17 83:18
85:12 87:17
88:13 89:6
90:9,22 96:9
96:20 97:10
101:3,11
**emailed (1)**
46:23
**employed (2)**
11:11,13
**employee (23)**
3:18 23:4 32:6
32:10,15 33:3

34:17,21,21
35:21 36:8,10
36:16 37:1,10
38:5,23 39:5
63:20 65:19
72:4,8 94:21
**employees (13)**
30:4,16,17
31:16 32:16,20
35:3,16 45:5
53:13 62:3,14
62:15
**employer (4)**
10:2 86:8,9,16
**employment (6)**
6:7 39:9 42:1
94:13,16,17
**ended (1)** 87:9
**ends (1)** 75:3
**endurance (1)**
8:9
**engaged (1)** 17:4
**entails (1)** 40:19
**entered (1)**
45:20
**entire (5)** 13:7
14:10 25:13
27:20 96:17
**entirety (1)** 45:9
**esquire (2)** 2:4,9
**essentially (2)**
22:7,14
**established (1)**
91:10
**estimating (1)**
17:13
**estimation (3)**
43:3,11 92:23
**ethnicity (2)**
22:24 76:14
**evaluations (1)**
41:14
**evaporators (1)**
71:8
**evening (1)**

23:22
**event (1)** 86:21
**events (1)** 8:21
**eventually (1)**
15:13
**everybody (1)**
101:4
**evidence (1)**
102:4
**ew2 (1)** 86:7
**exactly (2)** 9:16
75:13
**examination (1)**
5:13
**examined (1)**
5:10
**example (3)**
35:19 36:7,13
**exchange (7)**
70:4,16,21
71:16 72:20
87:16 90:5
**excluding (1)**
16:7
**excuse (2)** 28:24
41:1
**excused (1)**
101:15
**exhibit (11)** 18:3
76:20 77:23,24
84:15,20 87:22
93:20 95:19,23
95:24
**exhibits (1)** 3:10
**exit (1)** 73:14
**expect (2)** 6:3
8:4
**expires (1)**
102:18
**explain (2)** 6:2
24:19
**expletive (1)**
83:2
**expletives (1)**
71:16

**explicit (1)** 80:24
**explicitly (1)** 8:3

**F**

**f (1)** 102:1
**fair (13)** 12:21
13:7 15:7 17:8
24:3 27:4
33:10 35:5
36:23 40:22
41:21 42:4
58:22
**fairly (2)** 32:14
92:19
**fake (1)** 51:18
**familiar (3)** 20:9
20:11 32:12
**far (7)** 16:5
20:13 22:11
30:9 31:18
48:13 52:8
**fashion (3)** 66:3
66:11 72:5
**favorite (1)**
52:13
**fed (1)** 73:12
**feel (9)** 64:3,20
64:24 65:18,21
80:6 86:5 96:1
96:17
**feeling (3)** 79:20
79:21 80:2
**fellow (1)** 63:19
**felt (7)** 51:23
52:18 62:20
63:5 75:14
80:20 81:9
**file (1)** 10:4
**filed (1)** 68:5
**fill (1)** 45:17
**filthy (1)** 87:10
**find (7)** 6:6 44:6
45:14 58:24
89:3,13,21
**fine (5)** 14:4

18:17 75:18
77:4 101:6
**finished (3)**
82:15,22,23
**fire (1)** 38:1
**first (17)** 5:23
15:21 18:3
37:22 44:6
45:11,14 46:12
51:6,14 56:16
78:6 79:7
80:23 82:1
95:12 97:13
**five (3)** 77:2,10
92:22
**focus (3)** 19:11
24:15 85:15
**follow (3)** 23:21
34:19 59:12
**followed (3)** 34:5
48:7,8
**following (3)**
60:5 61:4,6
**follows (1)** 5:11
**foregoing (2)**
102:6,20
**foreman (32)**
11:1 28:15
29:3,12 30:2
30:18 31:20,20
32:5 38:9
42:13,16 43:14
46:13,20 47:10
54:7 59:5,13
59:17 60:9,13
61:20 62:7
68:21 69:5,6
74:13 91:6
97:4 98:9 99:7
**foremans (1)**
60:4
**form (23)** 4:5
33:17,19 61:18
61:21 62:21
66:3,11 67:9

KARL MICHENER

68:7,22 69:9
69:21 71:1,18
72:10 76:17
83:18 87:17
88:13 89:6
90:9,22
**format (1)**
101:12
**forth (1)** 52:4
**forward (2)**
30:10 35:14
**found (2)** 59:14
100:1
**four (1)** 20:13
**fourpage (1)**
77:24
**fourth (1)** 81:24
**framed (1)** 32:21
**free (2)** 86:5
96:1
**frequency (2)**
31:17 56:1
**friday (4)** 23:14
23:24 54:14
91:19
**fridays (1)** 23:23
**friendly (1)**
51:23
**friends (1)** 52:2
**front (9)** 18:15
53:12 70:4
71:7 74:21
84:23 86:6
96:4,11
**frozen (2)** 15:6,8
**fuck (2)** 72:1,7
**fucking (1)** 83:4
**full (6)** 9:4 15:3
15:4,9 23:7
75:5
**fully (5)** 7:10,12
9:1 89:23
102:5
**further (2)** 4:12
101:1

| **G** |
| --- |

**game (1)** 24:3
**gas (2)** 16:4,8
**gender (6)** 64:16
64:21 67:3
79:11,22 80:3
**general (4)**
23:20 33:19
37:21 48:12
**generally (4)**
16:9 18:7
24:11 30:18
**gentleman (1)**
22:5
**getting (3)** 38:23
46:5 55:15
**gig (1)** 40:21
**give (2)** 54:10
74:23
**given (3)** 47:4
67:20 71:14
**gives (1)** 59:5
**giving (1)** 93:8
**glances (1)** 52:5
**gmail (1)** 1:23
**go (24)** 13:16
29:9,11,12
30:18 33:19,21
33:23 34:9,11
46:2 51:1,9,9
53:2 54:11
58:5 71:12
79:6 85:22
86:24 87:21
99:23,23
**goes (1)** 52:8
**going (38)** 6:12
6:15,22,24 7:7
7:11,19 8:10
14:2 18:2,4,8
18:12,13,14
31:17 34:22
44:2 45:8 46:8
48:11 53:3,20
54:11 57:14

59:23,24 65:18
70:16 73:13
76:19,20,23
86:4,24 87:4
95:24 97:11
**golden (4)** 27:22
27:22 28:2
29:8
**good (10)** 5:19
9:3 15:24
41:10 52:18
53:2,3 77:13
77:15 78:22
**goodfaith (2)**
83:17,24
**gotten (1)** 96:11
**graduated (1)**
15:3
**gray (9)** 43:9
49:20 50:9
52:11 56:7
57:4,7 58:7
100:11
**greet (1)** 45:5
**greeting (1)**
45:23
**grocery (4)** 25:1
27:6 28:13
46:7
**groundwork (1)**
6:3
**group (2)** 63:24
64:8
**grove (15)** 11:17
12:3,6,11,16
12:22 16:1
20:6 23:11
24:8 26:20,22
27:2 32:16,22
**guard (2)** 80:15
80:20
**guess (2)** 81:13
81:15
**guest (1)** 85:21
**guests (2)** 41:10

45:6
**guy (1)** 22:4

| **H** |
| --- |

**hadnt (2)** 58:1,2
**hair (8)** 74:21
75:8,10,11,12
75:18,24 76:2
**haley (2)** 20:9,17
**half (2)** 14:18
96:13
**handbook (7)**
32:10,13,15
33:3,23 35:12
36:12
**handle (3)** 30:8
30:13 33:18
**handles (2)** 30:4
30:6
**hanging (1)**
97:18
**happen (3)** 8:4
31:17 53:11
**happened (21)**
36:19 45:3
46:4 47:1,17
48:13 49:15
50:1 51:15
53:18 56:8,12
56:20 57:4
68:16 80:5,24
82:2,6 89:3,12
**happening (2)**
35:10 56:11
**happens (1)** 34:1
**happy (1)** 7:18
**harassed (2)**
62:20 63:5
**harassing (2)**
66:10,23
**harassment (8)**
42:24 43:4,12
62:12 92:13,14
100:20,22
**hard (5)** 18:14

71:6,8 86:6
96:20
**harmony (1)**
1:22
**havent (1)** 96:11
**head (2)** 6:14,14
**hear (10)** 6:11
70:16,19,24
71:6,8,14 72:6
72:6 75:20
**heard (5)** 45:6
49:7,9 61:2
68:24
**hearing (11)**
57:7 73:16,19
81:8 84:21
85:2 86:10,13
97:1,3,14
**heated (2)** 70:4
70:21
**held (2)** 1:12
77:6
**helpful (1)** 36:18
**herman (2)**
20:11 21:11
**hes (1)** 22:5
**hey (3)** 33:16
46:1 66:22
**hierarchy (1)**
25:3
**highest (1)** 12:22
**hill (2)** 15:18,22
**hire (2)** 15:1
94:15
**hired (4)** 15:2,4
15:5,7
**hiring (1)** 16:12
**history (1)** 10:3
**hold (6)** 13:5
14:8,21 40:17
84:16 96:9
**home (9)** 9:9
54:8,9 59:6,7
59:10,18,24
92:1

KARL MICHENER

110

**honest (5)** 52:17
83:24 88:11,15
88:20
**hope (1)** 66:19
**hour (2)** 54:2
59:20
**hours (1)** 23:18
**hr (1)** 30:2
**huge (1)** 87:3
**human (25)**
16:12,18,22,22
17:2,3,6 28:19
29:9,9,11,15
29:21 33:22
34:20,22 37:5
37:9,19 38:4
38:11,13,19
43:24 54:10
**hurling (1)** 73:8
**husband (1)**
52:15

**I**

**id (4)** 29:9 53:24
54:3 82:9
**idea (2)** 53:2,3
**identification ...**
19:5
**identify (1)**
96:12
**ill (6)** 44:6 48:19
54:14 78:18
86:7 95:1
**im (72)** 6:23 7:7
7:8,11,19 9:15
11:17 14:2
18:2,4,8,12,14
19:19 20:9,11
20:13 24:1
34:22 35:8
36:2,12 37:15
43:24 44:2,24
46:4,6,16
48:24,24 49:10
49:24 52:14,15

53:9 54:5,11
65:21 69:1
71:7,13 73:13
75:12,12 76:19
77:13,22 82:20
82:23 84:2,19
85:3 86:3,24
87:3 88:2,18
89:8,10,18,21
90:18 93:18
94:7 95:22,24
97:1,10 99:19
99:23 100:17
**immediate (3)**
34:15 61:22
62:9
**immediately (1)**
47:3
**important (1)**
7:3
**incident (20)**
44:6 45:6,12
45:14,15 46:1
46:11 47:16,17
48:14 49:10
52:22 57:11
62:6 78:11,15
83:3,10 84:2,7
**include (2)**
75:10 83:13
**included (1)**
81:5
**indicate (1)** 4:24
**indicated (1)**
57:21
**indicating (2)**
58:14 73:5
**individual (2)**
21:12 29:12
**individuals (4)**
19:23 23:1
24:22 70:21
**inform (3)** 55:20
93:2 95:7
**information (1...**

43:14,23 53:6
54:10 55:15
59:1 60:9
67:19 80:9,10
94:13,18
**informed (3)**
43:10 44:20
60:13
**informing (1)**
64:20
**infraction (11)**
33:15 34:1,2
34:10,12,14,17
34:19,24 36:13
36:14
**infractions (2)**
35:17,22
**inhibit (1)** 8:20
**initial (1)** 15:1
**initially (1)**
30:11
**inside (1)** 48:10
**instance (4)** 17:3
23:14 30:16
37:7
**instructed (1)**
43:22
**instructions (1)**
8:17
**interaction (1)**
54:12
**intercoms (1)**
71:12
**interruption (1)**
97:11
**intimidation (2)**
74:3,7
**intoxicated (1)**
21:6
**investigate (2)**
43:22 51:3
**investigated (1)**
43:13
**investigation (...**
46:11 53:19

57:17 58:23
60:7,18 63:4
68:24 69:3,7
73:2 74:13
91:14 99:14,15
99:22,24
**involuntary (2)**
22:17 42:4
**involved (5)**
20:20 22:10
34:23 47:6
53:22
**involves (1)**
37:10
**isnt (1)** 75:22
**issue (16)** 29:9
30:7,8 32:6
33:18 34:18
36:24 37:1,11
39:4 62:4,8
79:8 90:6,21
99:20
**issued (2)** 68:22
76:17
**issues (6)** 30:5
30:10,15 38:6
100:12,21
**issuing (3)** 30:16
61:17 68:16
**itll (1)** 67:22
**ive (2)** 32:19
67:19

**J**

**jacket (2)** 55:2
100:15
**james (4)** 25:10
26:1 27:15
45:16
**january (3)** 97:9
97:22 98:5
**jeff (2)** 5:16 8:2
**jeffrey (2)** 2:9
5:6
**jelliott (1)** 2:11

**jersey (1)** 1:15
**job (8)** 15:24
16:2,7,9 35:2
35:12 36:11
75:16
**joke (2)** 54:22
100:15
**joked (1)** 98:21
**jokedabout (1)**
99:18
**joking (2)** 99:2
99:12
**judge (1)** 84:3
**july (1)** 79:15
**june (5)** 1:12
10:16 13:24,24
15:1

**K**

**karl (5)** 1:11 3:3
3:16 5:9 9:5
**karpf (2)** 2:4,4
**karpflaw (1)** 2:6
**kept (1)** 32:15
**kind (5)** 22:15
24:5 30:10
37:23 53:4
**knew (1)** 90:19
**know (80)** 6:7
7:8,17 8:9 9:15
12:10 14:2,3
19:7 20:2,5,8
20:17,21 21:10
21:12,22 26:13
26:17 28:11,15
29:17 30:1,23
31:17 33:21
34:20 37:23
38:17 39:11
40:14 41:6,16
42:8 44:14
45:9 46:6 47:1
48:16,16 49:4
52:11,14,24
53:4,4,17,18

54:12 56:11,13
56:17 57:1,5
60:3 62:4,7
64:5 71:4,9
74:22 78:1,7
80:6 82:10,15
82:22 84:1,12
84:14 90:1,1,3
90:15 91:3
93:3 95:5,17
96:16 98:19
**knowing (2)**
31:16 91:12
**knowledge (16)**
20:4 28:17
31:5 33:2 39:5
44:5 45:8 49:5
55:7 60:24
63:16 70:24
72:24 74:15
76:16 91:12
**known (1)** 9:6
**kostelac (10)**
29:15,19,21
30:2,6,19 31:2
31:6 32:3
38:15
**kozloffstoudt (1)**
2:11
**kozzloff (1)** 2:9
**ks000227 (1)**
3:14
**ks000315 (1)**
3:17
**ks000316 (1)**
3:18
**ks000317320 (1)**
3:15
**ks000696 (1)**
3:12
**ks227 (1)** 85:7
**ks237 (1)** 86:4
**ks262 (1)** 85:7
**ks315 (1)** 95:24
**ks316 (1)** 93:20

**ks317 (1)** 77:24
**ks318 (1)** 80:23
**ks320 (2)** 78:1
88:2
**ks696 (1)** 19:5

**L**

**lack (2)** 37:23
66:6
**lansdale (4)** 40:4
40:6 67:18
68:4
**late (2)** 49:1
57:10
**lawsuit (2)** 5:21
98:5
**lawyer (2)** 86:9
86:16
**layout (1)** 69:18
**lead (1)** 89:3
**leading (1)**
39:15
**learn (9)** 56:5
67:12,16,24
71:15 72:19
81:4 83:12
92:4
**learned (7)**
44:15,16 60:17
68:4 84:12
90:3,10
**learning (4)** 46:5
48:14 71:23
87:15
**leave (3)** 26:8,8
50:3
**leaving (1)** 83:23
**led (1)** 90:6
**left (3)** 19:19
48:5 91:15
**legal (1)** 19:4
**level (2)** 17:5,6
**license (1)**
102:14
**lieu (1)** 4:13

**life (1)** 58:9
**lighter (1)** 75:14
**line (2)** 85:15,16
**lines (1)** 58:3
**listed (2)** 20:7
21:18
**listen (2)** 53:17
75:16
**listing (2)** 3:12
21:8
**litigation (4)**
67:23 71:23
72:19 97:15
**little (7)** 6:2
16:21 44:3
52:19 54:17
93:21 96:1
**located (1)** 30:22
**location (26)**
11:17 12:3,5
12:22 13:2,17
13:19 14:14,14
14:16,24 15:17
15:19,22 16:18
17:21 23:11
25:5 32:16
36:20 39:12,24
41:3 62:5
67:14,18
**locations (1)**
13:15
**long (1)** 60:21
**longer (1)** 20:12
**look (1)** 18:7
20:1 46:19
76:23 78:6
86:5 93:15
**looking (4)**
18:16 22:24
81:20 82:11
**looks (2)** 82:3
95:2
**loose (3)** 25:20
25:22 26:9
**loss (1)** 34:22

**lot (5)** 36:3
40:20 54:18
62:5 71:9
**lots (1)** 46:7
**loud (3)** 69:24
71:5,10

**M**

**m (5)** 1:13 23:14
23:15,20
101:17
**macrone (1)**
40:23
**main (1)** 40:21
**making (3)**
63:12 83:17,23
**management (6)**
12:8,9 31:15
76:1 81:10
86:18
**manager (25)**
12:19 17:21
24:24 25:1,4
25:13,17,19,24
26:3,7,9,22
27:6,7,15,20
28:6 29:16
37:4,9,18 39:4
45:24 64:5
**managers (7)**
17:11 23:22
25:2,8 27:9
28:11 38:22
**managing (1)**
17:10
**marcos (3)** 17:23
20:14 22:20
**marked (5)**
19:12 77:23
84:20 93:19
95:23
**markets (2)** 1:7
11:14
**matter (2)** 4:15
102:7

**mcdonough (1)**
38:16
**mcdonoughs (1)**
38:17
**mcgrory (94)**
3:15 11:4
22:21 44:10
47:12,13,16
48:1,3,13,21
49:6,14,19
50:1,3,19 51:1
51:6 53:9,23
55:17,22 56:15
56:21 57:9,16
58:24 59:4,12
60:8 62:19
63:2,10,17,23
64:2,7,19,23
65:8 66:2,6
68:6,18,18,22
69:9,14,18
70:5 71:16,23
72:20,23 73:22
74:6,16 75:7
75:14 76:6,10
76:16 78:10
79:7,19 80:2
80:10,19,23
81:5,15 83:1,9
83:13,22 84:7
84:12 86:8,10
86:13,20,23
87:15 88:4,11
89:1 90:4,17
90:21 91:8
98:21 99:2
101:13
**mcgrorys (12)**
44:15,20 45:10
57:12 58:17
70:23 76:21
77:16 78:24
85:9 89:11
101:6
**mean (11)** 22:2

KARL MICHENER

62:1,11 63:18
65:14 69:1
72:16 73:8,8
73:10 82:17
**meaning (1)**
27:7
**means (4)** 62:13
86:8,9 102:22
**meant (1)** 65:15
**meat (21)** 3:12
17:18,21 19:24
22:4 23:4
40:19,20 41:9
43:7 47:18
48:6 54:24
55:2,3 57:9
64:11 69:16
70:11,15 86:21
**media (1)** 18:16
**medication (1)**
8:19
**memorized (1)**
11:20
**mentioned (12)**
16:21 30:21
41:20 51:4,12
51:18 52:3
53:8 54:19
63:23 67:1
81:9
**mentioning (1)**
19:7
**merchandisin...**
16:14
**mercon (7)**
17:23,24 22:20
40:24 41:1
66:16,20
**met (4)** 10:18
31:2,20 32:5
**michener (24)**
1:11 3:3,16 5:9
5:19 8:8 9:5
18:2,19,24
23:6 66:22

76:20 77:9,22
84:19 85:19
88:1 93:18
95:22 96:16
97:20,22
100:24
**middle (3)** 19:12
22:23 83:3
**midway (1)**
86:24
**mine (1)** 25:2
**minor (1)** 34:18
**minutes (1)**
92:22
**monday (4)** 1:12
23:14 61:2,5
**month (3)** 56:8
81:16 94:12
**months (5)**
19:23 79:9,14
80:5 98:1
**morning (3)**
5:19 8:10,19
**mosteller (3)**
20:12 21:15,22
**move (2)** 7:12
35:14
**movie (2)** 43:9
52:13
**multiple (1)**
50:22
**music (1)** 71:12

**N**

**n (3)** 2:1 3:1
102:1
**name (10)** 5:1,19
9:4 25:21
27:17 29:18
74:22 75:1,5
79:10
**names (4)** 9:7
19:18 20:1,7
**narrow (2)**
26:11 48:15

**narvaez (2)**
20:11 21:11
**natural (1)**
75:11
**nature (4)** 49:22
50:5 60:2
62:11
**ncra (1)** 102:15
**necessarily (1)**
72:16
**necessary (2)**
27:9 32:17
**necessitates (1)**
24:6
**need (16)** 8:1,7
8:10 18:7
33:18 34:5
35:6,13,23
53:17,19 54:19
65:17 77:14
85:21,23
**needed (2)** 30:3
58:13
**needs (1)** 17:4
**neither (1)** 97:17
**never (14)** 36:19
55:8,12 61:24
64:4 65:16,22
68:20 74:9
81:19 84:12
95:15 98:20,21
**new (1)** 1:14
**news (1)** 93:8
**nice (1)** 41:11
**night (2)** 23:24
23:24
**nine (1)** 17:16
**nocallnoshow ...**
35:10,20 36:10
36:21
**nod (1)** 6:14
**noise (1)** 71:9
**normally (2)**
23:23 24:2
**notary (2)** 1:14

102:16
**noted (1)** 102:4
**notes (1)** 102:6
**notice (3)** 93:13
93:24 94:2
**notified (1)** 94:9
**notifying (1)**
93:7
**number (8)**
11:18 12:5
13:19 14:16
15:19 18:5
19:3 40:4

**O**

**o (1)** 102:1
**oath (1)** 4:13
**object (11)**
62:21 69:21
71:1,18 72:10
83:18 87:17
88:13 89:6
90:9,22
**objection (3)** 8:2
63:6 67:9
**objections (3)**
4:4,19 102:4
**objects (1)** 7:24
**observe (1)** 41:3
**obstructing (1)**
70:10
**obviously (5)** 6:9
15:12 16:15
27:5 37:24
**occasion (4)**
32:4 41:2 66:1
66:9
**occasions (2)**
60:8 63:3
**occurred (5)**
49:5 55:21
56:18 70:4
78:16
**october (22)**
19:24 25:23

33:4 39:13
40:7 42:10
48:22 49:2
57:11 78:14,18
80:4,17 81:6
82:2,14,16
84:7 89:12
90:5 91:10
94:22
**offense (2)** 35:13
62:17
**office (6)** 9:17
29:16 44:23
45:1 46:2,6
**offices (1)** 9:18
**official (5)** 4:21
63:18,21 65:12
65:22
**okay (215)** 6:2,8
7:1,5,13,21 8:4
8:14 9:6,11,23
10:5,8,13,17
11:7,11 12:2,6
12:15 13:1,4
13:10,13,23
14:10,20 15:11
15:20,24 16:7
16:17 17:2,8
17:13 18:9,20
18:24 19:6,9
19:13,18,22
20:5,10,16,21
20:24 21:7,11
21:15 22:19,23
23:6,13,17
24:14 25:3
26:2,13,21
27:4,19 28:1,5
28:10,15,20
29:10,20,24
30:21 31:19,23
32:4,9,21 33:2
33:7 34:2,8
35:1,15,19
36:5,23 37:6

KARL MICHENER

37:20 38:11,21
39:3,8,11,22
40:2,5,22
41:16,24 42:8
43:10,16 44:2
44:11 45:11,22
46:14,18 47:8
47:15 48:15
49:4,13,18
50:8,13,17
51:5,11 52:3,9
53:23 54:16
55:2,7,14
56:14,24 57:6
57:14 58:10,17
59:3,16,22
60:12,21 61:3
61:15 62:19
63:10,15 64:6
64:13 65:7,10
66:5 67:1,16
68:3,6 69:16
70:3,20 72:4
72:18 73:15
75:6,18,18
76:9,13,19,24
77:5,22 78:1
78:13 79:2,6
80:1,13,22
81:12,18 82:24
83:8,12,16
84:6,10,15
85:1,6,8,10,21
86:9,11,22,23
87:21 89:19
90:3 91:1,5,18
91:21 92:4,7
93:24 94:8,19
95:1,10,15,18
95:18 97:8,20
98:9,14 100:23
100:23,24
**olcese (39)** 2:4
3:4 5:4,4,15,18
5:20 18:17,18

18:23 63:1,9
67:11 70:2
71:3,21 72:13
77:4,8,21
82:18 83:21
84:18 85:16,18
86:2 87:20,24
88:17 89:9
90:14,24 93:17
95:21 96:15,22
97:7,19,21
**older (1)** 22:5
**omission (1)**
88:14
**omitted (1)**
89:22
**onepage (2)**
93:19 95:23
**ones (1)** 87:5
**onley (107)** 1:3
5:21 6:6 23:3
39:9 40:14
41:14 42:12,17
42:23 43:3,11
44:7 47:6,9,19
47:23 48:4,7,8
48:21 49:6,20
50:2,14,24
51:1,3,6,10
54:22 55:16
56:16 57:8,15
57:21 58:9,14
59:6,7,9,18,19
59:23 60:8,13
61:14 62:17
63:5,11,17,24
64:7,9 65:16
65:22 66:3,10
66:23 67:6,24
68:8 69:7,12
71:17,24 72:21
73:16 74:17
76:11 78:11
79:10,21 83:2
84:8,22 87:16

88:22 89:22
90:5,8,11,16
91:2,4,7,13,15
91:24 92:4,11
93:9,13 94:1,3
94:5,9 95:7,16
97:6 98:20,23
99:1,5,9
100:18,23
**onleys (12)** 10:3
10:9 42:1,19
59:14 64:4
66:6 67:2
86:18 98:2,5
98:15
**online (1)** 32:18
**onthejob (1)**
21:5
**opened (3)** 25:10
39:13,20
**operate (1)**
36:17
**operations (2)**
16:12 28:14
**opinion (4)**
37:16 43:17
88:5,19
**opportunity (2)**
6:5 49:14
**opposed (1)**
63:19
**opt (1)** 18:16
**order (2)** 13:16
34:6
**ordering (2)**
16:13 101:9
**organization (1)**
51:19
**outline (1)** 16:15
**oversee (1)**
17:14
**overseeing (1)**
17:20

_____
**P**

**p (5)** 2:1,1,4
23:15 101:17
**pa (2)** 2:5,10
**page (12)** 3:2,15
78:6,23 80:22
81:24,24 82:5
82:13 83:4
84:23 88:2
**paged (1)** 96:13
**pages (1)** 85:6
**paperwork (3)**
10:1 94:6 98:7
**paragraph (2)**
79:8 80:14
**part (24)** 15:2
19:14 31:24
35:2 40:11
45:23 51:19
52:9,17 57:17
58:23 62:2
63:3 64:3
65:21 66:16
90:19 98:22
99:4,8,16,22
99:24 100:18
**participant (1)**
51:24
**participants (1)**
2:2
**participated (2)**
73:19 84:21
**participating (...**
4:8
**particular (1)**
11:15
**parties (1)** 4:17
**paying (1)** 71:11
**penalty (1)** 4:15
**pending (1)** 8:13
**pennsylvania (...**
1:2,15
**people (3)** 36:3
38:1 70:19
**peoples (1)**
75:23

**perfectly (1)**
18:17
**performance (7)**
36:24 37:11
38:6 41:8,14
41:18 66:7
**perimeter (1)**
45:5
**perjury (1)** 4:16
**person (13)** 4:13
7:6 30:11 31:3
31:21 32:5
38:7 45:19
65:20 71:11,13
82:12 90:17
**personal (2)**
16:18 55:1
**personally (2)**
41:21 91:13
**personnel (2)**
10:4 16:23
**pertaining (1)**
41:17
**philadelphia (2)**
102:17,17
**phone (3)** 46:17
46:18 94:9
**physical (2)** 78:3
96:3
**physically (2)**
4:9 69:23
**picking (1)** 87:9
**place (5)** 12:14
43:17 54:22
55:18 86:21
**placing (2)** 43:6
100:15
**plaintiff (4)** 1:4
2:7 5:5,20
**plaintiffs (1)** 5:3
**play (1)** 44:7
**playing (2)** 43:6
71:12
**pleasant (2)**
41:12,20

KARL MICHENER

please (7) 4:24
7:16 8:8 9:3,11
19:7 82:15
pocket (5) 43:7
54:23,24 99:4
99:13
point (8) 15:20
26:24 42:1
47:4 48:3
61:17 71:22
72:18
polchin (5)
27:15,18,19,23
28:1
polchins (1)
27:16
policy (18) 33:8
33:11,14,20
34:3 43:1,4,12
43:15,21 62:18
74:2 75:9,11
75:15 83:16
92:14,14
politics (9) 51:14
51:22 52:8
55:22,24 56:2
56:9 58:6 68:9
pop (1) 77:18
position (16)
12:13,15 13:5
14:7,20 15:5
15:12 26:8,16
28:6,12,17,21
33:23 38:18
40:17
positions (4)
14:8,20 24:21
34:13
possible (1) 74:1
possibly (2) 21:5
34:22
pot (30) 72:20
73:2 74:6,11
83:10,11,14,23
84:1,5,11,13

87:10,15,19
88:6,8,9,20,22
88:23,24 89:4
89:14,19,23
90:4,11,16
91:8
pots (4) 73:7,10
73:11,23
potts (15) 11:17
12:3,6,11,16
12:21 16:1
20:6 23:10
24:8 26:20,22
27:2 32:16,22
practical (1)
100:15
practice (8) 31:5
31:24 37:2,16
38:3 45:24
62:3 66:16
prank (12) 43:6
44:7 49:20
50:9 54:20
55:8,17 56:3
57:2,3,8 99:18
pranked (2)
55:12 98:20
pranking (4)
52:22 56:6,19
98:16
precipitated (1)
82:6
premarked (1)
19:2
prep (3) 22:3
47:18 70:1
preparation (2)
10:21 19:16
prepare (1) 9:24
prepared (1)
97:17
preparing (1)
47:20
presence (1)
100:13

present (5) 2:2
4:10 15:9
76:22 84:6
presented (3)
41:11 94:3,5
president (2)
28:13 38:19
pretty (1) 6:4
prevention (1)
34:23
previous (4)
14:19 39:14
67:19 87:22
previously (6)
12:4 40:2
53:10 77:17
82:24 101:12
printed (1)
32:19
prior (21) 12:2
13:10,13,17
14:13 19:23
39:23 45:7
50:13 56:9
57:10 59:18
63:11,16 66:21
67:23 71:23
72:18 80:16
81:18 95:12
probably (1) 7:3
problem (6)
16:13 33:17
65:17 77:15
82:21 96:22
problems (1)
37:23
procedure (2)
33:24 97:16
proceeding (2)
4:8,11
proceedings (1)
102:4
processing (1)
101:5
progressive (3)

33:11,14 34:3
promoted (1)
12:13
proper (1) 53:18
protect (1) 55:5
proud (5) 47:22
48:2 50:15
51:17,18
provide (2) 7:20
96:24
provided (3)
80:9,10 95:16
public (7) 1:14
69:19 70:9,15
70:23 72:6
102:16
pull (2) 74:24
84:15
punch (1) 34:18
purchase (1)
58:2
purposes (1)
19:4
put (5) 18:15
31:12 88:1,23
89:15
putting (3) 73:3
99:3,12

**Q**

quantify (1)
31:8
quarry (1) 30:24
question (16)
5:23 7:8,10,13
7:20,24 8:2,3
11:8 18:8
25:16 30:2
32:21 36:4
67:6 69:4
questionanda...
6:4
questioning (2)
59:19 67:20
questions (13)

4:5 6:6,12 7:16
8:13,16 9:1
18:9 76:24
86:10,13 101:1
101:3
quick (1) 77:10
quiet (2) 48:4
87:8

**R**

r (4) 2:1,4,9
102:1
race (7) 64:14
67:5,7,13,17
67:24 76:13
rachida (7) 75:1
75:3,11,15
76:2,11,13
rachidas (1)
75:8
randall (1) 29:15
randalls (1)
29:17
randy (1) 29:14
ranking (1)
12:23
rate (1) 21:6
reach (1) 30:1
reached (2) 61:7
91:7
reaching (2)
35:6 37:3
read (22) 44:22
45:3,8,10,18
46:2,9,24
47:14 49:8,12
49:15 57:11
58:17 79:3
82:12 83:9
85:12,20 87:1
87:12 96:2
reading (5) 4:2
31:1 51:7
56:15 80:18
real (1) 51:19

KARL MICHENER

**reason (4)** 8:23
83:13 99:4
100:18
**recall (23)** 8:20
10:15 26:10
32:8 36:22
39:8 47:15
49:18 55:19
57:7 66:5,20
71:19,22 72:2
73:15,24 76:9
80:19,21 91:19
91:24 93:5
**receive (1)** 68:6
**recess (1)** 77:7
**recognize (4)**
19:13 78:7
93:22 96:4
**recollection (2)**
78:15 87:14
**recommend (2)**
42:16,19
**recommendati...**
61:17
**record (7)** 3:18
5:2 8:1 9:4
77:6 94:22
97:11
**records (1)** 94:3
**red (2)** 15:18,21
**redners (30)** 1:7
3:12 5:21 6:7
11:14 13:10
14:15,24 15:9
20:8,12,18
21:13 22:21
26:8,14 28:5
30:22 32:9
33:7,10 35:24
39:23 42:1,9
43:3 67:8 68:1
74:2 83:16
**reference (2)**
94:14 95:11
**referenced (1)**

3:10
**references (1)**
79:23
**referring (5)**
10:9 28:8 58:6
58:7 97:15
**refrain (1)** 7:9
**refresh (2)** 78:14
87:14
**refrigerated (1)**
22:3
**refusing (2)**
47:23 48:1
**regard (1)** 87:5
**regarding (9)**
6:7 37:1 46:11
54:21 56:6
84:22 94:6
95:10 100:3
**regardless (1)**
59:22
**regards (1)**
99:19
**regional (1)** 28:6
**regular (5)** 31:7
31:8,9 32:1
55:24
**relationship (1)**
52:18
**relay (1)** 60:9
**relaying (1)**
60:17
**remain (1)** 25:12
**remained (1)**
23:9
**remarks (1)**
95:11
**remember (13)**
21:4 46:20
57:20 65:24
73:22 79:18
81:10 86:12
88:7 91:5
92:15 93:1
98:4

**remote (1)** 1:11
**remotely (3)** 2:2
4:11 6:10
**repeat (6)** 29:2
36:5 49:23
62:23 89:7
98:24
**replaced (1)**
27:21
**report (8)** 27:8,9
27:13 28:2,12
29:1,7 38:16
**reported (1)**
24:22
**reporter (5)** 4:7
4:23 6:15
101:8 102:24
**reporting (3)**
1:21,22 4:11
**reports (4)** 24:17
25:2 27:7
28:24
**represent (5)**
5:20 48:20
78:18 86:7
95:1
**reproduction (...**
102:21
**requested (1)**
97:4
**require (1)**
34:20
**required (1)**
31:18
**reserved (1)** 4:5
**resolve (1)** 32:7
**resource (1)**
38:13
**resources (24)**
16:13,19,22,23
17:3,3,7 28:19
29:9,9,11,15
29:22 33:22
34:20,22 37:5
37:9,19 38:5

38:12,19 43:24
54:11
**respond (2)** 6:12
6:17
**responding (1)**
7:9
**response (6)** 7:1
7:12,20 10:2
37:22 92:16
**responsibility ...**
75:17,23 76:8
**restroom (2)**
8:11 77:3
**result (1)** 69:8
**retire (1)** 27:23
**retired (1)** 27:21
**returning (1)**
92:1
**review (4)** 10:10
10:13 32:17
33:21
**reviewing (3)**
20:3 82:23
96:19
**rhoton (15)**
22:20 43:6
44:8 47:5,9
49:21 50:9
52:23 54:21
55:11 56:6,19
98:16,20 99:3
**rhotons (1)**
99:13
**right (68)** 7:15
7:23 8:7,16,23
9:19 13:16
17:8 18:24
19:2,20 20:5
21:7 22:21
23:6 24:7,14
25:7 27:4,12
30:11,14,21
32:9 34:6 39:2
39:3,8 44:14
53:3 54:23

55:14 57:6,14
57:19 60:1,6
60:10 70:14
73:6,20 74:24
77:9,15 78:9
78:13,22 79:4
80:18 81:21
82:2,7,9 84:19
85:13,14,23
86:3,7,15,16
92:10 93:18
95:13,18,22
98:2 100:6
**rioting (4)** 47:22
47:24 48:2
51:20
**riots (1)** 87:6
**rk (1)** 1:21
**rkreporting (1)**
1:23
**road (3)** 2:5 9:10
30:24
**robin (3)** 1:13
6:15 102:13
**robins (1)** 7:4
**role (2)** 24:14
35:1
**roles (1)** 30:9
**room (5)** 9:20
22:3 51:12
71:5 73:9
**rotation (1)**
31:12
**row (3)** 35:11,20
36:10
**rpr (3)** 1:14
102:13,15
**running (1)** 46:7

**S**

**s (1)** 2:1
**sanatoga (1)**
9:10
**sandra (3)** 3:15
20:14 22:20

KS - MSJ 000948

KARL MICHENER

**sandy (5)** 51:13
52:12,24 54:11
75:22
**saturday (2)**
54:15 91:20
**saw (2)** 19:14
88:8
**saying (7)** 66:22
71:20 73:23
88:15 98:22
99:16,19
**says (3)** 45:24
80:5 86:20
**scanned (1)**
46:23
**schedule (3)**
23:9,12 24:6
**schlegel (12)**
25:10,12 26:1
26:6,13 27:1
45:16 48:10
49:7 66:15,21
80:8
**scope (2)** 75:22
76:8
**screen (5)** 18:4
19:1 77:18,23
96:14
**scroll (6)** 19:8
78:2 82:10
93:22 96:3,10
**scrolling (1)**
85:3
**se (1)** 59:23
**seafood (3)**
40:20 41:11
47:21
**sealing (1)** 4:3
**second (8)** 25:4
57:16 59:3
74:23 80:13,22
84:16 95:12
**section (6)** 19:12
83:9 86:5,15
87:12 95:10

**see (17)** 6:10,11
9:19 19:18
31:10,13 79:12
81:2 83:4,6,8
83:11 84:2,4
84:10 97:23
98:17
**seeing (2)** 85:20
88:10
**seen (3)** 84:22
85:3 96:17
**selbyville (1)**
1:23
**send (4)** 54:8
59:6,10,18
**sense (1)** 43:19
**sent (6)** 22:11
54:9 59:7,24
92:1 98:7
**separated (1)**
30:9
**separation (3)**
22:13,16 42:5
**september (15)**
13:3,5,11,14
21:8,19 26:5
44:19 49:1
56:8,22 57:11
66:22 81:1,6
**serve (1)** 16:22
**service (1)** 16:14
**services (1)** 1:22
**session (1)** 6:5
**set (2)** 23:12
24:1
**seven (1)** 20:7
**sex (5)** 58:9,9
86:19 100:10
100:14
**sexual (10)**
42:24 43:4,12
49:22 50:5
62:12 80:24
92:14 100:20
100:22

**shades (9)** 43:9
49:20 50:8
52:10 56:7
57:4,7 58:7
100:11
**share (1)** 18:4
**shared (1)** 19:1
**sharing (1)**
77:22
**shaun (4)** 20:14
22:20 52:22
100:13
**shauns (1)**
100:15
**shes (5)** 28:19
43:23 53:1,4
88:15
**shift (2)** 44:17
45:1
**short (1)** 77:2
**shouldnt (3)**
53:4,5,9
**shouting (1)**
70:22
**show (7)** 18:2,5
18:6 35:11
76:19 77:16
95:18
**showed (3)** 10:5
52:4 88:3
**showing (4)** 19:1
84:19 93:18
95:22
**shown (12)** 10:1
10:3,4,8 18:22
19:15 77:20
84:17 86:1
87:23 93:16
95:20
**shrimp (1)** 47:20
**shut (4)** 48:5
71:20 87:9,11
**sic (2)** 50:14
89:22
**side (2)** 19:19

59:15
**signature (3)**
78:23,24 95:2
**signing (1)** 4:2
**similar (2)** 51:15
72:5
**sink (10)** 70:4,8
70:17 73:4,6
88:21,24 89:5
89:14 90:18
**sinks (1)** 73:5
**sir (18)** 8:15,18
8:22 9:2,8,22
10:12 11:12
18:21 19:10
23:16 77:19
85:5,11,24
86:14 92:9
95:4
**sit (1)** 53:13
**sitting (1)** 79:4
**situation (6)**
36:22 45:10
51:2,15 68:13
73:13
**six (2)** 19:23
31:11
**slightly (1)** 16:5
**slowly (1)** 85:4
**socalled (1)**
45:15
**sole (1)** 35:3
**solely (1)** 4:22
**solving (1)** 16:13
**somebody (2)**
37:15 93:8
**somebodys (2)**
35:14 37:22
**sorry (16)** 9:15
20:13 35:8
36:2 39:18
46:16 53:9
68:18 74:23,23
82:20 89:8
96:21 97:10

98:24 99:23
**sort (1)** 94:16
**sound (5)** 21:9
48:22 65:5
75:2 78:19
**sounds (3)** 56:22
79:16 92:19
**south (2)** 9:10
87:6
**speak (17)** 10:22
24:6 26:7 41:5
47:11,13 49:14
50:19 51:6
52:6 55:11
57:15 65:8
70:18 71:7
80:8 91:16
**speaking (10)**
32:22 34:12
43:8 49:20
50:24 55:16
59:7 60:7,8
69:6
**speaks (1)** 7:6
**specific (2)**
54:20 85:9
**specifically (2)**
30:4 69:4
**specify (1)** 22:2
**spell (3)** 25:21
27:16 29:17
**spoke (13)** 43:5
47:2,4 50:22
54:8 57:16,19
58:18 59:12,13
59:19 63:2
91:12
**spoken (3)** 53:8
53:10 58:1
**spot (1)** 85:9
**stage (2)** 34:9,12
**stamp (2)** 19:4
86:3
**stamped (5)**
19:5 77:24

KARL MICHENER

117

85:7 93:20
95:24
**stand (1)** 8:11
**standing (1)**
  70:15
**start (7)** 13:1,20
  14:17,23 23:20
  33:16 45:1
**started (8)** 13:4
  26:4 39:12,19
  40:15 44:17
  45:17 51:13
**starting (3)**
  13:18 20:16
  51:5
**starts (1)** 82:1
**state (2)** 9:3 64:2
**stated (1)** 33:22
**statement (72)**
  3:15,16 44:10
  44:12,15,21
  45:2,7,9,10,13
  45:18 46:1,10
  46:20,24 47:5
  47:7,9,14
  48:11 49:8,11
  49:16 50:4,12
  50:20 51:7
  53:24 54:4,6
  56:15,22,23
  57:12 58:18,20
  58:24 63:12,16
  70:23 72:24
  76:21 77:16
  78:10 79:2
  80:4,11,18
  81:7,12,20
  82:4,7,12,14
  83:14 84:4
  88:12 89:2,10
  89:16,20,20,24
  90:19 96:23
  97:3,5,12
  98:14 100:17
**statements (2)**

47:5 51:2
**states (4)** 1:1
  7:24 75:11
  82:13
**stating (2)** 5:1
  84:11
**station (2)** 16:4
  16:8
**stay (2)** 44:3
  71:24
**steamer (1)**
  47:20
**stenographic (1)**
  102:6
**steps (1)** 53:13
**stipulations (1)**
  5:15
**stole (1)** 34:21
**stop (1)** 83:5
**store (42)** 11:15
  12:12,17,18,19
  13:6,8 14:9,22
  15:13,15,21
  16:1,3,4,10,23
  17:9 23:21
  24:15,23 25:4
  25:10 27:5,12
  31:13 32:16,24
  35:1 36:20
  39:20 40:2
  43:24 45:4,20
  45:23 46:7
  48:8 53:12
  66:17 86:18
  98:8
**stores (2)** 31:6
  32:1
**stormed (1)** 48:3
**story (1)** 59:15
**stoudt (1)** 2:9
**street (1)** 2:5
**stuff (3)** 58:4,6
  73:4
**subject (1)** 69:9
**submitted (1)**

78:10
**subsequent (1)**
  94:10
**substantive (1)**
  77:11
**suggested (1)**
  58:2
**suggestion (1)**
  100:14
**suite (1)** 2:5
**summer (1)** 65:2
**supervision (2)**
  24:18 102:23
**supervisor (5)**
  29:6,8 37:17
  37:18 40:23
**supervisors (2)**
  28:9 29:5
**supervisory (1)**
  12:13
**supplies (1)**
  70:12
**support (3)** 29:7
  30:3 34:20
**supporter (1)**
  87:3
**supporters (1)**
  87:5
**suppose (3)**
  16:16 34:24
  40:21
**sure (14)** 7:11
  20:23 24:21
  46:4 48:24
  49:10 54:18
  69:1 71:13
  75:13 84:3,14
  95:17 97:1
**suspension (3)**
  33:21 34:5
  62:8
**sworn (1)** 5:10

———————
**T**

**t (2)** 102:1,1

**tables (1)** 70:11
**take (14)** 7:5,6
  8:13 12:14
  18:6 20:1 24:2
  24:11 36:4
  76:23 77:2
  78:6 93:15
  96:1
**taken (1)** 102:6
**talk (7)** 11:1,4
  31:15 52:13
  54:11 58:4
  87:7
**talked (13)**
  52:20 53:1
  54:2 55:22
  56:2 67:2
  76:21 77:17
  79:3 80:16
  81:18 87:2
  99:2
**talking (18)** 44:4
  47:22 48:16
  51:13,16 52:10
  52:12,21 53:7
  56:7,19 57:24
  58:8 68:9
  81:10 82:1
  86:18 98:16
**talks (1)** 77:11
**team (1)** 76:1
**tell (10)** 45:19
  50:4 51:10
  53:21 55:17
  62:19 63:4,21
  72:23 77:14
**telling (3)** 47:16
  65:19 71:24
**tells (1)** 8:3
**terminable (2)**
  35:13 62:16
**terminate (20)**
  35:3,7,16,21
  35:24 36:8,16
  36:21 37:21

38:23 42:11
  62:3 90:8 91:2
  91:4,7 98:23
  99:7,8 100:2
**terminated (18)**
  20:19,22 21:3
  21:16,23 42:2
  42:9,17,23
  43:18 60:14
  93:3,4,10
  94:10 95:8
  99:5 100:19
**terminating (2)**
  37:15 38:5
**termination (28)**
  6:8 21:7,18
  22:10,11,12
  34:15 37:1,12
  42:20 61:18,22
  62:10 92:5
  93:7,12,24
  94:2,6,15 97:6
  98:2,15 99:11
  99:17,20 100:4
  100:9
**terminations (1)**
  16:12
**terms (2)** 25:3
  46:10
**test (1)** 8:9
**testified (3)** 5:10
  88:8 98:19
**testimony (4)**
  3:13 4:15
  85:10 86:23
**texted (1)** 52:4
**texts (1)** 52:5
**thanked (2)**
  92:18 94:20
**thanks (1)** 101:4
**thats (26)** 6:24
  16:5,15 17:4
  18:17 20:2
  35:12 36:11
  37:24 38:1

KARL MICHENER

118

48:12 50:13
52:24 69:18
75:21,24 76:6
77:4 86:8,9
88:18,20 90:13
92:17 95:3
100:1
**thereabout (1)**
13:24
**theres (9)** 21:8
21:18 29:14
36:2 46:1,7
78:23 85:1
95:2
**theyll (1)** 31:12
**theyre (4)** 30:22
31:18 55:3
71:6
**thing (6)** 7:3
8:12 37:24
79:7 85:23
94:16
**things (8)** 14:3
36:3 40:20
46:4,8 65:18
70:10 80:14
**think (16)** 8:9,24
22:5,8 35:8
47:20 48:5
64:12 69:11
73:3,6,12
75:17 85:21
87:1 89:18
**thinking (2)**
37:8 60:4
**third (3)** 81:23
82:13 95:13
**thomas (2)** 20:9
20:16
**thought (4)**
41:23 52:1,2
69:1
**three (4)** 20:14
79:9,14 80:5
**threebay (2)**

73:5 88:21
**threw (17)** 72:20
73:2,11,12,23
83:10,14,23
84:1 87:15,18
88:7,9,20 89:4
89:23 90:4
**throw (3)** 73:13
84:5,10
**throwing (12)**
73:10 74:6,11
84:13 87:10
88:6,22,23,24
89:14,19 91:8
**thrown (4)** 73:7
90:11,16,17
**thursday (5)**
23:24 44:18
78:19 91:11,16
**thursdays (1)**
23:23
**time (54)** 4:6,19
7:5,6,7,16,23
13:7 14:10
15:2,3,5,9,11
15:21 18:6
23:7,10,20
24:9,16 25:13
25:18 27:20
34:18 36:2,4,6
36:19 38:8
45:14 46:5
48:9 50:13,20
56:12 57:17
59:5 64:15
66:5,20 67:3
71:13,14,22
72:14 80:19,23
89:8 91:22,23
96:1 100:16
101:1
**timeline (1)**
56:10
**times (4)** 32:20
50:22 58:18

63:15
**timing (1)** 48:16
**title (1)** 12:23
**today (8)** 7:4,16
8:4 9:1 11:2,5
18:3 84:11
**todays (3)** 9:14
9:24 10:23
**told (16)** 45:15
45:16 48:6,11
61:15 65:22
71:20 72:2
75:1,15,22
76:6 87:7,11
87:11 92:12
**top (4)** 78:13
79:8 93:21
97:8
**tou (2)** 75:3,4
**touch (1)** 54:14
**toy (2)** 100:11
100:14
**toys (2)** 80:24
86:19
**training (2)**
16:14 30:6
**transcribed (1)**
4:22
**transcript (14)**
3:13 4:11 6:23
10:10 54:20
84:20 85:1,3,6
88:4 101:5,10
102:7,21
**transfer (3)** 12:6
40:9,12
**transferred (6)**
11:21,22 12:2
12:10 27:1
40:6
**treatment (2)**
64:1,11
**trial (1)** 4:6
**tried (1)** 53:6
**trouble (2)** 53:16

53:21
**true (1)** 58:16
**trump (2)** 87:3,5
**truthful (2)**
83:17 88:5
**truthfully (1)**
9:1
**try (7)** 7:11 24:2
24:11,15 30:7
37:21 48:15
**trying (9)** 7:17
32:6 38:2 44:7
49:24 58:15
63:24 64:7
71:7
**tuesday (2)** 61:2
61:6
**turnover (1)**
62:5
**two (17)** 35:11
35:20 36:10
41:21 48:17
56:17 58:18
60:8,23 63:3
70:21 72:24
79:9,14 80:5
100:8,21
**twofold (3)**
98:15 99:11
100:6
**type (1)** 98:12

---
**U**
**uhhuhs (1)** 6:21
**uhuhs (1)** 6:21
**um (1)** 16:11
**unacceptable (...**
62:12,13,13
**uncomfortabl...**
81:9,14
**underneath (1)**
25:9
**understand (11)**
6:22 7:15 8:5
28:5 41:24

46:9 47:23
48:1 78:3,9,24
**understandin...**
19:22 29:20
31:24 32:22
39:22 40:5
42:22 48:19
55:23 59:17
64:9,13 65:13
66:13 69:17
70:3,6,14 75:6
80:1 81:5,14
97:20
**understood (21)**
6:18,19 7:2,14
7:21,22 8:6
14:1,6 18:10
22:19 24:5
29:10 30:12,14
31:19 38:3
57:6 65:24
94:19 100:24
**unemploymen...**
73:16 81:8,13
84:21 88:3
96:24 97:2
**unfortunately ...**
54:6
**united (1)** 1:1
**unwanted (2)**
51:24 52:7
**updated (2)** 33:3
33:5
**upper (2)** 12:8,9
**upset (1)** 48:3
**use (5)** 8:11
50:10 72:7
94:16 100:10
**usual (1)** 5:15
**usually (2)** 23:21
47:1

---
**V**
**vacation (1)**
10:19

KARL MICHENER

119

**vance (2)** 1:14
102:13
**verbal (4)** 33:16
34:4 62:9 65:7
**verbally (2)** 4:14
6:17
**verification (1)**
94:17
**versus (3)** 34:15
34:15 82:11
**vice (2)** 28:13
38:19
**videoconferen...**
1:11
**view (1)** 70:8
**violate (1)** 43:3
**violated (2)**
43:12 92:13
**violation (2)**
42:24 62:11
**violence (2)** 74:3
74:6
**visible (3)** 19:9
69:19 70:8
**visit (4)** 31:6,14
31:15,24
**visitation (1)**
31:11
**voiced (1)** 64:4
**voluntary (3)**
22:16,18 42:5
**vs (1)** 1:5

**W**

**wait (2)** 7:11
97:1
**waive (1)** 4:18
**waived (1)** 4:4
**walk (1)** 45:5
**walked (1)** 87:4
**wall (1)** 88:22
**want (30)** 7:12
19:11 21:24
22:1 24:15
37:24 44:3

46:22 48:15
49:4 53:16,20
54:3,16 62:3,4
62:5 76:22
77:16 78:2
79:6 82:10
85:8,14,20,22
87:7 96:2,12
97:17
**wanted (6)** 22:8
42:6 51:3
57:24 58:20
64:2
**warning (9)** 3:18
33:19 34:4,15
62:8 94:21
95:12,13,13
**wasnt (8)** 22:12
52:7,16 53:2,3
84:2,4 94:3
**watching (3)**
43:8 51:17
100:11
**water (4)** 87:10
88:21,23,24
**way (15)** 7:18
15:12 23:17
24:20 31:16
32:2 36:18
47:21 65:18
80:7 85:7
92:17 96:10
101:7,12
**wear (1)** 55:3
**weather (1)** 22:6
**wednesdays (2)**
24:2,12
**week (6)** 10:16
10:18 39:14
54:15 61:4,6
**weekend (3)**
31:10,13 61:1
**weeks (1)** 31:12
**went (8)** 10:18
23:1 48:7 55:8

57:16 58:23
59:8 75:21
**west (1)** 87:6
**westview (1)**
2:10
**weve (2)** 76:21
77:17
**whats (2)** 11:19
63:21
**white (1)** 55:2
**willing (1)** 51:24
**witness (20)** 3:2
4:10,14 18:15
62:23 63:8
67:10 69:23
71:2,19 72:12
83:20 86:8
87:18 88:14
89:7 90:10,23
96:23 101:15
**woman (1)**
64:12
**wont (2)** 8:24
75:20
**word (1)** 72:7
**words (4)** 6:21
73:11 90:18
101:8
**work (30)** 10:3
11:16 12:3
13:10,13,18
14:14 15:8
20:6,8 22:1,21
23:1,7,13,19
23:24 24:3,6
26:19 31:11
41:3 42:6
44:16 86:19
91:23,23 92:1
99:3 100:14
**worked (19)**
15:12 16:10,17
19:24 23:10
25:9,14 27:20
28:20 29:4,13

38:12,18 39:23
40:3 41:6,9,22
57:10
**working (14)**
13:1 14:13,23
22:6 28:3 38:8
39:23 40:15,18
41:17 44:2
52:18 67:7,17
**workplace (3)**
62:13 64:1
90:13
**works (4)** 20:12
20:17 21:13
26:14
**world (1)** 92:18
**worry (1)** 75:23
**wouldnt (4)**
34:19 53:21
87:9 92:12
**wrapper (2)**
40:19 41:9
**write (10)** 6:16
54:3,4,6 89:23
97:5 98:10,14
99:10 100:3
**writes (5)** 22:24
79:8,14 80:13
83:4
**writing (3)** 80:2
89:2,11
**written (12)**
44:11,15 45:2
54:1 62:8
63:12,16 65:10
65:14 72:24
76:21 81:20
**wrong (2)** 65:18
65:23
**wrote (8)** 48:5
50:4,20 59:1
81:15 99:15
100:1,16
**wyomissing (1)**
2:10

**X**

**x (1)** 3:1
**xi (1)** 102:14

**Y**

**yeah (10)** 36:7
48:18 49:24
52:11,24 63:2
65:6 77:4
100:7,20
**year (2)** 14:18
26:11
**years (2)** 14:3
48:17
**yelled (1)** 71:24
**yelling (1)** 48:4
**youd (2)** 19:8
96:2
**youre (24)** 5:22
6:12 7:19 14:2
17:10 18:13
20:6 25:7
33:19 35:22
37:8 38:4
45:23 56:3
70:15 75:18,18
82:11,15,22
88:15 89:18
99:16 101:9
**youve (3)** 23:10
54:13 96:17

**Z**

**zoom (4)** 19:8
78:2 93:20
95:24

**0**

**000262 (1)** 3:14
**02131 (1)** 102:14
**05 (1)** 1:13

**1**

**1 (14)** 44:17,18
48:22 78:14,18
80:4,17 81:6

KARL MICHENER

82:14,16 89:12
90:5 91:10
101:17
**10120 (1)** 3:15
**10minute (2)**
77:2,10
**11 (2)** 1:13
101:17
**1111 (1)** 9:10
**11821 (1)** 3:16
**11th (2)** 10:16
10:16
**128 (1)** 2:5
**17 (2)** 97:23 98:6
**19 (2)** 3:12 39:13
**19020 (1)** 2:5
**19610 (1)** 2:10
**19975 (1)** 1:23
**1st (2)** 82:2 84:7

**2**

**2 (2)** 1:6 86:8
**20 (1)** 26:12
**2005 (1)** 15:1
**2006 (3)** 15:3,4,9
**2015 (4)** 14:19
15:16,20,23
**2016 (1)** 14:19
**2017 (1)** 13:22
**2019 (7)** 13:3,5
13:11,14 21:8
26:5 40:7
**2020 (21)** 19:24
25:23 33:4
42:10 48:22
56:8 65:3,4
66:22 78:14,19
79:15 80:4,18
81:7 82:14,16
89:12 90:5
91:10 94:22
**2021 (6)** 21:19
27:1,24 65:2
97:23 98:6
**2022 (2)** 1:12

11:24
**21 (1)** 26:12
**2156390801 (1)**
2:6
**2159467009 (1)**
1:23
**21cv04785wb ...**
1:6
**24 (1)** 21:8
**2640 (1)** 2:10
**27 (2)** 1:12 21:19

**3**

**3 (1)** 30:24
**30 (1)** 44:18
**31 (1)** 15:19
**3331 (1)** 2:5
**36 (2)** 11:18 85:6
**37390 (1)** 1:22

**4**

**4 (4)** 13:3,5,11
13:14
**4th (1)** 26:4

**5**

**5 (4)** 3:4 19:24
23:14 56:8
**50 (9)** 43:9 49:20
50:8 52:10
56:7 57:3,7
58:7 100:11
**50degree (1)**
22:6
**5th (3)** 56:22
81:1,6

**6**

**6 (1)** 23:20
**6103706700 (1)**
2:11
**63 (1)** 40:4
**67 (1)** 12:5

**7**

**7 (1)** 94:22

**77 (1)** 3:15
**791984 (1)** 9:12

**8**

**817327 (1)**
102:15
**82522 (1)** 102:18
**84 (1)** 3:13
**87 (1)** 13:19

**9**

**9 (1)** 23:14
**93 (1)** 3:18
**95 (1)** 3:16
**97 (1)** 14:16

KS - MSJ 000953

# EXHIBITS

# KARL MICHENER

## Date: June 27, 2022

## Connie Onley v. Redner's Markets, Inc.

## No.:  USDC EDPA 21-4785

R&K Reporting Inc.
37390 Harmony Drive
Selbyville, Delaware 19975
Phone: 215-946-7009
Email: scheduling@rkcourtreporting.com

KS - MSJ 000954

R&K Reporting, Inc.
6/27/22
Onley v Redner's Mkets, Inc.
**D-2**

# Redner's Meat Department Listing

## 2 year prior to term date - 10-05-2020

Store Opened August 2019

| Employee Name | Hire Date | Job Title | Ethnicity | Gender | Pay Rate | FT/PT | Termination Date |
|---|---|---|---|---|---|---|---|
| **MEAT** | | | | | | | |
| **67** | | | | | | | |
| HALEY, THOMAS P. | 08/07/2019 | Clerk | White | Male | $13.00 | P | 09/24/2019 |
| NARVAEZ Jr., HERMAN | 10/28/2019 | Clerk | Hispanic or Latino | Male | $12.00 | P | 11/14/2019 |
| MOSTELLER, DAVID R. | 09/04/2019 | Meat Clean-Up | White | Male | $14.00 | P | 09/27/2021 |
| RHOTON, SHAUN R. | 08/26/2011 | Meat Cutter | White | Male | $18.50 | F | |
| MERCON Jr., MARCOS P. | 07/02/2018 | Meat Manager | White | Male | $26.92 | F | |
| MCGRORY, SANDRA | 10/21/2019 | Meat Wrapper | White | Female | $14.50 | F | |
| ONLEY, CONNIE L. | 10/15/2017 | Meat Wrapper | Black or African American | Female | $14.75 | F | 10/05/2020 |

## 6 months prior to term date - 10-05-2020

| Employee Name | Hire Date | Job Title | Ethnicity | Gender | Pay Rate | FT/PT | Termination Date |
|---|---|---|---|---|---|---|---|
| **MEAT** | | | | | | | |
| **67** | | | | | | | |
| HALEY, THOMAS P. | 08/07/2019 | Clerk | White | Male | $13.00 | P | 09/24/2019 |
| NARVAEZ Jr., HERMAN | 10/28/2019 | Clerk | Hispanic or Latino | Male | $12.00 | P | 11/14/2019 |
| MOSTELLER, DAVID R. | 09/04/2019 | Meat Clean-Up | White | Male | $14.00 | P | 09/27/2021 |
| RHOTON, SHAUN R. | 08/26/2011 | Meat Cutter | White | Male | $18.50 | F | |
| MERCON Jr., MARCOS P. | 07/02/2018 | Meat Manager | White | Male | $26.92 | F | |
| MCGRORY, SANDRA | 10/21/2019 | Meat Wrapper | White | Female | $14.50 | F | |
| ONLEY, CONNIE L. | 10/15/2017 | Meat Wrapper | Black or African American | Female | $14.75 | F | 10/05/2020 |

## 12 months previous to term date - 10-05-2020

| Employee Name | Hire Date | Job Title | Ethnicity | Gender | Pay Rate | FT/PT | Termination Date |
|---|---|---|---|---|---|---|---|
| **MEAT** | | | | | | | |
| **67** | | | | | | | |
| HANSON, JON G. | 03/22/2022 | Clerk | White | Male | $15.50 | F | |

KS - 000696
KS - MSJ 000955



**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW**
**ROOM 1116, LABOR & INDUSTRY BUILDING**
**651 BOAS STREET**
**HARRISBURG, PA 17121-0750**

| Phone: 717-787-5122 | www.dli.pa.gov | Fax: 717-787-6125 |
|---|---|---|

## TRANSCRIPT OF TESTIMONY

R&K Reporting, Inc.
6/27/22
Onley v Redner's Mkets, Inc.
**D-4**

**CLAIMANT:** CONNIE I ONLEY
700 LOWER STATE RD 23-B7
NORTH WALES PA   19454

**SS NUMBER:** 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

**APPEAL NUMBER:** 21-09-I-2331

**DATE OF HEARING:** 7/12/2021 (TELEPHONE)

**PLACE OF HEARING:** KING OF PRUSSIA PA

**HEARING BEFORE:** R   REFEREE  TIFFANY MCMASTER

**APPEARANCES:**

| Claimant | C. | Connie I. Onley |
| Claimant's Attorney | CL | Allison Barker |
| Employer's Attorney | EL | Jason Hopp |
| Employer Witnesses | EW1 | Karl Michener |
| | EW2 | Sandra McGrory |
| | EW3 | Shaun Rhoton |

*Auxiliary aids and services are available on request to individuals with disabilities.*
*Equal Opportunity Employer/Program*

BD-67 REV 1-16

KS - 000227

KS - MSJ 000956

CONNIE I. ONLEY            21-09-I-2331                          1

July 12, 2021

R         We are on record in Appeal Number 21-09-I-2331.  The
          Claimant is Connie Onley.  The Employer is Redner's Tiger
          Markets, Inc.  The parties are scheduled to participate in
          the hearing today by telephone.  The Referee is going to
          begin by contacting the Claimant at Area Code 267, 475-8297.
          The Referee is, then, going to contact Claimant's counsel,
          Allison Barker, at Area Code 215, 639-0801.  I am, then,
          going to contact the Employer counsel, Jason Hopp, at Area
          Code 484, 248-5820, and then the Employer witnesses at
          (215)527-2392.  It is 11:35 a.m.

REC       Please leave your message for Connie Onley.

R         Ms. Onley, this is Appeals Referee McMaster.  It is Monday,
          July 12, 2021.  I was calling you about the unemployment
          hearing we had rescheduled for this morning.  I'm going to
          call your counsel at this time, and I will, depending on
          what is discussed with her, be making an attempt to contact
          you back for the hearing.  Thank you.

UM        Hello, Karpf Karpf & Cerutti, Michel [phonetic] speaking.

R         Yes, may I speak with Allison Barker, please?
UM        Yes, you can.  May I ask who's calling?

R         Yes, this is Appeals Referee McMaster.  I was calling about
          an unemployment hearing we have today.
UM        Okay.  All right.  I'll see if she's available, all right?

R         Yes, thank you.
CL        Good morning, this is Allison Barker.

R         Good morning, Ms. Barker.  I attempted to call your client
          and got a voicemail.
CL        Okay.  She was having an issue earlier.  I know that I tried
          -- first tried to call her and got her voicemail, and then
          called her again.  She wasn't receiving all calls.  I can
          try to call her and conference her in.

R         Well, no, I just wasn't sure if there was an additional
          issue involved in that.  So, why don't you let me try to
          make an attempt to call her myself first?
CL        Okay.

R         And then, if we continue to run into an issue, well, we'll
          have to figure that out from there.  So, bear with me, let
          me try to call the Claimant again.
CL        Okay, thank you.

CONNIE I. ONLEY                21-09-I-2331                                    2

R     And I just -- there's no change to your client's number, to
      your knowledge, correct?
CL    Correct.

R     Okay. Ms. Onley, are you on the line? Ms. Barker, are you
      still there?
CL    Yes.

R     All right. My system is showing that the Claimant answered
      the phone. Ms. Onley, are you there? All right, I'm
      disconnecting. I will try one more time.
CL    Okay. I'm sorry about this.
C     Hello?

R     Ms. Onley?
C     Yes, ma'am. I'm sorry. For some reason, your first call
      didn't come through to me. I don't know why.

R     Are you still there, Ms. Onley?
C     Yes, I'm here.

R     Okay, because you got cut off there for a moment. All
      right. Ms. Barker...
C     There's something...

R     ...I...
C     ...going on with my phone, so you might lose me. I don't
      know what's going on here.

R     Okay. Well, Ms. Onley, I have to advise you that your
      Hearing Notice told you it was your responsibility to ensure
      that you could participate in the hearing today. So, if you
      need to make...
C     Yes, ma'am.

R     ...other arrangements to use a different phone number or
      something like that, you need to let me know that now,
      because that's not going to be something that we're going to
      continue to address during the hearing. Okay.
C     Okay. Well, I don't have any other number, so I'm going to
      have to go with what I have. But thank you.

R     All right. I am next going to contact the Employer's
      counsel. I'm going to advise you both that during the
      process of my contacting the rest of the individuals for the
      hearing, you get disconnected, please hang up and I will
      call you back as soon as I realize you are no longer on the
      line.
C     Thank you.

KS - 000229

KS - MSJ 000958

CONNIE I. ONLEY                21-09-I-2331                               3

R      All right.
CL     Thank you.
EL     Hello, this is Jason Hopp.

R      Mr. Hopp, this is Appeals Referee McMaster calling about the
       hearing for Connie Onley.  Are you ready to proceed?
EL     I'm sorry, I caught you halfway through your sentence.  This
       is Jason Hopp at Redner's Markets.

R      Yes, this is Referee McMaster calling about the unemployment
       hearing for Connie Onley.
EL     Yes.

R      You ready to proceed, sir?
EL     Yes.

R      Okay.  I have the Claimant and her counsel on the line.  I
       am now contacting the Employer witnesses.  While I am doing
       that, again, if any party gets disconnected from the call,
       please hang up and I will call you back.
EW1    Hello?

R      Yes, is this Mr. Rhoton?
EW1    This is Mr. Michener.

R      Oh, Mr. Michener.  I'm sorry.  Mr. Hopp?
EL     Yes?

R      You said Mr. -- Ms. McGrory and Ms. Rhoton were going to
       participate today.  You also have Mr. Michener?
EL     Well, he's the Store Manager.  I'm assuming he's scheduled
       to work today.  Mr. Michener, is Ms. McGrory and Mr. Rhoton
       there?
EW1    Yes.

R      Okay.  All right.  I'm sorry about that.  I was asking for
       Mr. Rhoton based on the e-mail that I received.  I
       apologize.  Okay.  All right.  So, it appears as though I
       now have everyone on the line.  I'm going to do a roll call
       just to make sure I'm not missing anyone.  Ms. Onley, are
       you still on the line?
C      Excuse me?

R      Ms. Onley, are you still on the line?
C      Yes, ma'am.

R      Ms. Barker, are you still on the line?
CL     Yes.

CONNIE I. ONLEY                21-09-I-2331                          4

R      Mr. Hopp?
EL     Jason Hopp is here, yes.

R      Okay.  And Mr. Michener and Ms. McGrory and Ms. Rhoton?
EW2    Yes.

R      All right.
EW3    Yes, ma'am.

R      All right.  Now, there are a few things that I need to
       remind you of again before we start the hearing for today.
       The first is that I am digitally recording today's hearing.
       That will become the official record of today's hearing.  I
       turned on my recording before I began contacting any of the
       parties.  I have been on record this whole time.  During the
       hearing today, if you have difficulty hearing me or one
       another for any reason at any time, please let me know.
       Finally, if you should get disconnected from the call today,
       please hang up and I will call that party back as soon as I
       realize that party is no longer on the line.  Ms. Onley, do
       you have any questions about that information before we get
       started today?
C      No, ma'am.

R      Ms. Barker, questions from you about that information before
       we get started today?
CL     No.

R      Mr. Hopp, questions from you about that information before
       we get started today?
EL     No.

R      Mr. Michener, on behalf of the Employer witnesses, any
       questions about that information before we get started
       today?
EW1    No questions.

R      All right.  I will begin today's hearing, then, at this time
       with some opening statements.  We are back on record in
       Appeal Number 21-09-I-2331.  The Claimant is Connie Onley.
       The Employer is Redner's Tiger Markets, Incorporated.  The
       hearing is taking place on Monday, July 12, 2021.  The time
       is now 11:45 a.m.  The hearing was scheduled to begin at
       11:30 a.m.  I am Appeals Referee Tiffany McMaster.  I have
       been assigned by the Unemployment Compensation Board of
       Review to conduct today's hearing, take testimony and
       evidence on the issues under appeal, and issue a Written
       Decision to the parties.  Today's hearing is being digitally
       recorded.  The digital recording will become the official

record of the proceeding.  The Claimant is participating in today's hearing by telephone.  For the record, ma'am, would you please state and spell your first and last name?

C    Are you asking me?

R    Ms. Onley, you're the Claimant.

C    Okay.  First name, Connie, C-O-N-N-I-E; last name, Onley, O-N-L-E-Y.

R    Ms. Onley, has there been any change to your mailing address since the last hearing?

C    No, ma'am.

R    Thank you.  Ms. Onley, you are represented by counsel, correct?

C    Yes, ma'am.

R    Counsel, for the record, would you please state and spell your first and last name?

CL    Allison, A-L-L-I-S-O-N; Barker, B as in Boy, A-R-K-E-R.

R    Ms. Barker, any change to your mailing address since the last hearing?

CL    No.

R    Thank you.  The Employer is participating in today's hearing by telephone.  I'd like to begin with the Employer's counsel.  For the record, sir, please state and spell your first and last name.

EL    Jason Hopp, J-A-S-O-N, H-O-P-P.

R    And Mr. Hopp, if memory serves me correctly, you indicated at the first hearing in this matter that your mailing address was 3 Quarry Road, Reading, PA 19605.  Is that correct?

EL    Yes.

R    Thank you.  I would like each of the Employer witnesses, one at a time, to please state and spell your first and last name for the record.  I would like to begin with Mr. Michener, then Ms. McGrory, then Mr. Rhoton.

EW1    Karl Michener, K-A-R-L, M-I-C-H-E-N-E-R.

EW2    Sandra McGrory, S-A-N-D-R-A, M-C-G-R-O-R-Y.
EW3    Shaun Rhoton, S-H-A-U-N, R-H-O-T-O-N.

R    Thank you.  Mr. -- on behalf of the Employer, Mr. Hopp, did the Employer receive its Notice of Hearing for today?

EL    Yes.

CONNIE I. ONLEY                    21-09-I-2331                                   6

R        Ms. Barker, on behalf of the Claimant, did the Claimant
         receive Notice of Hearing for today?
CL       Yes.

R        Ms. -- oh, I'm sorry. Ms. Barker and Mr. Hopp, since both
         parties are represented in the hearing today, are the
         parties aware of their rights? Ms. Barker?
CL       Yes.

R        Mr. Hopp?
EL       Yes.

R        Do you waive recitation of the rights at this time, Ms.
         Barker?
CL       Yes.

R        Mr. Hopp?
EL       Yes.

R        Thank you. All testimony in today's proceeding must be
         under oath or affirmation. Because the parties are
         testifying by telephone, there is a second oath I need to
         administer to you. At this time, Ms. Onley, Mr. Michener,
         Ms. McGrory, and Mr. Rhoton, would you all please raise your
         right hands? And please keep them raised until I advise you
         to lower them.

PARTIES DULY SWORN

TELEPHONIC OATH

R        You may lower your hands. Let the record reflect the
         parties have been duly sworn. Now, today's proceeding is a
         continuation of a prior hearing. Where we left off was at
         the conclusion of Mr. Michener's testimony. So, the purpose
         of today's hearing is to take testimony from Ms. McGrory and
         Mr. Rhoton; after which -- I will begin by having a few
         questions potentially for those witnesses. Mr. Hopp will be
         permitted to question the Employer's witnesses. And then,
         Ms. Barker, you have the right to cross-examine the Employer
         witnesses. After the Employer's testimony has been
         completed, we will turn to the Claimant. I will begin by
         asking the Claimant a few background questions regarding the
         separation from employment. I will, then, have -- Ms.
         Barker, you will be permitted to question your client. Mr.
         Hopp, you will, then, have the opportunity to cross-examine
         the Claimant if you have any questions for the Claimant.
         Each party will, then, be given one opportunity to offer
         rebuttal or additional testimony or evidence. This would be

CONNIE I. ONLEY                    21-09-I-2331                                    7

testimony or evidence that was not previously provided. I
will, then, close the record and the parties will get a
Written Decision in the mail. Ms. Barker, any questions
about the hearing procedure we're going to follow today?

CL    No.

R     Mr. Hopp, questions from the Employer about the hearing
      procedure we're going to follow for today?

EL    No.

R     Thank you. Before we get started with the testimony, there
      are a few additional documents I need to enter into the
      record. These are documents that were created related to
      what happened after the prior hearing. I'm going to begin
      with Referee Exhibit 5. That as a Notice of Continuance
      which was mailed on May 28, 2021. That was issued after the
      hearing was concluded on May 26 and needed to be
      rescheduled. Referee Exhibit 6 is e-mail correspondence
      between the Employer and the Referee's Office with dates
      they were not available for the rescheduling. Referee
      Exhibit 7 is a Notice of Hearing mailed on May 28, 2021 for
      a hearing that was scheduled on June 14, 2021, however, I
      will note that due to an internal error, Ms. Barker was not
      listed as an additional party on that Hearing Notice, did
      not receive notice of the hearing, and the hearing was
      rescheduled accordingly. Referee Exhibit 8 was an e-mail
      from the Employer counsel, dated June 7, 2021, providing
      contact information for the prior hearing. Referee Exhibit
      9 is an e-mail from the Referee's Office to Ms. Barker, with
      dates that they would be unavailable for the relisting of
      this hearing. Referee Exhibit 10 is an e-mail from the
      Employer to the Referee's Office, listing dates the parties
      are unavailable for the relisting of this hearing. Referee
      Exhibit 11 is a document titled E-Mail Log Detail View.
      This appears to show the Hearing Notice was received or
      acknowledged or seen on June 21, 2021. I'm not exactly sure
      what that document is. Referee Exhibit 12 is the Notice of
      Hearing for today's proceeding, which includes the actual
      Hearing Notice, as well as the Telephone Regulations and a
      multi-language notice. Finally, Referee Exhibit 13 is e-
      mail correspondence from Mr. Hopp to the Referee's Office,
      with the telephone number for himself and the Employer
      witnesses for today's proceeding. Ms. Barker, any
      objections to Referee Exhibit 5 through 13 being entered
      into the record?

CL    No.

R     Mr. Hopp, objections to Referee Exhibits 5 through 13 being
      entered into the record?

CONNIE I. ONLEY               21-09-I-2331                    8

EL      No.

R       Referee Exhibits 5 through 13 are entered into the record
        without objection.  All right.  Mr. Hopp, why don't you
        begin with -- who is the Employer's next witness, Mr. Hopp?
        Who do you plan on calling, Mr. Rhoton or Ms. McGrory?
EL      Ms. McGrory,

R       Okay.  Bear with me one second, please?  All right.  Mr.
        Hopp, why don't you begin questioning your witness at this
        time?
EL      Thank you.  Ms. McGrory, where do you work?
EW2     Redner's Fresh Market.

EL      At what location?
EW2     Audubon, Pennsylvania.

EL      And what is your position at Redner's?
EW2     I'm a Meat Wrapper.

EL      Okay.  How long have you worked at that position at
        Redner's?

R       Okay, Mr. Hopp, I'm going to stop you.  Let's move it along
        to the actual reason for why we're here, please?  Do you
        have any questions for her about why the Claimant was
        discharged?

EL      Yes.  Are you...

R       Go ahead.

EL      Are you at a position of supervision or management at
        Redner's?
EW2     No.

EL      All right.  Let me direct your attention back to September
        5th.  What happened that day involving Connie Onley?
EW2     September 5th?  Connie was stating to me that she would like
        to put her dildo into Shaun's coat pocket to get him back
        for some of the things that he -- I don't know why she
        wanted to do it, honestly.

EL      I just want -- to make things easier, Ms. McGrory, I just
        want you to tell us what Connie Onley said in your presence,
        that's all.  So, back in the meat room in September, what
        did she tell you?
EW2     That she wants to put a dildo into Shaun's coat pocket.  And
        then, I advised her that that's not a good idea.

KS - 000235

KS - MSJ 000964

EL      Did she mention the use of a sex toy other than that one
        time to you?

EW2     There was times -- there was one time when I was making talk
        that she made a comment in regards to that. And then, there
        was one time, I was in the process of getting ready to wrap
        meat, she had came out and said that she knows how to clean
        it; and I didn't know what she was talking about, and I'm
        like what are you talking about, and then she stated her
        dildo.

EL      All right. Did she ever make mention to you in the
        workplace of -- well, first of all, did all of these
        discussions happen during the workplace while you were
        working?

EW2     Oh, yes. Yes.

EL      All right. And did she ever mention a movie to you in the
        context of the sex toy, the dildo?

EW2     Yes, Fifty Shades of Grey, and I made...

EL      What did she say?

EW2     Let me...

EL      Just based on your recollection, that's all I'm asking.

EW2     That she would -- she made the comment to me about Fifty
        Shades of Grey, and I let her know that that was one of my
        favorite movies because I like the one actor in it. And
        there was a time when she told me that she did watch the
        movie and it got her really worked up, and she pulled her
        dildo out and used it.

EL      All right. And how did you respond to what she said then?

EW2     I don't really care, it's not what I want to hear.

EL      I'm sorry. Okay. You verbally said that to her? I'm
        asking.

EW2     Yes.

EL      Okay. And then, how did she respond?

EW2     I really don't remember. I think she just proceeded...

EL      Okay.

EW2     ...to go on.

EL      All right. Now, you mentioned earlier in your testimony
        that Connie Onley wanted to put the dildo in Shaun Rhoton's
        coat pocket. Could you just go into more detail so I'd
        fully understand what happened there?

KS - 000236

KS - MSJ 000965

EW2    So, she wanted to put -- she physically set it up to where she felt like she needed to get him back.  And...

EL     For what?  Did she say for what?  To get back for what?
EW2    Just teasing, being normal co-workers in the department, pranks and stuff.  And I explained to her that I don't think that that's a good idea.  And then, it caught me off guard, but I think it was a day or two later, I had said something to Shaun and just to give him a heads-up, if that does happen, that he knows where it came from.  And, apparently, Connie had said that she was going to do it to him, told Shaun that, and then, I guess, at that point, Shaun took it up to the front office.

EL     All right.  Now, how did you end up -- did you end up discussing with store management Connie Onley's talking about using sex toys at work?
EW2    There was an event that took place in the Meat Department...

EL     When was that approximately?
EW2    October...

EL     If you recall.
EW2    August of 2020 I guess it was.  I went in and I talked to Karl in regards to the situation that Connie had brought up to me that she feels that her and I are being discriminated against.  And I didn't feel that way at all, so it kind of caught me off guard.  And I had went in and I spoke to Karl in regards about that, and I told him that I didn't want anything to do with that if that's where she's leading.  So, I don't exactly know what transpired, but our other manager, Dave Kemp [phonetic], came in, and I was talking to Dave Kemp in regards to some things that were going on and letting him know that I wasn't comfortable in that kind of conversation, and I don't want my name in it because that's not how I feel at all.  And then, I think it was actually a few days later, after I talked to Dave, I was doing dishes -- I'm a huge Trump supporter -- and Connie had walked up and she was going on in regard to us Trump supporters are the ones that are causing the riots out west and down south.  And I told her, I don't want to talk about this, and I asked her to be quiet.  I had asked her to shut up, and she wouldn't; and I ended up picking up the pot and throwing it into the filthy water and told her, just shut up.  And I screamed at her and I walked out; and when I walked out, she proceeded to follow me.  And I turned to her and I told her to stop following me.  And then, I ended up walking out the receiving door, and then she ended up following me outside; and I was screaming at her, go back inside, leave me alone,

I don't want to talk about this. And then, I did stay out there and cooled down. Connie went back in, and then I came in about 10 minutes later. And I was met at the back door by an old Assistant Store Director, Jim; and Jim asked if everything was okay, and I told him no. And then, he goes, do you want to write an incident report up? And I said yes. And then, when we got into the office, I'm like, do you want to know everything? And then, that's when I just started writing.

EL      Okay. So, that's when you told store management for the first time about Connie Onley's discussion in the workplace of the use of sex toy?

EW2     Correct. I don't talk about that stuff to people I don't feel comfortable with.

EL      All right. Did you ever...
EW2     And it's just...

EL      ...acknowledge...
EW2     ...something...

EL      ...to your...
EW2     ...that I did not know how to address -- what was that?

EL      I'm sorry. Finish, please? Finish what you were saying.
EW2     It's something that I verbally wouldn't know how to address. I was better off writing it on paper, but it's not like I was worried about writing it on paper because I didn't think it was actually going to happen. But, then, after everything transpired is when I'm like this has to be addressed.

EL      All right. So, can you approximate, approximately, from the time that Connie Onley was discussing in the meat room her use of sex toys and the possible planting of a sex toy in Shaun Rhoton's coat pocket, from the time you reported it, how much time went by approximately?

EW2     It was about a month, a month and a half maybe.

EL      All right.
EW2     But there were other incidences that happened in-between that that I never went to management before for, either.

EL      Can you elaborate on that, please?
EW2     There was times where she was talking about pole dancing, and she actually did a pole dance in the meat room, and I remember our meat -- my meat manager turning and looking up and telling her, don't ever do that again. And...

CONNIE I. ONLEY          21-09-I-2331                    12

C      Never happened.

R      I'm sorry. Ms. Onley, I believe that may have been a
       comment made by you, where you said that that never
       happened. Is that right?
C      Yes, ma'am.

R      Ms. Onley, it's not your opportunity to speak. Please don't
       interrupt. Go ahead, Mr. Hopp.
EL     One moment, please? I have nothing further of this witness.

R      Okay. Ms. Barker, do you have questions for Ms. McGrory?

CL     Yes, thank you. Ms. McGrory, to your knowledge, did Ms.
       Onley ever place a dildo or a sex toy in anyone's pocket at
       Redner's?.
EW2    No.

CL     Okay. And it wasn't until Ms. Onley, and you had a
       discussion about Trump and the riots that you reported
       anything that Ms. Onley had said in your presence, is that
       correct?
EW2    Correct, because I don't feel comfortable going to upper
       management and talking about stuff like that.

CL     And there was -- you did ultimately write a statement,
       correct?
EW2    Correct.

CL     And you complained in that statement that you felt Ms. Onley
       played the race card. That was part of your complaint,
       correct?
EW2    Yes.

CL     Okay. And did you ever -- did you get any discipline for
       screaming and throwing a pot at Redner's?
EL     Objection...
EW2    No.

R      Hold on.
EL     Objection.

R      Hold on. Okay. Mr. Hopp, what is your objection?
EL     It's completely irrelevant. The standard here is to
       determine whether or not there's a basis under Unemployment
       Law of whether the Claimant is eligible for benefits.

R      Okay. Ms. Barker, Mr. Hopp is raising the relevance of your
       question. Do you have a response to his objection?

CONNIE I. ONLEY                    21-09-I-2331                         13

CL      Yes, it would be -- it would go to show that there's
        different treatment between one individual and another for
        misconduct within the workplace.

EL      Well, they're complete -- I mean, let's just assume for the
        sake of argument that that's accurate. They're 180-degree
        different issues, a pot and a -- and water being thrown down
        versus an employee discussing the use of a dildo in the
        workplace.

R       Okay. All right. Mr. Hopp, your objection is noted. I'm
        going to overrule it for the completeness of the record.
        I'm going to allow the witness to answer the question;
        however, whether or not it is considered in rendering my
        Decision will be another story, you know. I'll evaluate
        that as need be in my Decision, if necessary. So, the
        objection is noted but overruled. Ms. McGrory, can you
        answer Ms. Barker's question? And if you need it repeated,
        please let her know that.

EW2     Can you repeat it?

CL      Sure. Were you ever disciplined for what you said, when you
        threw the pot and when you screamed?

EW2     No.

CL      Okay. Did you ever...

EW2     I...

CL      Oh, go ahead. Sorry.

EW2     I would like to back up to when I first started at Redner's,
        but I would just like to voice my concern here.

R       Ms...

EW2     When I first...

R       Ms...

EW2     ...started at...

R       Now, Ms...

EW2     ...Redner's...

R       Whoa, whoa, whoa. Ms. McGrory...

EW2     I'm just...

R       Excuse me.

EW2     Yes?

R       Thank you. Everybody stop speaking. Ms. McGrory, right
        now, we're on cross-examination, which means that you need

CONNIE I. ONLEY                 21-09-I-2331                        14.

    to limit what you're saying to questions that are posed to
    you from Ms. Barker.  So, what you're about...
EW2  Okay.

R   ...to say is not in response to a question, so we're not
    going to -- I'm not going to allow that.  So, Ms. Barker, do
    you have any other questions for Ms. McGrory?

CL   Yes.  Ms. McGrory, did you ever bring up the idea of a dildo
    or a sex toy with Ms. Onley?
EW2  No.

CL   Did you ever show her on your Amazon account any sex toys
    that you had purchased?
EW2  No.

CL   Okay.  Did you ever tell her where she could find a dildo at
    a local sex shop?
EW2  No.

CL   Okay.  I don't have anything further, Referee.

R   Just bear with me one moment, please?  I'm sorry, Ms.
    Barker, I was in the middle of writing a note.  Did you ---
    the last question you asked Ms. McGrory to which she
    responded in the negative, your question was did she ever
    tell the Claimant where she could purchase...
CL   A sex toy at a local sex shop.

R   Okay.  All right.  Mr. Hopp, do you have any redirect of Ms.
    McGrory?
EL   No.

R   Okay.  Mr. Hopp, do you wish to call Mr. Rhoton?
EL   Yes.

R   Okay, go ahead.

EL   All right.  Mr. Rhoton...
EW3  Yes?

EL   ...what do you do at Redner's?
EW3  I am a Meat Cutter.

EL   All right.  And is that a managerial or a supervisory
    position at Redner's?
EW3  No, it is not.

KS - 000241

KS - MSJ 000970

CONNIE I. ONLEY                    21-09-I-2331                              15

EL      All right.  Let's, and you're a Meat, you've been a Meat
        Cutter at the — at what location?

EW3     The Audubon Redner's Fresh Market, Audubon, Pennsylvania.

EL      All right.  And, previously, you've worked with Connie
        Onley?

EW3     Yes.

EL      All right.  Now, you've heard the testimony discussing Ms.
        Onley's discussion of sex toys in the workplace.  Have you
        ever personally witnessed her discussing sex toys in the
        workplace at Redner's?

EW3     Yes, I overheard two conversations.

EL      All right.  Tell me what you specifically heard Connie Onley
        say?

EW3     Oh, yeah, sure.  So, I was at the cutting table.  Sandy was
        making sausage.  Connie was standing next to her.  Connie
        had said that she had just watched the movie Fifty Shades of
        Grey, and I heard what I thought was that she forgot her
        toy.  So, later on, I had asked Sandy, I'm like, did she
        really say she forgot her toy?  She's like, no, no, no, no,
        she got her toy.  I'm not any naïve.  I knew exactly what
        she was talking about.  Then, later in that day, I'm at the
        auto-wrapper, wrapping some filet mignons that I had cut,
        and I heard Connie say to Sandy, oh, I cleaned it using hot
        water and soap.  Then, Sandy says, what are you talking
        about?  Connie says, you know what I'm talking about,
        knowing what she was talking about from the earlier
        conversation with Sandra.  Both times, Sandy was clearly
        upset and disturbed by the conversation.

EL      I have nothing further.

R       Bear with me one second, please?  Ms. Barker, do you have
        any questions for Mr. Rhoton?

CL      Yes.  Mr. Rhoton, did you ever complain about those comments
        you just testified to to management?

EW3     No.  No, I'm not the type of person to do that.  I was
        thinking that this isn't really a hundred percent regarding
        this case, but her conduct was a little unnerving.  There
        was multiple times where she had screamed at the department
        manager, and I was actually thinking about going to HR
        regarding that.  But, as far as the sexual content, no, I
        did not.

CL      And whatever you just testified to you also did not report
        to management, is that correct?

EW3     Correct.

CI      Okay.  And to your knowledge, did that conduct you just said
        regarding screaming, did that play any role in Connie's
        termination, to your knowledge?
EL      Objection...
EW3     No, I don't know...

EL      Objection.
EW3     ...that, no.

R       Okay.
EL      She's asking the witness to guess.

R       Okay, hold on.
EL      He's not in a...

R       Hold on.
EL      ...position...

R       Timeout, timeout.  Timeout, please?  Here's what I'm going
        to need, Mr. Hopp and Ms. Barker in particular:  I
        understand the inclination to want to object as soon as
        possible prior to the question being finished; however, that
        causes a problem with me understanding what the question was
        and what the objection is so that I can properly rule.  So,
        I am going to ask both counsel, please, despite the fact
        that -- again, I understand your inclination to object as
        quickly as possible to prevent a particular question or
        issue being presented; because of the constraints of a phone
        hearing, I can't allow that.  So, Ms. Barker, unfortunately,
        I did not hear the rest of your question before I believe
        Mr. Hopp began to object.  So, we're going to kind of need
        to hit the rewind button here.  Ms. Barker, can you start
        over with whatever it was that you were saying, if you
        recall, prior to Mr. Hopp objecting?
CI      Sure.  I actually think I might be able to potentially -- I
        would object to Mr. Rhoton's previous testimony as being
        irrelevant as it's not part of the reason for Ms. Onley's
        termination.  But that's what I was trying to get out by my
        next question, which was, do you have any knowledge whether
        that information played any role in the decision to
        terminate Ms. Onley?

R       Okay.  So, Mr. Hopp, then, what were you about to say after
        Ms. Barker said that?
EL      Objection for lack of relevance and foundation.  The
        testimony is he's -- Mr. Rhoton is a Meat Wrapper that is
        not in a managerial position at Redner's and would have no

CONNIE I. ONLEY           21-09-I-2331                    17

knowledge outside of guessing what the basis of someone's termination is.

R       Okay. Both of your objections are overruled. Mr. Rhoton opened the door by making the comment, and I believe that the question that was posed by Ms. Barker is a proper inquiry based on that statement. And, Ms. Barker, his testimony was a fair statement of why he did what -- or did or did not do what he did or did not do based on his prior response. So, both of your objections are noted but overruled. Mr. Rhoton, can you answer Ms. Barker's question?

EW3     Sure. Can you please repeat the question?

CL      Sure. To your knowledge, did -- the testimony that you previously supplied regarding Ms. Onley allegedly screaming, did that play any role in her termination?

EW3     That I am not sure. I don't believe so, but I do not know.

CL      Okay, thank you. And for the conversations that you testified that you witnessed, were you present the entire time that Ms. Onley and Ms. McGrory were near each other and conversing?

EW3     Just those two times that I had recalled, yes.

CL      Okay. But, so, are you -- you wouldn't have been present for any conversation leading up to what you heard or after you left the area, is that correct?

EW3     I'm going to -- I'm confused by your question.

CL      Is it fair to say that there were conversations between Ms. Onley and Ms. McGrory that you were not present for?

EW3     Maybe. I...

CL      Okay.

EW3     ...don't know. I mean, if I wasn't there, I wouldn't know the conversation.

CL      Right. Okay, understood. That's all I have, Referee.

R.      Mr. Hopp, do you have any redirect of Mr. Rhoton?
EL      No.

R       Okay. I do apologize. Ms. McGrory, I wrote something down in my notes that I believe was incorrect, so I want to come back to you to ensure that I understood your testimony correctly. The conversation...

EW2     Sure.

KS - 000244

KS - MSJ 000973

CONNIE I. ONLEY            21-09-I-2331                        18

R        ...that you said that you had with Ms. Onley about Ms. Onley
         stating that she wanted to put a dildo in Mr. Rhoton's coat
         pocket, did you testify to the date in which that
         conversation took place?

EW2      On approximately September 5th.

R        September 5th? Thank you. I had written down October 5th,
         which is why I was a bit confused. And then, I wanted to
         make sure that I further understood. Did you recall when
         you reported that statement to anyone in management?

EW2      October 1st.

R        October 1st. And that was, if I understood your testimony,
         in -- I'm sorry. That was subsequent to this issue that you
         testified about, where the conversation involving Trump
         occurred, and you alleged that the Claimant followed you out
         after you asked her to stop talking about it, et cetera, is
         that correct?

EW2      Correct, that happened.

R        Okay.
EW2      ...October 1st.

R        Okay, thank you. I wanted to ensure that I had the timeline
         on that correct. Thank you. All right. Mr. Hopp, at this
         time, do you have anything further from the Employer?

EL       No.

R        Okay. All right. Ms. Barker, I'm going to begin by asking
         your client a few questions before I turn her testimony over
         to you. Ms. Onley, were you aware that the Employer had a
         policy that prohibited offensive remarks, comments, jokes,
         slurs, verbal conduct pertaining to an individual's race,
         color, national origin, religion, sex, et cetera?

C        No, because this took place on a daily basis.

R        That's not what I asked you, ma'am. I asked you, did you
         know the Employer had a written policy?

C        Yes.

R        Okay. Did you also know the Employer had a written policy
         that prohibited offensive sexual remarks, sexual advances or
         requests for sexual favors?

C        Yes.

R        Okay. On September 5th of 2020, did you tell Ms. McGrory
         that you were going to put a dildo in Mr. Rhoton's coat
         pocket?

C       I don't know if it was September 5th, but I did make an imply
        to that.

R       Okay, ma'am, I don't understand what that means.  Did you
        tell her you were going to put a dildo in Mr. Rhoton's coat
        pocket?

C       No, ma'am, I did not say I was going to do it.  I said I was
        thinking about doing something to get him back, and I
        mentioned that.

R       Okay.  Ms. Barker, do you have questions for your client?

CL      Yes.  Okay.  Ms. Onley, the day of your termination, please
        explain to the Referee what of relevance happened that day,
        October 1st.

C       Okay.  That morning, it was the second time in a week that
        Sandy was a no-call/no-show.  She finally showed up a couple
        of hours after she was supposed to be there.  I don't know
        what happened prior to her walking into the meat room, but I
        do know our manager was outside of the meat room.  I did not
        see him, but he was outdoor making something, and I'm
        standing there doing fish.  She comes in.  As she's coming
        by, she gives me this look.  And I looked at her and she
        said, is he mad?  And I said, very.  She said, well, too
        bad.  He needs to f-ing get over it.  At which time, she
        passed by me, went into the back so she could break down the
        load and get her chicken.  And that's where that ended
        there, okay?  Once that happened, she came back out.  She
        went out.  She did her chicken, and we weren't really saying
        anything to one another.  She -- because I knew Marcus
        [phonetic] was upset, and then I knew she was upset.  I know
        she had been going through some stuff, I don't know what.  I
        didn't ask.  I thought it was not the time to ask.  So, we
        just went on about doing our daily procedures at work.  She
        went out and did whatever she'd be out doing whatever.  So,
        I'm doing the seafood.  She comes back in.  She goes over,
        and I think she was cleaning up her section, and she was
        washing dishes or whatever in the sink, and I'm getting
        ready to steam shrimp.  So, I'm over at the -- she was
        washing dishes or whatever, and I go over to do the shrimp.
        And then, while I'm doing the shrimp, I said, Sandy, I was
        watching the news last night and that they were talking
        about that antifa thing again, and what they said was that
        they were a, they were not -- it was an idea, that it wasn't
        real, and that they were not the ones doing all this
        craziness with all these riots and whatever.  And I said, it
        was the Proud Boys; and she said, I never heard of the Proud
        Boys.  I said, well, they mentioned the Proud Boys.  I never
        heard of them, either.  And she said that's why she don't

watch the news because it's fake news. I said, well, I like
to know what's going on in the world around me. And we were
talking. She's still at the sink, doing her thing. I'm at
the steamer. My back was kind of turned from her a little
bit, and we was talking. And I said, yeah, I said, the
Proud Boys and these militia groups or whatever, I said,
they're the ones that's been starting all the trouble.
These Black Lives Matters were supposed to be peaceful; and
they were coming in, setting them up and starting the
trouble to make it look like it was a violent march when it
really wasn't. She said, well, that's not true. I said,
well, since they're the news and, you know, I kind of -- I
believe what they're saying because I have been following
this. And she says to me, well, when have I ever told you
something that wasn't true? And I said, hmm. Actually,
Sandy, you said quite a few things that I didn't feel were
true. Now, again, I wasn't looking at her when I said that.
Next thing you know, I hear there's pots and things
slamming, she's yelling and screaming, shut up, shut up,
shut the F up, stop f-ing talking, as she's approaching me
at this point. Okay? And I'm standing there in shock
because I didn't see this coming. We had these kind of
conversations daily inside the meat room, outside of the
meat room, on break time and whatever. So, there were a lot
of conversations she and I had that no one else in the meat
room would have been privileged to, but she and I had these
conversations with others in Redner's...

R       Okay.
C       ...that did...

R       I'm sorry.
C       ...at the time...

R       I'm sorry. Hang on, Ms. Onley. With all due respect, your
        counsel's question is, what happened on October 1st? So,
        please limit your testimony right now to what actually
        happened on October 1st.
C       Okay. So, I'll backtrack a little bit. So, when the
        screaming started and she approached me and got a bit to my
        face, I was standing there holding on a pan of shrimp. I
        was in shock. I was still in, I didn't have a response,
        didn't know how to react to that because -- I don't know. I
        was just in shock. I was stunned. I was frozen. So, she's
        screaming and screaming, and I'm standing there praying,
        Lord, get out of my face, because I didn't know how much
        longer I can let her scream at me. She turns and she walks
        out. Honestly, I did not follow her, by the way. I was
        standing there just in shock, like there was nobody in there

KS - 000247

KS - MSJ 000976

with her and I.  There was no Shaun, no managers, no one.
So, I'm wondering why the manager didn't come in, because he
was right outside of the...

R    Okay.
C    ...department's...

R    Again...
C    ...door, where you just...

R    ...Ms. Onley, what happened?
C    Okay.

R    Please don't tell me what you were shocked about.  That's
     not what your counsel asked you.
C    Okay.  I'm sorry.  So...

R    So...
C    ...she walked out.

R    So, she walked out...
C    I'm standing...

R    ...and then what happened?
C    Excuse me?

R    She walked out, and then what happened?
C    I stood there and stopped and in disbelief.  I did not run
     out after her when she left.  A few minutes later, manager
     comes in.  I walked out because I could still hear her out
     back, screaming and yelling.  So, the manager walks in.  He
     says, what happened?  I'm like, I'm not sure.  At this point
     -- I said, I'll be back in a minute.  So, at this point, I
     looked out, I see her at the other end of the hallway, still
     yelling and screaming.  And I come out, and there's a lot of
     people back there and were asking me, what's going on?  I'm
     like, I'm not sure.  So, I proceeded to walk down the
     hallway towards her.  She, then, goes out the back door
     there, and I walked down.  I go around, opened the door, and
     I called her, Sandy, Sandy, where are you going?  Go back
     inside.  Sandy, what's the matter?  Go back inside.  What's
     wrong?  F-ing go back inside.  Well, I turned, and she kept
     walking, and she was so far down I just turned and came back
     inside, came back into the meat room.  The manager was
     there, and he said, what's going on?  I'm like, I don't
     know.  We were talking, and, all of a sudden, she all lost
     it.  And that was that.  He didn't say nothing else to me, I
     didn't say nothing else to him.  We waited for her to come
     back.  It took a very long time.  I went on break.  I never

saw her outside.  I did not see her.  I came back in.  I
said, Marcus, did Sandy come back?  He said no.  I said,
she's been gone a really long time.  I hope she's okay.  And
he...

CL      Okay.
C       So, he didn't know...

CL      I'm just going to...
C       That was that.

CL      Ms. Onley, I'm just going to redirect you.  So, at some
        point, did you go and speak with Mr. Michener, the Store
        Director?
C       No.  He was off that day.

CL      Okay.  Did, at some point, did you speak to him about what
        happened that day?
C       I believe it was the next day, when I came in.

CL      Okay.  And can you tell me about that conversation?

R       Actually -- I'm sorry.
C       Okay.

R       Ms. Onley and Ms. Barker, I would like to interrupt briefly.
        I have a question that I would like to ask in-between that.
        Ms. Onley, did Mr. Michener approach you or did you approach
        him the next day, when you had this conversation?
C       I asked -- because we ran into each other.  I had just
        talked to him at 6 in the morning and he was up at the front
        desk.

R       And who started...
C       So, I kind of...

R       ...the conversation?
C       Excuse me?

R       Who started the conversation, you or him?
C       I asked him if he wanted to talk to me, and he said -- I
        said, do you want to talk to me?  I said, I just talked to
        Sandy.  Do you want to talk to me now or wait until later?
        He said, we'll wait.  And then, he said, oh, wait, let's
        talk now) and, at which time, he took me into his office and
        we talked.

R       And why did you think that he wanted to talk to you before
        you asked him?

CONNIE I. ONLEY                  21-09-I-2331                              23

C       Because that day, when I left, Jim had came -- as I was
        ready to go off my shift, Jim came up to me and he said to
        me, is everything okay? And I was a little suffered, so I
        was like, you know, I'm fine. And he said, are you sure?
        And I said, yeah, I'm fine. And he didn't say nothing to me
        after that. It was after the fact that someone had -- I
        don't even remember who it was that said I needed to go and
        speak to Karl. And I said, about yesterday? And he said
        yes. That's why I asked Karl that when I saw him.

R       Okay, go ahead. So, now, the...
CL      Okay.

R       Ms. Barker's question was, what did you discuss?
C       Excuse me?

R       Ms. Barker's question was, what did you talk about?
C       When we went into his office, he said, okay -- he let me
        know that Sandy had came in. He said, I wasn't here. I
        said, I know you were off. Apparently, she spoke to Jim,
        and he was basically relaying to me what he was told. And
        so, when he was telling me what Sandy had said, I said,
        okay, this is how -- when he brought up the sex thing, okay?
        He didn't bring up the screaming and yelling and getting to
        my face. He brought up the sex thing. I said, well,
        actually, I said, what she's telling you was not true. I
        said, first of all, I never initiated that conversation.
        What I said was we talked about movies and things all the
        time. So, I said, I have -- we were talking about movies.
        I said, well, this weekend, I watched the Fifty Shades of
        Grey. And that's when Sandy said -- she was at the chicken
        thing, pricing, at the machine pricing her chicken. Marcus
        was at his desk, writing something down or whatever. And I
        said, yeah, I watched Fifty Shades of Grey. And I said, you
        know, I watched the first one with my husband, and I missed
        him. And, you know, I said, I find it to be kind of -- I
        said, I'm not into porn at all. I don't watch it at all. I
        said, this movie is kind of pornographic. She says, no,
        it's not, really. I said, but I did think it was. I liked
        the storyline, but I thought it was kind of, you know -- the
        stuff that was going on in the movie. I don't need to go
        into details. I'm sure you guys know what went on in the
        movie. So, anyhow, she says, oh, that was my favorite
        movie. I loved that movie, and so on and so on and so on.
        And I'm like, oh, okay. Well, you know, I don't know if I
        should -- I didn't watch the other two because he was gagged
        by then, and I don't know if I should watch it because I
        felt some kind of way when I watched it, and I missed him.
        And you guys want to say stuff on -- would want to say on

KS - 000250

KS - MSJ 000979

this day, but there were things that led up to this, anyhow, about my not having sex and not dating and all that stuff. And at which...

CL    Ms...

C     ...point...

CL    Ms. Onley, let me focus...

C     Um-hum?

CL    ...please? So, in terms of conversations regarding sex toys, what, if anything, did Ms. McGrory ever say to you regarding sex toys?

C     She was saying that I -- she had suggested that I go to one of the places, the adult toy stores. And I said, I've never been into an adult toy store. I wouldn't have a reason to go there. I have a husband. She said that she would. And I asked her, why would you do that? You have a husband. She informed me they don't sleep together, okay? And I thought that was odd, but that's their thing. So, he -- she let me know her husband sleeps downstairs, she slept upstairs. She purchased a toy and suggested that I go to the -- to that store, and she was talking about one that was close to the job. And I said, I'll never go. I said, I'm almost embarrassed to go in there, not to mention what if I'm in there and somebody greets me. She said to me at which time, get over it. She said, when you go in there, she said, more Christians, church people will go -- you'll find there's more going there than anybody. And I said, really? I said, well, I don't know anybody at my church that goes to those places. No one's even ever mentioned them, so I don't know. She said, well, they wouldn't make any admission. I'm just telling you, more Christians go to those places. And I asked her had she ever been there, and she said yes. And I asked her if she bought anything, and she said she bought something, but she bought hers on Amazon. She pulled out her phone, went on Amazon and showed me what she had purchased. Okay?

CL    And prior to this...

C     And I said...

CL    Prior to this, what, if any, times have you brought up or initiated the topic of the sex toy?

C     Never prior to that first day, when we were talking about Fifty Shades of Grey. We never talked about sex toys ever.

CL    And who initiated the sex toy in that conversation?

KS - MSJ 000980
KS - 000251

C.     Sandy did.  She was advising me to go to the adult toy
       store.

CL     Okay, understood.  And during your conversation with Mr.
       Michener, did you express that to him when the notion of a
       sex toy was brought up?

C      Yes, ma'am, I certainly did.

CL     And did you report anything to Mr. Michener regarding what
       Ms. McGrory had said or done the day before, on October 1st,
       as it related to the antifa conversation you talked about?

C.     I told him all of it that day.

CL     Okay.
C      But that's the first that I've said something to him about
       it.

CL     Any time at any conversation that you just talked about with
       Sandra as it related to a sex toy, did she ever tell you to
       stop talking about those things?

C      No.  No, she was very comfortable.

CL     And the day, the final day that, you know -- with the
       throwing of the pot and the screaming, did anybody from
       Redner's intervene during those events?

C      Not one person came in and said anything.  She just -- no.

CL     Whether it was that day or another day, did Ms. McGrory ever
       mention anything negative as it related to Black Lives
       Matter or George Floyd?

C      All the time.

CL     And how did that make you feel?
C      I felt bad inside because I knew I had to work with her, and
       I didn't know how to -- I was not going to get through to
       her.  She was set on her belief; I was set on mine.  We had
       our conversations.  We agreed to disagree, and she felt her
       way, I felt my way.  But I think, part of it, she thought
       she could get through to me because of my husband, so --
       well, because of who he was, rather.  And I think that might
       be why -- I can't say what her motives were, but she was
       trying to convince me to be afraid...

CL     Right.
C.     ...for her instead of whatever, and she couldn't do it.  And
       it just...

CL     Okay.
C      It pissed her off that she couldn't do it.

KS - MSJ 000981
KS - 000252

CONNIE I. ONLEY                    21-09-I-2331                              26

CL      What did she say about George Floyd?
EL      Again...

C       I mean...
EL      ...I'm going to object.

R       Okay.  Okay, hold on.  Go ahead, Mr. Hopp, so I can hear
        your objection, please?
EL      I mean, the relevance between the Claimant engaging in
        sexual harassment in the workplace -- which is the
        articulated basis of how she's terminated -- to now going in
        an exposé as to a non-managerial witness's thoughts on
        George Floyd.

R       Ms. Barker, any response to Mr. Hopp's objection?
CL      Yes, because the next question will be whether she reported
        that to management; and then, we would again get into the
        disparate response.  They're both -- they would both be
        complaints regarding, you know, an act that's forbidden,
        whether it's race or sex, and the disparate way that they
        disciplined Ms. Onley versus Ms. McGrory.

R       Okay.  Mr. Hopp, your objection will be noted for the
        record.  I will overrule it to make sure that the record is
        complete on all issues that may impact my Decision.  So, go
        ahead, Ms. Onley.
C       Okay.  With the George Floyd thing, she was saying how he
        deserved what he got because he was on drugs or a drug
        dealer or something to that effect.  We were not in the meat
        room -- just to be clear about this -- when we had this
        conversation.  We were on break.  And I was like, no, he
        wasn't -- what happened to him, he did nothing wrong.  And
        she was just, he was a drug addict, and that's what happens
        to drug addicts.  And so, I'm like, but he wasn't; but even
        -- he may have done drugs; but even if he did drugs, what
        happened to him was not justified.  That resulted...

R       Okay.
C       ...to his death...

R       Ms...
C       ...because of it.

R       Ms. Onley, your counsel's...
C       Yes?

R       ...question is what did Ms. McGrory say, not what you said.
C       Oh, okay.  Okay.  Well, that is what...

KS - MSJ 000982
KS - 000253

CL     And...

C      ...she said, that he deserved it.

CL     Okay.  And did you report that to Mr. Michener when you
       spoke with him?

C.     No.  Well, on that day, when I had that conversation, yes, I
       did tell him about that, and it entailed a whole lot of
       other stuff we discussed.

CL     But you -- on the day after the screaming and throwing of
       the pot, you did say that to Mr. Michener, correct?

C      Yes, I did.

CL     Okay.  And did you ever willfully violate any rules at
       Redner's?

C      No, ma'am, I did not.  In my four years, no.

CL     Okay.  Are you currently able and available to work?

C      Yes, ma'am, I am.

CL     Okay.  I don't have any additional questions, Referee.

R      Mr. Hopp, do you have any questions for the Claimant at this
       time?

EL     Yes.

R      Go ahead.

EL     Ms. Onley, you discussed in the workplace using a dildo
       while watching Fifty Shades of Grey, isn't that correct?

C      I did not use a dildo while watching Fifty Shades of Grey.

EL     No, that's not my question.  My question was, did you
       discuss in the workplace that you used a dildo while
       watching Fifty Shades of Grey?

C      And the answer is no, I did not use a dildo while watching
       Fifty Shades of Grey, and I never told her I did that.

EL     All right.  So, you do recall Mr. Michener's testimony,
       correct?

C.     Not sure what you're asking.

EL     All right.  Mr. Michener testified previously.  You remember
       that?

C      Um-hum.

EL     All right.  Now, to refresh your recollection, Mr. Michener
       testified that you admitted to discussing using a dildo

KS - MSJ 000983
KS - 000254

CONNIE I. ONLEY         21-09-I-2331                          28

> while watching Fifty Shades of Grey.  Do you recall that
> now?

C       Yes, but the way you're asking the question is confusing.

EL      All right.  Explain to me how it's confusing.

R       Well, now, Mr. Hopp, if she's indicating confusion, that is
        something I will take into account.  But can you rephrase
        the question potentially in another way?

EL      Sure.  So, you would agree with me that you had a discussion
        with Mr. Michener where you wouldn't disagree that the words
        came out of your mouth at some point while you were working
        that you used a dildo, a sex toy while watching Fifty Shades
        of Grey?

CL      Referee...
C       I never discussed...

CL      ...objection.
C       ...with him...

R       Okay.
CL      I'm sorry.

R       Ms. Barker, what is your objection?
CL      I'm just objecting it's been asked and answered.

R       Well, actually, with all due respect, Ms. Barker, your
        client indicated she was confused by the question, so I
        can't tell whether or not it actually has been asked and
        answered.  Here is -- let me see if I can assist here and
        try to move past this.  Ms. Onley, Mr. Michener testified he
        asked you pointblank did you ever say -- hold on, I want to
        get it right, so bear with me here.  Did you ever say that
        you talked about using a dildo after watching Fifty Shades
        of Grey?  He says you told him you did.  Did you do so?
C       I never discussed with Shaun dildos or anything else.

R       We're talking about Mr. Michener.
C       Oh, the manager.  I did tell him -- I didn't tell him I was
        using it while I was watching Fifty Shades of Grey.  I
        explained to him the situation based on what he told me
        Sandy told him.

R       That's not the question, Ms. Onley.  The question is very
        specific.  Did you tell him, Mr. Michener, yes, we talked
        about me using a dildo after watching Fifty Shades of Grey?
C       Yes, ma'am.

CONNIE I. ONLEY                21-09-I-2331                              29

R      Any other questions, Mr. Hopp?

EL     Did you, in the workplace, discuss cleaning or how to clean
       your dildo after using it?
C      Yes, she instructed me how to clean it.

EL     No, that's not what I asked you. What I asked you is, did
       you explain or discuss in the workplace how you cleaned your
       dildo?
C      Yes. Between her and I, yes.

EL     All right. Did you admit to Mr. Michener that you discussed
       that with Sandy?
C      Yes, sir. Yes, sir, I did.

EL     All right. Now, you testified that Sandy was always this
       willing participant in these conversations with you about
       the use of dildos. Did I understand that correctly?
C      Yes, sir.

EL     All right. Did you hear the testimony of Mr. Rhoton?
C      Yes.

EL     All right. I believe Mr. Rhoton testified that he
       personally witnessed you bring up in the workplace the use
       of a dildo, and Sandy said something to the effect that she
       didn't want to hear it. Do you recall that...
C      No...

EL     ...testimony?
C      ...that's not -- I recall his testimony, but that's not what
       happened. But I recall the testimony, yes.

EL     Okay. One minute, please? Now, you bring up George Floyd,
       Black Lives Matter, political conversations in your
       testimony. Mr. Michener also testified regarding the
       conversation he had with you about those topics. Don't you
       recall that?
C      I do recall that, yes, sir.

EL     All right. And I believe -- and I'm asking for your
       recollection, is I believe that he said that you discussed
       politics, but there was no animosity towards each other.
C      Not...

EL     Do you recall that?
C      I don't think so.

EL     Okay. I got nothing further.

KS - MSJ 000985
KS - 000256

CONNIE I. ONLEY          21-09-I-2331                    30

R      Okay.  Ms. Onley, can you tell me approximately when these
       conversations with Ms. McGrory occurred regarding Black
       Lives Matter and George Floyd?

C      Okay.  I want to understand exactly what you're -- because
       you've been saying keep it to this day.  So, are you asking
       me now when we had these conversations...

R      Yes.  Can you...
C      ...prior to...

R      ...give me...
C      ...this day?

R      Can you give me any type of timeframe as to when Ms. McGrory
       allegedly made negative comments about Black Lives Matter
       and George Floyd?

C      That actually started before August.  As soon as those riots
       and things were going on, from the time they started, we
       have had many conversations about it.

R      Okay.  So...
C      And that just...

R      ...let's just...
C      ...went on...

R      Let's see if we can narrow down the timeline.  So, my
       recollection is George Floyd died Memorial Day weekend of
       2020, and, not too long after that, protests started to
       occur in June.  So, can you tell me around when you're
       saying this conversation with Ms. McGrory happened?

C      I would say it was -- that's a while back.  I would say
       June, July.  I can't give you a date, but, somewhere in
       there, we were talking about it.

R      Okay.
C      Ever since this started going viral on the news and
       everything, we were talking about it.

R      And you said that your perception of Ms. McGrory in those
       conversations, that she was very set in her beliefs as to
       what you say she was saying, correct?
C      Yes, ma'am.

R      Why would you have a conversation with Ms. McGrory on
       October 1st about antifa and the riots and the Proud Boys if
       you had already had that past experience in conversing about
       that with Ms. McGrory?

KS - MSJ 000986
KS - 000257

CONNIE I. ONLEY                21-09-I-2331                          31

C       Because, prior to that, they were -- and the government was
        investigating it.  And this particular night before, as I
        was watching the news and things, and they were saying where
        antifa didn't really exist and they were a, more of a idea
        than a actual group.  And I was trying to tell her that they
        weren't real, and she was trying to say that, yes, they
        were, they're the ones starting all the trouble around the
        United States with these riots.

R       My question is, why would you engage Ms. McGrory in that
        conversation given what you testified earlier was the
        conversation you had with her about these things, where you
        said she appeared set in her beliefs?

C       We discussed these all the time.  Neither one of us -- it's
        not like she was angry with me.  I wasn't angry with her.
        We just discussed things, just in conversation.

R       Until -- according to you -- this last conversation, where
        your testimony was that she was slamming pots, screaming in
        your face, getting in your face, et cetera?

C       Right, because she, at that point, she was like she didn't
        want to hear it anymore; because she said to me, I've never
        told you any -- have I ever told you anything that wasn't
        true?  And I said, well, actually, there were a lot of
        things you said that I disagree with.  And that's when she
        slammed, and things got crazy.

R       Now, if I understood your testimony correctly -- and this is
        what I want to make sure I'm clear, Ms. Onley.  Prior to Ms.
        McGrory bringing up the issue of sex toys, and specifically
        dildos, that was not something that you were ever involved
        with prior?

C       Never.  We didn't have those conversations prior to me
        mentioning the movie.

R       I didn't ask you about your conversations.  Was it something
        that you had been involved with in any way prior to Ms.
        McGrory...

C       No, ma'am.

R       ...suggesting to you about it?

C       No, ma'am.

R       Why would that have been the choice of prank or -- you said
        that you were thinking about putting a dildo in Mr. Rhoton's
        pocket to get back at him.  If that was not something that
        you had been involved with prior to Ms. McGrory's
        suggestion, why would that have been your choice of your
        prank or getting back at Mr. Rhoton?

KS - MSJ 000987
KS - 000258

C        Because I was pranked every day. Every day, my whole shift,
         I was -- pranks were pulled on me.

R        I'm not...
C        Okay?

R        Ms. -- okay. Ms. Onley, again, that wasn't my question. My
         question was, why did you choose that particular thing if
         that was not something that you had been involved with
         prior?

C        Well, Shaun had informed me -- I kept telling him, well, I'm
         going to get you back one day, one day, one day. He said,
         it'll never happen. It'll never happen. You're not good
         enough or smart enough to get me back. So, I was thinking,
         I said to Sandy I should -- I didn't say I was going to do
         it. I said, you know what? I should probably put it in his
         coat pocket. And when he goes on break, come back, and
         he'll put his hand in his pocket and pull it out.

R        But...
C        And she was...

R        Okay.
C        And she laughed.

R        Ms. Onley, my question is, why did you choose a dildo in
         particular? That is my question.
C        I was trying to think of a way to get him back, something
         that would have an effect on him that he -- I wanted the
         pranks to stop.

R        Okay.
C        Okay?

R        Um-hum.
C        I wanted them to stop, and I begged him to stop. And I
         thought, you know what? After I let her know -- because she
         asked me if I had went to the store; and I said no, I'm not
         going to go. And that's why she showed me on Amazon that I
         could go to -- she informed me I could go to Amazon and
         showed me what she had bought. So, I was like, that's
         something that would really get him.

R        Okay. Ms. Barker, do you have any redirect of your client?
CL       Just very briefly. Mr. Hopp had asked you a question
         regarding cleaning of a sex toy. Was that a conversation
         you initiated?
C        No, ma'am. When I had -- no. The answer to that is no, but
         she told me not to use soap and water on it. I told her

KS - MSJ 000988
KS - 000259

CONNIE I. ONLEY          21-09-I-2331                    33

that I have bought it, bought one off of Amazon and that it
had came, and I had never -- I said, I still haven't used
it. I'm a little nervous about using it. And she said,
well, you know, you can't use soap and water. When you use
it, you cannot use soap and water. And I said, why not?
How do you clean it? She said, just water. And I said,
well, that won't clean it. And she said that's what she did
with hers. So, I...

CL      Okay. And when...
C       That was the...

CL      And when...
C       ...conversation at that point.

CL      Okay. And also, Mr. Hopp had asked you a couple of
        questions about what you may or may not have said to Mr.
        Michener on your last day of employment. And when you
        admitted to these conversations, did you also explain the
        context therein that those conversations were happening?
C       I certainly did. I...

CL      Okay.
C       I absolutely...

CL      That's all I have.
C       Absolutely.

R       Okay. Any recross of the Claimant, Mr. Hopp?
EL      No.

R       Okay. Turning back to each party now once as I indicated I
        would do. Mr. Hopp, do you have any rebuttal or additional
        testimony or evidence from Mr. Michener?
EL      No.

R       Do you have any rebuttal or additional testimony or evidence
        from Ms. McGrory?
EL      No, I have no further evidence.

R       Does that include Mr. Rhoton?
EL      Correct.

R       Okay. All right. Ms. Barker, anything else from your
        client at this time before I close the record today?
CL      No.

R       Okay. Mr. Hopp, do you wish to make any type of closing
        statement?

KS - MSJ 000989
KS - 000260

EL ·    Yes.

R       Go ahead.
EL      The Employer established a rule -- which is, by common law,
        you know, constructively noticed upon every employee in this
        Commonwealth -- that they can't engage in sexual harassment.
        Mr. Michener testified that the Claimant admitted to
        discussing the use of a sex toy in the workplace and
        discussed -- she discussed cleaning it in the workplace.
        Obviously, the Claimant has competent counsel.  Mr. Michener
        testified.  The Claimant obviously -- Claimant's counsel
        obviously discussed with her client prior to the hearing
        what happened, her version.  At no time did Mr. Michener
        testify that there was some greater context to the
        Claimant's admissions that she used a sex toy.  All he
        testified to is she used a sex toy and discussed using it in
        the workplace and discussed cleaning it, period.  There's
        been no evidence solicited outside of the Claimant's
        uncorroborated evidence that that's the case; however, the
        Employer's evidence is further corroborated by Mr. Rhoton,
        that Mr. Rhoton testified that Ms. McGrory was very
        uncomfortable -- very uncomfortable -- with the discussion
        in the workplace about the Claimant's use of dildos.  He
        testified to that.  Mr. Michener's testimony was consistent
        with that in terms of the admissions made by the Claimant;
        and then, on top of that, what Ms. McGrory said.  So, we
        have three separate witnesses having a consistent version.
        And then, you have the Claimant with, frankly, rambling
        testimony that is unwilling to answer questions when posed,
        which I would suggest shows her lack of credibility.  We've
        established a rule is broken, we established that it is
        applied consistently, we established that she had knowledge
        of it, and there's multiple corroborations in the violation.
        Thank you.

·R      Ms. Barker, do you wish to make a closing statement?
CL·     Yes, please?  Thank you.  The Employer here has not
        established -- or has not met their burden to prove that Ms.
        Onley committed willful misconduct.  Firstly, I would just
        pose that, you know, calling Ms. Onley's, you know,
        testimony rambling is unnecessary, but, you know, she's
        recalling events from many months ago.  She testified
        credibly that these conversations were not initiated by her,
        that she participated in them after they were being brought
        up by a co-worker who they had many conversations together.
        Although Mr. Hopp had said that Mr. Rhoton said he perceived
        Ms. McGrory to be uncomfortable, Ms. McGrory never said she
        was uncomfortable.  She didn't report any of these things
        until after she probably thought she was going to get in

KS - MSJ 000990
KS - 000261

CONNIE I. ONLEY                21-09-I-2331                                35

          trouble for screaming and throwing things in a workplace.
          So, from that perspective, her complaints are not credible.
          Ms. Onley described with the context her version of what she
          told Ms. Michener -- Mr. Michener is ample evidence to
          support that.  These two individuals did both -- Ms. McGrory
          also admitted here in this conversation that she threw a
          pot, screamed.  She was not disciplined for doing that.  Ms.
          Onley reported the conversations regarding Black Lives
          Matter and George Floyd, and, also, she was not disciplined
          for those things.  From that perspective, this Employer does
          not evenly or equitably, you know, put forth their -- the
          disciplinary policy, and, therefore, Ms. Onley has not
          committed willful misconduct under the Law.  They have not
          met their burden, and we respectfully request that you find
          in Ms. Onley's favor.  Thank you.

R         All right.  The time is 1:01 p.m.  I am going to move to
          close the record at this time.  As I stated, you will get a
          Decision in the mail as soon as possible.  I'd like to thank
          you all for participating in today's hearing, and the record
          is now closed.  Thank you very much and have a nice day.
CL        Thank you.

EL        Thank you.
EW1       Thank you.

R         Thank you.  Bye-bye.  The record is closed.


          I hereby certify that, to the best of my ability, the
          foregoing is an accurate transcript of the testimony given
          in the hearing held by the Referee in conjunction with the
          above-captioned case.

                                    _Enrico E. Fabian_ (signature)
                                    _____
                                    Enrico E. Fabian, Transcriptionist
                                    DIAZ TRANSCRIPTION SERVICES
                                    August 23, 2021

KS - MSJ 000991
KS - 000262



R&K Reporting, Inc.
6/17/22 CDL
Onley v Redner's Mkets, Inc.
D-5

Oct 1, 2020

I Sandra McGrory have approached
Carl Store General Manager aprox.
2-3 month ago about an Issue my
Name was brought into by
Connie (Seafood Clerk in Meat Dept)
about how she feels herself and
I are being discriminated against
because we are females in the Dept
When I was approached by Meat
Dept. Manager about this concern.
I was caught off guard because by
No means do I feel this way at
all. And I expressed to Marcos and
Carl I do not want my Name in
anyway in this. I'm assuming
action may have been taken or at
least I would hope.

Things have not calmed down and
I am Certainly on guard with
Connie as I've been approached
for a second time by Marcos on
the above statement.

I Just had a Sit down with
Dave Kenny approx. September 10th
in Regard to Connie about things
She talks about in the meat

KS - 000317
KS - MSJ 000992

Dept. that I don't feel comfortable with. I expressed to Dave that I don't like how Connie continues to play the Race card, age card, and once again that myself and Connie we discriminated against because we are females. I expressed to Dave I do not feel that way at all.

Approx on Sept. 5th Connie made a statement to me that she wants to put a dildo in Shawns coat pocket I advised her it's not a good idea A few days later Connie infront of several co-workers in the meat Dept. blantly said how she uses sexual toys and enjoys them, I clearly said out loud I don't care and walke dept away.

Approx. Sept 25th I was making sausage for the meat case and was almost done when Connie came next to me and explained to me she watch 50 Shades of Gray I turned and said Oh thats my second favorite movie Connie then very loudly says the movie get

KS - 000318
KS - MSJ 000993

... ... such a mood I
pulled my dildo out and used it
I looked at her and said I don't
Care. I then turned and did
not Realize Shaun was present for
the Conversation that Just took
place and was Just as shocked as
I was.

Later that afternoon I was waitin
to use the wrapper to wrap meat.
As Shaun was Using it @ the time
All of a Sudden Connie Calls my Name
and Says to me All you need is hot
water and Sanitizer to Clean it
I turned and said what are you
talking About She laft and Says my
Sex toy. Shaun leaves Room and I
Clearly Said I don't Care.

Oct. 1st 2020 I was doing dishes and
Connie Started talking About how White
TRUMP Supporter are Causing all the
Riots in AmeRica and how there is
no Such thing as Antifa and Its only
the TRUMP SuppoRtes Causing the
issues. I looked at Connie and
Clearly Said Enough Stop I don't
want to hear it. Connie Continues

KS - 000319
KS - MSJ 000994

with other items in Regards to it's all the white people doing this. I at that time lost it screamed loudly at her I don't care I don't want to hear any more stop it. Walked / stormed out of meat Dept. Connie followed me I yelled again I don't Fucking care stop it. I was very angry I asked to go out the Recieving door to escape As connie was behind me I went out back to get my mind clear and to calm down Connie then follows me outside And I screamed at her to go away leave me alone and I walked up the back side of the building took a few minutes to calm down then came back into building where I was met by Jim asst.(gm) and then walked to office to write up the statement

Sandra McGrory

R&K Reporting, Inc.
6/27/22
Onley v Redner's Mkets, Inc.
**D-7**

Statement in reference to Connie Onely                                    1-17-21

Karl Michener

Regarding Connie's termination, the issue was two-fold.  I received a complaint from Sandra McGrory that Connie was talking about using a sex toy while watching 50 Shades of Grey.  This happened while in the presence of a male employee, Shaun Rhoton, as well.  This was an unwelcomed topic of conversation and considered sexual harassment.  Sandra also claimed in her complaint that Connie suggested she bring her sex toy to work and place it in Shaun's jacket as a practical joke, which would be considered sexual harassment if carried out.  When I questioned Connie during my investigation, she admitted to both of these events.  Her termination had nothing to do with race or politics.

Regarding politics, I was unaware of her conversations with Sandy previous to my investigation into the matter of the sexual harassment.  When I questioned her she explained it as part of her working relationship with Sandy.  They discussed politics with no animosity toward each other.  She did not give me any indication that there was a problem with Sandy and she was a willing participant in those conversations.

In paragraph four of the complaint, Connie lists several items.  I can only speak to item #1.  An employee, Rachida, had died her hair and was approached by Sandy.  Rachida did give us a statement concerning the incident.  After speaking with Human Resources, Sandy was instructed by me that policy is not hers to enforce and she should not worry about other people's hair or anything else.  To my knowledge there have been no other instances of this nature.  I cannot speak to the other points listed as I was not part of those conversations.  Furthermore, I never received a complaint from Connie about discrimination of any sort.  My only experience with that topic was a complaint I received from Sandy that Connie kept trying to claim that her and Sandy were being discriminated against because they were women.  To my knowledge this was between the two of them and never expressed to anyone in management.  In Sandy's statement, she was adamant that she did not feel that way.

Regarding my experience with Connie, I thought we had a good working relationship.  We often talked about cooking and different recipes we were trying.  I always made time for our conversations.  Connie had some health issues and I was doing my best to be supportive, offering her time off, our Employee Assistance Program information, adjusting her schedule so she could make her appointments.  We talked numerous times about what she was going through because some family members had similar issues and I wanted to be there for her if she needed something, even just a person to listen.  I'm finding it difficult to understand why she believes anything I've done was racially motivated.

R&K Reporting, Inc.
6/27/22
Onley v Redner's Mkets, Inc.
D-8

# EMPLOYEE WARNING RECORD

Employee's Name **Connie** Onley          Employee # _____          Store # **67 Audubon**

Position: **Meat Wrapper/Seafood Clerk**          Date of Warning **10-07-20**

## WARNING

Date of Violation _____          NATURE OF VIOLATION          ☐ Substandard Work   ☒ Conduct   ☐ Tardiness   ☐ Uncooperative
Time of Violation _____                                       ☐ Carelessness   ☐ Disobedience   ☐
Place Violation Occurred **Meat Prep Room**

## COMPANY REMARKS

An employee complained that Connie was discussing using a sex toy after watching a particular movie. She also suggested she was going to pull a prank an another employee by hiding a sex toy in their coat. Connie admitted to both of these occurrences when questioned by the Store Director, Karl Michener. This type of behavior is unacceptable in the work place.

| HAS EMPLOYEE BEEN WARNED PREVIOUSLY?<br>☐ Yes   ☐ No | Form of Warning | WHEN WARNED and BY WHOM | | |
|---|---|---|---|---|
| | | 1st Warning | 2nd Warning | 3rd Warning |
| | Oral | | | |
| | Written | | | |

## EMPLOYEE'S REMARKS RE: VIOLATION

The absence of any statement on the part of the EMPLOYEE indicates his/her agreement with the report as stated.

I have entered my version of the matter above.

Employee's Signature _____          Date _____

## ACTION TO BE TAKEN

Termination.

I have read this "warning" and understand it.

Employee's Signature _____   Date _____

**Karl Michener**     **Store Director**     10-07-20
Signature of person who prepared warning          Title     Date

Supervisor's Signature          Date

Printed in U.S.A.

KS - 000316
KS - MSJ 000997