Jeffrey R. Elliott, Esquire
Attorney I.D. 38147
KOZLOFF STOUDT
2640 Westview Drive
Wyomissing, PA 19610
610-670-2552                                      Attorney for Defendant

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONNIE ONELY, | : CIVIL ACTION |
|      Plaintiff | : |
| | : |
|    v. | : No. 21-cv-4785 |
| | : |
| REDNER'S MARKETS, INC. | : |
|      Defendant | : Assigned to: Wendy Beetlestone, J. |

---

# EXHIBIT "D"

---

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

CONNIE ONLEY                    :
                               :
          Plaintiff,           :
                               :
          vs.                  : CIVIL ACTION
                               : 2:21-cv-04785-WB
                               :
REDNER'S MARKETS, INC.         :
                               :
          Defendant.           :

- - -

REMOTE videoconference deposition of

ALEXIS FOREMAN

held on Monday, June 27, 2022, beginning

at approximately 2:08 p.m., before Robin A.

Vance, CCR, RPR and Notary Public for New

Jersey, Pennsylvania and Delaware.

- - -

R&K REPORTING, INC.
Court Reporting Services
37390 Harmony Drive
Selbyville, Delaware 19975
215-946-7009   rkreporting@gmail.com

KS - MSJ 000998

ALEXIS FOREMAN

A P P E A R A N C E S:

(ALL PARTICIPANTS WERE PRESENT REMOTELY)


KARPF, KARPF & CERUTTI, P.C.
BY:  ANDREW R. OLCESE, ESQUIRE
3331 Street Road, Suite 128
Bensalem, PA 19020
215-639-0801
aolcese@karpf-law.com
-- Attorneys for the Plaintiff


KOZZLOFF STOUDT
BY:  JEFFREY R. ELLIOTT, ESQUIRE
2640 Westview Drive
Wyomissing, PA 19610
610-370-6700
jelliott@kozloffstoudt.com
-- Attorneys for the Defendant

KS - MSJ 000999

ALEXIS FOREMAN

I N D E X

WITNESS                                      PAGE

ALEXIS FOREMAN

    BY MR. OLCESE                                 5

EXHIBITS REFERENCED

| No. | DESCRIPTION | PAGE |
|---|---|---|
| D-5 | 10/1/20 Statement - S. McGrory<br>(KS000317-320) | 56 |

ALEXIS FOREMAN

[Page 4]

```
 1                    (It is agreed by and between
 2           counsel that reading, signing,
 3           certification and sealing are hereby
 4           waived; all objections, except as to the
 5           form of the questions, are reserved until
 6           the time of trial.)
 7                    COURT REPORTER:  The attorneys
 8           participating in this proceeding
 9           acknowledge that I am not physically
10           present with the witness and that I will
11           be reporting this proceeding remotely.
12                    They further acknowledge that, in
13           lieu of an oath administered in person,
14           the witness will verbally declare that her
15           testimony in this matter is under penalty
16           of perjury.
17                    The parties and their counsel
18           consent to this arrangement and waive any
19           objections at this time.
20                    Counsel also acknowledges and
21           agrees that the official transcript is
22           solely the one transcribed by the court
23           reporter.
24                    Counsel, please indicate your
```

ALEXIS FOREMAN

[Page 5]

```
 1          agreement by stating your name and your
 2          agreement on the record beginning with
 3          Plaintiff's counsel.
 4                MR. OLCESE:  Andrew Olcese for the
 5          plaintiff.  I consent and agree.
 6                MR. ELLIOTT:  Jeffrey Elliott for
 7          the defendant.  I also consent and agree.
 8                      -   -   -
 9                ALEXIS FOREMAN, having been duly
10          sworn, was examined and testified as
11          follows:
12                      -   -   -
13                   EXAMINATION
14                      -   -   -
15  BY MR. OLCESE:
16      Q.     Good afternoon again, Miss Foreman.
17  My name is Andrew Olcese.  I represent Connie
18  Onley in a lawsuit against Redner's.
19                First question, have you ever been
20  part of a deposition before?
21      A.     Yes, I have.
22      Q.     Okay.  So, starting with the most
23  recent, when was the last time you were in a
24  deposition?
```

ALEXIS FOREMAN

[Page 6]

```
 1      A.      I believe it was approximately three
 2  or four years ago.
 3      Q.      Okay.  And did it involve your
 4  employment with Redner's?
 5      A.      Yes, it did.
 6      Q.      Okay.  What position did you have with
 7  Redner's at that time?
 8      A.      Director of employee relations.
 9      Q.      And were you the plaintiff in any suit
10  brought against Redner's as a result of that
11  deposition?
12      A.      No, I was not.
13      Q.      Okay.  So were you being deposed in
14  the deposition you're describing as part of the
15  defendant with Redner's?
16      A.      Correct.
17      Q.      Do you know the name of that
18  plaintiff?
19      A.      Gretta Slough.
20      Q.      Can you spell the first and last name,
21  please?
22      A.      To the best of my ability,
23  G-R-E-T-T-A, Slough, S-L-O-U-G-H.
24      Q.      And to your understanding why was Miss
```

ALEXIS FOREMAN

1    Slough bringing a lawsuit against Redner's?

2         A.      It was a harassment case.

3         Q.      Can you be more specific in terms of

4    what type of harassment?

5         A.      Sure.  Sexual harassment.

6         Q.      Did Miss Slough allege any claims of

7    gender discrimination against Redner's?

8         A.      No.

9         Q.      Do you know if this matter that you

10   were involved in with a deposition was in federal

11   court or state court?

12        A.      If I recall correctly, it was state.

13        Q.      Okay.  Did this matter ever go to

14   trial?

15        A.      No.

16        Q.      Okay.  Do you know if it was dismissed

17   before trial or just resolved?

18        A.      I believe it was resolved.

19        Q.      Okay.  And to your understanding, why

20   were you being deposed?

21        A.      I took the initial complaint when

22   my -- when the complaint came across, it was over

23   a weekend.  And at the time, I wasn't handling

24   these types of manners -- matters, excuse me, and

ALEXIS FOREMAN

1   my boss was on vacation at the time, so I took

2   the complaint initially.

3       Q.      Okay.  And who was your boss at the

4   time that was on vacation?

5       A.      Robert McDonough.

6       Q.      So you received the complaint and then

7   to your knowledge, that's why you were being

8   deposed?

9       A.      Yes.

10      Q.      Okay.  And during this deposition,

11  what did you testify about generally?

12      A.      The nature of the complaint.

13      Q.      Okay.

14      A.      Her report.

15      Q.      So did Miss Slough during her

16  employment complain and bring those complaints to

17  your attention?

18      A.      Yes, she did.

19      Q.      Okay.  And did she complain sexual

20  harassment allegations against a certain

21  individual?

22      A.      Yes.

23      Q.      Is that individual still employed with

24  Redner's?

ALEXIS FOREMAN

[Page 9]

```
 1     A.     No, he is not.

 2     Q.     Can you identify that individual?

 3     A.     I can't recall his last name.  I know

 4  his first name is Jeff and he is no longer

 5  employed.

 6     Q.     Okay.  And what store did Miss Slough

 7  and Jeff work at where these allegations of

 8  harassment occurred?

 9     A.     The Fredericksburg store location.

10     Q.     Okay.

11            MR. ELLIOTT:  Fredericksburg,

12        Pennsylvania?

13            THE WITNESS:  Yes.

14  BY MR. OLCESE:

15     Q.     Okay.  Do you know if Mr. Karl

16  Michener was ever deposed as part of the

17  complaint for Miss Slough?

18     A.     He was not.

19     Q.     Okay.  Do you know if Sandra McGrory

20  was part of the complaint against -- from Miss

21  Slough?

22     A.     She was not.

23     Q.     All right.  Other than that issue with

24  Miss Slough where you were deposed, have you ever
```

ALEXIS FOREMAN

[Page 10]

1    been a part of any other depositions?

2         A.     I have not.

3         Q.     Okay.  So I'm correct this would be

4    your second deposition?

5         A.     Correct.

6         Q.     All right.  Okay.  So just to remind

7    you because it's been at least three to four

8    years, and I'm sure you already know, but this is

9    pretty much a question-and-answer session.  It's

10   an opportunity for me, on behalf of Miss Onley,

11   to find out what you know regarding her

12   employment and separation from Redner's.  Okay?

13   So with that being the case, we're obviously

14   conducting this remote.  You and I can see each

15   other, but everything that's being said is being

16   typed down by the court reporter.  So what that

17   means is even though I can see you, all of your

18   responses to my questions need to be answered

19   verbally.  So if you give me a head nod or a head

20   bob to a question that can be answered in a yes

21   or no, I'm going to ask you, is that a yes or no,

22   just so Robin can write it down.  Okay?

23        A.     Correct, understood.

24        Q.     Also, if you answer with like uh-huhs

ALEXIS FOREMAN

1   or uh-uhs, even if I understand what you're

2   saying, I'm going to ask if that's a yes or no so

3   Robin can write it down.  Okay?

4       A.      Okay.

5       Q.      Biggest thing, and you're do a good

6   job so far and I'll try to keep doing a fair job

7   of it, only one person can speak at a time so

8   that Robin can really type down everything

9   clearly.  So with that being the case, I'm going

10   to ask you to refrain from responding and

11   answering my questions until I fully get out the

12   question, even if you know what's going to be

13   asked.  Okay?

14       A.      Okay.

15       Q.      And I'll try to do my best to give you

16   as much time as you need to response in any way

17   you feel appropriate before I go on to the next

18   question.  All right?

19       A.      Understood.

20       Q.      If you need to take a break at any

21   point, to use the restroom, to stand up and

22   stretch or get a bite to eat, perfectly fine, let

23   me know.  The only thing I ask is if there's a

24   question pending, that you answer it before we

ALEXIS FOREMAN

[Page 12]

1    take a break.  Okay?

2        A.      Okay.

3        Q.      At certain points your counsel Jeff

4    might make objections to my questions.  Even if

5    he objects, you still need to answer my questions

6    unless he explicitly tells you to not answer my

7    question.  Is that understood?

8        A.      Understood.

9        Q.      All right.  If at any point I ask a

10   question that you don't understand, you want me

11   to reword it or clarify, please let me know, I'm

12   happy to.  Sometimes it might just come out a

13   little jumbled in my mouth, so I'm happy to

14   clarify anything.  The only thing is, though, if

15   you answer my question, I'm going to assume that

16   you understood what was being asked.  Okay?

17       A.      Okay.

18       Q.      All right.  Do you have any questions

19   at all?

20       A.      Not at this time.

21       Q.      Okay.  Miss Foreman, are you on any

22   medication today that would inhibit your ability

23   to recall past events?

24       A.      No.

ALEXIS FOREMAN

[Page 13]

1      Q.      Is there any reason that you can think

2  of that you will not be able to answer my

3  questions fully and truthfully today?

4      A.      No.

5      Q.      All right.  Great.  Can you please

6  state your full name for the record?

7      A.      Alexis Foreman.

8      Q.      Are you known by any other names or

9  maiden names?

10     A.      Alexis Hill Foreman.

11     Q.      And what is your current home address?

12     A.      247 Preston Road, Warnersville, PA

13  19565.

14     Q.      Okay.  And what, if anything, have you

15  done to prepare yourself for today's deposition?

16     A.      I reviewed all the information on

17  file, the EEOC complaint, our position statement,

18  and the civil complaint as well.

19     Q.      Other than reviewing the EEOC

20  complaint, the civil complaint, and the EEOC

21  response statement from Redner's, did you review

22  anything else?

23     A.      I -- the employment file, Connie's

24  employment file, Connie Onley.

ALEXIS FOREMAN

[Page 14]

```
1        Q.      And when did you review all these
2   documents?
3        A.      Friday, Saturday, Sunday, and a little
4   bit today.
5        Q.      When did you review them today?
6        A.      When did -- I'm sorry, I didn't hear
7   you.  When did I review them tonight?
8        Q.      Today, yes.
9        A.      In between other issues at work.
10       Q.      Okay.  Did you speak with anyone about
11   preparing for today's deposition?
12       A.      I spoke to Jeff Elliott.
13       Q.      Anyone else?
14       A.      No.
15       Q.      Did you talk to Karl Michener about
16   your deposition today?
17       A.      I did not.
18       Q.      Did you talk to Sandra McGrory about
19   her deposition?
20       A.      No, I did not.
21       Q.      Okay.  I apologize, I ask everyone
22   this question who I depose.  Have you ever been
23   convicted of a crime?
24       A.      No, I have not.
```

ALEXIS FOREMAN

[Page 15]

1       Q.      All right.  You're currently employed
2    at Redner's, Miss Foreman?
3       A.      Yes.
4       Q.      And what is your current position?
5       A.      Director of employee relations and
6    assistant vice president of human resources.
7       Q.      Okay.  Just to clarify, director of
8    employee relations and assistant VP of human
9    resources, is that two positions that you hold
10   now?
11      A.      Essentially, I guess you could say
12   that.
13                   MR. OLCESE:  Off the record.
14                   (Discussion held off the Record.)
15   BY MR. OLCESE:
16      Q.      I notice that when you spoke about
17   your previous deposition about three to four
18   years ago, you stated your position was director
19   of employee relations.  So is the assistant VP of
20   HR something within the last three or four years
21   that you obtained?
22      A.      Yes.
23      Q.      Okay.  When did you become assistant
24   VP of HR?

ALEXIS FOREMAN

1      A.      I don't recall exactly the date.  I
2  would say somewhere within that timeframe, and it
3  has to be at least three years now --
4      Q.      At least three years?
5      A.      Yes.
6      Q.      And I apologize, I didn't mean to cut
7  you off.  If I did, was there something else you
8  wanted to say?
9      A.      I was going to say I could be -- I
10 could have misspoke on the Gretta Slough.  It
11 could have been five years ago.  I truly can't
12 remember.  It was a while ago.
13     Q.      Understood.  But fair to say you have
14 held the roles of director of employee relations
15 and assistant VP of HR for at least three years?
16     A.      Absolutely, yes.
17     Q.      Certainly through 2020, correct?
18     A.      Yes.
19     Q.      Okay.  When did you start working for
20 Redner's?
21     A.      Full time?  When I graduated from
22 college in 1997.
23     Q.      And when you started full time 1997,
24 what was that first position you were hired into?

ALEXIS FOREMAN

[Page 17]

1      A.      I was hired as an assistant director

2  of recruiting in training and education.

3      Q.      And when did you become director of

4  employee relations?

5      A.      Five or ten years ago, somewhere in

6  that timeframe.

7      Q.      Okay.  And like you're doing already,

8  obviously some things I'm talking about that are

9  multiple years ago, I'm going to soon get

10  hopefully more recent, but as best you can, try

11  to approximate and narrow down.  You know,

12  obviously I understand if you can't remember

13  certain days, but even like the year might be

14  helpful.  Okay?

15      A.      Okay.

16      Q.      When you became director of employee

17  relations between 2010 and 2015 approximately,

18  where did you work?

19      A.      Out of the corporate office.

20      Q.      And where is that corporate office?

21      A.      In Maiden Creek, Pennsylvania.

22      Q.      And have you worked out of Maiden

23  Creek, PA, the corporate office, since at least

24  2015?

ALEXIS FOREMAN

[Page 18]

1       A.      Yes.

2       Q.      Okay.  Since that time you've never

3    worked personally within a store location,

4    correct?

5       A.      No.

6       Q.      Okay.  Narrowing the time a little

7    bit, so I want to focus on second half of 2020 to

8    the present.  As part of your practice as

9    director of employee relations or assistant VP in

10   human resources, do you travel to the store

11   locations?

12      A.      Yes, I do.

13      Q.      Okay.  How often do you travel to

14   store locations?

15      A.      At the minimum, probably six times a

16   year at the very minimal.  And the reason I say

17   that is we have weekend duty and we're scheduled

18   five to six weekends a year, which is visiting a

19   number of locations throughout the weekend.

20      Q.      Okay.  Currently how many store

21   locations does Redner's have?

22      A.      We have 45 supermarkets, 12

23   convenience stores, five pharmacies, and maybe

24   eight to 10 kiosks which are like gas stations in

ALEXIS FOREMAN

1   front of the store locations.

2       Q.      Okay.  So, am I correct that all those

3   locations you just described, you try to travel

4   to each one six times per year?

5       A.      No, we have designated regions that

6   we're assigned to based on the weekend.

7       Q.      Okay.  So currently, what is the name

8   of your region that you are assigned to?

9       A.      I have the entire company.

10      Q.      Okay.  So do you travel to all the

11  supermarkets and kiosks and pharmacies that you

12  described, each location six times per year, or

13  do you get to choose which of that total you make

14  six visits per year?

15      A.      I make six visits per year and again,

16  that's a minimum.  That's just weekend duty.  I

17  typically go beyond that.  But the way the

18  weekends works is there's typically five to six

19  supervisors on and we select a number of stores.

20  It could be six or eight stores a day and we go

21  Saturday, and then we pick a different six to

22  eight stores on a Sunday.

23      Q.      And generally when you're visiting

24  these stores, like you said, six to eight per

ALEXIS FOREMAN

1    day, what is the purpose of it?

2        A.      So, purpose changed since COVID.

3    Prior to COVID we would help with deliveries or

4    add-on products.  Since then, it has become store

5    visits, making sure the operations and the store

6    overall, the presentation is good.  If there are

7    any -- I'm obviously an HR person, so I don't

8    focus as much on the operation side.  However,

9    that -- I still do have to complete store reports

10   with each store and evaluating the overall store.

11   And then if there's any specific needs, personnel

12   needs or employee relations issues, we will

13   discuss it at that time.

14       Q.      Is it fair to say that the major

15   purpose or the main purpose of you visiting these

16   stores goes towards more your position as

17   director of employee relations rather than as the

18   assistant VP of HR?

19       A.      Not necessarily.

20       Q.      Okay.

21       A.      It's really all-encompassing.

22       Q.      Okay.  But is the purpose for like a

23   human resources approach where you're reaching

24   out to your employees?

R&K Reporting Inc.

KS - MSJ 0001017

ALEXIS FOREMAN

```
 1      A.      Some of the -- yes, that is part of
 2   the weekend visit for sure.
 3      Q.      Okay.  All right.  And in your roles
 4   currently, who do you report to?
 5      A.      Robert McDonough, who is the vice
 6   president of human resources.
 7      Q.      Anyone else?
 8      A.      He's my -- he would be the one I would
 9   say I would report to.
10      Q.      When did you start reporting to
11   Mr. McDonough?
12      A.      My entire career, he was always my
13   boss.
14      Q.      Okay.  Have your job duties changed
15   since October of 2020?
16      A.      No.
17      Q.      Other than the store visits we just
18   talked a little bit about, can you generally
19   describe what are your job duties in your current
20   roles?
21      A.      Overseeing the human resource
22   department as a whole, payroll duties, benefits
23   management.  I oversee the benefits.  Any type of
24   employee conflict, employee engagement.  Any type
```

ALEXIS FOREMAN

[Page 22]

1   of issue, typically I handle most of them.

2       Q.      Okay.  When you said benefits, am I

3   correct that part of your job duties are also

4   administering any employee request for family

5   medical leave or short term disability leave?

6       A.      Yes, I -- I oversee that process.  We

7   have a benefits manager that handles that.

8       Q.      Okay.  You oversee the benefits

9   manager that would administer FMLA or short term

10  disability?

11      A.      Correct.

12      Q.      And employee engagement, we talked

13  about also with discipline.  When there's ever an

14  occasion where an employee is going to be

15  issued discipline, do you have to be made aware

16  of that before the discipline is issued?

17      A.      Not necessarily.  It depends on the

18  severity of the issue.

19      Q.      Okay.  So to your understanding, can a

20  store director issue discipline to an employee

21  without consulting with you?

22      A.      On some situations, yes.

23      Q.      Okay.  What -- an example, what are

24  situations a store director can do that versus

ALEXIS FOREMAN

[Page 23]

1    those they cannot?

2        A.      I would -- an example would be if

3    someone were absent from work on a regular basis,

4    and our handbook states more than one absence per

5    month is considered excessive.  They would not

6    have to ask me to write someone up for excessive

7    absenteeism.

8        Q.      Okay.  And what's an example of some

9    kind of infraction they would need to contact you

10   for and get consultation on?

11       A.      Performance-related issues,

12   harassment-related issues, any type of complaint,

13   they usually seek advice on those matters.

14       Q.      Now, just to clarify, you say they

15   usually seek advice, meaning the store directors,

16   but that's not the same as they have to.  So is

17   it your understanding per Redner's policy that a

18   store director looking to discipline an employee

19   for harassment-related reasons,

20   performance-related reasons, do they need to

21   consultant with you before doing so?

22       A.      Harassment, yes.  Performance-related,

23   not necessarily.

24       Q.      And is it your understanding that the

ALEXIS FOREMAN

[Page 24]

1   store directors can make the decision to

2   terminate an employee without consulting with you

3   first?

4       A.      No.

5       Q.      Okay.  So every employee termination

6   has to go through your office; is that right?

7       A.      Correct.

8       Q.      And then am I correct that you make

9   the decision if an employee will be terminated or

10  not?

11      A.      Myself and my boss, Bob McDonough, and

12  Randy Kostelac.  The three of us are capable of

13  making those decisions.

14      Q.      Okay.  The second individual, you said

15  Randy, what's this person's last name?

16      A.      Kostelac.  K-O-S-T-E-L-A-C.

17      Q.      And what is his position?

18      A.      Director of training and education.

19      Q.      And do you have the ability to

20  terminate an employee without first consulting

21  with either Mr. Kostelac or Mr. McDonough?

22      A.      I do.

23      Q.      Okay.  All right.  But to your

24  understanding, if a store director was consulting

ALEXIS FOREMAN

[Page 25]

1    with human resources to make a recommendation

2    whether an employee should be terminated or not,

3    they have to go through either yourself,

4    Mr. McDonough or Mr. Kostelac?

5        A.      Correct.

6        Q.      Okay.  When is the last time you had

7    visited the Audubon store location?

8        A.      I believe the last weekend I worked,

9    which was a month ago.

10       Q.      Okay.  Prior to that visit, when was

11   the next most recent time to Audubon?

12       A.      It was within a few months.

13       Q.      Okay.  So, fair to assume every couple

14   of months you're at least making your rounds to

15   most, if not all the stores?

16       A.      Correct.

17       Q.      So did you ever visit Audubon in 2020?

18       A.      Yes.

19       Q.      Okay.  All right.  Then I presume

20   during her employment, you had the opportunity to

21   meet Miss Onley?

22       A.      I've met Miss Onley, yes.

23       Q.      I understand that she worked for

24   Redner's for a few years prior to her separation.

ALEXIS FOREMAN

[Page 26]

1  Do you know when she started working for

2  Redner's?

3       A.     October 2017.

4       Q.     And were you part of her hiring at

5  all?

6       A.     I was not.

7       Q.     You didn't interview her, correct?

8       A.     Correct.

9       Q.     Okay.  And I understand she started

10 working at the Lansdale location?

11      A.     Yes.

12      Q.     When do you recall meeting Miss Onley

13 for the first time?

14      A.     I believe it was around March of 2019.

15      Q.     And this encounter where you met Miss

16 Onley in March of 2019, was it, for lack of a

17 better term, by chance because it was just a

18 visit you were making to the store or was there a

19 specific reason you were going to meet her?

20      A.     It was a scheduled meeting.

21      Q.     What was that scheduled meeting about?

22      A.     Store director Steve DiGiorgio reached

23 out to me, saying that there was some ongoing,

24 how would I put it, ongoing concern between Dave

KS - MSJ 0001023

ALEXIS FOREMAN

[Page 27]

```
 1   Goodman and Connie Onley, and that she is

 2   struggling to work with him amicably,

 3   essentially.  And he had told me that they had

 4   met before and he was seeking my advice and asked

 5   for me to come to the store for a meeting.

 6       Q.      Okay.  And Dave Goodman, it's my

 7   understanding he is the meat department manager

 8   at the Lansdowne location as of this time that

 9   we're talking about?

10               MR. ELLIOTT:  Object to form.  Go

11        ahead, you can answer.

12               THE WITNESS:  Yeah, I don't know if

13        he is a manager at this time honestly.  I

14        know at the time he was not.

15   BY MR. OLCESE:

16       Q.      Oh.  What position then did

17   Mr. Goodman hold as of March 2019?

18       A.      He was a meat cutter.

19       Q.      Okay.  But Mr. DeGeorgio was the store

20   director at Lansdale?

21       A.      Yes.

22       Q.      Okay.  And did Mr. DeGeorgio go into

23   any more specifics about why Miss Onley and why

24   Mr. Goodman, as you say, were not working
```

ALEXIS FOREMAN

1    amicably?

2       A.      I don't recall specifically.  I think

3    it had more to do with performance issues.

4       Q.      Was it your understanding that at this

5    time Mr. Goodman was Miss Onley's supervisor?

6       A.      The store manager, Mr. Ciaccio would

7    have been her direct report.  On his days off it

8    would have been Dave Goodman.

9       Q.      You said Mr. Ciaccio.  I thought it

10   was Mr. DeGeorgio who was the store director.

11      A.      Her direct report would be her meat

12   manager.  That would be her direct report.  The

13   next level would be the store director.

14      Q.      Okay.  And who was her direct report,

15   the department manager?

16      A.      Mr. Ciaccio.

17      Q.      Do you know how to spell that?

18      A.      I believe it's C-I-A-C-C-I-O.

19      Q.      Okay.  And was Mr. Ciaccio, was he a

20   part of the meeting when you arrived in March of

21   2019?

22      A.      He was.

23      Q.      Okay.  So who participated in that

24   meeting?

ALEXIS FOREMAN

```
 1      A.      Myself, Dave Kehm, who was a meat

 2   supervisor, Steve DeGeorgio, and Connie Onley, as

 3   well as Dave Goodman.

 4      Q.      And what was discussed?

 5      A.      Initially I had brought Connie in.  I

 6   wanted to meet her and get an understanding of

 7   her complaints.  And at that time, she discussed

 8   with me she felt that she was being mistreated

 9   because she was female and that Dave was treating

10   her differently.

11      Q.      Did she give examples or descriptions

12   of how she believed she was being treated

13   differently because she was female?

14      A.      She was stating, if I recall

15   correctly, he was not happy with her performance

16   and was pointing out errors she was making, and

17   that no one else was getting these errors pointed

18   out to them, and she felt that it was because she

19   was female.  And he would raise his voice and get

20   frustrated with her.

21      Q.      Okay.  And did she express the errors

22   that were being pointed out to her regarding her

23   performance that was being presented to her by

24   Mr. DeGeorgio?
```

ALEXIS FOREMAN

```
 1     A.     I'm sorry.
 2     Q.     Or Mr. Goodman?
 3     A.     These errors were being pointed out to
 4   her by Mr. Goodman.
 5     Q.     Okay.  And she was expressing to you
 6   in this meeting, at least, you know, initially,
 7   that she felt that this was unfair based on
 8   Mr. Goodman's actions?
 9     A.     Based on what he was saying to her and
10   trying to correct.
11     Q.     Okay.  Okay.  And then after speaking
12   with her, is that where all the other -- excuse
13   me -- all the other participants came in and you
14   guys had a meeting about what was discussed?
15     A.     Steve DeGeorgio and Dave Kehm were
16   present with the meat manager Anthony Ciaccio
17   during that initial conversation with Miss Onley.
18   After I understood her complaint, I asked her if
19   she would be comfortable if we brought Dave back
20   to discuss it because I felt like it was
21   something that we could work out.  And she agreed
22   to that.
23     Q.     Okay.  And then what happened when you
24   brought Mr. Goodman in to participate as well?
```

ALEXIS FOREMAN

```
 1      A.      He admitted that he had raised his
 2  voice and confronted her about errors she was
 3  making.  I did not -- based on his explanation,
 4  he was merely pointing out her errors and
 5  expiration dates, you know, coding with the meat
 6  wrapper and the labels.  He also wasn't happy
 7  that she spent a lot of time on the floor talking
 8  to customers.  And those behaviors is what he was
 9  trying to correct.  We came to the conclusion
10  that probably he could have used a better
11  technique to conversate that with her.  He seemed
12  to get loud.  However, at that time he said it
13  was never anything based on her gender.  It was
14  just merely he wanted to correct the behavior
15  because it was a busy department and he was
16  getting frustrated by her errors.
17      Q.      So, after meeting that you just
18  described, was Mr. Goodman ever issued any form
19  of discipline as a result of that meeting?
20      A.      No, he was not.
21      Q.      And was Miss Onley ever issued any
22  form of discipline for bringing that complaint to
23  your attention?
24      A.      No, she was not.
```

ALEXIS FOREMAN

1      Q.     Okay.  So after that conversation that

2   we just described, was there anything else done

3   on your end as part of any investigation into

4   Miss Onley's complaints?

5      A.     At that time it wasn't necessary.  The

6   way the meeting ended was that they understood --

7   had a better understanding of each other and

8   where each of them was coming from; meaning Dave

9   understood how Connie was feeling, the way he

10  tried to correct the behavior was not comfortable

11  with her, and he understood that and he realized

12  he could do better.  She appreciated that.  And

13  they basically shook hands and said, let's move

14  forward, we can -- we don't have to like each

15  other but we can work together amicably.  And

16  that was the agreement.

17     Q.     Understood.  Okay.  And the next few

18  months from March of 2019 until approximately

19  October of 2019, did you ever come to learn of

20  any other complaints or issues from Miss Onley at

21  the Lansdale location?

22     A.     No.

23     Q.     Did you ever come to learn of any

24  complaints or issues from March of 2019 until

ALEXIS FOREMAN

1    October of 2019 about Miss Onley?

2        A.     No.

3        Q.     From anyone else, is what I'm asking.

4        A.     No.

5        Q.     Okay.  So your understanding was after

6    that meeting, discussing everything out, that

7    nothing further happened regarding her complaints

8    at Lansdale, correct?

9        A.     Correct.

10       Q.     All right.  After that meeting, did

11   you ever return and visit Lansdale while Miss

12   Onley worked there?

13       A.     I'm sure I did.

14       Q.     Okay.  Can you remember specifically

15   between March and October of '19, 2019, whenever

16   that may have occurred?

17       A.     No.  I would assume on one of my

18   weekend visits at the very least.

19       Q.     Do you remember, though, any of those

20   weekend visits, if you, you know, made an effort

21   to speak to Miss Onley if she was working, to

22   kind of follow up with her to see how she was

23   doing?

24       A.     I always walk through the store and

ALEXIS FOREMAN

1    make sure I greet everyone in the store as best I

2    can, yes.  I don't recall seeing her, no, or

3    having a conversation.

4        Q.    You don't remember having like a

5    follow-up conversation with Miss Onley after the

6    meeting in March, correct?

7        A.    Correct.

8        Q.    Okay.  All right.  And then I

9    understand that around October 2019, Miss Onley

10   was transferred from Lansdale to the Audubon

11   location, correct?

12       A.    Correct.

13       Q.    And that's when the Audubon location I

14   believe was opening?

15       A.    Correct.

16       Q.    How did it come to be that Miss Onley

17   transferred to Audubon, to your knowledge?

18       A.    I got an e-mail from the store from

19   Steve DeGeorgio, from the store, suggesting that

20   Connie Onley became aware of the new fresh

21   market.  It was very inviting for people, it was

22   something exciting and new for us.  We

23   communicated that throughout the company.  And

24   she was always very good at customer service and

ALEXIS FOREMAN

[Page 35]

1    we were -- our culture, we were shifting our

2    culture to really focus on that with this new

3    store.  And she requested to transfer to the meat

4    department.  We had a lot of specialties and the

5    seafood is where she wanted to go.  So she

6    requested that.  And typically those requests

7    have to be approved by HR as well as the meat

8    supervisor, Dave Kehm, to make sure that we have

9    the adequate staffing.  And both of us

10   immediately said she'd be perfect and we agreed

11   with the transfer.

12        Q.     So when you say we agreed, does that

13   mean specifically yourself and Mr. Kehm approved

14   that transfer?

15        A.     Correct.  And Randy Kostelac is

16   involved with staffing for new stores, the

17   director of training and education, so we also

18   asked his advice and he agreed to it as well.

19        Q.     Did you have to consult with anyone

20   else at the Lansdale location to get their input

21   or feedback about the transfer request?

22        A.     Yes, absolutely.  I talked to Steve

23   because we don't -- what we consider is we don't

24   want to transfer a problem.  So if there is an

ALEXIS FOREMAN

[Page 36]

1    individual who has been excessively disciplined

2    or has, you know, absenteeism issues, things like

3    that, I just wanted to make sure she was doing

4    well in the department and he said everything's

5    been fine and I think she'd be great.  So, with

6    that, we all agreed that she should be

7    transferred.

8        Q.      And did you ever come to learn while

9    working at Lansdale whether or not Miss Onley

10   had, as you say, a discipline problem or a

11   history of receiving discipline?

12       A.      At Lansdale she did not.

13       Q.      Okay.  And as part of that transfer,

14   did you consult with any of the new members of

15   management that would be stepping in at the

16   Audubon location about her request?

17       A.      No.

18       Q.      Okay.  So the management that was put

19   in place at Audubon for its opening, they had no

20   say whatsoever on who, including Miss Onley,

21   would be transferred to that location?

22       A.      No.

23       Q.      Okay.  When Miss Onley was transferred

24   to the Audubon location, I understand she still

ALEXIS FOREMAN

[Page 37]

1    worked in the meat department as a meat wrapper.

2    On any of your weekend visits or any other

3    visits, do you recall going to visit and speak

4    with Miss Onley?

5        A.    I don't recall specifically.  What I

6    can say is if I did see her, I didn't have an

7    all-out conversation.  I would have just said

8    hello, how are you doing today.  That's typically

9    what I do unless I'm confronted with something,

10   which I was not.

11       Q.    Do you remember at any point from

12   October 2019 until October '20, visiting the

13   Audubon location specifically because you had to

14   meet with Miss Onley?

15       A.    I did not do that, no.

16       Q.    And I understand that during their

17   time working at the Audubon location, you came to

18   learn of a number of occurrences related to Miss

19   Onley's health that were concerning to some

20   members of management; is that right?

21       A.    Yes.

22       Q.    Just -- the volume was low; was that a

23   yes or a no?

24       A.    Sorry, that was a yes.

ALEXIS FOREMAN

[Page 38]

```
 1      Q.      No problem.  So when is the first time
 2  you came to learn anything about Miss Onley's
 3  health while working at the Audubon location?
 4      A.      I would say late May, early June of
 5  2020.  I received an e-mail correspondence from
 6  Mr. Michener.
 7      Q.      And what did that e-mail
 8  correspondence say?
 9      A.      He had just been concerned with her
10  health at that time.
11      Q.      Did he describe what was going on or
12  why he had concerns about her health?
13      A.      I know he talked about blackout.  I
14  don't know if it was in that first e-mail or that
15  came later in August.  I can't recall.  But I
16  know that there were some issues initially -- oh,
17  you know what, I remember now.
18              So in -- I'm sorry.  In late May,
19  early June, it was during COVID and she was
20  experiencing a lot of absenteeism if she was --
21  due to her not feeling well.  And he -- and we
22  had a COVID protocol where, you know, if you had
23  COVID, there was specific guidelines you had to
24  follow.  But if you had any type of illness, you
```

ALEXIS FOREMAN

1    had to be symptom and fever-free for 24 hours

2    upon returning.  And he was worried that he would

3    have to put a COVID form in for her, but it was

4    something separate and he was asking how to

5    handle that.  That was the initial e-mail.

6         Q.     Okay.  And during the onset of the

7    COVID-19 pandemic, I'll say around March 2020,

8    Redner's stayed open obviously because it's a

9    necessary grocery store, correct?

10        A.     Correct.

11        Q.     Did you ever come to learn, or

12   Mr. Michener share with you, that the health

13   concerns Miss Onley was suffering from were

14   related to her hypertension and high blood

15   pressure?

16        A.     I do recall that, yes.

17        Q.     Did he tell you that in the e-mail or

18   do you remember him informing you of that some

19   other means, maybe on the phone?

20        A.     I believe it was over the phone.  I

21   don't know that that was ever sent in e-mail.

22        Q.     Okay.  But you two would have

23   discussions over the phone where it sounds like

24   he would reach out to you for consultation on

ALEXIS FOREMAN

1    what to do to address her health concerns?

2                    MR. ELLIOTT:  Object to the form.

3    BY MR. OLCESE:

4         Q.     You can answer.

5         A.     Yes, that's correct.

6         Q.     Okay.  And during these discussions

7    with Mr. Michener, was the subject of the

8    discussion pretty much how to accommodate Miss

9    Onley if she needed to take like a leave of

10   absence from work?

11                   MR. ELLIOTT:  Object to the form.

12                   THE WITNESS:  I can answer?

13                   MR. ELLIOTT:  Yes.

14                   THE WITNESS:  Sorry.  So, it -- the

15          way the conversations went is that we were

16          concerned with her overall health and that

17          we thought if she is experiencing health

18          issues, would it make sense for her to

19          take an FMLA.  If she's missing time, she

20          has -- potentially could lose her job if

21          she misses too much time according to our

22          handbook.  So that the FMLA would be

23          there, so if she needed to take time off

24          to get herself healthy, it would be an

KS - MSJ 0001037

ALEXIS FOREMAN

```
 1          approved leave, she would be eligible for
 2          pay, things like that.
 3               So I had asked Mr. Michener to
 4          communicate that to her.  Some employees
 5          don't know that they would be eligible for
 6          this and how FMLA works.  Her response was
 7          she didn't want to take it, she liked
 8          coming to work, she would be lonely.
 9          Unfortunately her husband passed and this
10          was her main focus.  And so the agreement
11          was that if you need time or to work
12          around doctors schedules, we'll do
13          whatever you need to do.  But beyond that,
14          there were no requests for accommodations.
15   BY MR. OLCESE:
16      Q.     So she never requested time off from
17   work either, for instance, under the FMLA or
18   maybe like short term disability?
19      A.     Correct.
20               MR. ELLIOTT:  Object to the form.
21          You can answer.
22               THE WITNESS:  Yeah, she never did.
23          And we offered it to her.
24   BY MR. OLCESE:
```

ALEXIS FOREMAN

1      Q.      And when you say you offered it to

2   her -- well, let's just do the first question.

3   When was it offered to her?

4      A.      August of 2020.

5      Q.      And who would be the one offering it

6   to her?

7      A.      I asked Karl to have a conversation

8   with her, letting her know that she was eligible

9   and she could take an FMLA if she chose to.

10      Q.      Okay.

11      A.      And she declined.

12      Q.      Do you remember yourself or anyone

13   else in the human resources department ever

14   submitting FMLA paperwork to Miss Onley?

15      A.      No.  That's upon request.  She did not

16   request it and we don't send it out.

17      Q.      Okay.  Was it to your knowledge,

18   though, that as of August 2020 she was eligible

19   for FMLA if she requested it?

20      A.      Yes, she was.

21      Q.      Okay.  All right.  So, Mr. Michener

22   brings, you know, health concerns he has with

23   Miss Onley to your attention around June 2020.

24   You have subsequent conversations that lead you

KS - MSJ 0001039

ALEXIS FOREMAN

[Page 43]

1    to around August 2020.  Do you remember any other

2    written communications about Miss Onley's health

3    between June and August of 2020?

4        A.    No.

5        Q.    Okay.  I understand that Miss Onley

6    was separated sometime early October 2020.  Does

7    that sound accurate to you?

8        A.    Yes.

9        Q.    Do you know what -- if you know

10   specifically, what date was her termination date?

11       A.    10/5/2019 -- I'm sorry, 2020.

12       Q.    Okay.  And you said that -- I jumped

13   the gun and I said terminated.  I'm correct it

14   was an involuntary separation, correct?

15       A.    Correct.

16       Q.    Okay.  And who made the decision to

17   terminate Miss Onley?

18       A.    I did.

19       Q.    Okay.  And did you make that in

20   consultation with either Mr. McDonough or

21   Mr. Kostelac?

22       A.    I did discuss it with Mr. McDonough,

23   yes.

24       Q.    Okay.  And when did you first discuss

ALEXIS FOREMAN

1    it with Mr. McDonough?

2        A.      I would say potentially between

3    August -- I'm sorry, October 1st and October 5th

4    when we received the first statement from Miss

5    McGrory.

6        Q.      So it's your understanding that

7    Miss McGrory's statement was provided October 1,

8    2020; does that sound right?

9        A.      Yes.

10       Q.      Okay.  And -- well, if her last day of

11   employment or her termination notice was October

12   5, 2020, do you believe you made the decision to

13   terminate Miss Onley on October 5th?

14       A.      I believe it was October 7th.  I

15   believe it was the following Monday, if I'm not

16   mistaken.  I know it was the 7th, though.  That

17   was the date of the termination record.

18       Q.      Right.  But do you believe you made

19   the decision to terminate Miss Onley prior to the

20   record of -- that you're describing on October

21   7th?

22       A.      Honestly I don't know.  It was either

23   the 5th or the 7th.  I don't know.

24       Q.      Okay.  And in reaching that decision,

KS - MSJ 0001041

ALEXIS FOREMAN

```
 1   how did you first come to learn to know that
 2   there was a possible incident or infraction
 3   pertaining to Miss Onley?
 4        A.     I believe the first I was aware of it
 5   was when I received the statement on October 1st.
 6   Or shortly there before, Karl was e-mailing me
 7   that he had an issue and I asked him to get
 8   statements and send them to me.  So, around that
 9   time.
10        Q.     Okay.  So it started with Mr. Michener
11   e-mailing you about an issue, he was looking for
12   I guess advice from you, you said get statements,
13   correct?
14        A.     Correct.
15        Q.     And did he tell you what the incident
16   was about or who it was pertaining to?
17        A.     He just said it was a sexual
18   harassment issue and he didn't say initially.  It
19   was between -- I was juggling a couple things at
20   the time, so he was keeping it short.
21        Q.     Okay.  But you recall receiving an
22   e-mail, like the first time you learned about
23   anything between Miss Onley that led to her
24   termination, an e-mail from Mr. Michener saying
```

ALEXIS FOREMAN

[Page 46]

1    he needed your advice because it involved sexual

2    harassment?

3        A.    I don't recall specifically what it

4    said.  I believe he just said an issue.  I don't

5    know if it said harassment or sexual harassment.

6    I honestly don't know.  We do a lot of statements

7    for a variety of reasons and for a variety of

8    issues so I can get a better understanding of

9    what's going on in the store.

10       Q.    And this e-mail provided by

11   Mr. Michener -- I'm just trying to go

12   chronologically so I understand it.  Am I correct

13   if -- he e-mailed you about advice prior to you

14   seeing any statement from any witness about the

15   alleged event?

16       A.    Yes, I believe that's how it worked in

17   that case.  That's typical.

18       Q.    Right.  So he'd tell you something is

19   going on and then you advised him, get statements

20   from the witnesses and then let me know how it's

21   going, so to speak?

22       A.    Get statements from the witnesses and

23   then we'll discuss it.  That's typically how it

24   goes, yes.

ALEXIS FOREMAN

[Page 47]

```
1        Q.      Okay.  And you believe this all
2   started October 1, 2020?
3        A.      Yes.
4        Q.      All right.  Okay.  And then after
5   that, did Mr. Michener ever provide you with
6   statements that he had gathered?
7        A.      He gathered Sandra McGrory's on
8   October 1st.  And then I asked if there were any
9   other witnesses and Mr. Shaun Rhoton was also
10  stated, so I asked him to speak with Mr. Rhoton
11  as well.
12       Q.      And did Mr. Rhoton provide a statement
13  as well?
14       A.      He did.
15       Q.      Did you review that as well?
16       A.      I did.
17       Q.      Okay.  Did Mr. Michener inform you
18  that he spoke with anyone other than Miss McGrory
19  and Mr. Rhoton?
20       A.      I believe he spoke with the store --
21  excuse me -- the meat manager as well,
22  Mr. Mercon.
23       Q.      Mercon?  Okay.  Do you know if
24  Mr. Mercon provided a statement?
```

ALEXIS FOREMAN

[Page 48]

1     A.      He did not.

2     Q.      Okay.  Did you inform Mr. Michener to

3  speak to Miss Onley about what happened?

4     A.      Yes.

5     Q.      Okay.  Did he provide a statement from

6  Miss Onley?

7     A.      She did not write a statement.  We

8  asked her to.  She chose not to.

9     Q.      Did Mr. Michener inform you whether or

10  not he had a discussion personally with Miss

11  Onley about what happened?

12     A.      Yes, he did.

13     Q.      Okay.  And what did he share with you

14  regarding that discussion with her?

15     A.      That she admitted to talking about

16  using a sex toy, otherwise known as a dildo, in

17  the meat department to Sandra McGrory.

18     Q.      Did she admit to when she admitted to

19  using a dildo, like when that conversation took

20  place with Miss McGrory?

21          MR. ELLIOTT:  Object to the form.

22     You can answer.

23          THE WITNESS:  I believe she said it

24     was ongoing.  I don't -- I know there were

ALEXIS FOREMAN

```
 1          some dates in September that were pointed
 2          out, but they had brought up the
 3          conversation again with this 50 Shades of
 4          Gray movie that they discussed, which was
 5          the recent episode.
 6   BY MR. OLCESE:
 7      Q.     Okay.  And was it shared to you that
 8   Miss Onley said that both her and Miss McGrory
 9   were fans and watched 50 Shades of Gray?
10      A.     Yes.
11      Q.     And did Mr. Michener share with you
12   that Miss Onley stated that talks about a dildo
13   were initiated and started by Miss McGrory?
14      A.     No.
15      Q.     So to your understanding from
16   Mr. Michener, Miss Onley admitted that she
17   brought up talks of a dildo in the first place on
18   her own; is that accurate?
19      A.     That they had conversations, but that
20   the dildo particularly was her conversation.
21      Q.     Okay.
22      A.     Miss Onley's.
23      Q.     All right.  And I know the answer to
24   this but I have to ask it for the record.
```

ALEXIS FOREMAN

[Page 50]

1    Obviously the incident we're describing between

2    Miss McGrory and Miss Onley, you were not present

3    for, correct?

4        A.      Correct.

5        Q.      Okay.  And you were getting all of

6    your information from Mr. Michener?

7        A.      Correct.

8        Q.      Was there anyone else at the Audubon

9    location providing you information about this

10   incident other than Mr. Michener?

11       A.      Mr. Rhoton's statement as well.

12       Q.      Okay.  Did you ever speak to Mr. James

13   Schlegel about this incident?

14       A.      I may have.  I don't recall.

15       Q.      Okay.  So I understand that an

16   altercation occurred between Miss Onley and

17   Miss McGrory on October 1, 2020.  Does that sound

18   accurate to you?

19       A.      I -- I wouldn't describe it as an

20   altercation.

21       Q.      Okay.  Where they had a heated

22   exchange where they were yelling at each other or

23   something?

24       A.      My understanding was that Sandra got

ALEXIS FOREMAN

 1   very upset because Miss Onley would not leave her
 2   alone, and yet she did respond and she was
 3   yelling, yes.
 4        Q.     Okay.  And you understand that that
 5   exchange, I'll just say --
 6        A.     Okay.
 7        Q.     -- happened on October 1, 2020?
 8        A.     Yes.
 9        Q.     Okay.  And did you ever come to learn
10   during that exchange whether there was any
11   discussions between Miss McGrory and Miss Onley
12   that related to a dildo or 50 Shades of Gray or
13   any of that sexual nature content?
14        A.     I'm sorry, can you say that again?
15        Q.     Yeah.  So the exchange that we're
16   trying to talk about on October 1, 2020 from Miss
17   McGrory and Miss Onley, did you ever come to
18   learn that during that exchange, whether there
19   was any discussions about 50 Shades of Gray, a
20   dildo or anything sexual in nature?
21        A.     I'm not sure I'm -- I'm not sure I'm
22   hearing your question.  Are you asking me if I
23   was aware of any further discussion or previous
24   discussion, is that what your question is?

ALEXIS FOREMAN

```
 1     Q.     Yeah, so I guess -- let me try to make

 2   it more clear if I can.

 3              The exchange on October 1, 2020,

 4   what is your understanding was discussed that led

 5   to Miss Onley and Miss McGrory's actions that day

 6   that led to the statement?

 7     A.     My understanding is that she

 8   discussed -- she -- Miss Onley brought up the 50

 9   Shades of Gray movie and Miss McGrory responded

10   with that, yeah, that's my second favorite movie

11   or something like that.  And then Miss Onley went

12   on to suggest because of the mood that the movie

13   put her in, because she doesn't -- her husband is

14   no longer there, that she had to use this dildo

15   for that reason.  And Miss McGrory did not really

16   feel comfortable having that conversation.  She

17   was like, all right, enough.  And then later on

18   it was brought up again that, something about how

19   she's supposed to clean it, she made a joke about

20   it.  And I think Miss McGrory just had enough.

21   She was -- did not want to discuss it any

22   further.

23     Q.     And those discussions you just

24   described, to your knowledge that all occurred on
```

KS - MSJ 0001049

ALEXIS FOREMAN

[Page 53]

1    October 1, 2020?

2        A.      Yes.

3        Q.      Do you remember anything else being

4    brought up on October 1, 2020 that was discussed

5    between Miss Onley and Miss McGrory?

6        A.      Yes.  There was also questions about

7    religious and, I think, you know, the election,

8    those types of conversations.  Political

9    discussions is also what was brought up.

10       Q.      Do you remember anything more specific

11   than just religious or political conversations?

12       A.      The Trump -- I guess Miss McGrory

13   likes Trump and Miss Onley does not.  Miss Onley

14   suggested that Miss McGrory did not believe in

15   Black Lives Matter.  Those types of

16   conversations, yes.

17       Q.      Okay.  All right.  And did you ever

18   come to learn that from that exchange, Miss

19   McGrory used the F word, specifically telling

20   Miss Onley to stay the fuck away from her?

21       A.      Yeah, I was not aware of that.  I did

22   learn that later.

23       Q.      When did you learn that?

24       A.      I'm sorry?

ALEXIS FOREMAN

```
 1      Q.      When did you learn that?
 2      A.      I don't know.  After the fact.  I
 3  don't really know exactly when, but I didn't know
 4  that at the time.
 5      Q.      Okay.  Do you remember participating
 6  in an unemployment hearing for Miss Onley a
 7  couple months ago?
 8      A.      Yes.
 9      Q.      Do you remember if you learned that
10  Miss McGrory said those words before that
11  unemployment hearing?
12      A.      I don't believe so, no.
13      Q.      Okay.  And did you ever come to learn
14  that during their exchange, that Miss McGrory,
15  who was at a dish -- like a sink, threw a pot?
16      A.      That's not how it was described.
17      Q.      How was it described?
18      A.      She got frustrated, had a pot in her
19  hand, the sink was full of dishes, she threw it
20  in and like, I'm out of here, I'm leaving, and it
21  exploded with bubbles.
22      Q.      So she did throw a pot, right?
23      A.      Yes.
24      Q.      Okay.  And when did you first --
```

ALEXIS FOREMAN

[Page 55]

1      A.      And I was explaining the method of the

2   pot, not just throwing a pot across the room to

3   hit a wall, yeah.

4      Q.      Right.  So when did you first come to

5   learn that she threw a pot during this exchange

6   on October 1, 2020?

7      A.      I don't know.

8      Q.      Do you remember if you learned that

9   during the investigation, before Miss Onley was

10  terminated?

11     A.      I did not.

12     Q.      Okay.  So it happened after Miss

13  Onley's termination, right?

14     A.      (Indicating).

15     Q.      Do you know if you learned that during

16  the unemployment hearing that you participated

17  in?

18     A.      I did not know that then, no.

19     Q.      Okay.  Okay.  Let's see.  Do you

20  remember prior to October 1, 2020, receiving any

21  complaints at the Audubon location about Miss

22  Onley?

23     A.      I did not.

24     Q.      Okay.  Do you remember being made

ALEXIS FOREMAN

1    aware of any complaints from Miss McGrory at the

2    Audubon location prior to October 1, 2020 about

3    anyone else?

4         A.    No.

5                   (Brief recess.)

6    BY MR. OLCESE:

7         Q.    Miss Foreman, we're back on the record

8    after a short break.  I want to show you the

9    first exhibit today.  I'm going to share my

10   screen.  Jeff has hard copies I'm sure of the

11   ones I'm going to share.  If you prefer looking

12   at that that he provides you, that's fine.  If

13   you want to look at the screen, anything I show

14   you, please let me know if you want me to scroll

15   up or down so you can read it better, or zoom in

16   and zoom out.  Okay?

17        A.    Okay.

18                   (Document being shown.)

19   BY MR. OLCESE:

20        Q.    All right, Miss Foreman.  I'm sharing

21   my screen with an exhibit marked D-5.  This is a

22   four-page exhibit.  Bates stamped, which is a

23   reference for legal purposes in litigation, this

24   one is marked KS317 and then it goes

KS - MSJ 0001053

ALEXIS FOREMAN

[Page 57]

1    consecutively until KS320 on the bottom right

2    there.  Okay?

3        A.    Okay.

4        Q.    So this is a four-page document.  And

5    I'm happy to scroll up and down throughout if

6    you'd like to review the whole thing.  Just let

7    me know.

8              But my first question is for you,

9    when you have a chance to look at this, do you

10   recognize this document?

11       A.    I do.

12       Q.    So what is this document?

13       A.    It's Sandra McGrory's statement.

14       Q.    Okay.  And on the top it's dated

15   October 1, 2020, correct?

16       A.    Correct.

17       Q.    And is this an accurate copy of the

18   document that Mr. Michener forwarded to you on

19   October 1, 2020?

20       A.    Yes.

21       Q.    Okay.  So you got this statement, you

22   got Mr. Rhoton's statement, and you got

23   Mr. Mercon's statement, correct?

24       A.    I didn't get a statement from

ALEXIS FOREMAN

[Page 58]

1    Mr. Mercon.

2        Q.    Okay.  So just this statement and

3    Mr. Rhoton, correct?

4        A.    Correct.

5        Q.    All right.  And when you received it,

6    you had a chance to read it and review it,

7    correct?

8        A.    Correct.

9        Q.    So after you had a chance to do that,

10   what did you do next in terms of the

11   investigation?  Did you reach back out to

12   Mr. Michener?

13       A.    Yes.  Initially once I received Miss

14   McGrory's statement, I asked him if there was

15   anyone else that may have overheard these

16   conversations.  And he agreed, I believe it may

17   be in here, that Shaun was -- Mr. Rhoton was also

18   in the department at the time.  And I asked that

19   he bring Mr. Rhoton in, have a conversation and

20   ask him to write a statement, and he did that.

21       Q.    Okay.  Okay.  And at any point during,

22   I'll just describe it as an investigation, did

23   you personally speak with Miss McGrory?

24       A.    No.

ALEXIS FOREMAN

[Page 59]

1      Q.      At any point did you personally speak

2   with Mr. Rhoton during the investigation?

3      A.      No, sir.

4      Q.      Okay.  Did you ever personally speak

5   with Miss Onley during the investigation?

6      A.      No.

7      Q.      Okay.  And obviously you never

8   obtained any of the statements, you received them

9   from Mr. Michener?

10      A.      Correct.

11      Q.      Fair to say then that the

12   investigation was conducted by Mr. Michener and

13   he reported the results to you?

14      A.      Correct, that would be fair, yes.

15      Q.      Okay.  And other than what you already

16   described and we spoke about, where you called

17   Mr. Michener to get the statements after he

18   reached out to you initially about what was going

19   on, do you remember having any other

20   conversations or communications with Mr. Michener

21   later that day, October 1, 2020, after you

22   received all the statements?

23      A.      I don't know if it was October 1st.  I

24   just remember it being a very busy time.  It may

ALEXIS FOREMAN

[Page 60]

1   have been a day or two later.

2        Q.     Okay.  All right.  So what you're

3   thinking of, though, what do you remember

4   speaking with Mr. Michener about when you did

5   talk to him after you had all the statements?

6        A.     I asked him to bring Miss Onley in and

7   present her with the complaints.

8        Q.     Okay.  And it was your understanding

9   Mr. Michener did that?

10       A.     Yes.

11       Q.     Okay.  And then subsequently,

12  Mr. Michener informed you of what Miss Onley had

13  admitted to or said happened, correct?

14       A.     Correct.  And I asked for a statement.

15  And he said she was not willing to write a

16  statement.

17       Q.     Okay.  So at that point, what did you

18  and either Mr. Michener or anyone else involved

19  with that investigation do?

20       A.     I read over the material, I discussed

21  it with Mr. Michener, and I also discussed it

22  with Mr. McDonough.

23       Q.     So did the three of you discuss it

24  over like a conference call?

ALEXIS FOREMAN

1      A.      No.   First I discussed it with

2   Mr. Michener and then I walked across the hall

3   and discussed all of the information with

4   Mr. McDonough.

5      Q.      Okay.   And the discussion you first

6   had with Mr. Michener, am I correct you discussed

7   with him, I guess what type of discipline Miss

8   Onley or Miss McGrory would receive for this?

9              MR. ELLIOTT:   Object to the form.

10             THE WITNESS:   Yes, I did.

11   BY MR. OLCESE:

12     Q.      Okay.   And generally describe, what

13   did you talk about in that regard?   What do you

14   remember?

15     A.      I talked specifically about the --

16   what I remember is talking specifically about the

17   fact that this -- this sexual harassment type

18   information.   And that she admitted to having

19   that conversation with Miss -- excuse me, I'm

20   sorry -- Miss Onley had suggested this

21   conversation with the dildo, the washing, and

22   Miss McGrory repeatedly asked her to stop and she

23   continued with it and was not comfortable with

24   it.   And those types of conversations and

ALEXIS FOREMAN

[Page 62]

```
 1   potentially the joke where she was going to put
 2   the dildo in another employee's pocket in a meat
 3   department, is completely inappropriate and
 4   there's just no place for it in the workplace.
 5        Q.     And at that time Mr. Michener
 6   recommended that she be terminated?
 7                  MR. ELLIOTT:  Object to the form.
 8                  THE WITNESS:  He did not.  He
 9           basically said, I don't know where to go
10           with this, it is bad.  And I said,
11           unfortunately, the only -- this is how we
12           handle these situations.  It's
13           inappropriate, she's aware of it, it's in
14           the handbook, and we don't tolerate this
15           type of behavior.  And more than once she
16           had spoken about it and was asked to stop.
17   BY MR. OLCESE:
18        Q.     Well, when you say more than once she
19   was asked to stop, what are you referring to?
20        A.     Miss McGrory saying, I don't want to
21   hear it, and then her continuing.
22        Q.     Okay.  So the only evidence that you
23   had relying on that she was told previously and
24   asked to stop is just from Miss McGrory herself,
```

ALEXIS FOREMAN

[Page 63]

1    correct?

2        A.      I'm not sure about that.  I don't --

3    and I don't know that that would have been

4    something that would be -- that would change our

5    decision to terminate or not.  The fact that she

6    said it in general, and admitted to it, and is

7    aware of our sexual harassment policy, and the

8    fact that she was talking about bringing a dildo

9    to work, is just completely inappropriate.

10       Q.      Okay.  So during that conversation,

11   did you inform Mr. Michener that you were going

12   to terminate Miss Onley?

13       A.      During that conversation I took it and

14   said, this is where I'm thinking I'm going, I'm

15   going to verify that with my boss.  And that's

16   exactly what I did.

17       Q.      Was there any discussions brought up

18   about issuing Miss Onley a lesser form of

19   discipline rather than termination?

20       A.      No.

21       Q.      And why not?

22       A.      We felt that it reached that level of

23   termination.

24       Q.      And when you say we --

ALEXIS FOREMAN

[Page 64]

1    A.    I brought -- we -- so I brought it

2    across the hall and asked -- I showed my boss all

3    of the information.  He said, completely agree,

4    there's no other way, you need to terminate her.

5    Q.    And you say Mr. McDonough is who you

6    consulted with?

7    A.    Correct.

8    Q.    Okay.  And am I correct Redner's has a

9    progressive discipline policy?

10    A.    Not for this particular situation, we

11    do not.

12    Q.    What do you mean by that?

13    A.    So in our handbook it states that

14    you -- it could be discipline up to termination

15    on the first offense, just based on the severity.

16    Q.    Okay.  Was there any consideration or

17    discussion made about Miss Onley working for four

18    years without receiving any prior discipline?

19    A.    Again, in this type of situation, we

20    feel that this reaches a level that we can't --

21    we can't allow in our -- in the workplace.

22    Q.    When you say we, again, who are you

23    referencing?

24    A.    When I say we, I'm referencing myself

ALEXIS FOREMAN

1    and Mr. McDonough.

2         Q.    Okay.  Okay.  All right.  Looking at

3    the letter, the first paragraph, Miss McGrory

4    writes about two to three months ago having

5    discussions with Connie Onley where she feels

6    that she and Miss McGrory are discriminated

7    against because they are females in the

8    department.  Do you see that?

9         A.    Yes.

10        Q.    And Miss McGrory writes that she does

11   not feel that way, correct?

12        A.    Correct.

13        Q.    Do you remember ever learning about

14   Miss Onley complaining that she felt she was

15   being discriminated against due to her gender at

16   the Audubon location?

17        A.    No.

18        Q.    Is that something you would expect

19   management to make you aware of if an employee

20   complains of gender discrimination?

21        A.    Correct.  Not only management, but I

22   also had a conversation with Miss Onley when we

23   were ending the meeting at store 63, letting her

24   know that she knows who I am, she can reach out

KS - MSJ 0001062

ALEXIS FOREMAN

```
 1    to me if there are any other issues.  I had not
 2    heard from her at that point, since that point.
 3         Q.    Okay.  All right.  And through your
 4    discussions with Mr. Michener and your part in
 5    the investigation from this October 1, 2020
 6    incident, did you ever come to learn any reason
 7    why Miss McGrory included this in the statement,
 8    this first paragraph that we just described?
 9         A.    Yeah, I think she just continued to
10    become frustrated by her.  That's what I was
11    getting from them, and based on what she stated
12    in this.
13         Q.    Okay.  She writes later on, on the
14    bottom of the first page, Bates stamp 317:  I
15    just had a sit down with Dave Kemp approximately
16    September 10th in regard to Connie about things
17    she talks about in the meat department that I
18    don't feel comfortable with.
19               Do you remember ever learning about
20    a sit-down or a complaint from Miss McGrory with
21    Dave Kemp around September 10, 2020?
22         A.    I was not aware of that, no.
23         Q.    Okay.  And Dave Kemp, we spoke about
24    him before, wasn't he the assistant manager at
```

ALEXIS FOREMAN

1    the Lansdale location?

2       A.      No, Dave Kehm is -- it's not Kemp,

3    it's Kehm, K-E-H-M.  He is the director of -- not

4    exactly sure.  He's a meat specialist, so he

5    oversees 10 or 12 stores, the meat department

6    areas in those stores.  So he's a meat supervisor

7    essentially.

8       Q.      Okay.  But in this exhibit D-5 she's

9    writing about Dave Kemp.  I guess that's someone

10   else then, correct?

11      A.      No, I think she's referring to Dave

12   Kehm there.

13      Q.      Okay.  And is that something you would

14   expect in your practice to be made aware of, if

15   an employee was complaining about another

16   coworker?

17      A.      So a lot of times it does not cross my

18   desk.  He is a supervisor, so he could take that

19   complaint.  Typically, when it reaches the level

20   of HR, it's something that he feels could be an

21   issue and he would relate it to me.  At this time

22   I was not -- at that time I was not aware of him

23   sitting down with Sandra -- or Connie, I'm sorry.

24      Q.      Well, when you see it in the statement

ALEXIS FOREMAN

[Page 68]

1    that you reviewed on October 1, 2020, did you

2    ever try to reach out to Dave and figure out what

3    was going on?

4        A.      That had -- at the time, it had

5    nothing to do with the fact that -- the issue at

6    hand, in my opinion, which was her bringing a

7    dildo or talking about bringing a dildo to the

8    workplace.

9        Q.      Right.  But I mean it was important

10   enough apparently for Miss McGrory to write it in

11   this complaint, correct?

12       A.      Again, I think she was frustrated by

13   it, yes, by Connie -- by Miss Onley, so she put

14   it in there.

15       Q.      So, like, the answer to my prior

16   question, you did not reach out to Dave at the

17   time you received this statement to ask him if he

18   ever met with Miss McGrory?

19       A.      I don't believe I did, no.

20       Q.      Did you ever meet with him at any

21   point afterwards?

22       A.      After this statement?

23       Q.      Yeah, to talk about what Miss McGrory

24   writes in here, that she allegedly complained

ALEXIS FOREMAN

[Page 69]

1    about Miss Onley around September 10th?

2        A.    No.

3        Q.    Okay.  So you never confirmed one way

4    or the other with Dave or anyone, whether what

5    Miss McGrory writes here is truthful?

6                MR. ELLIOTT:  Object to the form.

7                THE WITNESS:  No.

8    BY MR. OLCESE:

9        Q.    Okay.  She writes:  I expressed to

10   Dave I don't like how Connie continues to play

11   the race card, age card, and once again that

12   myself and Connie were discriminated because we

13   are females.

14                Do you remember Miss Onley ever

15   bringing to your attention that she felt she was

16   being treated differently based on her race?

17       A.    No.

18       Q.    Did you ever speak to Miss McGrory

19   about what it meant when she said Miss Onley is

20   playing the race card?

21       A.    I never spoke to Miss McGrory.

22       Q.    I know not during the investigation,

23   but at any point after Miss Onley's termination

24   did you ever follow up with Miss McGrory to talk

ALEXIS FOREMAN

1    about what had transpired?

2        A.    No.

3        Q.    Okay.  Do you remember anyone at the

4    Audubon location ever speaking to you about Miss

5    Onley speaking that -- about Miss Onley

6    complaining that she felt she was being treated

7    unfairly based on her race?

8        A.    No.

9        Q.    Okay.  And do you have any

10   understanding why Miss McGrory, in writing this

11   statement, brings up the fact that Miss Onley had

12   complained that she was being treated differently

13   due to her race?

14                MR. ELLIOTT:  Object to the form.

15                THE WITNESS:  Apparently she must

16        have had that conversation with Miss

17        McGrory.  However, it was never reported.

18   BY MR. OLCESE:

19       Q.    Okay.  And then on the next paragraph

20   on KS318, it continues:  Approximately on

21   September 5th Connie made a statement to me that

22   she wants to put a dildo in Shaun's coat pocket.

23                So I asked you prior about comments

24   regarding the dildo, the prank against

ALEXIS FOREMAN

[Page 71]

```
 1   Mr. Rhoton, and content of a sexual nature,

 2   whether they occurred on October 1, 2020, and you

 3   believed they had.

 4            Reading this now, do you believe

 5   that that -- those kind of comments were

 6   discussed on October 1, 2020 or prior to October

 7   1, 2020?

 8       A.    So I'm just rereading the statement.

 9   According to this, yes, it looks like it happened

10   on September 5th.  And it looks like it was

11   ongoing.

12       Q.    Do you remember -- is there any reason

13   that sitting here today you don't believe that

14   you knew after reading this statement when you

15   first received it, October 1, 2020, that you

16   would have read these comments initiating about a

17   dildo started almost a month prior?

18            MR. ELLIOTT:  Object to the form.

19            THE WITNESS:  Yeah, I do recall

20       that.  And it -- honestly it wouldn't have

21       mattered.  They occurred and it's not

22       appropriate for the workplace.  And once

23       it has been reported, that's when we act

24       on it.  We don't know what we don't know.
```

ALEXIS FOREMAN

```
 1   BY MR. OLCESE:
 2       Q.      Right.  And then -- but isn't it fair
 3   to assume that the policy in place is to protect
 4   employees that feel they're being harassed,
 5   correct?
 6       A.      Correct.
 7       Q.      And wouldn't you expect an employee
 8   feeling they are being harassed would come and
 9   present the facts of what's happening within a
10   month timeframe?
11       A.      Not necessarily.  It doesn't always
12   work like that.
13       Q.      Why not?
14       A.      It depends on who's reporting it and
15   how they're feeling and the circumstances.
16       Q.      Do you remember ever considering the
17   fact, or talking with either Mr. McDonough or
18   Mr. Michener that Miss McGrory is now bringing
19   forward these alleged sexual harassment
20   complaints after a month, and if that mattered or
21   not?
22       A.      Yes.  It didn't matter.
23       Q.      It didn't matter?
24       A.      No.
```

ALEXIS FOREMAN

[Page 73]

1      Q.      Okay.  Did you ever question why, why
2  was Miss McGrory bringing it to our attention
3  today rather than any other day?
4      A.      Yes.
5      Q.      And what did you discuss with that?
6      A.      She basically said this is ongoing and
7  I'm tired of it.  I keep asking her to stop and
8  she keeps continuing.  I can't take it anymore.
9      Q.      And then on the last -- third page,
10  excuse me, she goes on to talk about what
11  transpired on October 1, 2020.  Do you see that
12  on Bates stamp KS319?
13      A.      I do, yes.
14      Q.      Okay.  What I'd like you to do is just
15  read to yourself, please, from that section to
16  the rest of the statement which ends on KS320,
17  page 4 of D-5, and let me know when you're
18  finished.  Okay?
19      A.      Okay.  (Reviewing document).  Okay.
20      Q.      Okay.  So you had a chance to read
21  that, correct, Miss Foreman?
22      A.      Correct.
23      Q.      All right.  So on the last page,
24  towards the middle, Miss McGrory writes:  I

ALEXIS FOREMAN

[Page 74]

```
 1   yelled again, I don't fucking care, stop it.

 2               Do you see that?

 3   A.     Yes.

 4   Q.     Right.  So when you read this report

 5   at that time, you knew Miss McGrory had used

 6   expletive language against Miss Onley, right?

 7   A.     Yeah, obviously I was wrong.  I forgot

 8   I read that.  But I -- yes, I did read that, and

 9   yes, I would have known that.

10   Q.     Right.  And did you ever come to learn

11   where this altercation between Miss Onley and

12   Miss McGrory took place on October 1, 2020?

13   A.     Initially in the meat room.

14   Q.     And you've been to the Audubon

15   location.  The meat room location, that's within

16   public view, correct; the customers can see

17   behind the meat counter?

18   A.     Not the way -- like in the meat room,

19   there's doors that are closed.  And where they

20   were, my understanding is they were in the back.

21   I'm not really sure if there were doors or not,

22   honestly, because I get the stores kind of

23   confused sometimes.  They're all set up a little

24   bit differently.
```

ALEXIS FOREMAN

[Page 75]

1      Q.      Based on your understanding of the
2   discipline policy, can an employee at Redner's be
3   disciplined for yelling and cursing and -- if the
4   customers can hear it?
5      A.      If the customers can hear it and it's
6   out on the sales floor, yes.
7      Q.      Okay.  So Miss McGrory was not
8   disciplined, so was it your understanding that
9   even though she was yelling and cursing, it was
10  not within an earshot of customers?
11     A.      It was not on the sales floor, yes.
12  That's my understanding.
13     Q.      How -- when did you come to learn it
14  was not on the sales floor?
15     A.      My understanding is that this occurred
16  in the meat room.
17     Q.      Right.  Who told you it was not on the
18  sales floor where customers couldn't hear it, is
19  what I'm asking?
20     A.      There was no talk about customers
21  overhearing it.
22     Q.      Okay.  So you're just assuming that no
23  customers overheard it because you didn't hear if
24  they did?

ALEXIS FOREMAN

[Page 76]

1    A.    It was discussed with -- I don't

2    really recall if it was discussed with Karl or

3    not.  So I would have to say yes, I didn't hear

4    it, that it was on the sales floor.  My

5    understanding was that it was in the meat room.

6    Q.    Okay.  And we talked a little bit ago

7    about you learning that Miss McGrory threw a pot

8    during this exchange, right?

9    A.    Yes.

10    Q.    Did you read anywhere in Miss

11    McGrory's statement where she admits to throwing

12    a pot?

13    A.    No.

14    Q.    Okay.  And doesn't Redner's have a

15    policy about making good faith, honest

16    complaints?

17    A.    Yes.

18    Q.    Do you believe it would be pertinent

19    that if Miss McGrory was being honest about the

20    entire exchange that she had with Miss Onley, she

21    would write, hey, I got mad, I cursed, like she

22    did, but then also write that she threw a pot?

23    A.    Sometimes they leave some details out

24    because they're really upset when they write

ALEXIS FOREMAN

[Page 77]

1    statements.  It's not unusual.

2        Q.    Right.

3        A.    They don't write everything out.

4        Q.    Right.  So, but wouldn't you agree

5    this statement is less than fully accurate then?

6                MR. ELLIOTT:  Object to the form.

7                THE WITNESS:  Yeah, I wouldn't

8        agree with that.

9    BY MR. OLCESE:

10       Q.    So this is fully accurate, this is

11   exactly what happened?

12       A.    I didn't say it was exactly what

13   happened, but it is pretty accurate.  And that

14   conversation was discussed, with Karl my

15   understanding was.

16       Q.    What was discussed?

17       A.    The situation that occurred that day.

18       Q.    It's your understanding that Miss

19   McGrory admitted to Mr. Michener when they spoke

20   during the investigation that she threw a pot?

21       A.    I don't know that for sure.

22       Q.    Okay.  Wouldn't that matter to you,

23   investigating what really happened, if an

24   employee threw a pot in an angry outburst?

ALEXIS FOREMAN

[Page 78]

1           MR. ELLIOTT:  Object to the form.

2           THE WITNESS:  Not when it was into

3     a sink.

4  BY MR. OLCESE:

5     Q.     Okay.  So there's no concern there

6  because it went into a sink; it has to hit

7  somebody, is that your testimony?

8     A.     No, that's not my testimony.  My

9  testimony is she just put it in the sink, tossed

10  it into the sink.  She wasn't trying to hurt

11  anyone, was my understanding.

12     Q.     Where did you -- I'm asking where did

13  you get that understanding?

14     A.     I got it probably during -- either

15  during the EEOC when Sandra responded in her

16  testimony.  I'm not really sure.

17     Q.     Well, are you just assuming now, or

18  did you receive that information that she placed

19  it in the sink gently from someone?

20     A.     Yeah, I didn't say that.  I said she

21  tossed it into the sink and didn't want to hurt

22  anyone.  And I believe when we were doing our

23  prep for the -- I'm sorry, the unemployment

24  hearing, I believe that may have been where it

ALEXIS FOREMAN

[Page 79]

1    came up.  I can't recall.  But I did have that

2    conversation with her.

3         Q.      Well, you testified earlier that the

4    first time you believe you learned that she threw

5    a pot was during the unemployment hearing you

6    participated in.

7         A.      I think that's what I just said.  I

8    believe that's what I just said.  During the

9    unemployment.  I thought that's what I just said.

10        Q.      Okay.  So, in your opinion though,

11   when she throws a pot, it's of no significance,

12   it has no bearing on her statement, because she

13   tossed it into the sink; is that right?

14        A.      It didn't -- in this matter that I was

15   addressing, it did not have an impact, no.

16        Q.      Well, doesn't the Redner's policy

17   against workplace violence also address workplace

18   intimidation?

19                     MR. ELLIOTT:  Object to the form.

20                     THE WITNESS:  We do have -- yeah,

21        we do have a clause about intimidation.

22   BY MR. OLCESE:

23        Q.      Okay.  And do you not think that an

24   employee yelling, cursing, throwing a pot, could

ALEXIS FOREMAN

[Page 80]

1    be intimidating to another coworker?

2        A.      I guess it could be.  In this

3    situation, to me it seemed like Miss Onley was

4    the aggressor because she wouldn't leave Miss

5    McGrory alone.

6        Q.      Right.

7        A.      And that was her way of getting away.

8        Q.      My question for you is, if you knew

9    Miss McGrory honestly said she got angry, she

10   shouted, she cursed at Miss Onley and then threw

11   a pot into the sink, is that something you would

12   have asked Mr. Michener to talk to her about, to

13   see possibly if Miss McGrory should be subject to

14   discipline for that behavior?

15       A.      We talked about the language, yes, and

16   he did speak with her about that.

17       Q.      But you did not talk about throwing a

18   pot because you don't know about it, right?

19       A.      Correct.

20       Q.      If you knew about it, sitting here

21   today, do you believe you would have instructed

22   Mr. Michener to have addressed that with her and

23   you possibly could have had a conversation about

24   subjecting her to discipline?

ALEXIS FOREMAN

[Page 81]

```
1              MR. ELLIOTT:  Object to the form.
2              THE WITNESS:  Possibly, but I would
3         think it would be more of a counseling.
4         It would depend on the circumstance.  Hard
5         to say.
6    BY MR. OLCESE:
7         Q.     Okay.  And if you knew at that time,
8    around October 1, 2020 when you were doing your
9    investigation, that Miss McGrory had thrown a
10   pot, would you have instructed Mr. Michener to
11   ask Miss Onley about that fact?
12        A.     I would have thought that would have
13   come up in whether she wrote a statement, which
14   she refused to do, or in the conversation.  And
15   my understanding is that never came up.
16        Q.     Right.  So my question though was, if
17   you knew about that, if Miss McGrory wrote it in
18   the statement, do you believe sitting here today
19   you would have asked Mr. Michener, when he got a
20   statement or questioned Miss Onley, to ask about
21   that subject of throwing the pot?
22        A.     Yeah, I probably would have.  I would
23   have thought it would have come up, though, if it
24   was an issue.
```

ALEXIS FOREMAN

1      Q.      Okay.  I mean, knowing that now, does
2   that change your decisionmaking sitting here
3   today, whether Miss Onley should have been
4   terminated?
5      A.      No, it does not.
6      Q.      Does it change the fact whether you
7   belive Miss McGrory should have been issued some
8   form of discipline for her actions?
9      A.      I can't answer that.
10     Q.      You don't know?
11     A.      I -- I would have had to have asked
12  the circumstances and had a better understanding
13  of how Connie felt, Miss Onley felt.  But neither
14  one of them told us about that at the time, so we
15  were unaware.
16     Q.      Okay.  Did you ever inform
17  Mr. Michener to send Miss Onley home for the day?
18     A.      Yes, that is typical protocol when
19  we're investigating.
20     Q.      Well, did you tell Mr. Michener to
21  send Miss McGrory home for the day?
22     A.      No.
23     Q.      If it's typical protocol, why did you
24  not do that?

ALEXIS FOREMAN

[Page 83]

```
1      A.      Because she was the one complaining.

2      Q.      Okay.  And do you recall if -- do you

3    know whether or not Miss Onley ever returned to

4    work after being sent home for that day?

5      A.      I don't believe she did.  I think she

6    was suspended pending HR review.

7      Q.      I understand Mr. Michener drafted a

8    termination notice a few days after doing the

9    investigation.  Were you -- did you take part in

10   drafting that termination notice at all?

11     A.      I typically do, but when I do, I write

12   my own name and title and it's not on there.  So

13   I'm assuming that I either communicated to Karl

14   how to write it or he did it himself.

15     Q.      All right.  Understood.  Bear with me

16   one second, please.

17              I understand that you drafted a

18   statement around January 18, 2021.  Do you

19   remember doing that?

20     A.      I do.

21     Q.      Why did you draft a statement at that

22   time?

23     A.      I believe it was our position

24   statement in response to the EEOC complaint.
```

ALEXIS FOREMAN

[Page 84]

1      Q.      And were you responsible for
2  responding to the EEOC charge of discrimination?
3      A.      I don't respond to it, our general
4  counsel does.  But because I was involved in it,
5  he asked me to write a statement.
6      Q.      I understand.  Okay.  And did you
7  reach out to anyone else to write statements?
8      A.      I believe I asked Mr. DeGeorgio and
9  Mr. Kehm.
10     Q.      Okay.  Did you type up anyone else's
11 statement other than your own?
12     A.      No.
13     Q.      Okay.  Do you remember reviewing
14 documents during this litigation called
15 interrogatories?
16     A.      Yes.
17     Q.      And I understand they were submitted
18 by counsel.  Before they were submitted, though,
19 did you have a chance to review them and make any
20 changes if necessary?
21     A.      Yes.
22     Q.      Okay.  All right.  Miss Foreman, I
23 appreciate your time.  I don't have anything
24 further unless Jeff has some few questions for

KS - MSJ 0001081

ALEXIS FOREMAN

```
 1    you, okay?
 2              MR. ELLIOTT:  No, I don't have any
 3         questions.  Thanks, Andrew.  And thanks,
 4         Miss Vance.
 5              COURT REPORTER:  Mr. Elliott, do
 6         you need a copy of her transcript also as
 7         well?
 8              MR. ELLIOTT:  We've already ordered
 9         this.  And I just talked to your colleague
10         about Mr. Michener's, so, same form, same
11         manner, same copy, indexing.  That would
12         be great.
13                        -   -   -
14            (Witness excused.)
15            (Deposition concluded at approximately
16    3:36 p.m.)
17
18
19
20
21
22
23
24
```

ALEXIS FOREMAN

[Page 86]

C E R T I F I C A T I O N

I hereby certify that the proceedings, evidence, and objections noted herein are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter, and that this is a correct transcript of the same.

————————————————————
Robin A. Vance, CCR, RPR
CCR-NJ License No. XI 02131
RPR - NCRA No. 817327
Notary Public
City of Philadelphia, Philadelphia County
Commission Expires 8/25/22

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

ALEXIS FOREMAN

87

**A**

**ability (3)** 6:22
12:22 24:19
**able (1)** 13:2
**absence (2)** 23:4
40:10
**absent (1)** 23:3
**absenteeism (3)**
23:7 36:2
38:20
**absolutely (2)**
16:16 35:22
**accommodate ...**
40:8
**accommodatio...**
41:14
**accurate (7)**
43:7 49:18
50:18 57:17
77:5,10,13
**accurately (1)**
86:5
**acknowledge (2)**
4:9,12
**acknowledges ...**
4:20
**act (1)** 71:23
**action (1)** 1:5
**actions (3)** 30:8
52:5 82:8
**addon (1)** 20:4
**address (3)**
13:11 40:1
79:17
**addressed (1)**
80:22
**addressing (1)**
79:15
**adequate (1)**
35:9
**administer (1)**
22:9
**administered (...**
4:13
**administering ...**

22:4
**admit (1)** 48:18
**admits (1)** 76:11
**admitted (8)**
31:1 48:15,18
49:16 60:13
61:18 63:6
77:19
**advice (7)** 23:13
23:15 27:4
35:18 45:12
46:1,13
**advised (1)**
46:19
**afternoon (1)**
5:16
**age (1)** 69:11
**aggressor (1)**
80:4
**ago (10)** 6:2
15:18 16:11,12
17:5,9 25:9
54:7 65:4 76:6
**agree (5)** 5:5,7
64:3 77:4,8
**agreed (7)** 4:1
30:21 35:10,12
35:18 36:6
58:16
**agreement (4)**
5:1,2 32:16
41:10
**agrees (1)** 4:21
**ahead (1)** 27:11
**alexis (5)** 1:11
3:3 5:9 13:7,10
**allegations (2)**
8:20 9:7
**allege (1)** 7:6
**alleged (2)** 46:15
72:19
**allegedly (1)**
68:24
**allencompassi...**
20:21

**allout (1)** 37:7
**allow (1)** 64:21
**altercation (3)**
50:16,20 74:11
**amicably (3)**
27:2 28:1
32:15
**andor (1)** 86:23
**andrew (4)** 2:4
5:4,17 85:3
**angry (2)** 77:24
80:9
**answer (14)**
10:24 11:24
12:5,6,15 13:2
27:11 40:4,12
41:21 48:22
49:23 68:15
82:9
**answered (2)**
10:18,20
**answering (1)**
11:11
**anthony (1)**
30:16
**anymore (1)**
73:8
**aolcese (1)** 2:6
**apologize (2)**
14:21 16:6
**apparently (2)**
68:10 70:15
**apply (1)** 86:21
**appreciate (1)**
84:23
**appreciated (1)**
32:12
**approach (1)**
20:23
**appropriate (2)**
11:17 71:22
**approved (3)**
35:7,13 41:1
**approximate (1)**
17:11

**approximately...**
1:13 6:1 17:17
32:18 66:15
70:20 85:15
**areas (1)** 67:6
**arrangement (1)**
4:18
**arrived (1)**
28:20
**asked (26)** 11:13
12:16 27:4
30:18 35:18
41:3 42:7 45:7
47:8,10 48:8
58:14,18 60:6
60:14 61:22
62:16,19,24
64:2 70:23
80:12 81:19
82:11 84:5,8
**asking (6)** 33:3
39:4 51:22
73:7 75:19
78:12
**assigned (2)**
19:6,8
**assistant (9)**
15:6,8,19,23
16:15 17:1
18:9 20:18
66:24
**assume (4)** 12:15
25:13 33:17
72:3
**assuming (3)**
75:22 78:17
83:13
**attention (5)**
8:17 31:23
42:23 69:15
73:2
**attorneys (3)** 2:7
2:12 4:7
**audubon (18)**
25:7,11,17

34:10,13,17
36:16,19,24
37:13,17 38:3
50:8 55:21
56:2 65:16
70:4 74:14
**august (6)** 38:15
42:4,18 43:1,3
44:3
**aware (12)** 22:15
34:20 45:4
51:23 53:21
56:1 62:13
63:7 65:19
66:22 67:14,22

**B**

**back (4)** 30:19
56:7 58:11
74:20
**bad (1)** 62:10
**based (10)** 19:6
30:7,9 31:3,13
64:15 66:11
69:16 70:7
75:1
**basically (3)**
32:13 62:9
73:6
**basis (1)** 23:3
**bates (3)** 56:22
66:14 73:12
**bear (1)** 83:15
**bearing (1)**
79:12
**beginning (2)**
1:12 5:2
**behalf (1)** 10:10
**behavior (4)**
31:14 32:10
62:15 80:14
**behaviors (1)**
31:8
**believe (33)** 6:1
7:18 25:8

ALEXIS FOREMAN

88

26:14 28:18
34:14 39:20
44:12,14,15,18
45:4 46:4,16
47:1,20 48:23
53:14 54:12
58:16 68:19
71:4,13 76:18
78:22,24 79:4
79:8 80:21
81:18 83:5,23
84:8
**believed (2)**
29:12 71:3
**belive (1)** 82:7
**benefits (5)**
21:22,23 22:2
22:7,8
**bensalem (1)** 2:5
**best (4)** 6:22
11:15 17:10
34:1
**better (7)** 26:17
31:10 32:7,12
46:8 56:15
82:12
**beyond (2)**
19:17 41:13
**biggest (1)** 11:5
**bit (5)** 14:4 18:7
21:18 74:24
76:6
**bite (1)** 11:22
**black (1)** 53:15
**blackout (1)**
38:13
**blood (1)** 39:14
**bob (2)** 10:20
24:11
**boss (6)** 8:1,3
21:13 24:11
63:15 64:2
**bottom (2)** 57:1
66:14
**break (3)** 11:20

12:1 56:8
**brief (1)** 56:5
**bring (3)** 8:16
58:19 60:6
**bringing (8)** 7:1
31:22 63:8
68:6,7 69:15
72:18 73:2
**brings (2)** 42:22
70:11
**brought (13)**
6:10 29:5
30:19,24 49:2
49:17 52:8,18
53:4,9 63:17
64:1,1
**bubbles (1)**
54:21
**busy (2)** 31:15
59:24

**C**

**c (4)** 2:1,4 86:1,1
**call (1)** 60:24
**called (2)** 59:16
84:14
**cant (9)** 9:3
16:11 17:12
38:15 64:20,21
73:8 79:1 82:9
**capable (1)**
24:12
**card (3)** 69:11
69:11,20
**care (1)** 74:1
**career (1)** 21:12
**case (4)** 7:2
10:13 11:9
46:17
**ccr (2)** 1:14
86:13
**ccrnj (1)** 86:14
**certain (3)** 8:20
12:3 17:13
**certainly (1)**

16:17
**certification (2)**
4:3 86:20
**certify (1)** 86:3
**certifying (1)**
86:23
**cerutti (1)** 2:4
**chance (6)** 26:17
57:9 58:6,9
73:20 84:19
**change (3)** 63:4
82:2,6
**changed (2)** 20:2
21:14
**changes (1)**
84:20
**charge (1)** 84:2
**choose (1)** 19:13
**chose (2)** 42:9
48:8
**chronologicall...**
46:12
**ciaccio (6)** 28:6
28:9,16,18,19
30:16
**circumstance ...**
81:4
**circumstances...**
72:15 82:12
**city (1)** 86:17
**civil (3)** 1:5
13:18,20
**claims (1)** 7:6
**clarify (4)** 12:11
12:14 15:7
23:14
**clause (1)** 79:21
**clean (1)** 52:19
**clear (1)** 52:2
**clearly (1)** 11:9
**closed (1)** 74:19
**coat (1)** 70:22
**coding (1)** 31:5
**colleague (1)**
85:9

**college (1)** 16:22
**com (3)** 1:24 2:6
2:11
**come (19)** 12:12
27:5 32:19,23
34:16 36:8
39:11 45:1
51:9,17 53:18
54:13 55:4
66:6 72:8
74:10 75:13
81:13,23
**comfortable (5)**
30:19 32:10
52:16 61:23
66:18
**coming (2)** 32:8
41:8
**comments (3)**
70:23 71:5,16
**commission (1)**
86:18
**communicate ...**
41:4
**communicate...**
34:23 83:13
**communicatio...**
43:2 59:20
**company (2)**
19:9 34:23
**complain (2)**
8:16,19
**complained (2)**
68:24 70:12
**complaining (4)**
65:14 67:15
70:6 83:1
**complains (1)**
65:20
**complaint (18)**
7:21,22 8:2,6
8:12 9:17,20
13:17,18,20,20
23:12 30:18
31:22 66:20

67:19 68:11
83:24
**complaints (11)**
8:16 29:7 32:4
32:20,24 33:7
55:21 56:1
60:7 72:20
76:16
**complete (1)**
20:9
**completely (3)**
62:3 63:9 64:3
**concern (2)**
26:24 78:5
**concerned (2)**
38:9 40:16
**concerning (1)**
37:19
**concerns (4)**
38:12 39:13
40:1 42:22
**concluded (1)**
85:15
**conclusion (1)**
31:9
**conducted (1)**
59:12
**conducting (1)**
10:14
**conference (1)**
60:24
**confirmed (1)**
69:3
**conflict (1)**
21:24
**confronted (2)**
31:2 37:9
**confused (1)**
74:23
**connie (16)** 1:3
5:17 13:24
27:1 29:2,5
32:9 34:20
65:5 66:16
67:23 68:13

ALEXIS FOREMAN

89

69:10,12 70:21
82:13
**connies (1)**
13:23
**consecutively ...**
57:1
**consent (3)** 4:18
5:5,7
**consider (1)**
35:23
**consideration ...**
64:16
**considered (1)**
23:5
**considering (1)**
72:16
**consult (2)** 35:19
36:14
**consultant (1)**
23:21
**consultation (3)**
23:10 39:24
43:20
**consulted (1)**
64:6
**consulting (4)**
22:21 24:2,20
24:24
**contact (1)** 23:9
**contained (1)**
86:5
**content (2)**
51:13 71:1
**continued (2)**
61:23 66:9
**continues (2)**
69:10 70:20
**continuing (2)**
62:21 73:8
**control (1)** 86:23
**convenience (1)**
18:23
**conversate (1)**
31:11
**conversation (...**

30:17 32:1
34:3,5 37:7
42:7 48:19
49:3,20 52:16
58:19 61:19,21
63:10,13 65:22
70:16 77:14
79:2 80:23
81:14
**conversations ...**
40:15 42:24
49:19 53:8,11
53:16 58:16
59:20 61:24
**convicted (1)**
14:23
**copies (1)** 56:10
**copy (3)** 57:17
85:6,11
**corporate (3)**
17:19,20,23
**correct (67)** 6:16
10:3,5,23
16:17 18:4
19:2 22:3,11
24:7,8 25:5,16
26:7,8 30:10
31:9,14 32:10
33:8,9 34:6,7
34:11,12,15
35:15 39:9,10
40:5 41:19
43:13,14,15
45:13,14 46:12
50:3,4,7 57:15
57:16,23 58:3
58:4,7,8 59:10
59:14 60:13,14
61:16 63:1 64:7
64:8 65:11,12
65:21 67:10
68:11 72:5,6
73:21,22 74:16
80:19 86:7
**correctly (2)**

7:12 29:15
**corresponden...**
38:5,8
**couldnt (1)**
75:18
**counsel (8)** 4:2
4:17,20,24 5:3
12:3 84:4,18
**counseling (1)**
81:3
**counter (1)**
74:17
**county (1)** 86:17
**couple (3)** 25:13
45:19 54:7
**court (8)** 1:1,22
4:7,22 7:11,11
10:16 85:5
**covid (6)** 20:2,3
38:19,22,23
39:3
**covid19 (1)** 39:7
**coworker (2)**
67:16 80:1
**creek (2)** 17:21
17:23
**crime (1)** 14:23
**cross (1)** 67:17
**culture (2)** 35:1
35:2
**current (3)**
13:11 15:4
21:19
**currently (4)**
15:1 18:20
19:7 21:4
**cursed (2)** 76:21
80:10
**cursing (3)** 75:3
75:9 79:24
**customer (1)**
34:24
**customers (8)**
31:8 74:16
75:4,5,10,18

75:20,23
**cut (1)** 16:6
**cutter (1)** 27:18

**D**

**d (1)** 3:1
**d5 (4)** 3:13
56:21 67:8
73:17
**date (4)** 16:1
43:10,10 44:17
**dated (1)** 57:14
**dates (2)** 31:5
49:1
**dave (20)** 26:24
27:6 28:8 29:1
29:3,9 30:15
30:19 32:8
35:8 66:15,21
66:23 67:2,9
67:11 68:2,16
69:4,10
**day (11)** 19:20
20:1 44:10
52:5 59:21
60:1 73:3
77:17 82:17,21
83:4
**days (3)** 17:13
28:7 83:8
**decision (7)** 24:1
24:9 43:16
44:12,19,24
63:5
**decisionmakin...**
82:2
**decisions (1)**
24:13
**declare (1)** 4:14
**declined (1)**
42:11
**defendant (4)**
1:8 2:12 5:7
6:15
**degeorgio (8)**

27:19,22 28:10
29:2,24 30:15
34:19 84:8
**delaware (2)**
1:15,23
**deliveries (1)**
20:3
**department (14)**
21:22 27:7
28:15 31:15
35:4 36:4 37:1
42:13 48:17
58:18 62:3
65:8 66:17
67:5
**depend (1)** 81:4
**depends (2)**
22:17 72:14
**depose (1)** 14:22
**deposed (5)** 6:13
7:20 8:8 9:16
9:24
**deposition (14)**
1:10 5:20,24
6:11,14 7:10
8:10 10:4
13:15 14:11,16
14:19 15:17
85:15
**depositions (1)**
10:1
**describe (5)**
21:19 38:11
50:19 58:22
61:12
**described (9)**
19:3,12 31:18
32:2 52:24
54:16,17 59:16
66:8
**describing (3)**
6:14 44:20
50:1
**description (1)**
3:12

ALEXIS FOREMAN

90

**descriptions (1)** 29:11
**designated (1)** 19:5
**desk (1)** 67:18
**details (1)** 76:23
**didnt (16)** 14:6 16:6 26:7 37:6 41:7 45:18 54:3 57:24 72:22,23 75:23 76:3 77:12 78:20,21 79:14
**different (1)** 19:21
**differently (5)** 29:10,13 69:16 70:12 74:24
**digiorgio (1)** 26:22
**dildo (16)** 48:16 48:19 49:12,17 49:20 51:12,20 52:14 61:21 62:2 63:8 68:7 68:7 70:22,24 71:17
**direct (5)** 28:7 28:11,12,14 86:22
**director (21)** 6:8 15:5,7,18 16:14 17:1,3 17:16 18:9 20:17 22:20,24 23:18 24:18,24 26:22 27:20 28:10,13 35:17 67:3
**directors (2)** 23:15 24:1
**disability (3)** 22:5,10 41:18
**discipline (18)** 22:13,15,16,20

23:18 31:19,22 36:10,11 61:7 63:19 64:9,14 64:18 75:2 80:14,24 82:8
**disciplined (3)** 36:1 75:3,8
**discriminated ...** 65:6,15 69:12
**discrimination...** 7:7 65:20 84:2
**discuss (8)** 20:13 30:20 43:22,24 46:23 52:21 60:23 73:5
**discussed (17)** 29:4,7 30:14 49:4 52:4,8 53:4 60:20,21 61:1,3,6 71:6 76:1,2 77:14 77:16
**discussing (1)** 33:6
**discussion (8)** 15:14 40:8 48:10,14 51:23 51:24 61:5 64:17
**discussions (9)** 39:23 40:6 51:11,19 52:23 53:9 63:17 65:5 66:4
**dish (1)** 54:15
**dishes (1)** 54:19
**dismissed (1)** 7:16
**district (2)** 1:1,2
**doctors (1)** 41:12
**document (6)** 56:18 57:4,10 57:12,18 73:19
**documents (2)**

14:2 84:14
**doesnt (4)** 52:13 72:11 76:14 79:16
**doing (10)** 11:6 17:7 23:21 33:23 36:3 37:8 78:22 81:8 83:8,19
**dont (48)** 12:10 16:1 20:7 27:12 28:2 32:14 34:2,4 35:23,23 37:5 38:14 39:21 41:5 42:16 44:22,23 46:3 46:4,6 48:24 50:14 54:2,3 54:12 55:7 59:23 62:9,14 62:20 63:2,3 66:18 68:19 69:10 71:13,24 71:24 74:1 76:1 77:3,21 80:18 82:10 83:5 84:3,23 85:2
**doors (2)** 74:19 74:21
**draft (1)** 83:21
**drafted (2)** 83:7 83:17
**drafting (1)** 83:10
**drive (2)** 1:23 2:10
**due (3)** 38:21 65:15 70:13
**duly (1)** 5:9
**duties (4)** 21:14 21:19,22 22:3
**duty (2)** 18:17 19:16

**E**
**e (4)** 2:1,1 3:1 86:1
**earlier (1)** 79:3
**early (3)** 38:4,19 43:6
**earshot (1)** 75:10
**eastern (1)** 1:2
**eat (1)** 11:22
**education (3)** 17:2 24:18 35:17
**eeoc (6)** 13:17,19 13:20 78:15 83:24 84:2
**effort (1)** 33:20
**eight (4)** 18:24 19:20,22,24
**either (9)** 24:21 25:3 41:17 43:20 44:22 60:18 72:17 78:14 83:13
**election (1)** 53:7
**eligible (4)** 41:1 41:5 42:8,18
**elliott (23)** 2:9 5:6,6 9:11 14:12 27:10 40:2,11,13 41:20 48:21 61:9 62:7 69:6 70:14 71:18 77:6 78:1 79:19 81:1 85:2,5,8
**elses (1)** 84:10
**email (10)** 34:18 38:5,7,14 39:5 39:17,21 45:22 45:24 46:10
**emailed (1)** 46:13
**emailing (2)**

45:6,11
**employed (3)** 8:23 9:5 15:1
**employee (28)** 6:8 15:5,8,19 16:14 17:4,16 18:9 20:12,17 21:24,24 22:4 22:12,14,20 23:18 24:2,5,9 24:20 25:2 65:19 67:15 72:7 75:2 77:24 79:24
**employees (4)** 20:24 41:4 62:2 72:4
**employment (7)** 6:4 8:16 10:2 13:23,24 25:20 44:11
**encounter (1)** 26:15
**ended (1)** 32:6
**ends (1)** 73:16
**engagement (2)** 21:24 22:12
**entire (3)** 19:9 21:12 76:20
**episode (1)** 49:5
**errors (7)** 29:16 29:17,21 30:3 31:2,4,16
**esquire (2)** 2:4,9
**essentially (3)** 15:11 27:3 67:7
**evaluating (1)** 20:10
**event (1)** 46:15
**events (1)** 12:23
**everythings (1)** 36:4
**evidence (2)** 62:22 86:4

ALEXIS FOREMAN

91

**exactly (6)** 16:1
54:3 63:16
67:4 77:11,12
**examination (1)**
5:13
**examined (1)**
5:10
**example (3)**
22:23 23:2,8
**examples (1)**
29:11
**excessive (2)**
23:5,6
**excessively (1)**
36:1
**exchange (11)**
50:22 51:5,10
51:15,18 52:3
53:18 54:14
55:5 76:8,20
**exciting (1)**
34:22
**excuse (5)** 7:24
30:12 47:21
61:19 73:10
**excused (1)**
85:14
**exhibit (4)** 56:9
56:21,22 67:8
**exhibits (1)** 3:11
**expect (3)** 65:18
67:14 72:7
**experiencing (2)**
38:20 40:17
**expiration (1)**
31:5
**expires (1)** 86:18
**explaining (1)**
55:1
**explanation (1)**
31:3
**expletive (1)**
74:6
**explicitly (1)**
12:6

**exploded (1)**
54:21
**express (1)**
29:21
**expressed (1)**
69:9
**expressing (1)**
30:5

---

**F**

**f (2)** 53:19 86:1
**fact (9)** 54:2
61:17 63:5,8
68:5 70:11
72:17 81:11
82:6
**facts (1)** 72:9
**fair (7)** 11:6
16:13 20:14
25:13 59:11,14
72:2
**faith (1)** 76:15
**family (1)** 22:4
**fans (1)** 49:9
**far (1)** 11:6
**favorite (1)**
52:10
**federal (1)** 7:10
**feedback (1)**
35:21
**feel (6)** 11:17
52:16 64:20
65:11 66:18
72:4
**feeling (4)** 32:9
38:21 72:8,15
**feels (2)** 65:5
67:20
**felt (10)** 29:8,18
30:7,20 63:22
65:14 69:15
70:6 82:13,13
**female (3)** 29:9
29:13,19
**females (2)** 65:7

69:13
**feverfree (1)**
39:1
**figure (1)** 68:2
**file (3)** 13:17,23
13:24
**find (1)** 10:11
**fine (3)** 11:22
36:5 56:12
**finished (1)**
73:18
**first (28)** 5:19
6:20 9:4 16:24
24:3,20 26:13
38:1,14 42:2
43:24 44:4
45:1,4,22
49:17 54:24
55:4 56:9 57:8
61:1,5 64:15
65:3 66:8,14
71:15 79:4
**five (5)** 16:11
17:5 18:18,23
19:18
**floor (6)** 31:7
75:6,11,14,18
76:4
**fmla (8)** 22:9
40:19,22 41:6
41:17 42:9,14
42:19
**focus (4)** 18:7
20:8 35:2
41:10
**follow (3)** 33:22
38:24 69:24
**following (1)**
44:15
**follows (1)** 5:11
**followup (1)**
34:5
**foregoing (2)**
86:6,20
**foreman (12)**

**1:11 3:3** 5:9,16
12:21 13:7,10
15:2 56:7,20
73:21 84:22
**forgot (1)** 74:7
**form (21)** 4:5
27:10 31:18,22
39:3 40:2,11
41:20 48:21
61:9 62:7
63:18 69:6
70:14 71:18
77:6 78:1
79:19 81:1
82:8 85:10
**forward (2)**
32:14 72:19
**forwarded (1)**
57:18
**four (5)** 6:2 10:7
15:17,20 64:17
**fourpage (2)**
56:22 57:4
**fredericksbur...**
9:9,11
**fresh (1)** 34:20
**friday (1)** 14:3
**front (1)** 19:1
**frustrated (5)**
29:20 31:16
54:18 66:10
68:12
**fuck (1)** 53:20
**fucking (1)** 74:1
**full (4)** 13:6
16:21,23 54:19
**fully (5)** 11:11
13:3 77:5,10
86:5
**further (5)** 4:12
33:7 51:23
52:22 84:24

---

**G**

**gas (1)** 18:24

**gathered (2)**
47:6,7
**gender (4)** 7:7
31:13 65:15,20
**general (2)** 63:6
84:3
**generally (4)**
8:11 19:23
21:18 61:12
**gently (1)** 78:19
**getting (5)** 29:17
31:16 50:5
66:11 80:7
**give (3)** 10:19
11:15 29:11
**gmail (1)** 1:24
**go (11)** 7:13
11:17 19:17,20
24:6 25:3
27:10,22 35:5
46:11 62:9
**goes (4)** 20:16
46:24 56:24
73:10
**going (22)** 10:21
11:2,9,12
12:15 16:9
17:9 22:14
26:19 37:3
38:11 46:9,19
46:21 56:9,11
59:18 62:1
63:11,14,15
68:3
**good (5)** 5:16
11:5 20:6
34:24 76:15
**goodman (11)**
27:1,6,17,24
28:5,8 29:3
30:2,4,24
31:18
**goodmans (1)**
30:8
**graduated (1)**

ALEXIS FOREMAN

16:21
**gray (5)** 49:4,9
  51:12,19 52:9
**great (3)** 13:5
  36:5 85:12
**greet (1)** 34:1
**gretta (3)** 6:19
  6:23 16:10
**grocery (1)** 39:9
**guess (7)** 15:11
  45:12 52:1
  53:12 61:7
  67:9 80:2
**guidelines (1)**
  38:23
**gun (1)** 43:13
**guys (1)** 30:14

**H**

**half (1)** 18:7
**hall (2)** 61:2
  64:2
**hand (2)** 54:19
  68:6
**handbook (4)**
  23:4 40:22
  62:14 64:13
**handle (3)** 22:1
  39:5 62:12
**handles (1)** 22:7
**handling (1)**
  7:23
**hands (1)** 32:13
**happened (11)**
  30:23 33:7
  48:3,11 51:7
  55:12 60:13
  71:9 77:11,13
  77:23
**happening (1)**
  72:9
**happy (5)** 12:12
  12:13 29:15
  31:6 57:5
**harassed (2)**

72:4,8
**harassment (13)**
  7:2,4,5 8:20
  9:8 23:22
  45:18 46:2,5,5
  61:17 63:7
  72:19
**harassmentrel...**
  23:12,19
**hard (2)** 56:10
  81:4
**harmony (1)**
  1:23
**head (2)** 10:19
  10:19
**health (10)**
  37:19 38:3,10
  38:12 39:12
  40:1,16,17
  42:22 43:2
**healthy (1)**
  40:24
**hear (7)** 14:6
  62:21 75:4,5
  75:18,23 76:3
**heard (1)** 66:2
**hearing (6)**
  51:22 54:6,11
  55:16 78:24
  79:5
**heated (1)** 50:21
**hed (1)** 46:18
**held (3)** 1:12
  15:14 16:14
**hello (1)** 37:8
**help (1)** 20:3
**helpful (1)** 17:14
**hes (3)** 21:8 67:4
  67:6
**hey (1)** 76:21
**high (1)** 39:14
**hill (1)** 13:10
**hired (2)** 16:24
  17:1
**hiring (1)** 26:4

**history (1)** 36:11
**hit (2)** 55:3 78:6
**hold (2)** 15:9
  27:17
**home (4)** 13:11
  82:17,21 83:4
**honest (2)** 76:15
  76:19
**honestly (6)**
  27:13 44:22
  46:6 71:20
  74:22 80:9
**hopefully (1)**
  17:10
**hours (1)** 39:1
**hr (8)** 15:20,24
  16:15 20:7,18
  35:7 67:20
  83:6
**human (8)** 15:6
  15:8 18:10
  20:23 21:6,21
  25:1 42:13
**hurt (2)** 78:10
  78:21
**husband (2)**
  41:9 52:13
**hypertension (1)**
  39:14

**I**

**id (1)** 73:14
**identify (1)** 9:2
**ill (5)** 11:6,15
  39:7 51:5
  58:22
**illness (1)** 38:24
**im (50)** 10:3,8
  10:21 11:2,9
  12:11,13,15
  14:6 17:8,9
  20:7 30:1 33:3
  33:13 37:9
  38:18 43:11,13
  44:3,15 46:11

51:14,21,21,21
  51:21 53:24
  54:20,20 56:9
  56:10,11,20
  57:5 61:19
  63:2,14,14,14
  64:24 67:23
  71:8 73:7
  74:21 75:19
  78:12,16,23
  83:13
**immediately (1)**
  35:10
**impact (1)** 79:15
**important (1)**
  68:9
**inappropriate ...**
  62:3,13 63:9
**incident (6)** 45:2
  45:15 50:1,10
  50:13 66:6
**included (1)**
  66:7
**including (1)**
  36:20
**indexing (1)**
  85:11
**indicate (1)** 4:24
**indicating (1)**
  55:14
**individual (5)**
  8:21,23 9:2
  24:14 36:1
**inform (5)** 47:17
  48:2,9 63:11
  82:16
**information (7)**
  13:16 50:6,9
  61:3,18 64:3
  78:18
**informed (1)**
  60:12
**informing (1)**
  39:18
**infraction (2)**

23:9 45:2
**inhibit (1)** 12:22
**initial (3)** 7:21
  30:17 39:5
**initially (8)** 8:2
  29:5 30:6
  38:16 45:18
  58:13 59:18
  74:13
**initiated (1)**
  49:13
**initiating (1)**
  71:16
**input (1)** 35:20
**instance (1)**
  41:17
**instructed (2)**
  80:21 81:10
**interrogatorie...**
  84:15
**interview (1)**
  26:7
**intimidating (1)**
  80:1
**intimidation (2)**
  79:18,21
**investigating (2)**
  77:23 82:19
**investigation (...**
  32:3 55:9
  58:11,22 59:2
  59:5,12 60:19
  66:5 69:22
  77:20 81:9
  83:9
**inviting (1)**
  34:21
**involuntary (1)**
  43:14
**involve (1)** 6:3
**involved (5)**
  7:10 35:16
  46:1 60:18
  84:4
**isnt (1)** 72:2

ALEXIS FOREMAN

93

**issue (11)** 9:23
22:1,18,20
45:7,11,18
46:4 67:21
68:5 81:24
**issued (5)** 22:15
22:16 31:18,21
82:7
**issues (12)** 14:9
20:12 23:11,12
28:3 32:20,24
36:2 38:16
40:18 46:8
66:1
**issuing (1)** 63:18
**ive (1)** 25:22

**J**

**james (1)** 50:12
**january (1)**
83:18
**jeff (6)** 9:4,7
12:3 14:12
56:10 84:24
**jeffrey (2)** 2:9
5:6
**jelliott (1)** 2:11
**jersey (1)** 1:15
**job (6)** 11:6,6
21:14,19 22:3
40:20
**joke (2)** 52:19
62:1
**juggling (1)**
45:19
**jumbled (1)**
12:13
**jumped (1)**
43:12
**june (5)** 1:12
38:4,19 42:23
43:3

**K**

**karl (7)** 9:15

14:15 42:7
45:6 76:2
77:14 83:13
**karpf (2)** 2:4,4
**karpflaw (1)** 2:6
**keep (2)** 11:6
73:7
**keeping (1)**
45:20
**keeps (1)** 73:8
**kehm (9)** 29:1
30:15 35:8,13
67:2,3,3,12
84:9
**kemp (5)** 66:15
66:21,23 67:2
67:9
**kind (4)** 23:9
33:22 71:5
74:22
**kiosks (2)** 18:24
19:11
**knew (6)** 71:14
74:5 80:8,20
81:7,17
**know (62)** 6:17
7:9,16 9:3,15
9:19 10:8,11
11:12,23 12:11
17:11 26:1
27:12,14 28:17
30:6 31:5
33:20 36:2
38:13,14,16,17
38:22 39:21
41:5 42:8,22
43:9,9 44:16
44:22,23 45:1
46:5,6,20
47:23 48:24
49:23 53:7
54:2,3,3 55:7
55:15,18 56:14
57:7 59:23
62:9 63:3

65:24 69:22
71:24,24 73:17
77:21 80:18
82:10 83:3
**knowing (1)**
82:1
**knowledge (4)**
8:7 34:17
42:17 52:24
**known (3)** 13:8
48:16 74:9
**knows (1)** 65:24
**kostelac (7)**
24:12,16,16,21
25:4 35:15
43:21
**kozloffstoudt (1)**
2:11
**kozzloff (1)** 2:9
**ks000317320 (1)**
3:13
**ks317 (1)** 56:24
**ks318 (1)** 70:20
**ks319 (1)** 73:12
**ks320 (2)** 57:1
73:16

**L**

**labels (1)** 31:6
**lack (1)** 26:16
**language (2)**
74:6 80:15
**lansdale (10)**
26:10 27:20
32:21 33:8,11
34:10 35:20
36:9,12 67:1
**lansdowne (1)**
27:8
**late (2)** 38:4,18
**lawsuit (2)** 5:18
7:1
**lead (1)** 42:24
**learn (18)** 32:19
32:23 36:8

37:18 38:2
39:11 45:1
51:9,18 53:18
53:22,23 54:1
54:13 55:5
66:6 74:10
75:13
**learned (5)**
45:22 54:9
55:8,15 79:4
**learning (3)**
65:13 66:19
76:7
**leave (7)** 22:5,5
40:9 41:1 51:1
76:23 80:4
**leaving (1)** 54:20
**led (3)** 45:23
52:4,6
**legal (1)** 56:23
**lesser (1)** 63:18
**letter (1)** 65:3
**letting (2)** 42:8
65:23
**level (4)** 28:13
63:22 64:20
67:19
**license (1)** 86:14
**lieu (1)** 4:13
**liked (1)** 41:7
**likes (1)** 53:13
**litigation (2)**
56:23 84:14
**little (6)** 12:13
14:3 18:6
21:18 74:23
76:6
**lives (1)** 53:15
**location (24)** 9:9
18:3 19:12
25:7 26:10
27:8 32:21
34:11,13 35:20
36:16,21,24
37:13,17 38:3

50:9 55:21
56:2 65:16
67:1 70:4
74:15,15
**locations (6)**
18:11,14,19,21
19:1,3
**lonely (1)** 41:8
**longer (2)** 9:4
52:14
**look (2)** 56:13
57:9
**looking (4)**
23:18 45:11
56:11 65:2
**looks (2)** 71:9,10
**lose (1)** 40:20
**lot (5)** 31:7 35:4
38:20 46:6
67:17
**loud (1)** 31:12
**low (1)** 37:22

**M**

**m (2)** 1:13 85:16
**mad (1)** 76:21
**maiden (3)** 13:9
17:21,22
**main (2)** 20:15
41:10
**major (1)** 20:14
**making (7)** 20:5
24:13 25:14
26:18 29:16
31:3 76:15
**management (6)**
21:23 36:15,18
37:20 65:19,21
**manager (10)**
22:7,9 27:7,13
28:6,12,15
30:16 47:21
66:24
**manner (1)**
85:11

ALEXIS FOREMAN

94

| | | | | |
|---|---|---|---|---|
| **manners (1)** 7:24 | 74:12 75:7 76:7,19 77:19 | **merely (2)** 31:4 31:14 | 25:12,14 32:18 54:7 65:4 | 34:20,22 35:2 35:16 36:14 |
| **march (9)** 26:14 26:16 27:17 28:20 32:18,24 33:15 34:6 39:7 | 80:5,9,13 81:9 81:17 82:7,21 **mcgrorys (6)** 44:7 47:7 52:5 57:13 58:14 76:11 | **met (4)** 25:22 26:15 27:4 68:18 **method (1)** 55:1 **michener (43)** 9:16 14:15 | **mood (1)** 52:12 **mouth (1)** 12:13 **move (1)** 32:13 **movie (4)** 49:4 52:9,10,12 **multiple (1)** 17:9 | **nod (1)** 10:19 **notary (2)** 1:14 86:16 **noted (1)** 86:4 **notes (1)** 86:6 **notice (4)** 15:16 44:11 83:8,10 |
| **marked (2)** 56:21,24 **market (1)** 34:21 **markets (1)** 1:7 **material (1)** 60:20 | **mean (5)** 16:6 35:13 64:12 68:9 82:1 **meaning (2)** 23:15 32:8 | 38:6 39:12 40:7 41:3 42:21 45:10,24 46:11 47:5,17 48:2,9 49:11 | **N** **n (3)** 2:1 3:1 86:1 **name (10)** 5:1,17 | **number (3)** 18:19 19:19 37:18 |
| **matter (9)** 4:15 7:9,13 53:15 72:22,23 77:22 79:14 86:7 | **means (3)** 10:17 39:19 86:22 **meant (1)** 69:19 **meat (23)** 27:7 | 49:16 50:6,10 57:18 58:12 59:9,12,17,20 60:4,9,12,18 | 6:17,20 9:3,4 13:6 19:7 24:15 83:12 **names (2)** 13:8,9 | **O** **o (1)** 86:1 **oath (1)** 4:13 **object (14)** 27:10 40:2,11 |
| **mattered (2)** 71:21 72:20 **matters (2)** 7:24 23:13 | 27:18 28:11 29:1 30:16 31:5 35:3,7 37:1,1 47:21 | 60:21 61:2,6 62:5 63:11 66:4 72:18 77:19 80:12,22 | **narrow (1)** 17:11 **narrowing (1)** 18:6 **nature (4)** 8:12 | 41:20 48:21 61:9 62:7 69:6 70:14 71:18 77:6 78:1 79:19 81:1 |
| **mcdonough (14)** 8:5 21:5,11 24:11,21 25:4 43:20,22 44:1 60:22 61:4 64:5 65:1 72:17 | 48:17 62:2 66:17 67:4,5,6 74:13,15,17,18 75:16 76:5 **medical (1)** 22:5 **medication (1)** 12:22 | 81:10,19 82:17 82:20 83:7 **micheners (1)** 85:10 **middle (1)** 73:24 **minimal (1)** 18:16 | 51:13,20 71:1 **ncra (1)** 86:15 **necessarily (4)** 20:19 22:17 23:23 72:11 **necessary (3)** | **objections (4)** 4:4,19 12:4 86:4 **objects (1)** 12:5 **obtained (2)** 15:21 59:8 |
| **mcgrory (58)** 3:13 9:19 14:18 44:5 47:18 48:17,20 49:8,13 50:2 50:17 51:11,17 | **meet (5)** 25:21 26:19 29:6 37:14 68:20 **meeting (15)** 26:12,20,21 | **minimum (2)** 18:15 19:16 **misses (1)** 40:21 **missing (1)** 40:19 | 32:5 39:9 84:20 **need (10)** 10:18 11:16,20 12:5 23:9,20 41:11 | **obviously (8)** 10:13 17:8,12 20:7 39:8 50:1 59:7 74:7 **occasion (1)** 22:14 |
| 52:9,15,20 53:5,12,14,19 54:10,14 56:1 58:23 61:8,22 62:20,24 65:3 65:6,10 66:7 66:20 68:10,18 68:23 69:5,18 69:21,24 70:10 70:17 72:18 73:2,24 74:5 | 27:5 28:20,24 30:6,14 31:17 31:19 32:6 33:6,10 34:6 65:23 **members (2)** 36:14 37:20 **mercon (4)** 47:22,23,24 58:1 **mercons (1)** 57:23 | **misspoke (1)** 16:10 **mistaken (1)** 44:16 **mistreated (1)** 29:8 **monday (2)** 1:12 44:15 **month (5)** 23:5 25:9 71:17 72:10,20 **months (5)** | 41:13 64:4 85:6 **needed (3)** 40:9 40:23 46:1 **needs (2)** 20:11 20:12 **neither (1)** 82:13 **never (9)** 18:2 31:13 41:16,22 59:7 69:3,21 70:17 81:15 **new (6)** 1:14 | **occurred (8)** 9:8 33:16 50:16 52:24 71:2,21 75:15 77:17 **occurrences (1)** 37:18 **october (41)** 21:15 26:3 32:19 33:1,15 34:9 37:12,12 |

ALEXIS FOREMAN

95

43:6 44:3,3,7
44:11,13,14,20
45:5 47:2,8
50:17 51:7,16
52:3 53:1,4
55:6,20 56:2
57:15,19 59:21
59:23 66:5
68:1 71:2,6,6
71:15 73:11
74:12 81:8
**offense (1)** 64:15
**offered (3)** 41:23
42:1,3
**offering (1)** 42:5
**office (4)** 17:19
17:20,23 24:6
**official (1)** 4:21
**oh (2)** 27:16
38:16
**okay (176)** 5:22
6:3,6,13 7:13
7:16,19 8:3,10
8:13,19 9:6,10
9:15,19 10:3,6
10:12,22 11:3
11:4,13,14
12:1,2,16,17
12:21 13:14
14:10,21 15:7
15:23 16:19
17:7,14,15
18:2,6,13,20
19:2,7,10
20:20,22 21:3
21:14 22:2,8
22:19,23 23:8
24:5,14,23
25:6,10,13,19
26:9 27:6,19
27:22 28:14,19
28:23 29:21
30:5,11,11,23
32:1,17 33:5
33:14 34:8

36:13,18,23
39:6,22 40:6
42:10,17,21
43:5,12,16,19
43:24 44:10,24
45:10,21 47:1
47:4,17,23
48:2,5,13 49:7
49:21 50:5,12
50:15,21 51:4
51:6,9 53:17
54:5,13,24
55:12,19,19,24
56:16,17 57:2
57:3,14,21
58:2,21,21
59:4,7,15 60:2
60:8,11,17
61:5,12 62:22
63:10 64:8,16
65:2,2 66:3,13
66:23 67:8,13
69:3,9 70:3,9
70:19 73:1,14
73:18,19,19,20
75:7,22 76:6
76:14 77:22
78:5 79:10,23
81:7 82:1,16
83:2 84:6,10
84:13,22 85:1
**olcese (25)** 2:4
3:4 5:4,4,15,17
9:14 15:13,15
27:15 40:3
41:15,24 49:6
56:6,19 61:11
62:17 69:8
70:18 72:1
77:9 78:4
79:22 81:6
**once (5)** 58:13
62:15,18 69:11
71:22
**ones (1)** 56:11

**ongoing (5)**
26:23,24 48:24
71:11 73:6
**onley (86)** 1:3
5:18 10:10
13:24 25:21,22
26:12,16 27:1
27:23 29:2
30:17 31:21
32:20 33:1,12
33:21 34:5,9
34:16,20 36:9
36:20,23 37:4
37:14 39:13
40:9 42:14,23
43:5,17 44:13
44:19 45:3,23
48:3,6,11 49:8
49:12,16 50:2
50:16 51:1,11
51:17 52:5,8
52:11 53:5,13
53:13,20 54:6
55:9,22 59:5
60:6,12 61:8
61:20 63:12,18
64:17 65:5,14
65:22 68:13
69:1,14,19
70:5,5,11 74:6
74:11 76:20
80:3,10 81:11
81:20 82:3,13
82:17 83:3
**onleys (8)** 28:5
32:4 37:19
38:2 43:2
49:22 55:13
69:23
**onset (1)** 39:6
**open (1)** 39:8
**opening (2)**
34:14 36:19
**operation (1)**
20:8

**operations (1)**
20:5
**opinion (2)** 68:6
79:10
**opportunity (2)**
10:10 25:20
**ordered (1)** 85:8
**outburst (1)**
77:24
**overall (3)** 20:6
20:10 40:16
**overheard (2)**
58:15 75:23
**overhearing (1)**
75:21
**oversee (3)**
21:23 22:6,8
**overseeing (1)**
21:21
**oversees (1)** 67:5

**P**

**p (5)** 1:13 2:1,1
2:4 85:16
**pa (4)** 2:5,10
13:12 17:23
**page (6)** 3:2,12
66:14 73:9,17
73:23
**pandemic (1)**
39:7
**paperwork (1)**
42:14
**paragraph (3)**
65:3 66:8
70:19
**part (14)** 5:20
6:14 9:16,20
10:1 18:8 21:11
22:3 26:4
28:20 32:3
36:13 66:4
83:9
**participants (2)**
2:2 30:13

**participate (1)**
30:24
**participated (3)**
28:23 55:16
79:6
**participating (...**
4:8 54:5
**particular (1)**
64:10
**particularly (1)**
49:20
**parties (1)** 4:17
**passed (1)** 41:9
**pay (1)** 41:2
**payroll (1)** 21:22
**penalty (1)** 4:15
**pending (2)**
11:24 83:6
**pennsylvania (...**
1:2,15 9:12
17:21
**people (1)** 34:21
**perfect (1)** 35:10
**perfectly (1)**
11:22
**performance (3)**
28:3 29:15,23
**performancer...**
23:11,20,22
**perjury (1)** 4:16
**person (3)** 4:13
11:7 20:7
**personally (5)**
18:3 48:10
58:23 59:1,4
**personnel (1)**
20:11
**persons (1)**
24:15
**pertaining (2)**
45:3,16
**pertinent (1)**
76:18
**pharmacies (2)**
18:23 19:11

ALEXIS FOREMAN

96

| | | | | |
|---|---|---|---|---|
| **philadelphia (2)** 86:17,17 | 83:23 | **previously (1)** 62:23 | 78:9 | 71:4,14 |
| **phone (3)** 39:19 39:20,23 | **positions (1)** 15:9 | **prior (12)** 20:3 25:10,24 44:19 | **Q** | **realized (1)** 32:11 |
| **physically (1)** 4:9 | **possible (1)** 45:2 **possibly (3)** 80:13,23 81:2 | 46:13 55:20 56:2 64:18 68:15 70:23 | **question (17)** 5:19 10:20 11:12,18,24 | **really (10)** 11:8 20:21 35:2 52:15 54:3 74:21 76:2,24 |
| **pick (1)** 19:21 **place (6)** 36:19 48:20 49:17 62:4 72:3 74:12 | **pot (18)** 54:15 54:18,22 55:2 55:2,5 76:7,12 76:22 77:20,24 79:5,11,24 80:11,18 81:10 81:21 | 71:6,17 **probably (4)** 18:15 31:10 78:14 81:22 **problem (3)** 35:24 36:10 38:1 | 12:7,10,15 14:22 42:2 51:22,24 57:8 68:16 73:1 80:8 81:16 **questionanda...** 10:9 | 77:23 78:16 **reason (6)** 13:1 18:16 26:19 52:15 66:6 71:12 **reasons (3)** 23:19,20 46:7 |
| **placed (1)** 78:18 **plaintiff (5)** 1:4 2:7 5:5 6:9,18 **plaintiffs (1)** 5:3 **play (1)** 69:10 **playing (1)** 69:20 | **potentially (3)** 40:20 44:2 62:1 **practice (2)** 18:8 67:14 **prank (1)** 70:24 | **proceeding (2)** 4:8,11 **proceedings (1)** 86:4 **process (1)** 22:6 **products (1)** 20:4 | **questioned (1)** 81:20 **questions (10)** 4:5 10:18 11:11 12:4,5 12:18 13:3 53:6 84:24 85:3 | **recall (19)** 7:12 9:3 12:23 16:1 26:12 28:2 29:14 34:2 37:3,5 38:15 39:16 45:21 46:3 50:14 |
| **please (7)** 4:24 6:21 12:11 13:5 56:14 73:15 83:16 **pocket (2)** 62:2 70:22 | **prefer (1)** 56:11 **prep (1)** 78:23 **prepare (1)** 13:15 **preparing (1)** 14:11 | **progressive (1)** 64:9 **protect (1)** 72:3 **protocol (3)** 38:22 82:18,23 | **R** **r (4)** 2:1,4,9 86:1 **race (5)** 69:11,16 69:20 70:7,13 | 71:19 76:2 79:1 83:2 **receive (2)** 61:8 78:18 **received (10)** 8:6 |
| **point (10)** 11:21 12:9 37:11 58:21 59:1 60:17 66:2,2 68:21 69:23 | **present (7)** 2:2 4:10 18:8 30:16 50:2 60:7 72:9 **presentation (1)** 20:6 | **provide (3)** 47:5 47:12 48:5 **provided (3)** 44:7 46:10 47:24 | **raise (1)** 29:19 **raised (1)** 31:1 **randy (3)** 24:12 24:15 35:15 **reach (6)** 39:24 | 38:5 44:4 45:5 58:5,13 59:8 59:22 68:17 71:15 **receiving (4)** 36:11 45:21 |
| **pointed (4)** 29:17,22 30:3 49:1 **pointing (2)** 29:16 31:4 | **presented (1)** 29:23 **president (2)** 15:6 21:6 **pressure (1)** 39:15 | **provides (1)** 56:12 **providing (1)** 50:9 **public (3)** 1:14 74:16 86:16 | 58:11 65:24 68:2,16 84:7 **reached (3)** 26:22 59:18 63:22 | 55:20 64:18 **recess (1)** 56:5 **recognize (1)** 57:10 **recommendati...** |
| **points (1)** 12:3 **policy (7)** 23:17 63:7 64:9 72:3 75:2 76:15 79:16 | **preston (1)** 13:12 **presume (1)** 25:19 **pretty (3)** 10:9 40:8 77:13 | **purpose (5)** 20:1 20:2,15,15,22 **purposes (1)** 56:23 **put (8)** 26:24 | **reaches (2)** 64:20 67:19 **reaching (2)** 20:23 44:24 **read (10)** 56:15 | 25:1 **recommended...** 62:6 **record (8)** 5:2 13:6 15:13,14 |
| **political (2)** 53:8 53:11 **position (9)** 6:6 13:17 15:4,18 16:24 20:16 24:17 27:16 | **previous (2)** 15:17 51:23 | 36:18 39:3 52:13 62:1 68:13 70:22 | 58:6 60:20 71:16 73:15,20 74:4,8,8 76:10 **reading (3)** 4:2 | 44:17,20 49:24 56:7 **recruiting (1)** |

ALEXIS FOREMAN

97

| | | | | |
|---|---|---|---|---|
| 17:2 | 43:1 53:3,10 | **resource (1)** | 50:11 57:22 | 14:18 47:7 |
| **redners (22)** 1:7 | 54:5,9 55:8,20 | 21:21 | **right (47)** 9:23 | 48:17 50:24 |
| 5:18 6:4,7,10 | 55:24 59:19,24 | **resources (7)** | 10:6 11:18 | 57:13 67:23 |
| 6:15 7:1,7 8:24 | 60:3 61:14,16 | 15:6,9 18:10 | 12:9,18 13:5 | 78:15 |
| 10:12 13:21 | 65:13 66:19 | 20:23 21:6 | 15:1 21:3 24:6 | **saturday (2)** |
| 15:2 16:20 | 69:14 70:3 | 25:1 42:13 | 24:23 25:19 | 14:3 19:21 |
| 18:21 23:17 | 71:12 72:16 | **respond (2)** 51:2 | 33:10 34:8 | **saying (5)** 11:2 |
| 25:24 26:2 | 83:19 84:13 | 84:3 | 37:20 42:21 | 26:23 30:9 |
| 39:8 64:8 75:2 | **remind (1)** 10:6 | **responded (2)** | 44:8,18 46:18 | 45:24 62:20 |
| 76:14 79:16 | **remote (2)** 1:10 | 52:9 78:15 | 47:4 49:23 | **scheduled (3)** |
| **reference (1)** | 10:14 | **responding (2)** | 52:17 53:17 | 18:17 26:20,21 |
| 56:23 | **remotely (2)** 2:2 | 11:10 84:2 | 54:22 55:4,13 | **schedules (1)** |
| **referenced (1)** | 4:11 | **response (4)** | 56:20 57:1 | 41:12 |
| 3:11 | **repeatedly (1)** | 11:16 13:21 | 58:5 60:2 65:2 | **schlegel (1)** |
| **referencing (2)** | 61:22 | 41:6 83:24 | 66:3 68:9 72:2 | 50:13 |
| 64:23,24 | **report (8)** 8:14 | **responses (1)** | 73:23 74:4,6 | **screen (3)** 56:10 |
| **referring (2)** | 21:4,9 28:7,11 | 10:18 | 74:10 75:17 | 56:13,21 |
| 62:19 67:11 | 28:12,14 74:4 | **responsible (1)** | 76:8 77:2,4 | **scroll (2)** 56:14 |
| **refrain (1)** 11:10 | **reported (3)** | 84:1 | 79:13 80:6,18 | 57:5 |
| **refused (1)** | 59:13 70:17 | **rest (1)** 73:16 | 81:16 83:15 | **seafood (1)** 35:5 |
| 81:14 | 71:23 | **restroom (1)** | 84:22 | **sealing (1)** 4:3 |
| **regard (2)** 61:13 | **reporter (5)** 4:7 | 11:21 | **rk (1)** 1:22 | **second (5)** 10:4 |
| 66:16 | 4:23 10:16 | **result (2)** 6:10 | **rkreporting (1)** | 18:7 24:14 |
| **regarding (5)** | 85:5 86:24 | 31:19 | 1:24 | 52:10 83:16 |
| 10:11 29:22 | **reporting (5)** | **results (1)** 59:13 | **road (2)** 2:5 | **section (1)** 73:15 |
| 33:7 48:14 | 1:22,22 4:11 | **return (1)** 33:11 | 13:12 | **see (11)** 10:14,17 |
| 70:24 | 21:10 72:14 | **returned (1)** | **robert (2)** 8:5 | 33:22 37:6 |
| **region (1)** 19:8 | **reports (1)** 20:9 | 83:3 | 21:5 | 55:19 65:8 |
| **regions (1)** 19:5 | **represent (1)** | **returning (1)** | **robin (5)** 1:13 | 67:24 73:11 |
| **regular (1)** 23:3 | 5:17 | 39:2 | 10:22 11:3,8 | 74:2,16 80:13 |
| **relate (1)** 67:21 | **reproduction (...** | **review (9)** 13:21 | 86:13 | **seeing (2)** 34:2 |
| **related (3)** 37:18 | 86:21 | 14:1,5,7 47:15 | **roles (3)** 16:14 | 46:14 |
| 39:14 51:12 | **request (5)** 22:4 | 57:6 58:6 83:6 | 21:3,20 | **seek (2)** 23:13,15 |
| **relations (10)** | 35:21 36:16 | 84:19 | **room (6)** 55:2 | **seeking (1)** 27:4 |
| 6:8 15:5,8,19 | 42:15,16 | **reviewed (2)** | 74:13,15,18 | **selbyville (1)** |
| 16:14 17:4,17 | **requested (4)** | 13:16 68:1 | 75:16 76:5 | 1:23 |
| 18:9 20:12,17 | 35:3,6 41:16 | **reviewing (3)** | **rounds (1)** 25:14 | **select (1)** 19:19 |
| **religious (2)** | 42:19 | 13:19 73:19 | **rpr (3)** 1:14 | **send (4)** 42:16 |
| 53:7,11 | **requests (2)** 35:6 | 84:13 | 86:13,15 | 45:8 82:17,21 |
| **relying (1)** 62:23 | 41:14 | **reword (1)** 12:11 | | **sense (1)** 40:18 |
| **remember (30)** | **rereading (1)** | **rhoton (9)** 47:9 | **S** | **sent (2)** 39:21 |
| 16:12 17:12 | 71:8 | 47:10,12,19 | **s (2)** 2:1 3:13 | 83:4 |
| 33:14,19 34:4 | **reserved (1)** 4:5 | 58:3,17,19 | **sales (5)** 75:6,11 | **separate (1)** 39:4 |
| 37:11 38:17 | **resolved (2)** 7:17 | 59:2 71:1 | 75:14,18 76:4 | **separated (1)** |
| 39:18 42:12 | 7:18 | **rhotons (2)** | **sandra (8)** 9:19 | 43:6 |

KS - MSJ 0001094

ALEXIS FOREMAN

98

**separation (3)** 10:12 25:24 43:14
**september (6)** 49:1 66:16,21 69:1 70:21 71:10
**service (1)** 34:24
**services (1)** 1:22
**session (1)** 10:9
**set (1)** 74:23
**severity (2)** 22:18 64:15
**sex (1)** 48:16
**sexual (11)** 7:5 8:19 45:17 46:1,5 51:13 51:20 61:17 63:7 71:1 72:19
**shades (5)** 49:3,9 51:12,19 52:9
**share (5)** 39:12 48:13 49:11 56:9,11
**shared (1)** 49:7
**sharing (1)** 56:20
**shaun (2)** 47:9 58:17
**shauns (1)** 70:22
**shed (2)** 35:10 36:5
**shes (5)** 40:19 52:19 62:13 67:8,11
**shifting (1)** 35:1
**shook (1)** 32:13
**short (5)** 22:5,9 41:18 45:20 56:8
**shortly (1)** 45:6
**shouted (1)** 80:10
**show (2)** 56:8,13

**showed (1)** 64:2
**shown (1)** 56:18
**side (1)** 20:8
**significance (1)** 79:11
**signing (1)** 4:2
**sink (10)** 54:15 54:19 78:3,6,9 78:10,19,21 79:13 80:11
**sir (1)** 59:3
**sit (1)** 66:15
**sitdown (1)** 66:20
**sitting (5)** 67:23 71:13 80:20 81:18 82:2
**situation (4)** 64:10,19 77:17 80:3
**situations (3)** 22:22,24 62:12
**six (10)** 18:15,18 19:4,12,14,15 19:18,20,21,24
**slough (11)** 6:19 6:23,23 7:1,6 8:15 9:6,17,21 9:24 16:10
**solely (1)** 4:22
**somebody (1)** 78:7
**soon (1)** 17:9
**sorry (12)** 14:6 30:1 37:24 38:18 40:14 43:11 44:3 51:14 53:24 61:20 67:23 78:23
**sound (3)** 43:7 44:8 50:17
**sounds (1)** 39:23
**speak (13)** 11:7 14:10 33:21

37:3 46:21 47:10 48:3 50:12 58:23 59:1,4 69:18 80:16
**speaking (4)** 30:11 60:4 70:4,5
**specialist (1)** 67:4
**specialties (1)** 35:4
**specific (5)** 7:3 20:11 26:19 38:23 53:10
**specifically (10)** 28:2 33:14 35:13 37:5,13 43:10 46:3 53:19 61:15,16
**specifics (1)** 27:23
**spell (2)** 6:20 28:17
**spent (1)** 31:7
**spoke (8)** 14:12 15:16 47:18,20 59:16 66:23 69:21 77:19
**spoken (1)** 62:16
**staffing (2)** 35:9 35:16
**stamp (2)** 66:14 73:12
**stamped (1)** 56:22
**stand (1)** 11:21
**start (2)** 16:19 21:10
**started (7)** 16:23 26:1,9 45:10 47:2 49:13 71:17
**starting (1)** 5:22
**state (3)** 7:11,12

13:6
**stated (4)** 15:18 47:10 49:12 66:11
**statement (43)** 3:13 13:17,21 44:4,7 45:5 46:14 47:12,24 48:5,7 50:11 52:6 57:13,21 57:22,23,24 58:2,14,20 60:14,16 66:7 67:24 68:17,22 70:11,21 71:8 71:14 73:16 76:11 77:5 79:12 81:13,18 81:20 83:18,21 83:24 84:5,11
**statements (12)** 45:8,12 46:6 46:19,22 47:6 59:8,17,22 60:5 77:1 84:7
**states (3)** 1:1 23:4 64:13
**stating (2)** 5:1 29:14
**stations (1)** 18:24
**stay (1)** 53:20
**stayed (1)** 39:8
**stenographic (1)** 86:6
**stepping (1)** 36:15
**steve (5)** 26:22 29:2 30:15 34:19 35:22
**stop (6)** 61:22 62:16,19,24 73:7 74:1
**store (36)** 9:6,9 18:3,10,14,20

19:1 20:4,5,9 20:10,10 21:17 22:20,24 23:15 23:18 24:1,24 25:7 26:18,22 27:5,19 28:6 28:10,13 33:24 34:1,18,19 35:3 39:9 46:9 47:20 65:23
**stores (11)** 18:23 19:19,20,22,24 20:16 25:15 35:16 67:5,6 74:22
**stoudt (1)** 2:9
**street (1)** 2:5
**stretch (1)** 11:22
**struggling (1)** 27:2
**subject (3)** 40:7 80:13 81:21
**subjecting (1)** 80:24
**submitted (2)** 84:17,18
**submitting (1)** 42:14
**subsequent (1)** 42:24
**subsequently (1)** 60:11
**suffering (1)** 39:13
**suggest (1)** 52:12
**suggested (2)** 53:14 61:20
**suggesting (1)** 34:19
**suit (1)** 6:9
**suite (1)** 2:5
**sunday (2)** 14:3 19:22
**supermarkets ...**

ALEXIS FOREMAN

18:22 19:11
**supervision (1)**
86:23
**supervisor (5)**
28:5 29:2 35:8
67:6,18
**supervisors (1)**
19:19
**supposed (1)**
52:19
**sure (16)** 7:5
10:8 20:5 21:2
33:13 34:1
35:8 36:3
51:21,21 56:10
63:2 67:4
74:21 77:21
78:16
**suspended (1)**
83:6
**sworn (1)** 5:10
**symptom (1)**
39:1

**T**
**t (2)** 86:1,1
**take (10)** 11:20
12:1 40:9,19
40:23 41:7
42:9 67:18
73:8 83:9
**taken (1)** 86:6
**talk (11)** 14:15
14:18 51:16
60:5 61:13
68:23 69:24
73:10 75:20
80:12,17
**talked (8)** 21:18
22:12 35:22
38:13 61:15
76:6 80:15
85:9
**talking (8)** 17:8
27:9 31:7

48:15 61:16
63:8 68:7
72:17
**talks (3)** 49:12
49:17 66:17
**technique (1)**
31:11
**tell (4)** 39:17
45:15 46:18
82:20
**telling (1)** 53:19
**tells (1)** 12:6
**ten (1)** 17:5
**term (4)** 22:5,9
26:17 41:18
**terminate (8)**
24:2,20 43:17
44:13,19 63:5
63:12 64:4
**terminated (6)**
24:9 25:2
43:13 55:10
62:6 82:4
**termination (12)**
24:5 43:10
44:11,17 45:24
55:13 63:19,23
64:14 69:23
83:8,10
**terms (2)** 7:3
58:10
**testified (2)** 5:10
79:3
**testify (1)** 8:11
**testimony (5)**
4:15 78:7,8,9
78:16
**thanks (2)** 85:3
85:3
**thats (26)** 8:7
10:15 11:2
19:16,16 23:16
34:13 37:8
40:5 42:15
46:16,17,23

52:10 54:16
56:12 63:15
66:10 67:9
71:23 74:15
75:12 78:8
79:7,8,9
**theres (8)** 11:23
19:18 20:11
22:13 62:4
64:4 74:19
78:5
**theyre (4)** 72:4
72:15 74:23
76:24
**thing (4)** 11:5,23
12:14 57:6
**things (5)** 17:8
36:2 41:2
45:19 66:16
**think (12)** 13:1
28:2 36:5
52:20 53:7
66:9 67:11
68:12 79:7,23
81:3 83:5
**thinking (2)**
60:3 63:14
**third (1)** 73:9
**thought (5)** 28:9
40:17 79:9
81:12,23
**three (10)** 6:1
10:7 15:17,20
16:3,4,15
24:12 60:23
65:4
**threw (9)** 54:15
54:19 55:5
76:7,22 77:20
77:24 79:4
80:10
**throw (1)** 54:22
**throwing (5)**
55:2 76:11
79:24 80:17

81:21
**thrown (1)** 81:9
**throws (1)** 79:11
**time (51)** 4:6,19
5:23 6:7 7:23
8:1,4 11:7,16
12:20 16:21,23
18:2,6 20:13
25:6,11 26:13
27:8,13,14
28:5 29:7 31:7
31:12 32:5
37:17 38:1,10
40:19,21,23
41:11,16 45:9
45:20,22 54:4
58:18 59:24
62:5 67:21,22
68:4,17 74:5
79:4 81:7
82:14 83:22
84:23
**timeframe (3)**
16:2 17:6
72:10
**times (4)** 18:15
19:4,12 67:17
**tired (1)** 73:7
**title (1)** 83:12
**today (13)** 12:22
13:3 14:4,5,8
14:16 37:8
56:9 71:13
73:3 80:21
81:18 82:3
**todays (2)** 13:15
14:11
**told (4)** 27:3
62:23 75:17
82:14
**tolerate (1)**
62:14
**tonight (1)** 14:7
**top (1)** 57:14
**tossed (3)** 78:9

78:21 79:13
**total (1)** 19:13
**toy (1)** 48:16
**training (3)** 17:2
24:18 35:17
**transcribed (1)**
4:22
**transcript (4)**
4:21 85:6 86:7
86:21
**transfer (6)** 35:3
35:11,14,21,24
36:13
**transferred (5)**
34:10,17 36:7
36:21,23
**transpired (2)**
70:1 73:11
**travel (4)** 18:10
18:13 19:3,10
**treated (4)** 29:12
69:16 70:6,12
**treating (1)** 29:9
**trial (3)** 4:6 7:14
7:17
**tried (1)** 32:10
**truly (1)** 16:11
**trump (2)** 53:12
53:13
**truthful (1)** 69:5
**truthfully (1)**
13:3
**try (6)** 11:6,15
17:10 19:3
52:1 68:2
**trying (5)** 30:10
31:9 46:11
51:16 78:10
**two (4)** 15:9
39:22 60:1
65:4
**type (11)** 7:4
11:8 21:23,24
23:12 38:24
61:7,17 62:15

ALEXIS FOREMAN

100

**typed (1)** 10:16
**types (4)** 7:24
53:8,15 61:24
**typical (3)** 46:17
82:18,23
**typically (8)**
19:17,18 22:1
35:6 37:8
46:23 67:19
83:11

**U**

**uhhuhs (1)**
10:24
**uhuhs (1)** 11:1
**unaware (1)**
82:15
**understand (16)**
11:1 12:10
17:12 25:23
26:9 34:9
36:24 37:16
43:5 46:12
50:15 51:4
83:7,17 84:6
84:17
**understandin...**
6:24 7:19
22:19 23:17,24
24:24 27:7
28:4 29:6 32:7
33:5 44:6 46:8
49:15 50:24
52:4,7 60:8
70:10 74:20
75:1,8,12,15
76:5 77:15,18
78:11,13 81:15
82:12
**understood (12)**
10:23 11:19
12:7,8,16
16:13 30:18
32:6,9,11,17
83:15

**unemploymen...**
54:6,11 55:16
78:23 79:5,9
**unfair (1)** 30:7
**unfairly (1)** 70:7
**unfortunately ...**
41:9 62:11
**united (1)** 1:1
**unusual (1)** 77:1
**upset (2)** 51:1
76:24
**use (2)** 11:21
52:14
**usually (2)** 23:13
23:15

**V**

**vacation (2)** 8:1
8:4
**vance (3)** 1:14
85:4 86:13
**variety (2)** 46:7
46:7
**verbally (2)** 4:14
10:19
**verify (1)** 63:15
**versus (1)** 22:24
**vice (2)** 15:6
21:5
**videoconferen...**
1:10
**view (1)** 74:16
**violence (1)**
79:17
**visit (6)** 21:2
25:10,17 26:18
33:11 37:3
**visited (1)** 25:7
**visiting (4)**
18:18 19:23
20:15 37:12
**visits (8)** 19:14
19:15 20:5
21:17 33:18,20
37:2,3

**voice (2)** 29:19
31:2
**volume (1)** 37:22
**vp (6)** 15:8,19,24
16:15 18:9
20:18
**vs (1)** 1:5

**W**

**waive (1)** 4:18
**waived (1)** 4:4
**walk (1)** 33:24
**walked (1)** 61:2
**wall (1)** 55:3
**want (10)** 12:10
18:7 35:24
41:7 52:21
56:8,13,14
62:20 78:21
**wanted (5)** 16:8
29:6 31:14
35:5 36:3
**wants (1)** 70:22
**warnersville (1)**
13:12
**washing (1)**
61:21
**wasnt (5)** 7:23
31:6 32:5
66:24 78:10
**watched (1)** 49:9
**way (10)** 11:16
19:17 32:6,9
40:15 64:4
65:11 69:3
74:18 80:7
**weekend (10)**
7:23 18:17,19
19:6,16 21:2
25:8 33:18,20
37:2
**weekends (2)**
18:18 19:18
**went (3)** 40:15
52:11 78:6

**westview (1)**
2:10
**weve (1)** 85:8
**whats (5)** 11:12
23:8 24:15
46:9 72:9
**whatsoever (1)**
36:20
**whos (1)** 72:14
**willing (1)** 60:15
**witness (20)** 3:2
4:10,14 9:13
27:12 40:12,14
41:22 46:14
48:23 61:10
62:8 69:7
70:15 71:19
77:7 78:2
79:20 81:2
85:14
**witnesses (3)**
46:20,22 47:9
**word (1)** 53:19
**words (1)** 54:10
**work (14)** 9:7
14:9 17:18
23:3 27:2
30:21 32:15
40:10 41:8,11
41:17 63:9
72:12 83:4
**worked (7)**
17:22 18:3
25:8,23 33:12
37:1 46:16
**working (9)**
16:19 26:1,10
27:24 33:21
36:9 37:17
38:3 64:17
**workplace (6)**
62:4 64:21
68:8 71:22
79:17,17
**works (2)** 19:18

41:6
**worried (1)** 39:2
**wouldnt (7)**
50:19 71:20
72:7 77:4,7,22
80:4
**wrapper (2)**
31:6 37:1
**write (15)** 10:22
11:3 23:6 48:7
58:20 60:15
68:10 76:21,22
76:24 77:3
83:11,14 84:5
84:7
**writes (7)** 65:4
65:10 66:13
68:24 69:5,9
73:24
**writing (2)** 67:9
70:10
**written (1)** 43:2
**wrong (1)** 74:7
**wrote (2)** 81:13
81:17
**wyomissing (1)**
2:10

**X**

**x (1)** 3:1
**xi (1)** 86:14

**Y**

**yeah (15)** 27:12
41:22 51:15
52:1,10 53:21
55:3 66:9
68:23 71:19
74:7 77:7
78:20 79:20
81:22
**year (7)** 17:13
18:16,18 19:4
19:12,14,15
**years (12)** 6:2

ALEXIS FOREMAN

10:8 15:18,20
16:3,4,11,15
17:5,9 25:24
64:18
**yelled (1)** 74:1
**yelling (5)** 50:22
51:3 75:3,9
79:24
**youd (1)** 57:6
**youre (12)** 6:14
11:1,5 15:1
17:7 19:23
20:23 25:14
44:20 60:2
73:17 75:22
**youve (2)** 18:2
74:14

**Z**

**zoom (2)** 56:15
56:16

**0**

**02131 (1)** 86:14
**08 (1)** 1:13

**1**

**1 (23)** 44:7 47:2
50:17 51:7,16
52:3 53:1,4
55:6,20 56:2
57:15,19 59:21
66:5 68:1 71:2
71:6,7,15
73:11 74:12
81:8
**10 (3)** 18:24
66:21 67:5
**10120 (1)** 3:13
**1052019 (1)**
43:11
**10th (2)** 66:16
69:1
**12 (2)** 18:22 67:5
**128 (1)** 2:5
**18 (1)** 83:18

**19 (1)** 33:15
**19020 (1)** 2:5
**19565 (1)** 13:13
**19610 (1)** 2:10
**1997 (2)** 16:22
16:23
**19975 (1)** 1:23
**1st (4)** 44:3 45:5
47:8 59:23

**2**

**2 (2)** 1:6,13
**20 (1)** 37:12
**2010 (1)** 17:17
**2015 (2)** 17:17
17:24
**2017 (1)** 26:3
**2019 (11)** 26:14
26:16 27:17
28:21 32:18,19
32:24 33:1,15
34:9 37:12
**2020 (38)** 16:17
18:7 21:15
25:17 38:5
39:7 42:4,18
42:23 43:1,3,6
43:11 44:8,12
47:2 50:17
51:7,16 52:3
53:1,4 55:6,20
56:2 57:15,19
59:21 66:5,21
68:1 71:2,6,7
71:15 73:11
74:12 81:8
**2021 (1)** 83:18
**2022 (1)** 1:12
**2156390801 (1)**
2:6
**2159467009 (1)**
1:24
**21cv04785wb ...**
1:6
**24 (1)** 39:1

**247 (1)** 13:12
**2640 (1)** 2:10
**27 (1)** 1:12

**3**

**3 (1)** 85:16
**317 (1)** 66:14
**3331 (1)** 2:5
**36 (1)** 85:16
**37390 (1)** 1:23

**4**

**4 (1)** 73:17
**45 (1)** 18:22

**5**

**5 (2)** 3:4 44:12
**50 (5)** 49:3,9
51:12,19 52:8
**56 (1)** 3:13
**5th (5)** 44:3,13
44:23 70:21
71:10

**6**

**6103706700 (1)**
2:11
**63 (1)** 65:23

**7**

**7th (4)** 44:14,16
44:21,23

**8**

**817327 (1)** 86:15
**82522 (1)** 86:18

**9**

# EXHIBITS

# ALEXIS FOREMAN

## Date: June 27, 2022

Connie Onley v. Redner's Markets, Inc.

No.:  USDC EDPA 21-4785

R&K Reporting Inc.
37390 Harmony Drive
Selbyville, Delaware 19975
Phone: 215-946-7009
Email: scheduling@rkcourtreporting.com

KS - MSJ 0001099



R&K Reporting, Inc.
6/17/22 CDL
Onley v Redner's Mkets, Inc.
D-5

Oct 1, 2020

1. I Sandra McGrory have approached
Carl Store General Manager aprox.
2-3 month ago about an Issue my
Name was brought into by
Connie (Seafood Clerk in Meat Dept)
about how She feels herself and
I are being discriminated against
because we are females in the Dept
when I was approached by Meat
Dept. Manager about this Concern.
I was caught off guard because by
No means do I feel this way at
all. And I expressed to Marcos and
Carl I do not want my Name in
anyway in this. I'm assuming
action may have been taken or at
least I would hope.

Things have not calmed down and
I am Certainly on guard with
Connie as I've been approched
for A Second time by Marcos on
the above Statement.

I Just had a Sit down with
Dave Kemps approx. September 10th
in Regard to Connie about Things
She talks about in the meat

KS - 000317
KS - MSJ 0001100

Dept. that I don't feel comfortable with. I expressed to Dave that I don't like how Connie continues to play the Race card, Age card, and once again that myself and Connie we discriminated against because we are females. I expressed to Dave I do not feel that way at all.

Approx on Sept. 5th Connie made a Statement to me that She wants to put a dildo in Shawns Coat Pocket I advised her its not a good idea. A few days later Connie infront of Several Co-workers in the meat Dept. blantly Said how She uses sexual toys and enjoys them. I clearly Said out loud I don't care and walked away.

Approx. Sept 25th I was making Sausage for the meat Case and was almost done when Connie Came next to me and explained to me She watch 50 Shades of Gray I turned and Said Oh thats my Second Favorite movie Connie then Very loudly says the movie got

KS - 000318

KS - MSJ 0001101

me in such a mood I
pulled my dildo out and used it
I looked at her and said I dont
Care. I then turned and did
not Realize Shaun was present for
the Conversation that just took
Place and was just as shocked as
I was.
Later that afternoon I was waiting
to use the wrapper to wrap meat.
As Shaun was using it @ the time
All of a sudden Connie calls my name
and says to me All you need is hot
water and Sanitizer to clean it
I turned and said what are you
talking about She look and says my
sex toy, Shaun leaves Room and I
clearly said I don't care.

Oct. 1st 2020 I was doing dishes and
Connie Started talking about how while
Trump Supporter are Causing all the
Riots in America and how there is
no such thing as Antifa and It's only
the Trump Supporters Causing the
issues. I looked at connie and
Clearly said enough Stop I don't
want to hear it. Connie Continues

with other Harris in Regards
to it's all the white People doing
this, I at that time lost it
screamed loudly at her I don't
care I don't want to hear any
more stop it. walked/stormed out
of meat Dept Connie followed me
I yelled again I don't fucking care
stop it. I was very angry I asked
to go out the Recieving door to
escape As connie was behind me
I went out back to get my mind
clear and to calm down Connie
then follows me outside and I
screamed at her to go away leave
me alone and I walked up the
back side of the building took a
few minutes to calm down then
came back into building where
I was met by Jim asst Gm and
then walked to office to write up
the statement

Saundra McCrory

KS - 000320

KS - MSJ 0001103