IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONNIE ONELY, | CIVIL ACTION |
| Plaintiff, | |
| v. | |
| REDNER'S MARKETS, INC. | NO.  21-4785 |
| *doing business as* REDNER'S | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Connie Onely, a Black woman, has sued the company that fired her, Defendant Redner's Markets, Inc. ("Redner's").  She alleges that she was subjected to retaliation, a hostile work environment, and discrimination in violation the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 42 Pa. C.S. § 951, *et seq.*, because of her race, sex, and perceived disability.

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all counts.  For the reasons that follow, Defendant's motion will be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The events underpinning her suit took place at the two locations at which she worked for Defendant—first in Lansdale, Pennsylvania, and then in Audubon, Pennsylvania.

### A.  Plaintiff's Work at the Lansdale Location

At the Lansdale location, Plaintiff worked in the Meat Department, where she was the only female employee.  According to Plaintiff, the men in the Lansdale Meat Department "stuck

1

together."  Plaintiff testified that her supervisor, Nino Ciaccio, reprimanded her when expired meat had to be thrown out.  She also testified that Ciaccio directed her to work late on certain days to clean the Meat Department after her male colleagues left, even though (as Defendant admits) every member of the Meat Department should have been involved in cleaning.

Plaintiff also worked with a man named David Goodman.  Although the parties disagree about the particulars of their interactions, the record shows that Goodman regularly cursed at Plaintiff, calling her a "bitch" within earshot, and telling her that, in the context of the hierarchy in the store, she was "lower than the bottom of his shoe." Goodman made clear to Plaintiff that he "would not have hired her."  He also called her "Celo," apparently referring to a Black drug dealer from a movie who drove the same type of car that she did.  She told Goodman that she did not appreciate being referred to by that name, after which he stopped doing it.

Although Plaintiff does not recall if she reported Goodman's uses of the nickname, she did report his other comments to the Lansdale store manager, Steve DiGiorgio, who met with her multiple times about her concerns and communicated them to Human Resources.  She also thought (and reported) that Goodman was mistreating her based on her gender.  Goodman was not disciplined, although management concluded that he could have communicated more effectively with Plaintiff.

### B.  Plaintiff Transfers to the Audubon Location

Plaintiff was transferred at her request[1] to a different Redner's store—in Audubon—to work as a Seafood Associate within the store's Meat Department, where she was the only Black employee.  She soon began to experience difficulties at that location too.

---

[1] The parties dispute whether Plaintiff requested the transfer because she was excited about the opportunity at the Audubon location or whether she simply no longer wanted to work with Goodman.

First, seeking to expand her skillset, Plaintiff approached Marcos Mercon, her supervisor, about becoming a Meat Cutter Apprentice.  Mercon told her that no open position was available at the store at the time.  Plaintiff admits that Mercon did not say anything to her face that would lead her to believe that he denied her that opportunity because of her sex or race.

Second, while working at the Audubon location, Plaintiff told the store's manager, Karl Michener, that she had been diagnosed with hypertension.  She did not seek a change in her job duties connected with her diagnosis, nor did it, for the most part, interfere with her ability to do her job.  She did, however (in May or June 2020), after blacking out in the women's bathroom,[2] ask Michener for time off to seek treatment.  Michener talked to Alexis Foreman, the head of Human Resources who instructed him to discuss with Plaintiff the possibility of her taking leave under the Family and Medical Leave Act ("FMLA").  Onely never requested FMLA leave or short-term disability.  A few months after this incident, on August 11, 2020, Michener emailed Human Resources requesting a "fit for duty" assessment for Plaintiff .

The third issue at the Audubon location arose out of Plaintiff's interactions with Sandra McGrory, a White woman who worked with Plaintiff in the Meat Department three days a week.  Their conversations touched on personal matters, race being a common theme.  Specifically:

- On one occasion, Plaintiff told McGrory that she had been married to a white man, and McGrory asked her questions about their relationship that Plaintiff considered racially discriminatory.

- McGrory made her opposition to the Black Lives Matter movement known.

- McGrory called into question the facts behind instances of police violence towards Black people that led many to protest during the summer of 2020.  When discussing the death of George Floyd, McGrory told Plaintiff that she did not believe that police had killed him.  She implied to Plaintiff that Floyd was responsible for his own death, either because he was on drugs or failed to obey police officers' instructions.  And in a discussion about the killing of Breonna Taylor, McGrory expressed little concern given

---

[2] She had suffered an episode of syncope, a medical event where the heart briefly stops beating.

her belief that either Taylor or her boyfriend was a drug dealer.

- Plaintiff further testified that McGrory expressed racial animus towards people of Asian descent.

Nor was Plaintiff the only Black woman with whom McGrory had disagreements that year.  Sometime during the summer of 2020, McGrory brought cashier Rachida Tou's hair to a store manager's attention.  She testified that she found Tou's purple braided hair "very offensive."  Defendant policy mandates employees have natural color hair.  Store management concluded that Tou did not need to change her hair and told McGrory that it was not her responsibility to police other people's hair or dress.

Plaintiff's firing arises out of at least one sexually explicit conversation between Plaintiff and McGrory in September 2020.  The parties vigorously dispute the particulars of their discussion.  After an investigation, Defendant concluded that Plaintiff had violated the company's sexual harassment policy by bringing up sex toys in a conversation in the workplace.  Plaintiff, on the other hand, testified that she believes that she and McGrory were at least equally culpable.  As she tells it, on September 3, McGrory and Plaintiff were discussing the movie "50 Shades of Grey."  Although Plaintiff admits that she was the first one to bring up the movie, she denies that she mentioned using a sex toy in that first conversation.  Instead, Plaintiff insists that it was McGrory who brought up using a sex toy for prurient purposes (they had been talking about pranking a male colleague by putting one in his coat), telling Plaintiff where to purchase and how to clean one in a subsequent conversation.  The parties agree that, no matter who started discussing sex toys, having a conversation about this at work violated Defendant's policy against sexual harassment.

A few weeks later, on October 1, 2020, Plaintiff and McGrory were discussing ongoing civil disturbances in the country.  Plaintiff suggested that supporters of then-President Donald Trump were behind the violence.  McGrory testified that Plaintiff blamed white supporters of

President Trump, but Plaintiff argues that this contradicts McGrory's prior statement in an unemployment compensation hearing, where she said that Plaintiff blamed Trump supporters without reference to their race. The parties agree, however, that in response to Plaintiff's comment, McGrory threw the pan that she was cleaning into the sink in anger and left the building.

This dispute caught the attention of a supervisor, who asked McGrory if she wanted to prepare a written statement about the incident. McGrory's subsequent statement mentioned both her argument with Plaintiff that day and their prior discussions about sex toys. According to McGrory's statement, Plaintiff had brought up sex toys on multiple occasions over the prior month. McGrory also explained that she had met with management approximately five days after their conversation about sex toys and said that she did not feel comfortable with how Plaintiff "continues to play the race card, age card, and [that] we [are] discriminated against because we are females." McGrory's statement omits that she threw the pan that she had been cleaning.

Word of this incident reached Foreman, who directed Michener to send Plaintiff home. The parties dispute whether Michener interviewed McGrory, or just Plaintiff, during his subsequent investigation. Plaintiff was terminated over the phone on or about October 5, 2020 for sexual harassment in violation of company policy. Defendant did not discipline McGrory for her conduct because Michener did not believe she had violated any company policies.

## II.   LEGAL STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) (cautioning that "courts are required to view the facts and draw *reasonable* inferences" in favor of the nonmoving party (emphasis added).  But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact."  *Id.* (citation omitted).  A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex*, 477 U.S. at 323.

## III.    DISCUSSION

Plaintiff presses myriad employment discrimination claims based on her race, gender, and perceived disability and on different theories of liability.  The gravamen of her Amended

Complaint is that, although Defendant says that it fired her because she violated company policy, that justification was pretextual, and Defendant in fact fired her because of her protected identities and protests against her poor treatment.  That means that most of her claims will be analyzed under the familiar burden-shifting framework for cases involving indirect evidence of discrimination from *McDonnell Douglas v. Green*.  411 U.S. 792, 802 (1973).  Per that framework, once a plaintiff has established the *prima facie* case, "the burden shifts to the employer to provide a legitimate . . . reason for its conduct." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (citation omitted).  If the employer does so, the burden shifts back to the employee, who must produce "evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citations omitted). To carry this burden, the plaintiff must offer "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). [3]

Although Plaintiff's Amended Complaint proceeds under many different statutes, not all of her claims need to be addressed separately.  Accordingly, the Court proceeds thematically, addressing Plaintiff's claims of disparate treatment first, followed by her claims of retaliation and hostile work environment discrimination.

---

[3] Defendant sometimes addresses Plaintiff's arguments under the *Price Waterhouse* "mixed motive" framework, *Price Waterhouse v. Hopkins*, 409 U.S. 228, 244-47 (1989) (plurality opinion), but Plaintiff's Amended Complaint and summary judgment briefing argue that her firing was pretextual, thereby directing the Court to analyze her claims under *McDonnell Douglas*.

## A.  Race and Sex Discrimination.

### *i.*    *The* **Prima Facie** *Case for Disparate Treatment Claims.*

Title VII prohibits "an employer [from] . . . discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Section 1981 gives "[a]ll persons within the jurisdiction of the United States . . . the same right" to, *inter alia*, "make and enforce contracts." 42 U.S.C. § 1981(a).

Establishing the *prima facie* case of employment discrimination under Title VII (and the PHRA)[4] and Section 1981 requires a plaintiff to show: (1) that she was a member of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse employment action, and (4) that adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination.  *Makky*, 541 F.3d at 214 (Title VII); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (Section 1981).  This test "'is not onerous' and poses 'a burden easily met.'"  *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  Plaintiffs can prove discrimination with indirect evidence using *McDonnell Douglas* burden-shifting under either statute.  *Burdine*, 450 U.S. at 252-53 (Title VII); *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020) (Section 1981).

Defendant argues that Plaintiff's evidence for her Section 1981 claim should be analyzed separately because of tighter causal connection that she must prove to establish liability under that statute.  True, the Supreme Court has held that a plaintiff proceeding under Section 1981

---

[4] Courts evaluate claims under the PHRA using the same standard as Title VII claims.  *See, e.g.*, *Branch v. Temple Univ.*, 554 F. Supp.3d 642, 648 (E.D. Pa. 2021).

must prove that "but for [her] race, [s]he would not have been discriminated against in the making or enforcing of contracts." *Tech Mahindra*, 70 F.4th at 651; *see Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). But, as the Third Circuit has pointed out, "*Comcast* was [not] an employment discrimination case . . . and therefore it does not impinge in the least on the indirect methods of proof formulated by the Supreme Court for employment discrimination claims." *Tech Mahindra*, 70 F.4th at 651. "And those methods of proof, such as the *McDonnell Douglas* burden-shifting framework . . . may be applied to claims under § 1981 for employment discrimination." *Id.* at 651-52.

Thus, as with retaliation claims brought under Title VII, which also require proof of but-for causation, a Section 1981 plaintiff can defeat a motion for summary judgment by showing merely that her race was the "*likely reason* for the adverse [employment] action." *Carvalho-Grevious*, 851 F.3d at 259 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)). To hold otherwise "would be tantamount to eliminating the *McDonnell Douglas* framework," *id.* (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015)). Therefore, the Court will analyze all of Plaintiff's race- and gender-based disparate treatment claims together.

### ii.   *Plaintiff Has Established the* **Prima Facie** *Case of Race Discrimination Only.*

Defendant argues that Plaintiff has failed to establish the *prima facie* case of discrimination because: (1) she was not qualified for the jobs she had at Redner's; and, (2) she was fired under circumstances that could not give rise to an inference of intentional race or sex discrimination.[5] On the former, Defendant points out that, while at the Lansdale location,

---

[5] Defendant does not challenge Plaintiff's protected status or that she suffered an adverse employment action.

Plaintiff made mistakes in how she coded, labeled, and handled meat at times.  On the latter, Defendant submits that Plaintiff was fired for violating the company's sexual harassment policies, that she has produced no evidence that similarly situated white or male employees were treated differently, and that there was no connection between her protected identities and her firing.

### a.  Qualification

To be considered qualified for a job for purposes of the *prima facie* case, a plaintiff need only show that she met the objective qualifications for a job, *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990), or that her employer "depart[ed] from a job posting's objective criteria," thereby "establish[ing] different qualifications against which an employee . . . should be measured," *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 540 (3d Cir. 2006).  Objective criteria include whether an employee possessed the requisite education, experience, or other skills necessary for the job from which she was terminated.  *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995).

Here, Defendant has not argued that Plaintiff lacked any such objective qualifications. Instead, Defendant points to reprimands she received at the Lansdale location for mislabeling or incorrectly coding meat products, the very same conduct that Plaintiff contends was part of the pattern of discrimination that she maintains form a basis for this suit, and which are undermined by Defendant's admissions that Plaintiff performed well in her job and received compliments from Michener for her interactions with customers and work at the Audubon location.  Thus, whether Plaintiff was qualified for her job is at least subject to genuine dispute, and Defendant is not entitled to summary judgment on this issue.

### b.  Inference of Intentional Discrimination

Viewing the evidence in the appropriate light at this stage in the case, Plaintiff has carried

her burden on the fourth element of the *prima facie* case of race, but not sex, discrimination. Plaintiff can raise an inference that the likely reason for her firing was discriminatory "'in a number of ways, including, but not limited to, comparator evidence,' or evidence of similar . . . discrimination towards other employees." *Selvato v. SEPTA*, 143 F. Supp.3d 257, 268 (E.D. Pa. 2015) (quoting *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (not precedential)).

Plaintiff identifies several instances of disparate treatment while working for Defendant that she says were based on her sex, race, or both: (1) the different jobs she was assigned; (2) the names she was called ("Celo" and "bitch"); (3) the discipline she received; (4) her inability to enroll in Defendant's meat-cutter apprentice program; and, (5) the fact that she, but not McGrory, was fired after they both violated Defendant's sexual harassment policies.

### 1. Race

Plaintiff's disparate-discipline argument raises the necessary inference of racial discrimination. Here, the key question is whether Plaintiff and McGrory were similarly situated when one was disciplined and the other was not. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 646 (3d Cir. 2015) (searching for evidence of "similarly situated, [not protected] employees experiencing similar difficulties and not receiving discipline"); *see also Wilson v. Graybar Elec. Co. Inc.*, 2019 WL 2061607, at *5 (E.D. Pa. May 9, 2019); *Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp.3d 571, 589-90 (E.D. Pa. 2017).[6]

Whether two individuals are similarly situated is generally a fact question for a jury to

---

[6] True, "reliance on a single member of the non-protected class is insufficient to give rise to an inference of discrimination when [a plaintiff] was treated the same as thirty-four members of the non[-]protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998). But here, Defendant has submitted no such evidence that Plaintiff was treated the same as other white employees besides McGrory. Indeed, with respect to the discipline that Plaintiff received, McGrory is the only similarly situated individual. Thus, *Simpson* is inapposite here. *See Smith v. Walgreen Co.*, 964 F. Supp.2d 338, 352 n.11 (D. Del. 2013).

decide. *See Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp.2d 517, 526 (E.D. Pa. 2014) (citing *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)). It is thus unsurprising that here, whether Plaintiff and McGrory were similarly culpable in violating company policy is in genuine dispute. Plaintiff insists that McGrory, a valid comparator given that they worked in the same department under the same supervisor, was the one who shifted the tone of their discussion of the movie "50 Shades of Grey" and brought up where to purchase sex toys. Defendant disagrees, having concluded in its investigation that disciplining McGrory was unnecessary. This genuine dispute precludes summary judgment. At this stage, the evidence suffices to raise an inference that Plaintiff and McGrory had violated Defendant's policy in similar, perhaps even identical, ways. Yet the parties do not dispute that McGrory was not disciplined at all, let alone fired. Indeed, it is even disputed whether Michener spoke with McGrory during his investigation of this incident. If proven at trial, the jury could conclude that these facts give rise to an inference of intentional racial discrimination. Thus, there are genuine disputes of material fact underlying Plaintiff's *prima facie* cases of race discrimination under both Title VII and Section 1981 that preclude summary judgment.

### 2. Sex

Plaintiff's claim of gender-based discrimination focuses instead on how she was spoken to by colleagues and superiors and the work she was assigned. As evidence of her claim, Onely points to (1) her being forced to clean the Meat Department; (2) her being disciplined for minor errors at greater rates than her male colleagues; and, (3) Goodman's repeated insults, all at the Lansdale location. But she has not produced any evidence connecting this discrimination to her firing in late 2020. *See Makky*, 541 F.3d at 214; *see, e.g.*, *Smith v. RB Distrib., Inc.*, 498 F. Supp.3d 645, 655 (E.D. Pa. 2020) (requiring evidence that "raise[d] a reasonable inference that

[the plaintiff's] gender played a motivating or determinative factor in her termination").

Defendant thus is entitled to summary judgment on Plaintiff's claim of sex discrimination in violation of Title VII and the PHRA.

### iii.    Whether Defendant's Proffered Non-Discriminatory Motive Was Pretextual Is Based on Disputed Facts.

The inquiry on Plaintiff's race discrimination claims does not end after the *prima facie* case.  The burden now shifts to Defendant to proffer a non-discriminatory reason for firing Plaintiff—here, her violation of the sexual harassment policy.  That justification is legitimate and non-discriminatory, *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018) ("Here WPHL supplied a legitimate and non-discriminatory reason for Younge's termination because it stated that he was fired for violating the station's Code of Conduct and Anti-Harassment Policy."), so the burden shifts back to Plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Defendant's] action."  *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022) (quoting *Fuentes*, 32 F.3d at 764).  These "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action" need only be significant enough "that a reasonable factfinder *could* rationally find them unworthy of credence."  *Fuentes*, 32 F.3d at 765 (internal quotation marks and citation omitted).

Plaintiff argues that her firing for violation of the sexual harassment policy was pretextual under the circumstances given Defendant's failure to discipline McGrory and McGrory's and Michener's contradictory testimony.  Without weighing these witnesses' credibility at this stage, *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (citation omitted),

13

the intense factual disputes over who brought up sex toys in the workplace, when, and in what context are sufficient to preclude summary judgment.  Drawing all reasonable inferences in Plaintiff's favor and evaluating the totality of the circumstances, a rational factfinder could conclude that, given Defendant's failure to discipline McGrory at all for the same (or at least a similar) violation of company policy, its proffered nondiscriminatory reason for firing Plaintiff should not be believed.  *Canada*, 49 F.4th at 347; *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989) ("Summary judgment is inappropriate, however, if the plaintiff . . . counters the defendant's proffered explanation with evidence raising a factual issue regarding the employer's true motivation for discharge.  When the defendant's intent has been called into question, the matter is within the sole province of the factfinder.").

### B.  Disability-Based Discrimination

The evidence cannot sustain Plaintiff's *prima facie* case of disability-based discrimination under the ADA.  Defendant argues that, even as predicated on a perceived disability, Plaintiff's ADA claim fails because she has not shown that Defendant's awareness of her hypertension led to any adverse employment action.  Because there is no genuine dispute that Plaintiff did not suffer an adverse employment action because of her perceived disability, Defendant is entitled to summary judgment on this claim.

Discrimination claims under the ADA require a plaintiff to show: (1) that she has a disability; (2) that she is qualified for the job; and, (3) that she "has suffered an adverse employment action because of that disability."  *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 414 (3d Cir. 2017) (quoting *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006)).  If an employee is perceived to be disabled, as Plaintiff was here, the first element of the *prima facie* case is satisfied.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 108-09 (3d Cir. 1996).

14

Here, there is no genuine dispute of material fact regarding whether her perceived disability led to her firing.  Plaintiff argues that her firing was at least in part related to her hypertension and her syncope episode.  She argues that there was a suspiciously close temporal proximity between Michener's August 11, 2020 email requesting a "fit for duty" assessment, and her firing[7] two months later.

That argument fails because, even if temporal proximity can help establish the *prima facie* case of disability-based discrimination in some instances, Plaintiff does not explain why the temporal proximity here raises any inference that it led to her firing.  The record does not show that Michener and Foreman continued to discuss Plaintiff's ability to work after he requested the assessment.  And Plaintiff has identified no additional record evidence that suggests that she "suffered an otherwise adverse employment decision *as a result of* [disability-based] discrimination."  *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 245 (3d Cir. 2020) (emphasis added) (quotation omitted).  Therefore, Defendant is entitled to summary judgment on her claim of disability-based discrimination under the ADA.  *See Kennedy v. Glen Mills School, Inc.*, 2011 WL 5552865, at *3-4 (E.D. Pa. Nov. 15, 2011).

### C.  Retaliation

In addition to disparate treatment, Title VII also prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice . . . ."  42 U.S.C. § 2000e-3(a).  Similarly, the ADA prohibits "discriminat[ion] against any individual because such individual has opposed any act or practice made unlawful by" its provisions.  *Id.* § 12203(a).  And despite there being no

---

[7] The Court does not understand Plaintiff to be arguing that Michener's request for the assessment was an adverse employment action by itself.

express textual reference to such a claim in Section 1981, the Supreme Court has held that plaintiffs can bring retaliation claims under that statute too.  *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452, 457 (2008).

### i.   The **Prima Facie** *Case of Retaliation*

Retaliation claims brought under Section 1981, Title VII, and the ADA have the same elements.[8]  Under each statute, for the burden to shift to the employer, the plaintiff "must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action,[9] and (3) there was a causal connection between the participation in the protected activity and the adverse action."  *Carvalho-Grevious*, 851 F.3d at 257 (citation omitted); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

If a plaintiff can establish this *prima facie* case, the burden shifts to the employer per *McDonnell Douglas* to proffer "'a legitimate, non-retaliatory reason' for its conduct."  *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).  This burden is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge."  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997) (citation omitted).  If the employer successfully does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Krouse*, 126 F.3d at 501 (citations omitted).

---

[8] *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) (race-based claim under Section 1981); *Connelly v. Lane Cosntr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016) (gender-based claim under Title VII); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (disability-based claim under the ADA).

[9] As with the other causes of action at issue here, the parties do not dispute that Plaintiff suffered an adverse employment action.

### ii.    *Engaged in Protected Activity*

Here, Defendant argues that Plaintiff only engaged in one protected activity over a year

before she was fired, and she therefore cannot establish the causation element.  Plaintiff disputes

this argument on both legal and factual grounds.  First, she argues that her complaint at the

Lansdale location was not the only legally protected conduct in which she engaged.  Second,

with the full scope of her protected conduct in view, she argues that there in fact was a causal

nexus between her complaints about McGrory and her termination.

Drawing all reasonable inferences in her favor, Plaintiff engaged in protected activity at

the Lansdale location only.  "Protected activities" include both participating in Title VII

proceedings and opposing what an employee reasonably believes to be conduct that is unlawful

under Title VII.  *Moore*, 461 F.3d at 341.  Opposing an employer's activities "includes not only

an employee's filing of formal charges of discrimination against an employer but also 'informal

protests of discriminatory employment practices, including making complaints to management.'"

*Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Curay-Cramer v.*

*Ursuline Acad. of Wilmington, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).  Thus, "[w]hen an

employee communicates *to her employer* a belief that the employer has engaged in . . . a form of

employment discrimination, that communication virtually always constitutes the employee's

opposition to the activity."  *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S.

271, 276 (2009) (emphasis added) (internal quotation marks and citation omitted).

Plaintiff argues that she engaged in protected activities by making repeated, formal and

informal complaints of racial and gender discrimination by Ciaccio and Goodman at the

Lansdale location and by making repeated informal complaints of racial discrimination to

Mercon and Michener at the Audubon location.  But not all of these are both (1) cognizable and

(2) supported in the record.  Of course, Plaintiff's formal complaint to DiGiorgio about Goodman clears this bar.  So does her complaint to Ciaccio about being cursed at, even if the precise substance of her concerns is disputed.

But the record is bereft of such complaints after she transferred to the Audubon location. Indeed, Plaintiff admitted that, after she moved, she never told anyone that she was being mistreated on the basis of sex.  True, McGrory testified that Mercon approached her and asked her whether she felt as if she was being discriminated against, but Plaintiff has adduced no evidence that Mercon's decision to approach McGrory was the result of any protected activity. And while McGrory said that Plaintiff had complained to her about sex discrimination, such complaints are not cognizable protected activity because there is no evidence that they were "communicate[d] to her employer." *Crawford* 555 U.S. at 276; *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (affirming grant of summary judgment to employer in part because "there [wa]s no indication that [supervisor] even knew about the [protected activity] when she proposed transferring respondent"); *see also E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 452 (3d Cir. 2015), *as amended on reh'g in part*, Mar. 26, 2015 (citations omitted) (holding that employee must "communicate opposition sufficiently specific to qualify as protected employee activity"); *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 801 (3d Cir. 2003) (noting that plaintiff employee failed to provide "evidence to rebut [employer's] declaration that he was unaware of [employee's] prior [protected] activity when he made his decision not to reinstate [him]").  It therefore is not genuinely in dispute that Plaintiff only engaged in any protected activity while at the Lansdale location.

### iii.   Causation

Nevertheless, if Plaintiff can show a causal link between her complaints about Goodman

and her firing, she has established the *prima facie* case.  But the record does not betray any such connection.  While the plaintiff eventually must "prove that retaliatory animus was the 'but-for' cause of the adverse employment action," in proving the *prima facie* case, she merely "must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action.'"  *Carvalho-Grevious*, 851 F.3d at 258-59 (quotation omitted).  The "temporal proximity" between the protected activity and adverse employment action can be "unusually suggestive" evidence of causation.  *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) (quotation omitted); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-80 (3d Cir. 2000).  Alternately, a plaintiff can prove causation by showing "a pattern of antagonism coupled with timing" suggestive of retaliation.  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  To be sure, these are not the only means available to the plaintiff, as causation is "gleaned from the record as a whole."  *Farrell*, 206 F.3d at 281.

Here, properly limited to the cognizable complaints supported by record evidence, there is no temporal proximity between her protected activity and her firing.  Plaintiff complained about Goodman's behavior in March 2019.  Defendant fired her in October 2020, over a year and a half later.  Far smaller gaps between the protected activity and adverse employment action cause the inference to "dissipate."  *See Moody*, 870 F.3d at 221 (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)) (three months).  And while the record is replete with examples of Defendant's employees allegedly mistreating Plaintiff, there is no evidence "establish[ing] a link between" her complaint and that mistreatment.  *Woodson*, 109 F.3d at 920.  No one testified that McGrory made racist remarks to Plaintiff or threw down the pan she was cleaning because she had complained to management about Goodman's conduct.

Nor is there evidence that Mercon denied Plaintiff the opportunity to be a Meat Cutter Apprentice because of that complaint.  Although, as discussed above, a rational factfinder could conclude that her firing for violation of Defendant's sexual harassment policy was pretextual and in fact because of her race, a rational factfinder could not draw the same connection between her firing and her complaint about Goodman.  Therefore, Defendant is entitled to summary judgment on Plaintiff's retaliation claims under Title VII, Section 1981, and the ADA.

### D.  Hostile Work Environment

Finally, the Court analyzes Plaintiff's claim that she was subjected to a hostile work environment while working for Defendant.  A hostile work environment claim under Title VII (and the PHRA), Section 1981, and the ADA,[10] has five elements.  A plaintiff must show "1) the employee suffered intentional discrimination because of his/her [protected status], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability."  *Castleberry*, 863 F.3d at 263 (3d Cir. 2017) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).[11]  The Third Circuit has emphasized that "[t]he correct standard is 'severe *or* pervasive.'"  *Id.* at 264.  Thus, "severe" and "pervasive" harassment "are alternative possibilities: some harassment may be

---

[10] Here, as at the Motion to Dismiss stage, the Court analyzes Plaintiff's Title VII and Section 1981 claims together. *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009); *Anderson v. Boeing Co.*, 694 F. App'x 84, 89 n.13 (3d Cir. 2017) (not precedential).  And "[t]he Third Circuit has assumed without specifically deciding that claims may be brought pursuant to the ADA . . . for a hostile work environment under substantially the same framework as a Title VII hostile work environment claim."  *Magerr v. City of Philadelphia*, 2016 WL 1404156, at *10 (E.D. Pa. Apr. 11, 2016); *see Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 666-67, 666 n.2 (3d Cir. 1999).

[11] A hostile work environment claim brought under the ADA similarly requires the plaintiff to show (1) that she was "a qualified individual with a disability under the ADA;" (2) that "she was subject to unwelcome harassment;" (3) that "the harassment was based on her disability or a request for an accommodation;" (4) that "the harassment was sufficiently severe or pervasive;" and (5) that the employer "knew or should have known of the harassment and failed to take prompt effective remedial action."  *Walton*, 168 F.3d at 667.

severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* (quotation omitted).

Hostile work environment is a theory of liability designed to remedy "the cumulative effect of a thousand cuts," and acts "which are not individually actionable . . . may be aggregated to make out a . . . claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006). Thus, "[w]hether an environment is hostile requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Castleberry*, 863 F.3d at 264 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).[12]

Here, Defendant disputes that how Plaintiff was treated rises to the level of "severe or pervasive" discrimination.[13]  Defendant argues that, because the comments directed at Plaintiff were isolated incidents, and were not meant to attack her because of her protected identities, they cannot form the basis for a hostile work environment action.  Plaintiff disagrees, submitting that being (1) "required to serve as a cleaner when no one else was;" (2) "not . . . permitted to apply for the meat cutter apprentice position;" and (3) "subjected to a barrage of rude, demeaning, bigoted, and delirious comments from Ciaccio, Goodman and McGrory," constitutes severe or

---

[12] Unlike the other causes of action at issue here, Defendant cannot rebut a hostile work environment claim under the *McDonnell Douglas* framework.  *Moody*, 870 F.3d at 213 n.11 (citation omitted) (noting that *McDonnell Douglas* "is inapplicable . . . because . . . there can be no legitimate justification for a hostile work environment").

[13] Any arguments based on other components of the *prima facie* case of hostile work environment discrimination, including *respondeat superior* liability, thus are waived.  *See, e.g.*, *Duran v. Equifirst Corp.*, 2010 WL 936199, at *3 (D.N.J. Mar. 12, 2010) ("The absence of argument constitutes waiver in regard to the issue left unaddressed."); *United States v. Healy*, 2013 WL 1624310, at *1 (M.D. Pa. Apr. 15, 2013) ("[I]ssues not briefed are deemed waived.").

pervasive discrimination.[14]

### i.   Race

On this record, drawing all reasonable inferences in her favor, a rational jury could

conclude that Plaintiff was subjected to sufficiently pervasive racial discrimination to constitute a

hostile work environment.  There are genuine disputes over the exact scope of the racially

discriminatory comments that Plaintiff faced at both the Lansdale and Audubon locations from

Goodman and McGrory, and drawing all reasonable inferences in her favor, *In re Chocolate*

*Confectionary Antitrust Litig.*, 801 F.3d 383, 396 (3d Cir. 2015) (citation omitted), these could, if

proven at trial, "be aggregated to make out a hostile work environment claim."  *O'Connor*, 440

F.3d at 127.

Plaintiff was subjected to racist comments and a racially charged work environment

throughout her time working for Defendant.  At the Lansdale location, Goodman called her

"Celo," a reference to a Black drug dealer from a movie.  Defendant does not dispute the

racialized nature of Goodman's nickname for Plaintiff.  Importantly, from this comment, a

rational jury could infer that this and other instances of Goodman's poor treatment of Plaintiff,

spanning months,[15] were motivated by racial animus.

Moreover, a rational jury further could conclude based on disputed material facts that,

once Plaintiff moved to the Audubon location, McGrory subjected her to a barrage of comments

that indicated that she viewed her Black colleagues with contempt and viewed Black people as

---

[14] Because Plaintiff does not disaggregate which of these instances contributed to a hostile work environment based on her sex, race, or perceived disability, the Court does so below based on the record and the allegations contained in the Amended Complaint.

[15] While Defendant denies that management heard about any problems between Plaintiff and Goodman after their March 2019 meeting, it does not point to any record evidence to contradict Plaintiff's testimony that, after she complained, she "got . . . more hostility" until she transferred over six months later.

inferior.  Based on several conversations between the two, Plaintiff understood McGrory as
(1) consistently dismissive of instances police violence against Black people, including
contending that George Floyd had not been killed by a police officer; (2) a vigorous opponent of
the Black Lives Matter movement; and (3) having open contempt for other racial minority
groups.  While the Court heeds Defendant's argument that McGrory's comments "constituted
discourse on issues of public concern at the time," at the summary judgment stage, a rational
factfinder could draw an alternate inference—that the way she spoke with Plaintiff crossed the
line and evinced anti-Black animus that unreasonably interfered with Plaintiff's ability to do her
job.

And the discrimination that Plaintiff faced was not limited to utterances alone.  A rational
factfinder could conclude that McGrory's conduct during her final argument with Plaintiff was
not just offensive, but threatening.  Plaintiff testified that when she pressed McGrory on her
views about the causes of social unrest in the summer of 2020, McGrory cursed at Plaintiff,
throwing a pan that she was cleaning into the sink in anger and exiting the building.  Some of the
particulars of their interaction are in dispute—contrary to McGrory's testimony, Plaintiff insists
that she did not follow McGrory away from the sink—but at the summary judgment stage, as
was the case at the motion to dismiss stage, McGrory's conduct here could help form the basis
for a racial hostile work environment claim.

As with Goodman, McGrory's own testimony and conduct strengthen the inferences that
a rational jury could draw about Plaintiff's facially race-neutral interactions with her.  McGrory
admitted that she has used the n-word before, if not in front of Plaintiff.  McGrory further
conceded that she only complained to management about the conduct of two colleagues, both of
them Black.  Specifically, she complained to management that another Black colleague's dyed,

braided hair was "very offensive."  In light of the well-established history of discrimination that Black women have faced on account of their hairstyles,[16] a rational jury could infer from McGrory's views of Tou's hair that this complaint and other comments that she made to Plaintiff were based in racial animus.  Finally, in her written complaint, McGrory expressed her frustration that Plaintiff "continue[d] to play the race card."  This evidence reinforces a reasonable inference that a jury could make that even seemingly innocuous questions about Plaintiff's interracial marriage could have been rooted in discriminatory animus.

Defendant submits that a recent hostile work environment case should guide the Court because it involved more egregious misconduct but still did not clear the threshold for severe or pervasive discrimination.  *See Henley v. Brandywine Hosp. LLC*, 2021 WL 1193277 (E.D. Pa. Mar. 30, 2021), *aff'd*, 2022 WL 2452307 (3d Cir. July 6, 2022) (not precedential).  First, neither this case nor the Third Circuit's non-precedential affirmance binds the Court.  Second, in any event, *Henley* is distinguishable because (1) the record there contained racist comments from only one colleague, 2021 WL 1193277, at *8; (2) there was "no evidence as to the frequency of these comments," *id.*; and, (3) the record contained no evidence of any conduct that a rational jury could conclude was threatening.  Here, a rational factfinder could conclude that Plaintiff suffered racial insults from both Goodman and McGrory over more than a year and that Plaintiff faced threatening, not merely offensive, conduct on at least one occasion.

Taken as a whole and drawing all reasonable inferences in her favor, a rational jury thus

---

[16] *See, e.g.*, Dawn D. Bennett-Alexander & Linda F. Harrison, *My Hair Is Not Like Yours: Workplace Hair Grooming Policies for African American Women as Racial Stereotyping in Violation of Title VII*, 22 Cardozo J.L. & Gender 437, 444-47 (2016).  Such discrimination is remediable under federal antidiscrimination law.  *See Wilson v. Timec Servs. Co., Inc.*, 2023 WL 3436900, at *6 n.5 (E.D. Cal. May 12, 2023) (collecting cases); *Haymon v. Metra*, 2020 WL 1548953, at *12 (N.D. Ill. Mar. 31, 2020) (citations omitted) ("[T]here is no question that racial discrimination claims by Black women on the basis of their hair texture or natural hairstyles are viable, and have been for a long time."); *but see E.E.O.C. v. Catastrophe Mgmt. Solutions*, 852 F.3d 1018, 1021 (11th Cir. 2016).

could conclude that the comments Plaintiff faced from Goodman and McGrory constitute the "thousand cuts" that render discrimination sufficiently pervasive to satisfy that element of the *prima facie* case of hostile work environment discrimination.[17]  *O'Connor*, 440 F.3d at 127.

### ii.  Sex

Plaintiff's other hostile work environment claims, however, falter.  Although Plaintiff's allegations of a sex-based hostile work environment were sufficient to survive Defendant's Motion to Dismiss, because the record does not substantiate all of the above alleged instances of sex discrimination, a jury could not reasonably find that she was subjected to sufficiently severe or pervasive discrimination based on her sex.  *See Anderson*, 477 U.S at 251-52.  True, whether Ciaccio assigned only Plaintiff to clean the Meat Department, even though every department employee should have been responsible for cleaning, is in dispute.  In addition, Goodman's reference to Plaintiff as a "bitch" is plainly gendered and offensive, and in light of that comment, a reasonable jury could conclude that Goodman's use of foul language and repeated yelling at her also were rooted in discriminatory animus.  But the same cannot be said of any demeaning comments made by Ciaccio.  Although Plaintiff maintains that Ciaccio yelled at her and threw things at her and not her male colleagues, the deposition testimony that she cites to support that proposition contains no allegation of disparate treatment by him.

Thus, the only allegations of sex discrimination in Plaintiff's briefing and supported by the record are Ciaccio's assignment of cleaning duties only to her and Goodman's discriminatory

---

[17] Defendant argues that it is entitled to summary judgment on Plaintiff's hostile work environment claims regardless of the strength of her *prima facie* case because she failed to avail herself of the available procedures to remedy the discriminatory acts that make up those claims.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) ("*Faragher-Ellerth*").  But that affirmative defense "is available only where the plaintiff did not experience a 'tangible employment action.'" *Moody*, 870 F.3d at 206 (quoting *Ellerth*, 524 U.S. at 765).  Plaintiff's firing plainly is such an action, *id.* at 216, so the *Faragher-Ellerth* defense to a hostile work environment claim is not available here.

language.  Taken together, a rational jury could not conclude that these comments, as supported

in the record with all reasonable inferences drawn in favor of Plaintiff, clear the high bar for

severe or pervasive sex discrimination.  If seven "relatively infrequen[t]" discriminatory

comments "spread out over a span of over three-and-a-half years" are insufficient to establish a

hostile work environment claim, *see Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir.

2023), then a single reference by a co-worker to Plaintiff as a "bitch" is not frequent enough to

be "pervasive" as a matter of law.  And while the Third Circuit has held that an employer's

single use of the n-word was severe enough to state a hostile work environment claim, it did so

after conducting a "context-specific" inquiry that emphasized that the supervisor had used that

slur in front of the Black plaintiffs and "[w]ithin the same breath, the use of this word was

accompanied by threats of termination (which ultimately occurred)."  *Castleberry*, 863 F.3d at

264-66.  Here, in contrast, the record indicates that Goodman referred to Plaintiff as a "bitch" to

a third party, and there is no evidence so directly linking Goodman's comment to a cognizable

adverse employment action (to say nothing of the singularly offensive, violent nature of the n-

word, which further distinguishes the case, *see Thomas v. Bronco Oilfield Servs.*, 503 F. Supp.3d

276, 299-300 (W.D. Pa. 2020) (collecting cases)).  Therefore, while a closer question,

Defendant's gender-based discrimination does not as a matter of law rise to the level of "severe"

harassment for purposes of a hostile work environment claim either.

### iii.    Disability

Finally, Plaintiff has failed to adduce evidence from which a rational factfinder could

conclude that she suffered severe or pervasive discrimination based on her perceived disability.

Her briefing only raises record evidence that she argues demonstrates "an atmosphere of hostility

that permeated the workplace and was causally connected to her race, gender, and complaints of

discrimination." There is no genuine dispute of material fact at issue, and a rational factfinder could not conclude that Plaintiff suffered severe or pervasive disability-based discrimination under the ADA, so Defendant is entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment shall be granted in part and denied in part. Summary judgment shall be granted with respect to Plaintiff's claims of (1) retaliation in violation of Section 1981; (2) sex-based discrimination, retaliation, and hostile work environment in violation of Title VII and the PHRA; and, (3) disability-based discrimination, retaliation, and hostile work environment under the ADA. Defendant's Motion for Summary Judgment shall be denied with respect to Plaintiff's claims of racial discrimination and race-based hostile work environment under Title VII, Section 1981, and the PHRA.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____
**WENDY BEETLESTONE, J.**